## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SOFTRAX CORPORATION,

               Plaintiff,

    v.

PATRICK RASICOT,

               Defendant.

Civil Action No. 05-11789-JLT

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## PATRICK RASICOT'S MOTION FOR SUMMARY JUDGMENT

In this diversity action removed to this Court, Plaintiff Softrax Corporation ("Softrax") seeks to enforce a noncompetition agreement to bar Defendant Patrick Rasicot ("Rasicot") from being employed by NetSuite, Inc. ("NetSuite"). Rasicot respectfully moves for summary judgment because there are no material facts in dispute that NetSuite does <u>not</u> constitute a business for whom Rasicot is prohibited from working under the unambiguous terms of his noncompetition agreement with Softrax.

## FACTUAL BACKGROUND

The material facts are not in dispute.

### The Parties

According to its complaint, Softrax Corporation ("Softrax") is a Delaware corporation, based in Canton, Massachusetts, that "develops, markets, distributes and supports software that provides revenue management functionality." Statement of Undisputed Material Facts ("SUMF") ¶ 1. Rasicot is a resident of Rhode Island, who was employed by Softrax from September 1996 until he resigned in June 2005. <u>Id.</u> ¶ 2.

Throughout his tenure at Softrax, the overwhelming majority of Softrax's customers were software companies. Id. ¶ 3.

### The Agreement

On March 13, 2000, Rasicot executed a standard form noncompetition agreement (the "Agreement") with Softrax. See Affidavit of Melissa M. Longo (September 12, 2005) ("Longo Aff."), Exhibit 1. The Agreement was drafted by Softrax, and Rasicot was not offered the opportunity to negotiate its terms. SUMF ¶ 5.

In relevant part, the Agreement purports to prohibit Rasicot, during a two-year period following the termination of employment, from engaging in (as an employee or otherwise) any "Prohibited Business." See Agreement, § 2(a), (b). In turn,

> the term **'Prohibited Business' shall mean any business engaged <u>primarily</u> in** the development, manufacture, production, sale, distribution, licensing or other disposition . . . of **products or services** involving operations, project management or financial application software **designed for use by software and information services companies**.

Agreement, § 2(c) (emphasis added).

### Softrax's Customer Base

At the time Rasicot signed the Agreement, approximately 95% of Softrax's customers were software manufacturers. SUMF ¶ 7. Today, software companies still comprise a majority of Softrax's customer base. Id. ¶ 8. According to Softrax's Chief Executive Officer, "Softrax initially focused its marketing and sales efforts on the software industry. The Company's software is still designed so that it can be effectively used by software companies and the software industry remains the largest part of our installed base." Id. (quoting Affidavit of Robert D. O'Connor, Jr. (July 29, 2005), ¶ 4 (attached as Exhibit 2 to the Longo Aff.)).

### NetSuite, Inc.

Rasicot resigned from Softrax in June 2005 and shortly thereafter began to work for NetSuite, Inc. ("NetSuite"). SUMF ¶ 9. NetSuite is an application service provider ("ASP") which licenses an integrated Enterprise Resource Planning ("ERP") Customer Relationship Management ("CRM") and eCommerce solution to small and mid-sized companies of all types. Id. ¶ 10.

Software companies represent only a tiny proportion of NetSuite's customers: out of 11,000 customer installations, only 212 – less than 2% – were for software companies. Id. ¶ 11. Similarly, of the 260 press releases NetSuite has issued since 1999, only <u>one</u> (May 18, 2004) has ever specifically mentioned software companies. Id. ¶ 12. In the same vein, of the eighteen "featured success stories" on NetSuite's "customers" web page, only one is about a software company; and of the nine industry segments listed on NetSuite's web page as the industries to which NetSuite markets its products, just one is software. Id. ¶ 13.

The spectrum of NetSuite's customers includes telecommunications and wireless, insurance, consumer goods, manufacturing, wholesale distribution, real estate, architecture and design, service, and software companies. Id. ¶ 14. The same generic NetSuite product is licensed to all of NetSuite's customers; none is specific to software companies. Id. ¶ 15. As explained by NetSuite's Vice President of Corporate Communications, "NetSuite's products are not 'designed for use by software companies.' NetSuite's products are designed for small and mid-sized business in general and NetSuite highlights different functionalities of its products to different sectors of the market." Id.

## PROCEDURAL HISTORY

On August 1, 2005, Softrax filed its Complaint against Rasicot in the Norfolk County (Massachusetts) Superior Court, alleging a single claim for breach of the Agreement, and a motion for preliminary injunction, accompanied by affidavits, seeking to prohibit Rasicot from working for NetSuite, which Softrax alleged was a "Prohibited Business." Rasicot opposed the preliminary injunction on August 10, 2005, and filed his own supporting affidavits.

The Superior Court (Brady, J.) held a non-evidentiary hearing on August 11, 2005 and, the next day, granted Softrax's motion to enjoin Rasicot from working for NetSuite until further order of the court. See Longo Aff., Exhibit 3. The court granted the preliminary injunction. Its entire reasoning and findings were expressed in a single paragraph of its handwritten Memorandum and Order:

> The $\pi$ is likely to prevail on the merits. NetSuite falls within the Contract's definition of "Prohibited Businesses" as it is "engaged primarily in the . . . sale . . . of products . . . involving . . . financial application software designed for use by softwear [sic] . . . companies." As I construe the language, it does not matter that a relatively small percentage of NetSuite's customers are softwear [sic] companies.

Id. (ellipses in original). On August 16, 2005, Rasicot filed a petition to a single justice of the state appeals court for interlocutory review of the superior court's order. The petition was denied, without opinion, on August 19, 2005 (Graham, J.). See Longo Aff., Exhibit 4.

On August 30, 2005, Rasicot removed the case to this Court, based on diversity jurisdiction.

# ARGUMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, there is no genuine issue of fact that NetSuite falls outside the noncompetition Agreement's unambiguous definition of a "Prohibited Business."

## I.    Summary Judgment Is Proper Because The Agreement Does Not Apply To NetSuite.

### A.    By Its Own Terms, The Agreement Is Not Applicable.

The parties' dispute turns on the interpretation of the noncompetition Agreement, which was drafted by Softrax, and in particular on the narrow definition of "Prohibited Business":[1]

> the term **'Prohibited Business' shall mean any business engaged <u>primarily</u> in** the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of **products or services** involving operations, project management or financial application software **designed for use by software and information services companies**.

Agreement, § 2(c) (emphasis added).

For a business to be a "Prohibited Business," therefore, it must be engaged "<u>primarily</u>" in the business of selling or developing a class of software that is "<u>designed for use by software and information service companies</u>." This narrow definition makes perfect sense because, at the time Rasicot signed the noncompete, in March 2000, the

---

[1] In considering the proper interpretation of this clause, the Court should be mindful that, under Massachusetts law, "[c]ontracts drafted by employers to limit the employment prospects of former employees – even those at a very high level – must be construed narrowly against the employer." <u>EMC Corp. v. Gresham</u>, No. 012084-BLS, 2001 WL 1763449, *4 (Mass. Super. Nov. 14, 2001) (citing <u>Sentry Ins. Co. v. Firnstein</u>, 14 Mass. App. Ct. 706, 707 (1982)).

overwhelming majority of Softrax's customers were software companies. See SUMF ¶ 7. Even today, Softrax's customers are predominantly software companies. See id. ¶ 8.

There are no material facts in dispute that NetSuite is not <u>primarily</u> engaged in selling software that is designed for software and information service companies. The record is consistent that NetSuite is now, and has always been, a company that markets and sells to a wide variety of small and mid-sized companies, with software companies accounting for a tiny percentage – less than 2% – of its sales. See id. ¶ 11.

The term "primarily" "is not an ambiguous or difficult word to understand." In re Stewart, 175 F.3d 796, 808 (10th Cir. 1999). In numerous contexts, courts have considered primarily to mean, at a minimum, more than half. See, e.g., id. ("Finding no cases to the contrary, we therefore define 'primarily' in the context of § 707(b) [of the Bankruptcy Code] as meaning consumer debt exceeding fifty percent of the total debt."); Malat v. Riddell, 383 U.S. 569, 572 (1966) (in tax context of determining capital gain, defining "primarily" to mean "of first importance" or "principally"); Schrader v. State, 517 A.2d 1139, 1146 (Md. Ct. App. 1987) (in criminal context of determining existence of pyramid scheme: "[w]e believe the word 'primarily,' as used in § 233D(a)(4), possesses a common and generally accepted meaning. . . . In quantifiable terms, 'primarily' is commonly understood to suggest a figure representing more than 50 percent.").

While it is no doubt true that NetSuite's products are <u>capable of</u> (or even well suited for) use by software companies, or that NetSuite markets to software companies (as well as to a host of other types of small to midsized companies), there is no dispute

that a tiny proportion of NetSuite's customers, less than 2%, are, in fact, software companies. See SUMF ¶ 11.

Unlike Softrax, NetSuite's products are not designed primarily for use by Software companies. See id. ¶ 15. The product that NetSuite markets to software companies is the exact same product that it markets to the several other industries to which it actively sells (wholesale and distribution, electronic commerce, advertising, agriculture, manufacturing, nonprofit, professional services, and retail). See id. ¶¶ 14-15. Thus, NetSuite cannot be described as engaging "primarily" in creating products designed for use by software companies. On its face, therefore, the Agreement does not apply to prevent Rasicot's employment with NetSuite.

### B.   The State Court Preliminary Injunction Decision Is Not Binding On This Court.

A state court order is not binding on a federal judge after removal, as "28 U.S.C. § 1450 establishes the authority of the federal district court to dissolve or modify all injunctions and orders issued prior to removal." Hyde Park Partners L.P. v. Connolly, 839 F.2d 837, 842 (1st Cir. 1988) (citing Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Local 70, 415 U.S. 423, 437 (1974)).

Similarly, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (citations omitted). Such findings are also not binding on summary judgment. See Technical Publishing Co. v. Lebhar-Friedman, Inc., 729 F.2d 1136, 1139 (7th Cir. 1984) ("[a] factual finding made in connection with a preliminary injunction is not binding" on a motion for summary judgment).

7

Stated differently, preliminary injunction rulings "are avowedly preliminary or tentative [and] do not trigger law of the case consequences." 18 Charles Alan Wright, Arthur D. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478.5 (2d ed. 1981). See also, e.g., Wilcox v. United States, 888 F.2d 1111, 1114 (6th Cir. 1989) (reversing and remanding summary judgment decision where district court erroneously concluded that prior preliminary injunction ruling was "law of the case"); Golden State Transit Corp. v. City of Los Angeles, 754 F.2d 830, 832 n. 3 (9th Cir. 1985) ("As a general rule, decisions on preliminary injunctions do not constitute law of the case and 'parties are free to litigate the merits.'") (citation omitted), rev'd on other grounds, 475 U.S. 608 (1986); Berrigan v. Sigler, 499 F.2d 514, 518 (D.C. Cir. 1974) ("The decision of a trial . . . court to grant or deny a preliminary injunction does not constitute the law of the case for the purpose of further proceedings and does not limit or preclude the parties from litigating the merits.").

Thus, because the interpretation of an unambiguous contract is a matter of law, and because the state court's decision need not be followed, this Court should interpret the definition of "Prohibited Business" precisely as it was written in the contract, and apply that precise definition to the uncontroverted, crucial fact that lies at the heart of this case – viz., that NetSuite is not "engaged primarily" in creating and selling products "designed for use by software and information service companies." If the Court applies that proper definition, summary judgment in Rasicot's favor naturally must follow.

## II.  Rasicot Should Be Awarded Fees And Expenses If His Motion Is Granted.

Section 9 of the Agreement provides that, "[i]n the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be

responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action." Agreement, § 9. Thus, if this Court determines that NetSuite is not a "Prohibited Business" within the meaning of the Agreement, Rasicot is entitled to an award of his costs and expenses, including attorneys' fees.

## **CONCLUSION**

For the foregoing reasons, Defendant Patrick Rasicot respectfully requests that this Court grant his Motion for Summary Judgment and enter final judgment in his favor, including an award of attorneys' fees.

Dated:  September 12, 2005

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP


/s/ Melissa M. Longo_____
Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO # 647649)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
Tel: 617-307-6100
Fax: 617-307-6101

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was delivered to all counsel of record on September 12, 2005, by electronic service.

/s/ Melissa M. Longo____·____
Melissa M. Longo

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SOFTRAX CORPORATION,<br><br>                    Plaintiff,<br><br>         v.<br><br>PATRICK RASICOT,<br><br>                    Defendant. | Civil Action No. 05-11789-JLT |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEFENDANT PATRICK RASICOT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant

Patrick Rasicot ("Rasicot") submits the following Statement of Undisputed Material

Facts in support of his Motion for Summary Judgment.  The material facts recited herein

are supported by accompanying affidavits, as referenced below.[1]

No genuine issue between the parties exists with respect to the following material

facts:

**The Parties**

1.       According to its complaint, Softrax Corporation ("Softrax") is a Delaware

corporation, based in Canton, Massachusetts, that "develops, markets, distributes and

supports software that provides revenue management functionality."  Complt. ¶ 3.

2.       Rasicot is a resident of Rhode Island, who was employed by Softrax from

September 1996 until he resigned in June 2005.  Id. ¶¶ 4, 8.

---

[1]  With the exception of the Affidavit of Melissa M. Longo, the affidavits submitted by Rasicot in support
of the instant Motion for Summary Judgment are the same affidavits he submitted to the state court in
opposing Softrax Corporation's motion for preliminary injunction.

3.     Throughout his tenure at Softrax, the overwhelming majority of Softrax's customers were software companies.  See Affidavit of Patrick Rasicot (August 10, 2005) ("Rasicot Aff."), ¶¶ 3, 13.

### The Agreement

4.     On March 13, 2000, Rasicot executed a standard form noncompetition agreement (the "Agreement") with Softrax.  See Affidavit of Melissa M. Longo (September 12, 2005) ("Longo Aff."), Exhibit 1.

5.     The Agreement was drafted by Softrax, and Rasicot was not offered the opportunity to negotiate its terms.  Rasicot Aff., ¶ 12.

6.     In relevant part, the Agreement purports to prohibit Rasicot, during a two-year period following the termination of employment, from engaging in (as an employee or otherwise) any "Prohibited Business."  See Agreement, § 2(a), (b).  In turn,

> the term **'Prohibited Business' shall mean any business engaged <u>primarily</u> in** the development, manufacture, production, sale, distribution, licensing or other disposition . . . of **products or services** involving operations, project management or financial application software **designed for use by software and information services companies**.

Agreement, § 2(c) (emphasis added).

### Softrax's Customer Base

7.     At the time Rasicot signed the Agreement, approximately 95% of Softrax's customers were software manufacturers.  Rasicot Aff., ¶ 13.

8.     Today, software companies still comprise a majority of Softrax's customer base, according to Softrax's Chief Executive Officer.  See Affidavit of Robert D. O'Connor, Jr. (July 29, 2005), ¶ 4 ("Softrax initially focused its marketing and sales efforts on the software industry.  The Company's software is still designed so that it can

be effectively used by software companies and the software industry remains the largest part of our installed base.") (attached as Exhibit 2 to the Longo Aff.).

### NetSuite, Inc.

9.      Rasicot resigned from Softrax in June 2005 and shortly thereafter began to work for NetSuite, Inc. ("NetSuite").  Rasicot Aff., ¶¶ 29-30.

10.     NetSuite is an application service provider ("ASP") which licenses an integrated Enterprise Resource Planning ("ERP") Customer Relationship Management ("CRM") and eCommerce solution to small and mid-sized companies of all types. Affidavit of Jim McGeever ("McGeever Aff.") (August 2005), ¶ 2.

11.     Software companies represent only a tiny proportion of NetSuite's customers:  out of 11,000 customer installations, only 212 – less than 2% – were for software companies.  Id. ¶ 4.

12.     Similarly, of the 260 press releases NetSuite has issued since 1999, only one (May 18, 2004) has ever specifically mentioned software companies.  See Affidavit of Mei Li (August 9, 2005) ("Li Aff."), ¶ 6.

13.     In the same vein, of the eighteen "featured success stories" on NetSuite's "customers" web page, only one is about a software company; and of the nine industry segments listed on NetSuite's web page as the industries to which NetSuite markets its products, just one is software.  See Li Aff., ¶¶ 4, 5 and Exhibits A, B.

14.     The spectrum of NetSuite's customers includes telecommunications and wireless, insurance, consumer goods, manufacturing, wholesale distribution, real estate, architecture and design, service, and software companies.  Id. ¶ 4.

15.    The same generic NetSuite product is licensed to all of NetSuite's customers; none is specific to software companies. Rasicot Aff., ¶ 32. As explained by NetSuite's Vice President of Corporate Communications, "NetSuite's products are not 'designed for use by software companies.' NetSuite's products are designed for small and mid-sized business in general and NetSuite highlights different functionalities of its products to different sectors of the market." Li Aff., ¶ 4.

Dated:  September 12, 2005

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP


/s/ Melissa M. Longo
Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO # 647649)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
Tel: 617-307-6100
Fax: 617-307-6101


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was delivered to all counsel of record on September 12, 2005, by electronic service.

/s/ Melissa M. Longo
Melissa M. Longo

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SOFTRAX CORPORATION,

        Plaintiff,

   v.

PATRICK RASICOT,

        Defendant.

Civil Action No. 05-11789-JLT

### AFFIDAVIT OF MELISSA M. LONGO

    I, MELISSA M. LONGO, declare under penalties of perjury as follows:

    1.    I am an associate with the law firm of Birnbaum & Godkin, L.L.P.

    2.    I am an attorney for Patrick Rasicot ("Rasicot") and make this affidavit in support of Rasicot's Motion for Summary Judgment.

    3.    I make this affidavit on personal knowledge, information and belief.

    4.    Attached as Exhibit 1 is a true and correct copy of Softrax Corporation's Noncompetition, Nondisclosure and Inventions Agreement.

    5.    Attached as Exhibit 2 is a true and correct copy of the July 29, 2005 Affidavit of Robert D. O'Connor, Jr.

    6.    Attached as Exhibit 3 is a true and correct copy of the August 12, 2005 Memorandum and Order.

    7.    Attached as Exhibit 4 is a true and correct copy of the August 19, 2005 denial of petition for single justice review.

Dated the 12th day of September 2005 in Boston, Massachusetts.

/s/ Melissa M. Longo_____
Melissa M. Longo

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was delivered to all counsel of record on September 12, 2005, by electronic service.

/s/ Melissa M. Longo_____
Melissa M. Longo

**EXHIBIT   1**

SOFTRAX CORPORATION

NONCOMPETITION, NONDISCLOSURE AND
INVENTIONS AGREEMENT

This Agreement is made among SOFTRAX Corporation, a Delaware corporation (the "Company"), and the undersigned employee of or consultant to the Company (the "Employee").

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the Employee hereby acknowledges and agrees as follows:

1.    Introduction. As a result of his/her relationship with the Company, and because of the nature of his/her responsibilities, the Employee has acquired or hereafter will acquire valuable trade secrets, proprietary data and confidential information with respect to the Company and its business.  In view of the foregoing, the Employee acknowledges that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company that the Employee undertakes the obligations contained in this Agreement.

2.    Noncompetition.  (a)  The Employee shall not, at any time during the term of his/her employment with Company or during the  "Noncompete Period" (as defined in paragraph (b) of this Section), directly or indirectly (either for his/her own account or as a stockholder, officer, director, employee, partner, consultant, joint venturer, lender or in any other capacity whatsoever), engage in or have any interest whatsoever in any "Prohibited Business" (as defined in paragraph (c) of this Section); provided, however, that the foregoing shall not preclude the Employee from acquiring or owning solely for investment purposes up to five (5%) percent of the combined voting power of the outstanding capital stock of a publicly held company.  The Employee also shall not, during the term of his/her employment with Company or during the Noncompete Period, accept employment, either directly or indirectly, with any entity which, as of the Severance Date, was either a customer of the Company or had been directly solicited by the Company with a view toward establishing a customer relationship.

1

(b)   For purposes of this Section, the term "Noncompete Period" shall mean the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the "Severance Date").

(c)   For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

3.   Nonsolicitation.  The Employee shall not, at any time during the term of his/her employment with Company or during the Noncompete Period:

(a)   directly or indirectly (except on behalf of the Company), solicit or attempt to solicit, divert or attempt to divert, handle or attempt to handle or service or attempt to service the account or business of any customer which as of the Severance Date or during the one (1) year period prior thereto was a customer of the Company or was directly solicited by the Company with a view toward establishing a customer relationship; or

(b)   directly or indirectly recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company terminate his employment with, or otherwise limit or cease his relationship with, the Company; or

(c)   directly or indirectly interfere or attempt to interfere in any way with the Company's relationships with any of its customers, sales representatives, suppliers, key advisors or consultants, including, without limitation, inducing or attempting to induce any customers, sales representative, supplier, key advisor or consultant to terminate or change the terms of its dealings with the Company.

4.   Nondisclosure.  The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the

2

Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information were communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company. The Employee agrees that such trade secrets, proprietary data and confidential information include but are not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements' and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives. Information that is proprietary or confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Notwithstanding the foregoing, the Employee may disclose such trade secrets, proprietary data and confidential information only to the extent that disclosure thereof is required (1) in the course of his/her performing services for or on behalf of the Company, or (2) by a court or other governmental agency of competent jurisdiction, provided the Employee promptly notifies the Company and cooperates fully with the Company in obtaining any available protective order or the equivalent prior to the disclosure of such information. This provision does not apply to any information which legally is or becomes generally known to the public from authorized sources other than the Employee.

5.    Title to Certain Property. All tangible materials including, but not in any way limited to, printouts, specifications, models, books, records, manuals, sales literature, training materials, customer files, correspondence, documents, contracts, orders, memoranda, notes, agreements, invoices and receipts (and all copies and reproductions thereof) in the possession or control of Employee which in any way relate or pertain to the Company's business or the business of any Affiliate of the Company, whether furnished to the Employee by

3

the Company or prepared, compiled or acquired by the Employee shall be the sole property of the Company.

6. **Inventions: Disclosure, Assignment and Further Assurances.** If at any time or times prior to the Severance Date, the Employee shall (either alone or with others) make, conceive, discover, reduce to practice or become possessed of any invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "Inventions") that relates to the business of the Company, or any of the products or services being developed, manufactured or sold by the Company, or results from tasks assigned the Shareholders by the Company or results from the use of premises or equipment owned, leased or contracted for by the Company, such Inventions and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and the Employee shall promptly disclose to the Company (or any persons designated by it) each such Invention and hereby assigns any rights the Employee may have or acquire in the Invention and benefits and/or rights resulting therefrom to the Company and its assigns without compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto with all necessary plans and models to the Company.

The Employee shall promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, any other invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) made, conceived, discovered, reduced to practice or possessed by the Employee (either alone or with others) at any time or times prior to the Severance Date for the purpose of determining whether they constitute "Inventions," as defined herein.

Upon disclosure of each Invention to the Company, the Employee shall, at the request and expense of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:

4

(a) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

In the event the Company is unable, after reasonable effort, to secure the Employee's signature on any letters patent, copyright or other analogous protection relating to an Invention, whether because of the Employee's physical or mental incapacity or for any other reason whatsoever, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney-in-fact, to act for and in their behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

7. **Absence of Restrictions Upon Disclosure and Competition.** The Employee represents and warrants that his/her performance of all of the terms of this Agreement and of services on behalf of the Company does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by him/her in confidence or in trust prior to his/her becoming associated with the Company or refrain from competing, directly or indirectly, with the business of any previous employer or other party. The Employee has returned all documents and materials belonging to any of his/her former employers. The Employee will not disclose to the Company or induce any of the Company's employees to use proprietary information or trade secrets of any of their former employers. The Employee has not entered into, and hereby agrees that he/she will not enter into, any agreement either written or oral in conflict herewith.

8. **Compliance with Company Nondisclosure Obligations.** The Employee hereby acknowledges that the Company may hereafter be

5

subject to non-disclosure or confidentiality agreements with third parties pursuant to which the Company must protect or refrain from use of proprietary and/or confidential information which is the property of such third party or other party. The Employee hereby agrees upon the direction of the Company to be bound by the terms of such agreements in the event the Employee has access in the course of his/her relationship with the Company to the proprietary and/or confidential information protected thereunder to the same extent as if the Employee was an original individual signatory thereto.

9. <u>Certain Remedies</u>. In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled, in addition to any other legal rights or remedies which it may have, to maintain an action for preliminary and permanent injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate. In the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action; provided, however, that if there is no clear prevailing party in such action, the court or arbiter hearing such action will make the determination as each party's responsibility for paying such costs and expenses.

10. <u>Reasonable Covenants</u>. The Employee acknowledges and agrees that the restrictive covenants contained herein (a) are necessary for the reasonable and proper protection of the goodwill of the Company and its trade secrets, proprietary data and confidential information, (b) are reasonable with respect to length of time, scope and geographic area and (c) will not reasonably prohibit the Employee from engaging in other businesses or employment for the purpose of earning a livelihood following the termination of his/her relationship with the Company.

11. <u>Severability</u>. Each provision of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. If the

invalidity or unenforceability of any provision hereof is due to unreasonableness of the time or scope or geographic extent of any covenant or restriction, said covenant or restriction nevertheless shall be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction.

12. <u>Assignment and Benefit</u>. This Agreement shall be binding upon the Employee's heirs, executors and administrators. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors and assigns.

13. <u>Waiver</u>. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

14. <u>Entire Agreement</u>. The Employee acknowledges receipt of this Agreement, and agree that with respect to the subject matter hereof it is the entire agreement with the Company, superseding any previous oral or written communication, representation, understanding or agreement with the Company or any representative thereof.

15. <u>Notice</u>. All notices, requests, demands and any other communications hereunder shall be made in writing and shall be deemed to have been duly given if delivered in person or sent by registered or certified mail, postage prepaid, if to the Company addressed to the President of the Company at the Company's principal executive office, and if to the Employee at the address appearing beneath his/her signatures to this Agreement. Any party may change its or his/her address for notice hereunder by giving notice of change of address in the manner herein provided.

16. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law principles. The Employee hereby submits to the personal jurisdiction of the courts of the Commonwealth of Massachusetts and the Federal Courts of the United States of America located in such commonwealth in respect to the interpretation and enforcement of

7

the provisions of this Agreement and all transactions contemplated hereby.

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ THE FOREGOING EMPLOYEE NON-COMPETITION, NONDISCLOSURE AND INVENTIONS AGREEMENT AND UNDERSTANDS AND AGREES TO EACH AND EVERY PROVISION. THE EMPLOYMENT FURTHER ACKNOWLEDGES THAT THIS AGREEMENT WAS DRAFTED BY COUNSEL ON BEHALF OF THE COMPANY AND THAT HE/SHE HAS BEEN GIVEN THE OPPORTUNITY TO CONSULT COUNSEL OF HIS/HER OWN CHOOSING AND HAS EITHER DONE SO OR VOLUNTARILY CHOSEN NOT TO DO SO PRIOR TO THEIR EXECUTION HEREOF.

Dated: 3/13/04

EMPLOYEE:

_Signature_

Patrick Rasicot
Printed Name

Address: 36 Cranberry Rd.
N. Attleboro, MA
02760

225627

8

**EXHIBIT   2**

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                              SUPERIOR COURT
                                         C. A. NO. ~~MICV~~ _05 - 1342_

| | |
|---|---|
| SOFTRAX CORPORATION, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
|  | ) |
| PATRICK RASICOT, | ) |
|  | ) |
| Defendant. | ) |
| | ) |

## AFFIDAVIT OF ROBERT D. O'CONNOR, JR.

I, Robert D. O'Connor, Jr. state under penalty of perjury as follows:

1.    I am currently the President and Chief Executive Officer of Softrax Corporation ("Softrax" or the "Company") and have held those or comparable positions since I helped to found the Company in 1985, under the name The RBS Group, Inc.  The Company changed its name to Softrax Corporation in 1998.

<u>Softrax's Business</u>

2.    Softrax develops, markets, distributes and supports software that provides revenue management functionality. This extends to, for example: revenue recognition management tools; the processing of orders and renewals; managing accounts receivable, general ledger and other financial processes; invoicing of transactional and subscription based sales; and forecasting and analytical tools.  In addition to licensing the software, Softrax provides professional services to support the implementation of the software at the customer's site (such services including, for examples, business processes analysis, installation and configuration, and training), and to develop software customizations requested by customers.

3.    Softrax is located in Canton, Massachusetts, where it employs approximately eighty (80) people.

4.    Softrax initially focused its marketing and sales efforts on the software industry.  The Company's software is still designed so that it can be effectively used by software companies and the software industry remains the largest part of our installed base. However, in recent years

the Company has expanded the reach of its software packages in order to successfully penetrate other markets.

5.    A major new product initiative currently underway is based on a new technological framework that supports a level of flexibility in functionality and interoperability with third party software systems which we believe will allow us to service and support the revenue management needs of almost every industry.

6.    We are able to undertake this new product initiative because of the many years of development and field expertise we have built up in the area of financial business practices and revenue management principles.   While we were originally able to acquire market share by focusing on revenue recognition principles and licensing paradigms characteristic of software vendors, the business processes and accounting requirements underlying revenue management concepts are common across many industries.

7.    For example, placing orders, order fulfillment and order invoicing are characteristic of most industries.  Processing renewals is a common requirement in a subset of industries, but a very large subset.   Basic financial procedures, associated with general ledger, accounts receivable and accounts payable, again are integral to most businesses.  The rules of revenue recognition, while differing for differing kinds of revenue, can be programmed based on established rules and follow an underlying shared logic.

8.    Although the above are basic revenue management principles and processes with which anyone can become readily familiar after a bit of training, what Softrax brings to the development table is a uniquely comprehensive and in depth understanding of how these principles and processes interrelate with all of the business processes of any given customer – and I should add, that most customers have some idiosyncrasies in their business practices.  Here are a few examples of how our expertise comes into play.  We are deeply familiar with where the 'touch points' are between business areas; that is, where data from one area needs to be transferred, processed and then re-entered into another area or sent back to the original area, or both.  We understand how accounting principles interrelate and therefore how changes in data in one entry may or should affect other data entries, often with additional cascading and interactive consequences.  For example, if payment terms on a sale are changed, it can affect the revenue already recognized on the sale as well as the amount of revenue which has been deferred.  This in turn is reflected on the income statement and balance sheet.  As another example, if a customer prepays a portion of the amount owed in connection with a sale, this can affect not only the revenue recognition issues referenced in the previous example, but also how revenue may be allocated across calendar periods; the prepayment will also need to be reflected in the customer financial profile data stored within the system.

9.    To date, because we are still a relatively small company, we cannot compete with the larger players, such as Microsoft and Oracle, with marketing dollars and brand name recognition. Where we can compete, and where we do compete successfully, is in terms of the domain expertise reflected in our products' extensive functionality, flexibility, interoperability, and highly configurable nature.

2

## Mr. Rasicot's Employment and His Agreement

10.    Softrax hired Patrick Rasicot in September 1996.  His first position was as a service professional who implemented our software with customers.  In March 2000, Mr. Rasicot was promoted to the position of product manager where he was intimately involved in the design and development of our products, in their subsequent improvement and enhancement based on customer requirements, and in identifying and prioritizing functionality areas which needed improvement in the different products.  Mr. Rasicot held the position of product manager (re-titled senior project specialist) for over five years, until he gave notice in June of this year.  At that time, he was earning an annual base salary of approximately $102,000.

11.    There is probably not another position in the Company where there is a greater concentration of product knowledge, customer issues, product development plans and market requirements than the position of product manager.  It is, simply, the product manager's job to have knowledge of, manage and respond to these different elements.  It is the product manager who writes the functional requirements and specifications for a product, and its new releases. These functional requirements in turn reflect a prioritization of customer and market demands, an assessment of product strengths and weaknesses, and an understanding of development challenges, resources and timelines.  Not surprisingly, a product manager 'touches' almost every other department in the Company.  Out of necessity, he works closely with the development engineering group, the customer support department, and the marketing, account management and sales teams and, in each case his work revolves around confidential and proprietary information of the Company.

12.    In view of all the facts described above, on his promotion to product manager, Softrax required Mr. Rasicot to sign a Noncompetition, Nondisclosure and Inventions Agreement ("Agreement").  A copy of the Agreement signed by Mr. Rasicot is attached as Exhibit A.  The form of agreement is required of our key employees, both as a corporate policy in order to protect the Company and as contractually required by our investors for the same reason.

13.    The covenants in the Agreement are designed to reasonably protect (1) the Company's confidential and proprietary information, (2) the investment the Company makes in its high level employees like Mr. Rasicot, (3) the Company's competitive edge in product development and customer service, and (4) the Company's goodwill and other interests.  The covenants include a prohibition against Mr. Rasicot taking employment from a competitor of the Company for two years after he leaves Softrax.

## Mr. Rasicot's Voluntary Departure

14.    On June 3, 2005, Mr. Rasicot informed the Company that he was terminating his employment with Softrax, effective June 17, 2005.  He said he was doing so voluntarily.  We were disappointed with Mr. Rasicot's decision as he was an experienced product manager.  Mr. Rasicot informed his direct manager, Gottfried Sehringer, Vice President, Marketing, and a number of other employees at Softrax, that he was planning to spend the summer thinking about what he wanted to do.  During my exit interview with him, Mr. Rasicot told me that he planned to spend the summer sailing, as he considered what he would do next.  Both the high valuation

we placed on Mr. Rasicot and the warmth we felt toward him after his years of employment here are reflected in the email I sent out to the Company on his departure. In that regard it should be noted that I do not regularly send out emails announcing the departure of an employee; rather, this is typically handled by the employee's manager or by the employee him/herself. A copy of my email, dated June 15, 2005, is attached as Exhibit B. Ironically, I entitled it "Ode to Pat Rasicot." Mr. Rasicot thanked me for my email.

Mr. Rasicot's Violation of His Non-Competition Agreement
and the Resulting Irreparable Harm to Softrax

15.     On July 18, 2005, Softrax confirmed that Mr. Rasicot was not taking the summer off but was instead providing consulting services to NetSuite, a Softrax competitor.

16.     NetSuite is a relatively new competitor in our market, but it is fast growing and very well funded. In the last six months Net Suite has aggressively, although unsuccessfully, tried to hire some of our top sales representatives; in the process, and as evidence of the aggressiveness with which it is launching its attack, NetSuite has made false representations about Softrax in order to persuade our sales representatives to 'jump' companies. We have also been told by some of our customers that NetSuite has focused its sights on us as a primary target. In addition, I learned only last week from our marketing department that NetSuite has modified portions of its website in order to more closely compete with the marketing approach we have taken on our website.

17.     Having Mr. Rasicot move to a direct competitor who has, by its own admission, placed Softrax in its crosshairs, is a horrific prospect. Preventing this kind of serious competitive risk is precisely why Mr. Rasicot was asked to sign a non-compete agreement when he was promoted to the position of product manager.

18.     After we learned of his work for NetSuite, Softrax reminded Mr. Rasicot of his non-competition commitment to Softrax. In response, Mr. Rasicot told us that he is 'only' implementing NetSuite software in the market vertical they call 'manufacturing.' He stated this as if the 'user' of the software made all the difference when what is at issue is the knowledge he gained at Softrax and the experience he can bring to bear with respect to how to take fundamental revenue management concepts and incorporate them in a flexible design for software that can be used by many types of businesses. When he gives a NetSuite customer a successful implementation, he will be drawing on all he has learned at Softrax. When he interfaces with NetSuite's other departments in the course of his implementation, he will be providing them with feedback, insights and issue identification deeply informed by his years with Softrax. When he evaluates the feasibility of a customer request for a customization or enhancement, he will do so drawing on a vast reservoir of know-how about what can work, what hasn't worked, and the pitfalls and shortcuts of any solution. All of this is of huge value to NetSuite, and any other Softrax competitor. It can save them time and money; it can give them a material development edge and boost in market share.

19.     On July 19, 2005, our outside legal counsel sent a letter to Mr. Rasicot demanding that he comply with the terms of the non-competition agreement he had signed with Softrax and that he immediately cease his employment with NetSuite. The letter asked for a response by July 22.

4

On July 22, 2005, shortly after the close of the business day, Mr. Rasicot emailed our outside counsel asking that his response time be extended to the following week. Softrax agreed to allow Mr. Rasicot until 10:00am on Wednesday, July 27, 2005, to respond to the demand letter.

20.    Mr. Rasicot never responded to the demand letter which had been delivered to him. However, on July 27, 2005, outside legal counsel for NetSuite sent a letter (the "NetSuite Letter") to our counsel, immediately forwarded to Softrax, which purported to respond to the demand letter we had sent Mr. Rasicot, although the NetSuite Letter was not written on behalf of Mr. Rasicot. From the NetSuite Letter we learned that Mr. Rasicot had continued to actively deceive us when he told us that he was only working as a part time contractor for NetSuite. Rather, according the NetSuite Letter, Mr. Rasicot was a full time employee with NetSuite where he held the position of "Subject Matter Expert" and where he was working directly with NetSuite's sales force and professional services team, and where he would be shortly working directly with NetSuite's customers.

21.    As set forth in far more detail in the affidavits of Gottfried Sehringer, Vice President of Marketing for Softrax, and of David Milligan, Vice President of Customer Services for Softrax, the position that Mr. Rasicot truly held with NetSuite (as opposed to the one he had falsely described to us as being his position), put Softrax in a still graver situation. Mr. Rasicot was now in a position where the confidential and proprietary information he had relating to Softrax's products, product strategies and customer requirements would necessarily be disclosed to NetSuite – to NetSuite's great benefit and to Softrax's great harm.

22.    Mr. Rasicot says he will not 'tell' NetSuite any Softrax proprietary or confidential information. But the knowledge and expertise and information that I have referenced above, will necessarily and inevitably be communicated, even if without a direct intent to do so, to a determined rival of ours. The threatened damage to us is material, irreparable and impossible to address simply with dollars.

23.    Moreover, I have to believe Mr. Rasicot knows this. When I spoke with him on his departure, and when he spoke to many others within the Company, he gave no indication of his plan to work for NetSuite. In fact, he affirmatively misled myself and others when he stated that he was planning to spend the summer thinking about what he wanted to do. He actively and deliberately hid his intentions thus making it impossible for us to forestall his actions.

24.    When we subsequently confronted him on learning that he had taken a position with NetSuite, Mr. Rasicot again lied to us about the nature of his position. He has also apparently lied to NetSuite, at least to the extent that the description in the NetSuite Letter of Mr. Rasicot's job responsibilities at Softrax were based on Mr. Rasicot's representations to his new employer.

25.    Given the pattern of deception and untrustworthiness which Mr. Rasicot has practiced to date, it would be unreasonable to now trust him when he says that he will take great care to protect the confidential and proprietary information of Softrax from disclosure to NetSuite – even were he capable of doing so.

5

26.    Mr. Rasicot has the skills and experience to find employment with many companies other than our competitors. We have only asked that he do so.

Signed under the penalty of perjuries this 29th day of July, 2005.

_____
                Robert D. O'Connor, Jr.

1

**EXHIBIT A**

O'CONNOR AFFIDAVIT - EXHIBIT A

## SOFTRAX CORPORATION

### NONCOMPETITION, NONDISCLOSURE AND
### INVENTIONS AGREEMENT

This Agreement is made among SOFTRAX Corporation, a Delaware corporation (the "Company"), and the undersigned employee of or consultant to the Company (the "Employee").

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the Employee hereby acknowledges and agrees as follows:

1.   <u>Introduction</u>. As a result of his/her relationship with the Company, and because of the nature of his/her responsibilities, the Employee has acquired or hereafter will acquire valuable trade secrets, proprietary data and confidential information with respect to the Company and its business.  In view of the foregoing, the Employee acknowledges that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company that the Employee undertakes the obligations contained in this Agreement.

2.   <u>Noncompetition.</u>  (a)  The Employee shall not, at any time during the term of his/her employment with Company or during the  "Noncompete Period" (as defined in paragraph (b) of this Section), directly or indirectly (either for his/her own account or as a stockholder, officer, director, employee, partner, consultant, joint venturer, lender or in any other capacity whatsoever), engage in or have any interest whatsoever in any "Prohibited Business" (as defined in paragraph (c) of this Section); <u>provided</u>, <u>however</u>, that the foregoing shall not preclude the Employee from acquiring or owning solely for investment purposes up to five (5%) percent of the combined voting power of the outstanding capital stock of a publicly held company.  The Employee also shall not, during the term of his/her employment with Company or during the Noncompete Period, accept employment, either directly or indirectly, with any entity which, as of the Severance Date, was either a customer of the Company or had been directly solicited by the Company with a view toward establishing a customer relationship.

1

(b)  For purposes of this Section, the term "Noncompete Period" shall mean the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the "Severance Date").

(c)  For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

3.  <u>Nonsolicitation</u>.  The Employee shall not, at any time during the term of his/her employment with Company or during the Noncompete Period:

(a)  directly or indirectly (except on behalf of the Company), solicit or attempt to solicit, divert or attempt to divert, handle or attempt to handle or service or attempt to service the account or business of any customer which as of the Severance Date or during the one (1) year period prior thereto was a customer of the Company or was directly solicited by the Company with a view toward establishing a customer relationship; or

(b)  directly or indirectly recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company terminate his employment with, or otherwise limit or cease his relationship with, the Company; or

(c)  directly or indirectly interfere or attempt to interfere in any way with the Company's relationships with any of its customers, sales representatives, suppliers, key advisors or consultants, including, without limitation, inducing or attempting to induce any customers, sales representative, supplier, key advisor or consultant to terminate or change the terms of its dealings with the Company.

4.  <u>Nondisclosure</u>.  The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the

2

Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information were communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company.  The Employee agrees that such trade secrets, proprietary data and confidential information include but are not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements' and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives.  Information that is proprietary or confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Notwithstanding the foregoing, the Employee may disclose such trade secrets, proprietary data and confidential information only to the extent that disclosure thereof is required (1) in the course of his/her performing services for or on behalf of the Company, or (2) by a court or other governmental agency of competent jurisdiction, provided the Employee promptly notifies the Company and cooperates fully with the Company in obtaining any available protective order or the equivalent prior to the disclosure of such information.  This provision does not apply to any information which legally is or becomes generally known to the public from authorized sources other than the Employee.

5.  <u>Title to Certain Property</u>. All tangible materials including, but not in any way limited to, printouts, specifications, models, books, records, manuals, sales literature, training materials, customer files, correspondence, documents, contracts, orders, memoranda, notes, agreements, invoices and receipts (and all copies and reproductions thereof) in the possession or control of Employee which in any way relate or pertain to the Company's business or the business of any Affiliate of the Company, whether furnished to the Employee by

3

the Company or prepared, compiled or acquired by the Employee shall be the sole property of the Company.

6.   _Inventions; Disclosure, Assignment and Further Assurances_.   If at any time or times prior to the Severance Date, the Employee shall (either alone or with others) make, conceive, discover, reduce to practice or become possessed of any invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "Inventions") that relates to the business of the Company, or any of the products or services being developed, manufactured or sold by the Company, or results from tasks assigned the Shareholders by the Company or results from the use of premises or equipment owned, leased or contracted for by the Company, such Inventions and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and the Employee shall promptly disclose to the Company (or any persons designated by it) each such Invention and hereby assigns any rights the Employee may have or acquire in the Invention and benefits and/or rights resulting therefrom to the Company and its assigns without compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto with all necessary plans and models to the Company.

The Employee shall promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, any other invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) made, conceived, discovered, reduced to practice or possessed by the Employee (either alone or with others) at any time or times prior to the Severance Date for the purpose of determining whether they constitute "Inventions," as defined herein.

Upon disclosure of each Invention to the Company, the Employee shall, at the request and expense of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:

4

(a) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

In the event the Company is unable, after reasonable effort, to secure the Employee's signature on any letters patent, copyright or other analogous protection relating to an Invention, whether because of the Employee's physical or mental incapacity or for any other reason whatsoever, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney-in-fact, to act for and in their behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

7.   **Absence of Restrictions Upon Disclosure and Competition**.  The Employee represents and warrants that his/her performance of all of the terms of this Agreement and of services on behalf of the Company does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by him/her in confidence or in trust prior to his/her becoming associated with the Company or refrain from competing, directly or indirectly, with the business of any previous employer or other party.  The Employee has returned all documents and materials belonging to any of his/her former employers.  The Employee will not disclose to the Company or induce any of the Company's employees to use proprietary information or trade secrets of any of their former employers. The Employee has not entered into, and hereby agrees that he/she will not enter into, any agreement either written or oral in conflict herewith.

8.   **Compliance with Company Nondisclosure Obligations**.  The Employee hereby acknowledges that the Company may hereafter be

5

subject to non-disclosure or confidentiality agreements with third parties pursuant to which the Company must protect or refrain from use of proprietary and/or confidential information which is the property of such third party or other party.  The Employee hereby agrees upon the direction of the Company to be bound by the terms of such agreements in the event the Employee has access in the course of his/her relationship with the Company to the proprietary and/or confidential information protected thereunder to the same extent as if the Employee was an original individual signatory thereto.

9.   Certain Remedies.  In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled, in addition to any other legal rights or remedies which it may have, to maintain an action for preliminary and permanent injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate.  In the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action; provided, however, that if there is no clear prevailing party in such action, the court or arbiter hearing such action will make the determination as each party's responsibility for paying such costs and expenses.

10.   Reasonable Covenants.  The Employee acknowledges and agrees that the restrictive covenants contained herein (a) are necessary for the reasonable and proper protection of the goodwill of the Company and its trade secrets, proprietary data and confidential information, (b) are reasonable with respect to length of time, scope and geographic area and (c) will not reasonably prohibit the Employee from engaging in other businesses or employment for the purpose of earning a livelihood following the termination of his/her relationship with the Company.

11.   Severability.  Each provision of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein.  If the

6

invalidity or unenforceability of any provision hereof is due to unreasonableness of the time or scope or geographic extent of any covenant or restriction, said covenant or restriction nevertheless shall be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction.

12. **Assignment and Benefit.** This Agreement shall be binding upon the Employee's heirs, executors and administrators. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors and assigns.

13. **Waiver.** No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

14. **Entire Agreement.** The Employee acknowledges receipt of this Agreement, and agree that with respect to the subject matter hereof it is the entire agreement with the Company, superseding any previous oral or written communication, representation, understanding or agreement with the Company or any representative thereof.

15. **Notice.** All notices, requests, demands and any other communications hereunder shall be made in writing and shall be deemed to have been duly given if delivered in person or sent by registered or certified mail, postage prepaid, if to the Company addressed to the President of the Company at the Company's principal executive office, and if to the Employee at the address appearing beneath his/her signatures to this Agreement. Any party may change its or his/her address for notice hereunder by giving notice of change of address in the manner herein provided.

16. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law principles. The Employee hereby submits to the personal jurisdiction of the courts of the Commonwealth of Massachusetts and the Federal Courts of the United States of America located in such commonwealth in respect to the interpretation and enforcement of

7

the provisions of this Agreement and all transactions
contemplated hereby.

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ THE
FOREGOING EMPLOYEE NON-COMPETITION, NONDISCLOSURE AND INVENTIONS
AGREEMENT AND UNDERSTANDS AND AGREES TO EACH AND EVERY PROVISION.
THE EMPLOYMENT FURTHER ACKNOWLEDGES THAT THIS AGREEMENT WAS
DRAFTED BY COUNSEL ON BEHALF OF THE COMPANY AND THAT HE/SHE HAS
BEEN GIVEN THE OPPORTUNITY TO CONSULT COUNSEL OF HIS/HER OWN
CHOOSING AND HAS EITHER DONE SO OR VOLUNTARILY CHOSEN NOT TO DO
SO PRIOR TO THEIR EXECUTION HEREOF.

Dated: 3/13/04

EMPLOYEE:

_____
Signature

Patrick Rosicot
Printed Name

Address: 36 Cranberry Rd.
N. Attleboro, MA
02760

225627

8

# EXHIBIT B

**O'CONNOR AFFIDAVIT - EXHIBIT B**

**From:** Robert O'Connor
**Sent:** Wednesday, June 15, 2005 11:41 AM
**To:** SOFTRAX Global
**Subject:** Ode to Pat Rasicot...

Everyone:

I wanted to take a few minutes of your time to salute Pat Rasicot via email. The timing of his resignation does not afford us the luxury of well deserved public appreciation. His personal schedule has a conflict that prevents him from joining us in New Hampshire.

Pat has played an invaluable role in the company's history and growth. Pat joined the company as an implementation project manager and consultant. He dedicated himself to thoroughly learning Operations and Financials and implemented many of our earliest and most challenging customers. The success of each of these implementations was a requirement to getting our company off-the-ground.

Pat later decided to use his product knowledge to be one of our first product mangers. In this capacity, Pat proved a great resource to our customers as well as our development, customer care, services and other internal organizations. He has always been the "go-to-person" of areas of complex issues that our customers and prospects face. While we may not have gotten ideas and answers with "service and a smile", we always got the best solution after his thoughtful consideration. In addition to these duties, Pat maintained an unofficial HR function when he frequently hosted employees in his cube to discuss current world events or latest company development!

Pat has decided it's time for a change and will be spending the summer sailing. We've asked him to help in some transitional training so we hopefully have not seen the last of him. Please join me in thanking Pat for his countless contributions to the birth and growth of Softrax. We wish him well in future endeavors and know that he will always remain a close friend of the company.

Best regards,

Bob

**EXHIBIT 3**

*August 1, 2005*
*On ... to issue under this*
*motion ret August 4, 2005*
*at 2:00 p.m.*
*On tick ... (...) I*
*AH hang Duly*
*Asst Clerk*

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT 05 01342

C. A. NO. MICV_____

*After hearing and review, allowed. D is enjoined from working for NetSuite, Inc. See reverse side for reasons and scheduling order.*

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

SOFTRAX CORPORATION, )
                     )
        Plaintiff,   )
                     )
v.                   )
                     )
                     )
PATRICK RASICOT,     )
                     )
        Defendant.   )

*Brady, J*
*12 Aug 05*
*8/*

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

Pursuant to Mass. R. Civ. P. 65, plaintiff Softrax Corporation ("Softrax") moves for a preliminary injunction restraining its former employee Patrick Rasicot ("Rasicot") from working for a competitor and thereby violating the noncompetition provision of the Noncompetition, Nondisclosure and Inventions Agreement he entered into with Softrax (the "Agreement"). The motion is supported by Softrax's Complaint and the Affidavits of Robert D. O'Connor, Jr., David Milligan, Jake Fennessy and Gottfried Sehringer filed herewith. A Memorandum in Support of Plaintiff's Motion for Preliminary Injunction will be filed in advance of the hearing.

Under the familiar considerations of *Packaging Industries Group, Inc. v. Cheney,* 380 Mass. 609, 616-18 (1980), entry of the requested preliminary injunction is appropriate and necessary to prevent irreparable harm to Softrax.

23

## Memorandum and Order

The π is likely to prevail on the merits. NetSuite falls within the Contract's definition of "Prohibited Businesses" as it is "engaged primarily in the ... sale ... of products ... involving ... financial application softwear designed for use by softwear ... companies." As I construe the language, it does not matter that a relatively small percentage of NetSuite's customers are softwear companies. The other defenses raised by Rasicot appear rather weak at this stage.

The case shall be brought to conclusion as soon as possible. Trial is set for Nov. 7, 200_ 9am. Final PTC shall be held on Wednesday, Nov. 2, 2005, 2 pm. All discovery shall be complete by 28 Oct 2005.

Patrick J Braley
Justice, S.C.
12 Aug 05

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. _05-1342_

_Softrax Corporation_ ......................... Plaintiff(s)

v.

_Patrick Rasicot_ ....................... Defendant(s)

## INTERLOCUTORY ORDER ON
## PRELIMINARY INJUNCTION

This action came on to be further heard at this sitting upon the return of an order of notice to show cause why the application for a preliminary injunction should not be granted, and was argued by counsel; and thereupon, upon consideration thereof, it is ORDERED and ADJUDGED that upon payment to the clerk of the sum of ~~$5.00~~ $90.00 the application under the _Plaintiff's Motion for Preliminary Injunction hereby_ ~~prayers of the Complaint hereby~~ is granted, and the defendant, _Patrick Rasicot is_

enjoined and restrained from

_Working for NetSuite, Inc._

until further order of Court.

By the Court (           _Brady,_                                    J.)

Entered ...._Aug 12, 2005_....      Att ..................................... _Assistant Clerk_

F—43

**EXHIBIT   4**

## COMMONWEALTH OF MASSACHUSETTS

### APPEALS COURT CLERK'S OFFICE
John Adams Courthouse
One Pemberton Square, Suite 1200
BOSTON, MASSACHUSETTS 02108-1705
(617) 725-8106

August 19, 2005

Scott A. Birnbaum, Esquire
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02210

RE:     No. 2005-J-0393

**SOFTRAX CORPORATION**
        **vs.**
**PATRICK RASICOT**

NOTICE OF DOCKET ENTRY

Please take note that, with respect to the PETITION pursuant
to GLc 231, s. 118 with attach, filed by Patrick Rasicot. (Paper
#1),

on August 18, 2005, the following order was entered on the docket
of the above-referenced case:

RE#1 After review, the petition is denied. (Graham, J.)
*Notice/attest/Brady, J.

Very truly yours,

The Clerk's Office

Dated: August 19, 2005

To:  Norfolk Superior Court Dept.
     Scott A. Birnbaum, Esquire
     T. Christopher Donnelly, Esquire

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                          SUPERIOR COURT
                                                     DOCKET NO. 05-1342

---
| | |
|---|---|
| SOFTRAX CORPORATION, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| PATRICK RASICOT, | ) |
| Defendant. | ) |
---

## AFFIDAVIT OF PATRICK RASICOT

I, Patrick Rasicot, being duly sworn, do hereby depose and state as follows:

1.      I submit this Affidavit, which, except where otherwise indicated, is based upon my personal knowledge, in opposition to the Motion for Preliminary Injunction filed by Softrax Corporation ("Softrax").

2.      I was employed by Softrax from September 1996 until I resigned in early June 2005. At the time of my resignation I was 43 years old.

3.      Throughout my tenure at Softrax, the overwhelming majority of Softrax's customers were software companies.

4.      When I started at Softrax, there were only 10 to 15 people working there and Softrax was releasing its first full product offering, Softrax Operations & Financials. The product performed specialized Renewal Maintenance Billing related to the software industry, as well as generic order management, inventory, shipping and financial processing.

5.      I was given the title of Professional Services Project Manager. In that position, I helped implement the software at customer sites. I was also responsible, over time, for building Softrax's Professional Services Department.

6.      Over the next three and a half years, as Project Manager, I managed and consulted on end-user implementations of the Operations & Financials products. During this period, Softrax's Professional Services Department grew to approximately twenty employees. I consistently received complimentary performance reviews and two Outstanding Contributor awards for my performance as a Project Manager and as the driving force behind the growth of Professional Services. Only one other person in Softrax's history had twice won the Outstanding Contributor award.

7.      My immediate supervisor was David Milligan, who was the Vice President of Professional Services and one of the principals of Softrax. I understand and believe that in the fall of 1999, Mr. Milligan was forced to relinquish that position because of his demeaning treatment of customers and employees, including me.

8.      Even though I had played a key role in successfully building the Professional Services group from the ground up, to my surprise and disappointment, I was not considered for the job of replacing Mr. Milligan. I was told, instead, that the company was intending to go public and wanted someone with "outside experience."

9.      In early 2000, having been passed over for a promotion and growing weary of an intense travel schedule, I began exploring job opportunities outside of Softrax. I found one that seemed like a good fit, but just before I accepted, Mr. Milligan told me that one of two existing Product Managers had been fired, and he persuaded me

to take the position. I accepted and moved from the Professional Services group to the Product Management group in March 2000, with the title of Product Manager. This was a lateral move, not a promotion.

10.     In fact, as a result of the lateral transfer to Product Management, my annual compensation actually *decreased*, as I took a cut in bonus potential. Specifically, my annual compensation for 2000 was $110,905, whereas my annual compensation for 2001 was $101,165.

11.     I was not required to sign a non-compete or any other confidentiality or employment agreement with Softrax when I was first hired, or at any time during the first three and a half years of my employment with Softrax.

12.     In March of 2000, I was asked to sign the Softrax Corporation Noncompetition, Nondisclosure and Inventions Agreement (the "Agreement") attached as Exhibit A to Softrax's complaint. I was not offered any additional compensation or consideration of any kind in exchange for signing it, nor did I receive any. I did not retain a lawyer to review the Agreement and no lawyer was provided to me for that purpose. I was not offered the opportunity to negotiate the terms of the Agreement. As I had decided to stay with Softrax, I signed the Agreement.

13.     At the time I signed the Agreement, Softrax's customer base was composed predominantly of software companies. I would estimate that, as of March 2000, something like 95% of Softrax's customers were in the business of developing, manufacturing, and/or selling software. Even today, the majority of Softrax's customers are still software and information service companies.

14. I was exposed to much of the same information about Softrax's products during the first three and a half years at Softrax as I was in the years after I signed the Agreement.

15. While I did receive a raise at this time, I was scheduled to receive that raise anyway as a result of my performance evaluation. The increase in compensation was not tied in any way to the transfer to the signing of the noncompetition agreement or my lateral transfer to the product management group.

16. As a Product Manager, I was responsible for heading up Softrax's three main product lines. I interacted with Development, Customer Service, Professional Services, and Marketing. My primary responsibility was to gather information related to product enhancement requests that could be put into the product. These primarily came through the Customer Support and Professional Services group – not from direct interaction with customers. The sheer number of requests (approximately 500 at any given time) did not allow for direct interaction with the customers. I would then put the information into business specifications, so that the Development team Product Manager, in turn, could write detailed functional specifications for the software product.

17. Throughout my time in Product Management, direct customer interaction was rare. Rather, Customer Service, Account Management, or Professional Services teams interacted directly with the customer and reported the information to Product Management. On rare occasions (fewer than five times a year, on average), I did interact directly with certain existing or prospective customers. Since mid-2004, the extent of my involvement with customers was further reduced as the Vice President of Marketing

4

determined that members of the product management group should no longer be interacting with customers directly.

18.    In 2001 and 2002, unable to meet sales quotas, Softrax implemented company-wide bonus freezes and pay cuts.

19.    In late 2001, the Product Management group was transferred to the Marketing group, where I reported to Gottfried Sehringer, the Vice President of Marketing. Mr. Sehringer changed my title to Senior Product Strategist and asked the people in my group to assume more duties related to market research and other traditional marketing functions.

20.    In 2002 the Financial Product Manager – a Certified Public Accountant – was laid off, and I was given all of his responsibilities, but no additional compensation.

21.    Over the next two years, I repeatedly asked Mr. Sehringer what was required to advance within the company. He repeatedly told me and others that there was no place to grow within the company.

22.    In spite of that repeated representation, in late summer 2004, a new Director of Product Management was hired from outside the company. My colleagues and I in the Product Management group were not told of this position until the day before the new hire started working.

23.    The new Director stayed for approximately three months, before he resigned. I believe that his resignation was triggered by his frustration with the way Softrax operated.

24.    In March of 2005, Softrax was looking for another Director of Product Management. I again asked Mr. Sehringer what was needed to grow within the organization to the Director position, and he replied to me and other Product Managers that that was not an option for us. Nevertheless, in May 2005, Softrax promoted to Director one of the other Product Managers, who was younger than me (and under 40 years of age) and whose performance track record was inferior to mine.

25.    From my perspective, Softrax's decision to promote a younger, less-qualified Product Manager than myself – while telling me I could not even be considered for the position – appeared to me as discrimination based on my age. I am aware that other Softrax employees have made complaints about discrimination in the workplace.

26.    At that point, I concluded that I needed to leave Softrax. The primary reason that I decided to leave Softrax was that it was a hostile work environment in which employees were treated unfairly and discriminatorily, with little prospect for advancement or competitive compensation.

27.    I began looking for other positions with other companies and I discovered the opportunity to work with NetSuite, Inc. ("NetSuite"). I pursued that opportunity, as I believed I was free to do under the terms of the Agreement, because NetSuite is not engaged primarily in creating or providing products or services designed for use by software or information services companies.

28.    I deeply resent and strongly dispute the accusations in Softrax's papers that I have been dishonest with them. The fact is that I gave nine years of dedicated, loyal service to Softrax, for which I was "rewarded" with increasing responsibilities at

less pay, told I would have no possibility for promotion, and then passed over for

promotion by a less qualified, less experienced younger employee. Under these

circumstances, I did not believe that I had any obligation to inform Softrax of my future

employment plans.

29.    Contrary to Softrax's papers, I did not say I was taking the summer off to

go sailing, or to "find myself," or anything else to that effect. Rather, during the first

week of June 2005, I announced my resignation to the new Director of Product

Managers, Josh Roffman, and told him that I was looking at my options and that I was

going to take some time off. At the time I had this conversation, I had not yet accepted

NetSuite's offer.

30.    I ultimately accepted NetSuite's offer to join them in the position of

"Subject Matter Expert" and, on June 9, 2005, I signed the Netsuite, Inc. Employment,

Confidential Information, Invention Assignment, and Arbitration Agreement (the

"NetSuite Agreement"). In that Agreement I expressly acknowledged that I would not

share any proprietary information I had obtained from any previous job. A true and

correct copy of the NetSuite Agreement is attached hereto as Exhibit A.

31.    I ended up taking four days off before starting with NetSuite. Once I

joined NetSuite, I underwent initial training for several weeks. While I was still in

training, in July 2005, I received a call from Softrax employee Jake Fennessy. I told Mr.

Fennessy that I was working for NetSuite, and that up to this point I had only been

working on-and-off. Mr. Fennessy said that I was in violation of my non-compete, but I

7

explained to him that NetSuite has many different areas of concentration beyond software and that none of NetSuite's confidential information was at risk.

32.    As a Subject Matter Expert at NetSuite, my primary responsibility is to assist NetSuite Sales Representatives in describing the NetSuite product to prospective customers and to work with such prospective customers to identify customers' needs as they relate to compliance with public laws and accounting standards such as those mandated by the Sarbanes-Oxley Act, Generally Accepted Accounting Procedures ("GAAP") compliance, Standard Operating Procedures for accounting, and other similar rules and regulations.   NetSuite's customers span a variety of industries beyond software companies, and all of its customers use the same, generic NetSuite product.

33.    At NetSuite, I have absolutely nothing to do with product development, writing software development specifications, or developing product strategies.  I have no influence on product development direction, defining product specifications and functionalities and bug fixes, or prioritizing the work on product functionality.

34.    In my job at NetSuite, I rely on knowledge of public accounting rules and regulations and not on any of Softrax's proprietary information.  In fact, information about Softrax's products and services is of no use to me whatsoever in performing my job responsibilities at NetSuite.  I have no involvement in attempting to differentiate NetSuite's products from Softrax's or in persuading customers to purchase NetSuite's products over Softrax's.

35.    The functions I have at NetSuite were formerly performed by NetSuite's Chief Financial Officer because of his accounting expertise. He hired me to replace him in that role so that he could devote his time and energies to other CFO functions.

36.    I have never disclosed to anyone, much less anyone at NetSuite, anything that can remotely be considered to be Softrax's confidential information. I have no intention of ever disclosing any such information, and every intention of abiding by my commitment to keep such information confidential.

37.    I am dependent on my position with NetSuite for my own and my family's livelihood. My family relies upon my salary, and will suffer if I am prohibited from working at NetSuite. I currently have no other employment prospects. As noted above, I had received a pay cut from Softrax at the same time I was given additional responsibilities, I was told that there was no possibility for advancement within Softrax, and then after I was falsely told that an insider would not be considered for the position of Director of Product Development, I was passed over for promotion by a younger, less experienced and less qualified co-worker. Prior to accepting to the position at NetSuite, I had been looking for another position for months and NetSuite's was the only offer I received.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 10th DAY OF AUGUST, 2005.

_____
Patrick Rasicot

**EXHIBIT  A**

# NETSUITE, INC.
## EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with NetSuite, Inc., its subsidiaries, affiliates, successors or assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

1.  **At-Will Employment**.  I understand and acknowledge that my employment with the Company is for an unspecified duration and constitutes "at-will" employment.  I also understand that any representation to the contrary is unauthorized and not valid unless obtained in writing and signed by the President of the Company.  I acknowledge that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice.

2.  **Confidential Information**.

(a)  **Company Information**.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company.  I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly, in writing, orally or by drawings or observation of parts or equipment.  I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

(b)  **Former Employer Information**.  I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c)  **Third Party Information**.  I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for

certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. **Inventions.**

(a) **Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively referred to as "Prior Inventions"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or machine.

(b) **Assignment of Inventions.** I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(f) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such invention. I also agree that I will not use, disclose, reproduce, transfer or otherwise exploit any Company Inventions for any purpose other than for the benefit of the Company in the fulfillment of my duties during my employment with the Company.

(c) **Inventions Assigned to the United States.** I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

(d) **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and

any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

(e) **Patent and Copyright Registrations**. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

(f) **Exception to Assignments**. I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and are not otherwise disclosed on Exhibit A.

4. **Conflicting Employment**. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

5. **Returning Company Documents**. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to paragraph 3(d). In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

6. **Notification of New Employer**. In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7. **Non-Solicitation**. I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or any customers, clients, or other entities to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees, customers, or clients of the Company, either for myself or for any other person or entity.

8. **Conflict of Interest Guidelines**. I agree to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D hereto.

9. **Representations**. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

10. **Arbitration and Equitable Relief**.

(a)    **Arbitration**. In consideration of my employment with NetSuite, Inc. (the "Company"), its promise to arbitrate all employment-related disputes and my receipt of the compensation, pay raises and other benefits paid to me by the Company, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder or benefit plan of the Company in their capacity as such or otherwise) arising out of, relating to, or resulting from my employment with the Company or the termination of my employment with the Company, including any breach of this Agreement, shall be subject to binding arbitration under the arbitration rules set forth in California Code of Civil Procedure Section 1280 through 1294.2, including Section 1283.05 (the "Rules") and pursuant to California law. Disputes which I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the California Fair Employment and Housing Act, the California Labor Code, claims of harassment, discrimination or wrongful termination and any statutory claims. I further understand that this Agreement to arbitrate also applies to any disputes that the Company may have with me.

(b)    **Procedure**. I agree that any arbitration will be administered by the American Arbitration Association ("AAA") and that a neutral arbitrator will be selected in a manner consistent with its National Rules for the Resolution of Employment Disputes. I agree that any arbitration under this section shall be conducted in San Mateo. The arbitration proceedings will allow for discovery according to the *AAA National Rules for the Resolution of Employment Disputes*, or the Rules. I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss

and demurrers, prior to any arbitration hearing. I agree that the arbitrator shall issue a written decision on the merits. I also agree that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law. I understand the Company will pay for any administrative or hearing fees charged by the arbitrator or AAA except that I shall pay the first $200.00 of any filing fees associated with any arbitration I initiate. I agree that the arbitrator shall administer and conduct any arbitration in a manner consistent with the Rules and that to the extent that the AAA's National Rules for the Resolution of Employment Disputes conflict with the Rules, the Rules shall take precedence.

(c)     **Remedy.** Except as provided by the Rules, arbitration shall be the sole, exclusive and final remedy for any dispute between me and the Company. Accordingly, except as provided for by the Rules, neither I nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration. Notwithstanding, the arbitrator will not have the authority to disregard or refuse to enforce any lawful company policy, and the arbitrator shall not order or require the Company to adopt a policy not otherwise required by law which the Company has not adopted.

(d)     **Availability of injunctive relief.** In addition to the right under the Rules to petition the court for provisional relief, I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of the Employment, Confidential Information, Invention Assignment Agreement between me and the Company or any other agreement regarding trade secrets, confidential information, nonsolicitation or Labor Code §2870. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys fees.

(e)     **Administrative relief.** I understand that this Agreement does not prohibit me from pursuing an administrative claim with a local, state or federal administrative body such as the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission or the Workers' Compensation Board. This Agreement does, however, preclude me from pursuing court action regarding any such claim.

(f)     **Voluntary nature of agreement**. I acknowledge and agree that I am executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. I further acknowledge and agree that I have carefully read this Agreement and that I have asked any questions needed for me to understand the terms, consequences and binding effect of this Agreement and fully understand it, including that I AM WAIVING MY RIGHT TO A JURY TRIAL. Finally, I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement.

11. **General Provisions**.

(a) **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(b) **Entire Agreement.**    This Agreement constitutes the entire agreement and understanding between the Parties concerning the subject matter of this Agreement and all prior representations, understandings, and agreements concerning the subject matter of this Agreement have been merged into this Agreement.

(c) **Severability.**  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d) **Successors and Assigns.**    This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

Date: _6 - 9 - 05_

_____
Signature

_PATRICK RASICOT_
Name of Employee (typed or printed)

Witness

<u>Exhibit A</u>

# LIST OF PRIOR INVENTIONS
# AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

✓     No inventions or improvements

_____     Additional Sheets Attached

Signature of Employee: _P=A R=i_

Print Name of Employee: _PATRICK RASICOT_

Date: _6-9-05_

**Exhibit B**

## CALIFORNIA LABOR CODE SECTION 2870
## INVENTION ON OWN TIME – EXEMPTION FROM AGREEMENT

"(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**Exhibit C**

# NETSUITE, INC.

## TERMINATION CERTIFICATION

### (To be completed at time of termination of employment.)

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to NetSuite, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Employment, Confidential Information, Invention Assignment and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Date: _____

_____
(Employee's Signature)

_____
(Type/Print Employee's Name)

**Exhibit D**

# NETSUITE, INC.

## CONFLICT OF INTEREST GUIDELINES

It is the policy of NetSuite, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations which must be avoided. Any exceptions must be reported to the President and written approval for continuation must be obtained.

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The Employment, Confidential Information, Invention Assignment and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.    Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

11.    Making any unlawful agreement with distributors with respect to prices.

12.    Improperly using or authorizing the use of any inventions which are the subject of patent claims of any other person or entity.

13.    Engaging in any conduct which is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C.A. NO. 05-1342

SOFTRAX CORPORATION,                  )
                                      )
                        Plaintiff,    )
                                      )
        v.                            )
                                      )
                                      )
PATRICK RASICOT,                      )
                                      )
                        Defendant.    )

## AFFIDAVIT OF JIM MCGEEVER

I, Jim McGeever, state under penalty of perjury as follows:

1.      I am the Chief Financial Officer ("CFO") at NetSuite, Inc. ("NetSuite"), which is located at 2955 Campus Drive, Suite 100, in San Mateo, California. I have been employed with NetSuite since January 2000. Unless otherwise indicated, I have personal knowledge of the following facts, and if called upon as a witness, I could and would competently testify to them.

2.      In my capacity as the CFO, I am generally familiar with the standard practices that NetSuite utilizes in its business practices and I am specifically aware of NetSuite's customer base and its so-called "competition" with Softrax Corporation ("Softrax"). NetSuite is an Application Service Provider, which licenses its integrated Enterprise Resource Planning ("ERP"), Customer Relationship Management ("CRM"), and eCommerce solution to small and mid-sized companies of all types through its hosted products. The products are not "designed for use by software companies." The products are specifically designed for small and mid-sized companies.

1

Generally speaking, an ASP is a third-party that manages and distributes software based services and solutions to customers across a wide area network (*e.g.* the Internet) from a central data center. All NetSuite customers access the Service via the Internet. The customer logs into the Service, and the Customer's Customer Identification and password are authenticated by our computers. Following authentication, the customer accesses their "Home Screen" and commences their use of the Service.

3.    Softrax is also a very different type of company than NetSuite. It is not an Application Service Provider with a hosted environment for its customers. To the contrary, Softrax is a standard software company, where customers purchase the software and load it onto their servers and computers for use within the company.

4.    In my capacity as the CFO for NetSuite, I have direct access to NetSuite's records. I have personally reviewed those records and can state as follows: While it is true that NetSuite has some customers who are software companies – these are miniscule portion of our business and our product is not designed specifically for software companies. Since its inception in 1998, NetSuite has successfully licensed its products to approximately 11,000 customers. Of those 11,000, only 212 - **less than 2% are software companies.** Indeed, our records show that of the 212 software companies that NetSuite gained as customers, NetSuite has only "competed" directly with Softrax on less than 20 of those customers. As a result, I do not consider Softrax to be a major competitor to NetSuite. Indeed, even in those rare instances where Softrax is in the picture with NetSuite is usually in combination with other vendors such as Great Plains, SalesForce.com, and/or Siebel. In fact, our records show that we more often compete against companies other than Softrax whenever we do sell to software companies.

5.    On or about June 9, 2005, Mr. Rasicot executed a confidentiality agreement in conjunction with his hiring at NetSuite. Pursuant to the terms of that agreement, Mr. Rasicot agreed as follows:

> I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to such employer, person or entity unless consented to in writing by such employer, person or entity.

6.    NetSuite takes the protection of confidential information and trade secrets very seriously, as NetSuite's business depends on such information. Consequently, NetSuite is highly sensitive to Mr. Rasicot's obligations to Softrax in that regard. I have personally been in several meetings with Mr. Rasicot since his arrival to NetSuite in late June 2005, and during those meetings I have I have reminded him not to disclose any trade secret Softrax information to anyone at NetSuite. In addition, when Mr. Rasicot recently forwarded a copy of Softrax's counsel's July 19, 2005 letter to me for review, I immediately called Mr. Rasicot and specifically informed him not to share any Softrax trade secret or confidential information with anyone at NetSuite and reminded him of his contractual obligation with NetSuite not to do so.

7.    To my knowledge, Mr. Rasicot has fully complied with his confidentiality obligations to Softrax. We at NetSuite have never asked Mr. Rasicot to disclose any of Softrax's confidential information, and he has never offered to disclose such information.

8.    Mr. Rasicot's knowledge of product design, product functionality, and product specifications of Softrax's product is of little to no value to NetSuite. NetSuite hired Mr. Rasicot for the specific purpose of replacing me on sales calls. In the past, I have been brought into the "pre-sales" process to discuss with certain customers how NetSuite's product meets the requirements of certain public laws, regulations, and accounting standards – since the sales team has very little working knowledge of these rules and regulations, whereas I have more knowledge based on the fact that I am the CFO of NetSuite. My knowledge of Softrax was irrelevant to my performance of that

duty – and I do not expect it to be relevant whatsoever to Mr. Rasicot's performance either. NetSuite as a company is growing and strategically speaking my time is better spent than on sales calls. Mr. Rasicot was hired to replace me in these sales calls and to bring with him his deeper understanding of those public laws and regulations.

Signed under the pains and penalties of perjury on this ___ day of August, 2005.

_____
Jim McGeever

4

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C.A. NO. 05-1342

|  |  |
|---|---|
| SOFTRAX CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| PATRICK RASICOT, | ) |
| Defendant. | ) |

## AFFIDAVIT OF MEI LI

I, Mei Li, state under penalty of perjury as follows:

1.    I am currently the Vice President of Corporate Communications of NetSuite, Inc. ("NetSuite"). I have been with NetSuite since January 2000. Unless otherwise indicated, I have personal knowledge of the following facts, and if called upon as a witness, I could and would competently testify to them.

2.    In my capacity as the Vice President of Corporate Communications I am in charge of all aspects of Public Relations, Investor Relations, Analyst Relations, and internal communications. It is my responsibility to develop, review, and approve (final approval being with the CEO) all press releases issued by NetSuite.

3.    I have reviewed the Affidavit of Gottfried Sehringer – specifically paragraph 12 thereof, wherein Mr. Sehringer makes unfounded representations about how NetSuite presents itself in the marketplace.

4.    NetSuite's products are not "designed for use by software companies." NetSuite's products are designed for small and mid-sized businesses in general and

NetSuite highlights different functionalities of its product to different sectors of the market. Our customers range from telecommunication and wireless companies, to insurance, to consumer goods ,to manufacturing, and include, wholesale distribution, real estate, architecture and design, services, and software companies. Attached hereto as **Exhibit A** is a true and correct copy of our "Customers" page from NetSuite's website. Of the 18 "Featured Success Stories" customers – only one is a "software company."

5.        Indeed, our Website also specifically lists the Industries to which NetSuite's product is marketed, which include Non-profit, Wholesale & Distribution, Electronic Commerce, Software, Advertising, Agriculture, Manufacturing, Retail, and Professional Services industries. Attached hereto as **Exhibit B** is a true and correct copy of our "Industries" web page from NetSuite's website.

6.        Mr. Sehringer mentions one NetSuite press release issued by NetSuite on May 18, 2004. I am familiar with this press release. Out of approximately a total of 260 press releases issued by NetSuite since 1999, this is the only press release NetSuite has ever issued specifically mentioning software companies.

7.        Mr. Sehringer describes Softrax as a "director competitor" to NetSuite. However, I had never heard of the company until today when I was shown Mr. Sehringer's statements.

Signed under the pains and penalties of perjury on this 9th day of August, 2005.

_____
Mei Li

# EXHIBIT A

 **NETSUITE**
ONE SYSTEM. NO LIMITS.

ome | Products | Customers | Industries | Services | Partners | News & Events | Resources          1 877 NETSUITE

Home > Customers

**Customer Success Stories**

ABBYY USA Software House, Inc.

Accordent

AD Systems

Advantage Asia Pacific Ltd

Aeris.net

Afro-Caribbean (AC) Healthcare Supply

Alan Stewart Homes, Ltd.

Alpha Thought Global, Inc.

Alligator River Growers

Alpine Investors

America Property Capital, LLC

Amicus Cellars & X Winery

Associated Grocers

!Yard Gallery

Big Toy Express

Biuti Profesional

BizActions LLC

BizCom USA/CX2 Technologies

Blueprint Global Services

Bonjour Fleurette

Buendia Coffee

California Software

Calley & Currier

Carolina CAD

CaseCentral

Cayman Islands Department of Tourism

Chicago Rubber & Seal

China Manufacturing Network

Clean Mark Group

Country Pet Foods

urtroom Connect

CPI USA

Custer Battles

# CUSTOMERS

## VIEW BY INDUSTRY
### Select Industry

NetSuite has thousands of customers worldwide ranging in industry, business size and software solutions. We encourage you to read these stories of tremendous savings, both through reducing IT costs, and more importantly through streamlining business operations.

 **FEATURED SUCCESS STORIES:** Telecommunications/Wireless

 **Aeris.net**
"The biggest bang for the buck today is in how much better we communicate between departments and how effective we are at solving customer issues."
—Peter Stone, CFO

WATCH THE VIDEO    DOWNLOAD THE STORY    READ THE STORY

Relat
Indus
Webin

## Insurance



**Filice Insurance**
"NetSuite's commissions module was a major selling point for us. We couldn't find any other system that offered such functionality. Better yet, this particular module alone saves us a lot of money – at least $100,000 a year – because the way we calculate commissions is very sophisticated and it can take a long time for the accounting staff to run the numbers correctly."

▶ Watch video
▶ Read the story
▶ Download the story








D3Data LLC

Dale Thomas Popcorn

Davis Anderson

:cision Management Company

Design Cinema Privee

Designs for Health

Deudraeth

Document Science

Drumbalaya

Drummond Media

DTE Energy Technologies

DuPont Air Products
NanoMaterials LLC

eBabka.com

Elcometer

Electronics Line

Engius LLC

EnergyFirst, a division of
NutriScience Corp.

Explore Consulting

Filice Insurance

:stRain

Forest YMCA

Foster's Promotional Goods Inc.

freshFlowers

GHA Technologies

Glass Dimensions

Hampton City Schools

Heartstrings Enterprises

Helio Solutions

High Wire Networks

Home America Lending

ID8 Media, Inc.

Innova Disc Golf

IQ Biometrix, Inc.

JnD Consulting

JR's Sports Collectibles

JTA Property

Justoffbase

ibilee Chocolates

Kassner Graphics

KIBAN Corporation

—Patrick Arnold, Vice
President of Sales

## Consumer Goods



**eBabka.com (Aunt Heddy's Bakery)**
"The common data set for the customers, partners and employees is, simply put, the heart and soul of NetSuite. All of our business functions—customer interactions, shipping, order management, marketing—revolve around that core data set."

—Gary Root, CEO

▶ Watch video
▶ Read the story
▶ Download the story

## Manufacturing



**China Manufacturing Network**
"NetSuite is so easy to use that I've saved probably $50,000 to $100,000 in IT and configuration costs over the year."

—Everette Phillips, President and CEO

▶ Watch video
▶ Read the story
▶ Download the story



**DuPont Air Products NanoMaterials LLC**
"With NetSuite, we're more closely linked with our customers and this allows us to better support them, so it eventually will affect our bottom line in a positive way."

—Robert Grashoff, CEO

▶ Watch video
▶ Read the story
▶ Download the story



**Novak Conversions Inc.**
"We make a change in one place, and NetSuite changes it everywhere. It is the repository for all our data. It is the center of our business."

—Eric Forsberg, Vice

▶ Watch video
▶ Read the story
▶ Download the story

La Jolla Institute

Lightyear Technology, Inc.                                    President

Littlearth

    hmueller & Associates, Inc.

Martor USA                        ## Wholesale / Distribution

Mavrik Jewelry

Mayday Mayday! Inc.               

Meredith Management              **TonerZone.com**
                                 "NetSuite has helped          ▸ Watch video
Miglia Technology Ltd.           us close a lot of deals.      ▸ Read the story
                                 Without NetSuite, I           ▸ Download the story
Millennium Venture Group         would need five
                                 additional people — up
MiniCo, Inc.                     to three in shipping
                                 and a couple in
MobiDepot                        customer service — to
                                 handle our current
Mobile Productivity              volume."
                                 —Ilan Douek, President
Mobileation.com

NAFFA International, Inc.         

National Society of Collegiate   **Lightyear**
Scholars                         **Technology, Inc.**          ▸ Watch video
                                 "The UPS® integration         ▸ Read the story
Nelson & Pickens L.C.            is a great feature for         ▸ Download the story
                                 our customers.
New England Arbors               Oftentimes they would
                                 ask us for status
Niche Retail                     updates and now we
                                 can provide it
Novak Conversions Inc.           immediately. Instead
                                 of having to go to the
    akland Athletics             shipper for the data, it
                                 is in our database and
Oriel Wines                      it doesn't matter who
                                 they call—customer
PAC International, Inc.          support, accounting
                                 etc.—we are all able to
Pioneer Organics                 access it immediately."

Poulter Company                  —John Borden, COO

Projector Doctor

Qualitek Services Inc.           

Randall Scott Cycle Company      **Elcometer**
                                 "I want to more than          ▸ Watch video
Resera, Inc.                     double my business            ▸ Read the story
                                 over the next five            ▸ Download the story
Retail Management Solutions      years, and the only
                                 cost-effective way to
RLE Technologies                 do this is with NetSuite
                                 Small Business."
Rococo Chocolates                —Joe Walker, Vice
                                 President
S&S Custom Wood Moldings

Saffron Rouge                    

Sansar Solutions                 **MiniCo, Inc.**
                                 "It worked the very           ▸ Watch video
Secara                           first day. It was             ▸ Read the story
                                 intuitive to get the          ▸ Download the story
SECPay Ltd                       order-taking system
                                 running on our own."
Similasan USA                    —Marilyn Leslie, CFO

    martSynch, Inc.

SoundCom

Spring Mountain Capital

Sun International

Sunset Companies

ie Association of Film
Commissioners International

The End Records

The Grove Consultants
International

TimeZoneOne

TonerZone

Total Immersion Swimming

TowerStream Corporation

Trailblazer Studio

TTI Instruments

Utility Safeguard

VimCo / Peg-lok

Vivitek, a member of the Sun
Chemical Group

Web Recruit

Wine Accents

WineGlobe

Workforce Solution Inc.

orldLingo



**Design for Health**
"Using NetSuite's SFA/CRM tool, our salespeople can track their sales and contacts in a very simple format. And it integrates directly into our company's financial information, part of the same NetSuite application. It is a beautiful resource for us."

—Jonathan Lizotte, Founder and CEO

▶ Watch video
▶ Read the story
▶ Download the story

## Real Estate



**Resera, Inc.**
"NetSuite shaves off at least a full week from my schedule every month and about a day and a half every week for my sales team."

—Courtenay Yates, Vice President and General Manager

▶ Read the story
▶ Download the story



**Meredith Management**
"With NetSuite, we have accurate, up-to-date information at our fingertips... and faster reporting means quicker budget decisions and better cash flow."

—Jonathan Hickok, CFO

▶ Watch video
▶ Read the story
▶ Download the story

## Architecture / Design



**ID8 Media. Inc.**
"Now we can design a marketing campaign based on who is buying what. Before it was just a canned campaign."

—Atul Bagga, Director of Marketing

▶ Watch video
▶ Read the story
▶ Download the story

## Services



**Lohmueller & Associates, Inc.**
"NetSuite is a much, much better fit for probably 80 percent of our clients."

—Rufus Lohmueller, Founder and President

▸ Watch video
▸ Read the story
▸ Download the story



**Projector Doctor**
"NetSuite substantially improves the infrastructure and valuation of our company."

—Dean Mitchell, Partner

▸ Watch video
▸ Read the story

## Software



**Document Sciences**
"Before NetSuite we would have to go through three different spread-sheets to establish what exactly was happening in our global sales pipeline."

—David Barker, Director of IT

▸ Watch video
▸ Read the story
▸ Download the story

## Software Reseller



**KIBAN Corporation**
"With NetSuite, I saw the opportunity to bring enterprise-class capabilities to SMBs at an affordable price."

—Robert Rudzki, President and Founder

▸ Watch video
▸ Read the story
▸ Download the story

# EXHIBIT B



| Home | Products | Customers | Industries | Services | Partners | News & Events | Resources | | 1 877 NETSUITE |

Home > Industries

**Software**

**Wholesale / Distribution**

**Electronic Commerce**

**Advertising**

**Agriculture**

**Manufacturing**

**Nonprofit**

**Professional Services**

**Retail**





Every industry has its own unique business processes and needs. For that reason, many companies today are demanding industry-focused solutions that meet their goals in every possible way.

With our Web-based, hosted solutions, NetSuite supports businesses across a wide variety of industries. Our solutions can be deployed faster and require less customization than generic packages that take a "one-size-fits-all" approach. And in case additional fine-tuning is needed, we offer extensive configuration and customization capabilities. Our Professional Services Team, along with our extensive network of local NetSuite Solution Providers, can set up the application, consult on best practices, and train your staff on all of NetSuite's capabilities.

**Learn more about how NetSuite works in your industries**

FREE TRIAL

SCHEDULE A DEMO

CONTACT ME

WHITEPAPER

FREE Aberdeen Executive Summary

ROLE-BASED DEMO

Watch Role-Based Demo



Software

Wholesale & Distribution

Electronic Commerce

Advertising

Agriculture

Manufacturing

Nonprofit

Professional Services

Retail

**Related Links**

**Customer Success Stories**

**Webinars**

About Us | Job Openings | Privacy Policy | Contact Us |    Copyright ©2005 NetSuite Inc. All rights reserved.