**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

Civil Action No. 05-11789-JLT

## NOTICE OF LOCAL RULE 81.1(a) FILING

Pursuant to Local Rule 81.1(a) of the Local Rules of the United States District Court for the District of Massachusetts, the undersigned counsel for defendant Patrick Rasicot hereby files certified copies of all records and proceedings contained in the files of the Massachusetts Superior Court (Norfolk County) in state Civil Action No. 2005-01342 and a certified copy of all docket entries in state Civil Action No. 2005-1342.

Dated: September 16, 2005

Respectfully submitted,
PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

CERTIFICATE OF SERVICE

I, Melissa M. Longo, counsel for the defendant, do hereby certify that on this 16th day of September 2005, I caused to be served a true copy of the foregoing upon all parties by mailing same, first class mail, postage pre-paid, to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Melissa M. Longo

Commonwealth of Massachusetts
NORFOLK SUPERIOR COURT
Case Summary
Civil Docket

## NOCV2005-01342
## Softrax Corporation v Rasicot

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 08/01/2005 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 09/01/2005 | **Session** | B - Civil B-CtRm 3 | | |
| **Origin** | 1 | **Case Type** | A99 - Misc contract | | |
| **Lead Case** | | **Track** | F | | |
| **Service** | 10/30/2005 | **Answer** | 12/29/2005 | **Rule12/19/20** | 12/29/2005 |
| **Rule 15** | 12/29/2005 | **Discovery** | 05/28/2006 | **Rule 56** | 06/27/2006 |
| Final PTC | 07/27/2006 | Disposition | 09/25/2006 | Jury Trial | No |

PARTIES

| | |
|---|---|
| Plaintiff<br>Softrax Corporation<br>Active 08/01/2005 | Private Counsel 129930<br>T Christopher Donnelly<br>Donnelly Conroy & Gelhaar<br>One Beacon Street<br>33rd floor<br>Boston, MA 02108-<br>Phone: 617-720-2880<br>Fax: 617-720-3554<br>Active 08/01/2005 Notify |
| **Defendant**<br>Patrick Rasicot<br>Served: 08/02/2005<br>Answered: 08/23/2005<br>Answered 08/23/2005 | **Private Counsel 630734**<br>Robert Noah Feldman<br>Birnbaum & Godkin LLP<br>280 Sunner St 5th Flr<br>Boston, MA 02210-1108<br>Phone: 617-307-6100<br>Fax: 617-307-6101<br>Active 08/03/2005 Notify<br><br>**Private Counsel 543834**<br>Scott A Birnbaum<br>Birnbaum & Godkin LLP<br>268 Summer Street<br>Boston, MA 02210-1108<br>Phone: 617-307-6100<br>Fax: 617-307-6101<br>Active 08/03/2005 Notify<br><br>**Private Counsel 647649**<br>Melissa M Longo<br>Birnbaum & Godkin LLP<br>280 Summer Streeet5th FLor<br>Boston, MA 02210-1108<br>Phone: 617-307-6100<br>Fax: 617-307-6101<br>Active 08/11/2005 Notify<br><br>*** See Attorney Information Above *** |

ENTRIES

**Commonwealth of Massachusetts**
**NORFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## NOCV2005-01342
## Softrax Corporation v Rasicot

| Date | Paper | Text |
|---|---|---|
| 08/01/2005 | 1.0 | Complaint & filing fee in the amount of $275 received |
| 08/01/2005 | | Origin 1, Type A99, Track F. |
| 08/01/2005 | 2.0 | Civil action cover sheet filed |
| 08/01/2005 | 3.0 | Plaintiff Softrax Corporation's MOTION for Preliminary Injunction |
| 08/01/2005 | 3.1 | Affidavit of Jake Fennessy |
| 08/01/2005 | 3.2 | Affidavit of Robert D. O'Connor, Jr. |
| 08/01/2005 | 3.3 | Affidavit of Gottfried Sehringer |
| 08/01/2005 | 3.4 | Affidavit of David Milligan |
| 08/01/2005 | | MOTION (P#3.0) Order of Notice to issue under this motion returnable August 4, 2005 at 2:00 p.m. (Barbara A. Dortch-Okara., Associate Justice). |
| 08/01/2005 | 4.0 | Plaintiff Softrax Corporation's MOTION for appointment of special process server - Motion allowed (Barbara Dortch-Okara, Associate Justice) dated August 1, 2005 |
| 08/01/2005 | | Fast track sent to plff's counsel |
| 08/03/2005 | 5.0 | Deft's Emergency Motion for continuance of Preliminary Injunction hearing. |
| 08/03/2005 | 6.0 | Plff. Softrax Corporation's Opposition to Motion for continuance of Preliminary Injunction hearing with alternative request for Temporary Restraining Order (faxed copy) |
| 08/04/2005 | | MOTION (P#5.0) ALLOWED (Dortch-Okara, Associate Justice) dated 8/3/05 Notices mailed August 04, 2005 |
| 08/04/2005 | 7.0 | Original of p#6.0 Opposition to motion for continuance of preliminary injunction hearing with alternative request for temporary restraining order |
| 08/04/2005 | 8.0 | SERVICE RETURNED: in hand to Patrick Rasicot(Defendant) 8/2/05 |
| 08/05/2005 | 9.0 | Memorandum: in support of motion for preliminary injunction filed by Softrax Corporation |
| 08/05/2005 | | MOTION (P#5.0) ALLOWED (O'Kara, Associate Justice) dated 8/3/05 Notices mailed August 05, 2005 |
| 08/05/2005 | | MOTION (P#6.0) Request for TRO DENIED (Dortch-Okara,Associate Justice).dated 8/3/05 Notices mailed August 05, 2005 |
| 08/11/2005 | 10.0 | Memorandum of Law in opposition to Softtrax's Motion for Preliminary Injunction. rec'd 8/10/05 |
| 08/15/2005 | | MOTION (P#3.0) After hearing and review, ALLOWED. Defendant is enjoined from working for NetSuite, Inc. -Memorandum and Order The Plaintiff is likely to prevail on the merits. NetSuite falls within the Contract's definition of "Prohibited Businesses" as it is "engaged primarily in the ... sale... of products ... involving ... financial application softwear designed for use by softwear ... Companies." As I Construe the language, it does not matter that a relatively small percentage of NetSuite's customers are softwear companies. The other defenses raised by Rasicot appear rather weak at this stage. The Case shall be brought to conclusion as soon as possible. Trial is set for November 7,2005, 9 A.M. Final PTC shall be held on Wednesday, November 2,2205, 2 p.m. All discovery shall be |

# Commonwealth of Massachusetts
NORFOLK SUPERIOR COURT
Case Summary
Civil Docket

## NOCV2005-01342
## Softrax Corporation v Rasicot

| Date | Paper | Text |
|---|---|---|
| | | complete by October 28,2005 (Patrick F. Brady, Associate Justice).dated 8/12/05 Notices mailed August 15, 2005 |
| 08/15/2005 | 11.0 | Reply Affidavit of Robert D O'Connor,Jr. rec'd 8/11/05 |
| 08/15/2005 | 12.0 | Reply Affidavit of Josh Roffman rec'd 8/11/05 |
| 08/15/2005 | 13.0 | Interlocutory Order on Preliminary Injunction under the Plaintiff's Motion for Preliminary Injunction hereby is granted, and the defendant, Patrick Rasicot is enjoined and restrained from working for Net Suite, Inc., (Brady,Justice) dated 8/12/05 certified copies mailed 8/15/05 |
| 08/15/2005 | | Filing fee for Preliminary Injunction paid in the amount of $90.00 by T Christopher Donnelly for Preliminary injunction |
| 08/16/2005 | 14.0 | Pre Trial ORDER: After a Motion hearing on August 11, 2005 before the Honorable Patrick F. Brady, the Court ORDERS: Trial without Jury is set for November 7, 2005 at 9:00 A.M. (Patrick F. Brady, Associate Justice)(Dated 8/11/05) |
| 08/19/2005 | 15.0 | Defendant Patrick Rasicot's Emergency MOTION for Clarification of Order of 8/12/05 (Brady, J.) (P#13.0) |
| 08/22/2005 | | MOTION (P#15.0) No clarification necessary. However, the Court notes that if Net Suite is paying Defendant, this strongly suggests that Defendant is performing some services in violation the Preliminary Injunction (Patrick F. Brady, Associate Justice). dated 8/22/05 Notices mailed 8/22/2005 |
| 08/22/2005 | 16.0 | Notice of docket entry received from Appeals Court -"After review, the petition is denied." |
| 08/23/2005 | 17.0 | ANSWER and jury demand of Patrick Rasicot(Defendant) - Fast track notice sent to defendant's attorney |
| 09/01/2005 | 18.0 | Deft. Patrick Rasicot's Notice of Removal |
| 09/01/2005 | | Case REMOVED this date to US District Court of Massachusetts |

### EVENTS

| Date | Session | Event | Result |
|---|---|---|---|
| 08/03/2005 | Non Jury-CtRm 8 | Motion/Hearing: prel inj | Event canceled not re-scheduled |
| 08/04/2005 | Civil B-CtRm 3 | Motion/Hearing: order of notice on preliminary injunction | Event moved to another session |
| 08/04/2005 | Non Jury-CtRm 8 | Motion/Hearing: R E attachmnt | Event not held-req of Defendant |
| 08/11/2005 | Civil B-CtRm 3 | Motion/Hearing: prel inj p.#3.0 | Event held as scheduled |
| 11/07/2005 | Civil B-CtRm 3 | TRIAL: non-jury | |

A TRUE COPY
Attest: Mary E. Kearney
Deputy Assistant Clerk
9/1/05

, 0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV 05 01342

| | | |
|---|---|---|
| SOFTRAX CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| PATRICK RASICOT, | ) | |
| Defendant. | ) | |

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

1. Plaintiff Softrax Corporation ("Softrax") brings this action against its former employee, defendant Patrick Rasicot ("Rasicot") to obtain preliminary and permanent injunctive relief and to recover attorney's fees arising from Mr. Rasicot's breach of his Noncompetition, Nondisclosure and Inventions Agreement. In violation of this contract, Rasicot is now working for NetSuite, Inc., a Softrax competitor. Rasicot's new employment, drawing upon Softrax's confidential information, trade secrets and proprietary data, has caused and, unless enjoined, will continue to cause immediate and irreparable harm to Softrax that cannot be remedied by monetary damages.

**PARTIES**

2. Plaintiff Softrax is a corporation organized under the laws of Delaware, with its principal place of business in Canton, Norfolk County, Massachusetts.

3. Softrax develops, markets, distributes and supports software that provides revenue management functionality. In addition to licensing the software, Softrax provides

professional services to support the implementation of the software at the customer's site (such services including, for example, business processes analysis, installation and configuration, and training), and to develop software customizations requested by customers.

4. Defendant Patrick Rasicot is an individual who, upon information and belief, resides at 250 Staple Road, Cumberland, Rhode Island.

**JURISDICTION AND VENUE**

5. The Court has personal jurisdiction over Rasicot. In addition, pursuant to his Noncompetition, Nondisclosure and Inventions Agreement with Softrax, Rasicot consented to jurisdiction in this Court.

6. Plaintiff's office is located in this County.

7. Venue and jurisdiction are proper in this Court.

**FACTS**

8. Softrax hired Rasicot in 1996, as a service professional who implemented Softrax software with customers. In March 2000, Mr. Rasicot was promoted to the position of product manager, where he was involved in the design and development of Softrax products, in their subsequent improvement and enhancement based on customer requirements, and in identifying and prioritizing functionality areas which needed improvement in the different products. Later, Rasicot's job title was changed to senior product specialist, but his essential job responsibilities and duites remain the same. Rasicot held this position until he resigned in June, 2005.

9. In connection with Rasicot's promotion to product manager, on or about March 13, 2000, Rasicot entered into a Noncompetition, Nondisclosure and

Inventions Agreement (the "Agreement"). A true and accurate copy of the Agreement is attached hereto as Exhibit A.

10. Softrax's offer of a position of product manager to Rasicot was expressly conditioned upon Rasicot's acceptance of the Agreement.

11. The Agreement contains a provision whereby Rasicot agreed, for a period of two years following his employment with Softrax, not to compete with Softrax. Rasicot expressly agreed not to be employed by or serve as a consultant to any Softrax competitor. The Agreement contains the following provision:

> 2. Noncompetition. (a) The Employee shall not, at any time during the term of his/her employment with Company or during the "Noncompete Period" (as defined in paragraph (b) of this Section), directly or indirectly (either for his/her own account or as a stockholder, officer, director, employee, partner, consultant, joint venturer, lender or in any other capacity whatsoever), engage in or have any interest whatsoever in any "Prohibited Business" (as defined in paragraph (c) of this Section); . . .
>
> (b) For purposes of this Section, the term "Noncompete Period" shall mean the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the "Severance Date").
>
> (c) For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

Exhibit A, *Agreement* §2.

12. In the Agreement, Rasicot also agreed not to disclose or use any Softrax confidential information, trade secrets or proprietary data. The Agreement contains the following provision:

> 4. Nondisclosure. The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or

> divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information was communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company. The Employee agrees that such trade secrets, proprietary data and confidential information include but not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives. Information this is proprietary or confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Exhibit A, *Agreement* §4.

13. As a product manager with Softrax, Rasicot was involved in all aspects of overseeing product development, from developing functional specifications at a very detailed level, to overseeing the development process, to, after a product's general release, being involved in customer issues with the products, including prioritization of product enhancements and new functionalities and addressing customer issues with the products. Rasicot's position required extensive involvement with Softrax's installed customer base as well as with Softrax's prospective customers. Rasicot gained extensive, detailed, confidential and proprietary knowledge concerning Softrax's products, Softrax's products in development and product development strategy, and Softrax's customers' business requirements.

14. On June 3, 2005, Rasicot informed Softrax that he was voluntarily terminating his employment with Softrax, effective June 17, 2005. Rasicot informed his direct

manager, Gottfried Sehringer, Softrax's Vice President, Marketing, and a number of other employees at Softrax, that he was planning to spend the summer thinking about what he wanted to do. Rasicot told Softrax employees that he planned to spend the summer sailing, as he considered what he would do next.

15. On or about July 14, 2005, Softrax heard a rumor that Rasicot had become affiliated with NetSuite, Inc. ("NetSuite"), a direct Softrax competitor. On or about Monday, July 18, 2005, Softrax asked Rasicot whether he was working for NetSuite. Rasicot said he was consulting two days per week for NetSuite solely in the area of assisting manufacturing companies with implementation of NetSuite software.

16. The following day, Softrax sent Rasicot by overnight courier a letter demanding his compliance with the Agreement, including his cessation of work for NetSuite. Softrax requested Rasicot's response by July 22, 2005. After 5:00 p.m. on Friday, July 22, Rasicot sent an email stating he needed until Wednesday, July 27 to reply. Rasicot did not reply on or before July 27, 2005. Softrax received that afternoon a letter from NetSuite in which it indicated that Rasicot was a full time employee of NetSuite, working with NetSuite sales force, professional service teams and customers. NetSuite's description of Rasicot's duties and responsibilities was substantially different than the description Rasicot's had given to Softrax on July 18, 2005.

17. NetSuite is an aggressive competitor in Softrax's software market. NetSuite has attempted to hire away Softrax's top sales representatives and targeted getting the business of Softrax's customers.

18. Softrax required Rasicot to sign the Agreement in order to avoid the serious competitive risk caused by Rasicot going to work for a direct competitor such as NetSuite.

19. In addition, in his employment at NetSuite, Rasicot is necessarily drawing on Softrax's confidential information, trade secrets and proprietary data to provide NetSuite customers with the knowledge and experience he gained through Softrax.

20. Rasicot's employment by NetSuite is in violation of the noncompetition provision of the Agreement. Exhibit A, *Agreement* §2.

21. As a result of Rasicot's conduct, Softrax has already suffered irreparable harm, and unless Rasicot is enjoined, Softrax will continue to suffer irreparable harm. His work for a direct competitor, utilizing Softrax's confidential information, trade secrets or proprietary data has caused and will continue to cause irreparable harm.

22. In the Agreement, Rasicot expressly agreed that in the event he breached any of the provisions therein, there would be substantial and irreparable harm to Softrax and the award of monetary damages would be inadequate. Exhibit A, *Agreement* §9.

**Count I - Breach of Contract**

23. Softrax repeats and incorporates by reference the allegations contained in paragraphs 1-22 as if they were made separately herein.

24. Through Rasicot's work for NetSuite, a direct competitor of Softrax and by his actions as further set forth above, Rasicot has materially breached the Agreement with Softrax.

25. Softrax has been irreparably harmed, and will continue to be irreparably harmed as a direct and proximate result of Rasicot's actions.

26. Under the Agreement, Rasicot is liable to Softrax for Softrax's reasonable legal fees and costs. Exhibit A, *Agreement* §9.

## REQUESTS FOR RELIEF

Softrax respectfully requests that this Court grant Softrax the following relief:

a) Enter a preliminary injunction, issued upon Short Order of Notice, restraining and enjoining Rasicot from (i) engaging in "Prohibited Business" as defined in Section 2(c) of the Agreement, including without limitation performing any services for NetSuite, Inc. and (ii) otherwise breaching the Agreement

b) Enter final judgment which includes a permanent injunction, restraining and enjoining Rasicot from (i) engaging in "Prohibited Business" as defined in Section 2(c) of the Agreement for the "Noncompete Period" defined in the Agreement and (ii) otherwise breaching the Agreement.

c) Award Softrax its attorney's fees and costs incurred in this action and in enforcing the Agreement, pursuant to Section 9 of the Agreement.

d) Enter such other and further relief as the Court deems just and proper.

SOFTRAX CORPORATION

By its attorneys,

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Date: August 1, 2005

A TRUE COPY
Attest: Mary E Kenney
Deputy Assistant Clerk
9/1/05

A

SOFTRAX CORPORATION

NONCOMPETITION, NONDISCLOSURE AND
INVENTIONS AGREEMENT

This Agreement is made among SOFTRAX Corporation, a Delaware corporation (the "Company"), and the undersigned employee of or consultant to the Company (the "Employee").

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the Employee hereby acknowledges and agrees as follows:

1. Introduction. As a result of his/her relationship with the Company, and because of the nature of his/her responsibilities, the Employee has acquired or hereafter will acquire valuable trade secrets, proprietary data and confidential information with respect to the Company and its business. In view of the foregoing, the Employee acknowledges that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company that the Employee undertakes the obligations contained in this Agreement.

2. Noncompetition. (a) The Employee shall not, at any time during the term of his/her employment with Company or during the "Noncompete Period" (as defined in paragraph (b) of this Section), directly or indirectly (either for his/her own account or as a stockholder, officer, director, employee, partner, consultant, joint venturer, lender or in any other capacity whatsoever), engage in or have any interest whatsoever in any "Prohibited Business" (as defined in paragraph (c) of this Section); provided, however, that the foregoing shall not preclude the Employee from acquiring or owning solely for investment purposes up to five (5%) percent of the combined voting power of the outstanding capital stock of a publicly held company. The Employee also shall not, during the term of his/her employment with Company or during the Noncompete Period, accept employment, either directly or indirectly, with any entity which, as of the Severance Date, was either a customer of the Company or had been directly solicited by the Company with a view toward establishing a customer relationship.



200'd 2//0#

££:/T 900Z.8T'unr

(b) For purposes of this Section, the term "Noncompete Period" shall mean the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the "Severance Date").

(c) For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

3. <u>Nonsolicitation</u>. The Employee shall not, at any time during the term of his/her employment with Company or during the Noncompete Period:

(a) directly or indirectly (except on behalf of the Company), solicit or attempt to solicit, divert or attempt to divert, handle or attempt to handle or service or attempt to service the account or business of any customer which as of the Severance Date or during the one (1) year period prior thereto was a customer of the Company or was directly solicited by the Company with a view toward establishing a customer relationship; or

(b) directly or indirectly recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company terminate his employment with, or otherwise limit or cease his relationship with, the Company; or

(c) directly or indirectly interfere or attempt to interfere in any way with the Company's relationships with any of its customers, sales representatives, suppliers, key advisors or consultants, including, without limitation, inducing or attempting to induce any customers, sales representative, supplier, key advisor or consultant to terminate or change the terms of its dealings with the Company.

4. <u>Nondisclosure</u>. The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the



£00'd 2//0#

SS:/T S00Z,8T'daS

Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information were communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company. The Employee agrees that such trade secrets, proprietary data and confidential information include but are not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements' and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives. Information that is proprietary or confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Notwithstanding the foregoing, the Employee may disclose such trade secrets, proprietary data and confidential information only to the extent that disclosure thereof is required (1) in the course of his/her performing services for or on behalf of the Company, or (2) by a court or other governmental agency of competent jurisdiction, provided the Employee promptly notifies the Company and cooperates fully with the Company in obtaining any available protective order or the equivalent prior to the disclosure of such information. This provision does not apply to any information which legally is or becomes generally known to the public from authorized sources other than the Employee.

5. Title to Certain Property. All tangible materials including, but not in any way limited to, printouts, specifications, models, books, records, manuals, sales literature, training materials, customer files, correspondence, documents, contracts, orders, memoranda, notes, agreements, invoices and receipts (and all copies and reproductions thereof) in the possession or control of Employee which in any way relate or pertain to the Company's business or the business of any Affiliate of the Company, whether furnished to the Employee by

the Company or prepared, compiled or acquired by the Employee shall be the sole property of the Company.

6. <u>Inventions: Disclosure, Assignment and Further Assurances</u>. If at any time or times prior to the Severance Date, the Employee shall (either alone or with others) make, conceive, discover, reduce to practice or become possessed of any invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "Inventions") that relates to the business of the Company, or any of the products or services being developed, manufactured or sold by the Company, or results from tasks assigned the Shareholders by the Company or results from the use of premises or equipment owned, leased or contracted for by the Company, such Inventions and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and the Employee shall promptly disclose to the Company (or any persons designated by it) each such Invention and hereby assigns any rights the Employee may have or acquire in the Invention and benefits and/or rights resulting therefrom to the Company and its assigns without compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto with all necessary plans and models to the Company.

The Employee shall promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, any other invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) made, conceived, discovered, reduced to practice or possessed by the Employee (either alone or with others) at any time or times prior to the Severance Date for the purpose of determining whether they constitute "Inventions," as defined herein.

Upon disclosure of each Invention to the Company, the Employee shall, at the request and expense of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:

(a) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

In the event the Company is unable, after reasonable effort, to secure the Employee's signature on any letters patent, copyright or other analogous protection relating to an Invention, whether because of the Employee's physical or mental incapacity or for any other reason whatsoever, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney-in-fact, to act for and in their behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

7. <u>Absence of Restrictions Upon Disclosure and Competition</u>. The Employee represents and warrants that his/her performance of all of the terms of this Agreement and of services on behalf of the Company does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by him/her in confidence or in trust prior to his/her becoming associated with the Company or refrain from competing, directly or indirectly, with the business of any previous employer or other party. The Employee has returned all documents and materials belonging to any of his/her former employers. The Employee will not disclose to the Company or induce any of the Company's employees to use proprietary information or trade secrets of any of their former employers. The Employee has not entered into, and hereby agrees that he/she will not enter into, any agreement either written or oral in conflict herewith.

8. <u>Compliance with Company Nondisclosure Obligations</u>. The Employee hereby acknowledges that the Company may hereafter be

subject to non-disclosure or confidentiality agreements with third parties pursuant to which the Company must protect or refrain from use of proprietary and/or confidential information which is the property of such third party or other party. The Employee hereby agrees upon the direction of the Company to be bound by the terms of such agreements in the event the Employee has access in the course of his/her relationship with the Company to the proprietary and/or confidential information protected thereunder to the same extent as if the Employee was an original individual signatory thereto.

9. Certain Remedies. In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled, in addition to any other legal rights or remedies which it may have, to maintain an action for preliminary and permanent injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate. In the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action; provided, however, that if there is no clear prevailing party in such action, the court or arbiter hearing such action will make the determination as each party's responsibility for paying such costs and expenses.

10. Reasonable Covenants. The Employee acknowledges and agrees that the restrictive covenants contained herein (a) are necessary for the reasonable and proper protection of the goodwill of the Company and its trade secrets, proprietary data and confidential information, (b) are reasonable with respect to length of time, scope and geographic area and (c) will not reasonably prohibit the Employee from engaging in other businesses or employment for the purpose of earning a livelihood following the termination of his/her relationship with the Company.

11. Severability. Each provision of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. If the

invalidity or unenforceability of any provision hereof is due to unreasonableness of the time or scope or geographic extent of any covenant or restriction, said covenant or restriction nevertheless shall be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction.

12. Assignment and Benefit. This Agreement shall be binding upon the Employee's heirs, executors and administrators. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors and assigns.

13. Waiver. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

14. Entire Agreement. The Employee acknowledges receipt of this Agreement, and agree that with respect to the subject matter hereof it is the entire agreement with the Company, superseding any previous oral or written communication, representation, understanding or agreement with the Company or any representative thereof.

15. Notice. All notices, requests, demands and any other communications hereunder shall be made in writing and shall be deemed to have been duly given if delivered in person or sent by registered or certified mail, postage prepaid, if to the Company addressed to the President of the Company at the Company's principal executive office, and if to the Employee at the address appearing beneath his/her signatures to this Agreement. Any party may change its or his/her address for notice hereunder by giving notice of change of address in the manner herein provided.

16. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law principles. The Employee hereby submits to the personal jurisdiction of the courts of the Commonwealth of Massachusetts and the Federal Courts of the United States of America located in such commonwealth in respect to the interpretation and enforcement of

the provisions of this Agreement and all transactions contemplated hereby.

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ THE FOREGOING EMPLOYEE NON-COMPETITION, NONDISCLOSURE AND INVENTIONS AGREEMENT AND UNDERSTANDS AND AGREES TO EACH AND EVERY PROVISION. THE EMPLOYMENT FURTHER ACKNOWLEDGES THAT THIS AGREEMENT WAS DRAFTED BY COUNSEL ON BEHALF OF THE COMPANY AND THAT HE/SHE HAS BEEN GIVEN THE OPPORTUNITY TO CONSULT COUNSEL OF HIS/HER OWN CHOOSING AND HAS EITHER DONE SO OR VOLUNTARILY CHOSEN NOT TO DO SO PRIOR TO THEIR EXECUTION HEREOF.

Dated: 3/13/00

EMPLOYEE:

[signature]
Signature

Patrick Rasicot
Printed Name

Address: 36 Cranberry Rd.
N. Attleboro, MA
02760

225627



#0112 P.009

MAR.18.2005 1:47PM

2.

| CIVIL ACTION COVER SHEET | Trial Court of Massachusetts<br>SUPERIOR COURT DEPARTMENT<br>County: NORFOLK | Docket Number 05 01342 |
|---|---|---|

| | |
|---|---|
| PLAINTIFF(S) SOFTRAX CORPORATION | DEFENDANT(S) PATRICK RASICOT |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE T. Christopher Donnelly, Donnelly, Conroy & Gelhaar, LLP, One Beacon St.,33rd Fl, Boston, MA 02108<br>Board of Bar Overseers number: 129930 | ATTORNEY (if known) |

B

**Origin code and track designation**

Place an x in one box only:

[ X ] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. c. 231, s.104 (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript;relief from judgment/ Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| A99 | Contract-Other Non-Compete | (F) | ( ) Yes (X) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
**(Attach additional sheets as necessary)**

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . $.............
2. Total Doctor expenses . . . . . $.............
3. Total chiropractic expenses . . . . . $.............
4. Total physical therapy expenses . . . . . $.............
5. Total other expenses (describe) . . . . . $.............

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

Subtotal $.............

B. Documented lost wages and compensation to date . . . . . $.............
C. Documented property damages to date . . . . . $.............
D. Reasonably anticipated future medical and hospital expenses . . . . . $.............
E. Reasonably anticipated lost wages . . . . . $.............
F. Other documented items of damages (describe)
$.............
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
$.............
TOTAL: $.............

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):
Action to enjoin violations of non-competition clause
TOTAL $.............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record T. C. Donnelly DATE: 8/1/05

A.O.S.C. 2003

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
8/1/05

August 1, 2005
O/A to issue under this motion ret. August 4, 2005
12:00 p.m.
Dr. [illegible] Chin, J.
Att. [illegible]
Asst Clk

3.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT 05 01342
C. A. NO. MICV__________

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

After hearing and review, allowed. D is enjoined from working for NetSuite, Inc. See reverse side for reasons and scheduling order.
Brady, J.
12 Aug 05

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
81

**PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

Pursuant to Mass. R. Civ. P. 65, plaintiff Softrax Corporation ("Softrax") moves for a preliminary injunction restraining its former employee Patrick Rasicot ("Rasicot") from working for a competitor and thereby violating the noncompetition provision of the Noncompetition, Nondisclosure and Inventions Agreement he entered into with Softrax (the "Agreement"). The motion is supported by Softrax's Complaint and the Affidavits of Robert D. O'Connor, Jr., David Milligan, Jake Fennessy and Gottfried Sehringer filed herewith. A Memorandum in Support of Plaintiff's Motion for Preliminary Injunction will be filed in advance of the hearing.

Under the familiar considerations of *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 616-18 (1980), entry of the requested preliminary injunction is appropriate and necessary to prevent irreparable harm to Softrax.

Softrax, a Canton developer and seller of software, has demonstrated an overwhelming likelihood of success on the merits. Rasicot executed the Agreement with Softrax as a condition of his promotion to product manager. In his new position as product manager, Rasicot was privy to extensive confidential and proprietary information relating to Softrax's product, product strategies and customer base. Rasicot expressly agreed that following the end of his employment with Softrax he would not perform any work for a competitor of Softrax. *Agreement* §2. This noncompetition agreement, supported by consideration, has a reasonable two year duration, which Rasicot acknowledged and to which he agreed. Following his voluntary departure from Softrax in June 2005, however, in express violation of the Agreement and in contradiction to the representations he made to Softrax regarding his future plans, Rasicot began working for NetSuite, a direct competitor of Softrax. Rasicot, therefore, is liable for breach of contract.

Softrax will continue to suffer irreparable harm if the requested injunction is denied. NetSuite competes with Softrax. Rasicot's employment with NetSuite gives NetSuite an unfair competitive advantage, the consequences of which will be extraordinarily difficult if not impossible to quantify in money damages. Indeed, Rasicot acknowledged in the Agreement that in the event he breached any of its provisions, Softrax would incur substantial and irreparable harm and an award of monetary damages would be inadequate. *Agreement* §9. Under these circumstances, monetary damages may never be quantifiable and would not suffice to make Softrax whole.

The balance of hardships clearly favors Softrax. Softrax has no adequate remedy in law. In contrast, Rasicot is free to seek employment with the many companies that do

not directly compete with Softrax and will not suffer any irreparable harm if he is directed to stop violating the Agreement.

A proposed form of Order is attached hereto as Exhibit A.

SOFTRAX CORPORATION

By its attorneys,

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Dated: August 1, 2005

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV__________

SOFTRAX CORPORATION, )
Plaintiff, )
v. )
PATRICK RASICOT, )
Defendant. )

# [PROPOSED] PRELIMINARY INJUNCTION ORDER

The Court having considered Plaintiff's Motion for Preliminary Injunction, the submissions in support thereof and in opposition thereto, and having heard counsel for both parties, finds that plaintiff Softrax Corporation ("Softrax") has demonstrated it is likely to succeed on its claims against defendant Patrick Rasicot ("Rasicot") for breach of the Noncompetition, Nondisclosure and Inventions Agreement he entered into with Softrax (the "Agreement"); that Softrax will suffer irreparable harm in the absence of immediate injunctive relief; that such injunctive relief will not cause any irreparable harm to Rasicot; and that the public interest supports entry of the requested preliminary relief, and therefore ORDERS:

Pursuant to Mass. R. Civ. P. 65, defendant Rasicot is hereby restrained and enjoined from (i) engaging in "Prohibited Business" as defined in Section 2(c) of the Agreement, including without limitation from performing any services for NetSuite, Inc., during the "Noncompete Period" defined in the Agreement, and (ii) otherwise breaching the Agreement.

______________________________
Justice of the Superior Court

3.1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV 05 01342

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

AFFIDAVIT OF JAKE FENNESSY

I, Jake Fennessy, state under penalty of perjury as follows:

1. I am currently the Chief Financial Officer of Softrax Corporation ("Softrax" or the "Company") and have held this or a comparable position since joining the Company in 199_.

2. I have known Patrick Rasicot during my entire tenure with Softrax, though he has never reported directly to me.

3. After Mr. Rasicot announced his resignation from the Company on June 3, 2005, I did have occasion to sit down with him and briefly discuss his decision. The conversation was casual and we talked mostly in generalities about his years at Softrax. I also asked him whether he would be interested in taking a position within our Professional Services Organization, rather than leaving the Company. I knew this possibility had been raised with him earlier, by Robert O'Connor, the President of Softrax, but I thought it would be worthwhile to raise it again. The Professional Services Organization now reports to me, and I knew that someone with Mr. Rasicot's domain knowledge, extensive familiarity with our customer base and in-depth knowledge of our products, would be an asset to the group. I believe he made a non-committal response.

4. On or about July 14, 2005, I first learned of a rumor that Mr. Rasicot may have joined NetSuite. This seemed highly unlikely to me, because Mr. Rasicot had worked for Softrax for over nine years, knew that NetSuite was a competitor and I assumed he had a sense of loyalty to the Company. I also knew that he had signed a non-compete agreement which would have precluded any such association. Nonetheless, we began to look into the rumor. On the following Monday, July 18, I decided to call Mr. Rasicot and ask him directly if the rumor was true. He said that it was true he was working for NetSuite, but that he was only working for it as an outside consultant for two days a week doing implementation of its products with manufacturing companies. I told him that his working for NetSuite was a source of serious concern for the Company given NetSuite's status as a competitor and its recent actions targeting Softrax in the marketplace and trying to hire Softrax employees. I also reminded him of the commitments he had made in the non-competition and non-disclosure agreement he had signed with the Company. He told me there was no overlap at all between the work he was doing for NetSuite and the work he did for Softrax. I told him that the Company would have to evaluate the new information and consider its position. We then ended the call.

5. After internal discussion among Softrax management, we decided that it was not tenable to allow Mr. Rasicot to maintain his affiliation with NetSuite, even in the limited capacity which Mr. Rasicot had described to me. Part of the reason for our concern was our own knowledge of how information flows within an organization, including, in particular, how closely we knew that implementation personnel work with other groups within an organization such as the development group, the product management group and the technical support staff. These issues are addressed more fully in the affidavit of Mr. O'Connor.

6. On July 19, 2005, our outside legal counsel sent by overnight courier a letter to Mr. Rasicot demanding that he comply with the terms of the non-competition and non-disclosure agreement he had signed with the Company when he became a product manager and that he end his relationship with NetSuite. The letter asked for a response from Mr. Rasicot by July 22.

7. On Friday, July 22, 2005, shortly after 5:00pm, Mr. Rasicot responded to our outside counsel by email saying he had been out of town and had only just seen the letter. He requested additional time to respond to outside counsel's letter. On the assumption that Mr. Rasicot -- after consulting with competent counsel--would agree to comply with his non-compete agreement, we consented to an extension until 10:00am the following Wednesday, July 27, 2005 -- essentially two business days.

8. Mr. Rasicot did not respond by 10:00am on July 27, 2005. However, at approximately 2:00pm, our outside counsel forwarded a letter he had received a few moments earlier from counsel for NetSuite (the "NetSuite Letter"). The NetSuite Letter stated that Mr. Rasicot was an employee of NetSuite and that he worked with NetSuite's sales force and professional services group and would soon be working with NetSuite customers. It also made several surprisingly inaccurate statements about the nature of the

work Mr. Rasicot did while with Softrax. Those misstatements are addressed in detail in the affidavit of Mr. Sehringer.

9. The NetSuite Letter brought both more immediacy and more intensity to our concern over Mr. Rasicot's relationship with NetSuite. It was now clear that Mr. Rasicot was in a unique position to do serious harm to Softrax. His position as Subject Matter Expert, working, according to the NetSuite letter, with NetSuite's sales and professional services group, made him a critical source of competitive information not only for those two organizations, but also, and obviously, for the NetSuite product development group. Mr. Rasicot's knowledge of confidential information relating to Softrax's products (including their software architecture, database logic, thematic structure and interoperability), to our product and marketing strategy, and to our customer base, was both extensive and of a nature that it would be communicated indirectly – simply through the advice and instruction he gave NetSuite as a result of his experience at Softrax – as well as directly.

10. The NetSuite letter heightened our concern for a second reason. Specifically, it was still more blatant evidence that Mr. Rasicot had yet again deceived us, this time with respect to his relationship with NetSuite. It also appeared that he had misled his new employer with respect to what his job responsibilities had been at Softrax. What this meant was that it would be irresponsible for us, as corporate management, to place any trust or rely in any way on Mr. Rasicot's sense of integrity or honor. Certainly it would be poor business judgment to rely on Mr. Rasicot's representations that he would not disclose confidential and proprietary information of Softrax's (even assuming this was possible which, for reasons referenced above and discussed in more length in the affidavits of my colleagues, is highly unlikely).

Signed under the penalties of perjury this 1st day of August, 2005.

Jake Fennessy

Jake Fennessy

A TRUE COPY

Attest: Mary E. Kenney

Deputy Assistant Clerk

9/1/05

3.2

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
C. A. NO. MICV 05 01342

| | |
|---|---|
| SOFTRAX CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| PATRICK RASICOT, | ) |
| Defendant. | ) |

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

AFFIDAVIT OF ROBERT D. O'CONNOR, JR.

I, Robert D. O'Connor, Jr. state under penalty of perjury as follows:

1. I am currently the President and Chief Executive Officer of Softrax Corporation ("Softrax" or the "Company") and have held those or comparable positions since I helped to found the Company in 1985, under the name The RBS Group, Inc. The Company changed its name to Softrax Corporation in 1998.

Softrax's Business

2. Softrax develops, markets, distributes and supports software that provides revenue management functionality. This extends to, for example: revenue recognition management tools; the processing of orders and renewals; managing accounts receivable, general ledger and other financial processes; invoicing of transactional and subscription based sales; and forecasting and analytical tools. In addition to licensing the software, Softrax provides professional services to support the implementation of the software at the customer's site (such services including, for examples, business processes analysis, installation and configuration, and training), and to develop software customizations requested by customers.

3. Softrax is located in Canton, Massachusetts, where it employs approximately eighty (80) people.

4. Softrax initially focused its marketing and sales efforts on the software industry. The Company's software is still designed so that it can be effectively used by software companies and the software industry remains the largest part of our installed base. However, in recent years

the Company has expanded the reach of its software packages in order to successfully penetrate other markets.

5. A major new product initiative currently underway is based on a new technological framework that supports a level of flexibility in functionality and interoperability with third party software systems which we believe will allow us to service and support the revenue management needs of almost every industry.

6. We are able to undertake this new product initiative because of the many years of development and field expertise we have built up in the area of financial business practices and revenue management principles. While we were originally able to acquire market share by focusing on revenue recognition principles and licensing paradigms characteristic of software vendors, the business processes and accounting requirements underlying revenue management concepts are common across many industries.

7. For example, placing orders, order fulfillment and order invoicing are characteristic of most industries. Processing renewals is a common requirement in a subset of industries, but a very large subset. Basic financial procedures, associated with general ledger, accounts receivable and accounts payable, again are integral to most businesses. The rules of revenue recognition, while differing for differing kinds of revenue, can be programmed based on established rules and follow an underlying shared logic.

8. Although the above are basic revenue management principles and processes with which anyone can become readily familiar after a bit of training, what Softrax brings to the development table is a uniquely comprehensive and in depth understanding of how these principles and processes interrelate with all of the business processes of any given customer – and I should add, that most customers have some idiosyncrasies in their business practices. Here are a few examples of how our expertise comes into play. We are deeply familiar with where the 'touch points' are between business areas; that is, where data from one area needs to be transferred, processed and then re-entered into another area or sent back to the original area, or both. We understand how accounting principles interrelate and therefore how changes in data in one entry may or should affect other data entries, often with additional cascading and interactive consequences. For example, if payment terms on a sale are changed, it can affect the revenue already recognized on the sale as well as the amount of revenue which has been deferred. This in turn is reflected on the income statement and balance sheet. As another example, if a customer prepays a portion of the amount owed in connection with a sale, this can affect not only the revenue recognition issues referenced in the previous example, but also how revenue may be allocated across calendar periods; the prepayment will also need to be reflected in the customer financial profile data stored within the system.

9. To date, because we are still a relatively small company, we cannot compete with the larger players, such as Microsoft and Oracle, with marketing dollars and brand name recognition. Where we can compete, and where we do compete successfully, is in terms of the domain expertise reflected in our products' extensive functionality, flexibility, interoperability, and highly configurable nature.

Mr. Rasicot's Employment and His Agreement

10. Softrax hired Patrick Rasicot in September 1996. His first position was as a service professional who implemented our software with customers. In March 2000, Mr. Rasicot was promoted to the position of product manager where he was intimately involved in the design and development of our products, in their subsequent improvement and enhancement based on customer requirements, and in identifying and prioritizing functionality areas which needed improvement in the different products. Mr. Rasicot held the position of product manager (re-titled senior project specialist) for over five years, until he gave notice in June of this year. At that time, he was earning an annual base salary of approximately $102,000.

11. There is probably not another position in the Company where there is a greater concentration of product knowledge, customer issues, product development plans and market requirements than the position of product manager. It is, simply, the product manager's job to have knowledge of, manage and respond to these different elements. It is the product manager who writes the functional requirements and specifications for a product, and its new releases. These functional requirements in turn reflect a prioritization of customer and market demands, an assessment of product strengths and weaknesses, and an understanding of development challenges, resources and timelines. Not surprisingly, a product manager 'touches' almost every other department in the Company. Out of necessity, he works closely with the development engineering group, the customer support department, and the marketing, account management and sales teams and, in each case his work revolves around confidential and proprietary information of the Company.

12. In view of all the facts described above, on his promotion to product manager, Softrax required Mr. Rasicot to sign a Noncompetition, Nondisclosure and Inventions Agreement ("Agreement"). A copy of the Agreement signed by Mr. Rasicot is attached as Exhibit A. The form of agreement is required of our key employees, both as a corporate policy in order to protect the Company and as contractually required by our investors for the same reason.

13. The covenants in the Agreement are designed to reasonably protect (1) the Company's confidential and proprietary information, (2) the investment the Company makes in its high level employees like Mr. Rasicot, (3) the Company's competitive edge in product development and customer service, and (4) the Company's goodwill and other interests. The covenants include a prohibition against Mr. Rasicot taking employment from a competitor of the Company for two years after he leaves Softrax.

Mr. Rasicot's Voluntary Departure

14. On June 3, 2005, Mr. Rasicot informed the Company that he was terminating his employment with Softrax, effective June 17, 2005. He said he was doing so voluntarily. We were disappointed with Mr. Rasicot's decision as he was an experienced product manager. Mr. Rasicot informed his direct manager, Gottfried Sehringer, Vice President, Marketing, and a number of other employees at Softrax, that he was planning to spend the summer thinking about what he wanted to do. During my exit interview with him, Mr. Rasicot told me that he planned to spend the summer sailing, as he considered what he would do next. Both the high valuation

we placed on Mr. Rasicot and the warmth we felt toward him after his years of employment here are reflected in the email I sent out to the Company on his departure. In that regard it should be noted that I do not regularly send out emails announcing the departure of an employee; rather, this is typically handled by the employee's manager or by the employee him/herself. A copy of my email, dated June 15, 2005, is attached as Exhibit B. Ironically, I entitled it "Ode to Pat Rasicot." Mr. Rasicot thanked me for my email.

Mr. Rasicot's Violation of His Non-Competition Agreement and the Resulting Irreparable Harm to Softrax

15. On July 18, 2005, Softrax confirmed that Mr. Rasicot was not taking the summer off but was instead providing consulting services to NetSuite, a Softrax competitor.

16. NetSuite is a relatively new competitor in our market, but it is fast growing and very well funded. In the last six months Net Suite has aggressively, although unsuccessfully, tried to hire some of our top sales representatives; in the process, and as evidence of the aggressiveness with which it is launching its attack, NetSuite has made false representations about Softrax in order to persuade our sales representatives to 'jump' companies. We have also been told by some of our customers that NetSuite has focused its sights on us as a primary target. In addition, I learned only last week from our marketing department that NetSuite has modified portions of its website in order to more closely compete with the marketing approach we have taken on our website.

17. Having Mr. Rasicot move to a direct competitor who has, by its own admission, placed Softrax in its crosshairs, is a horrific prospect. Preventing this kind of serious competitive risk is precisely why Mr. Rasicot was asked to sign a non-compete agreement when he was promoted to the position of product manager.

18. After we learned of his work for NetSuite, Softrax reminded Mr. Rasicot of his non-competition commitment to Softrax. In response, Mr. Rasicot told us that he is 'only' implementing NetSuite software in the market vertical they call 'manufacturing.' He stated this as if the 'user' of the software made all the difference when what is at issue is the knowledge he gained at Softrax and the experience he can bring to bear with respect to how to take fundamental revenue management concepts and incorporate them in a flexible design for software that can be used by many types of businesses. When he gives a NetSuite customer a successful implementation, he will be drawing on all he has learned at Softrax. When he interfaces with NetSuite's other departments in the course of his implementation, he will be providing them with feedback, insights and issue identification deeply informed by his years with Softrax. When he evaluates the feasibility of a customer request for a customization or enhancement, he will do so drawing on a vast reservoir of know-how about what can work, what hasn't worked, and the pitfalls and shortcuts of any solution. All of this is of huge value to NetSuite, and any other Softrax competitor. It can save them time and money; it can give them a material development edge and boost in market share.

19. On July 19, 2005, our outside legal counsel sent a letter to Mr. Rasicot demanding that he comply with the terms of the non-competition agreement he had signed with Softrax and that he immediately cease his employment with NetSuite. The letter asked for a response by July 22.

On July 22, 2005, shortly after the close of the business day, Mr. Rasicot emailed our outside counsel asking that his response time be extended to the following week. Softrax agreed to allow Mr. Rasicot until 10:00am on Wednesday, July 27, 2005, to respond to the demand letter.

20. Mr. Rasicot never responded to the demand letter which had been delivered to him. However, on July 27, 2005, outside legal counsel for NetSuite sent a letter (the "NetSuite Letter") to our counsel, immediately forwarded to Softrax, which purported to respond to the demand letter we had sent Mr. Rasicot, although the NetSuite Letter was not written on behalf of Mr. Rasicot. From the NetSuite Letter we learned that Mr. Rasicot had continued to actively deceive us when he told us that he was only working as a part time contractor for NetSuite. Rather, according the NetSuite Letter, Mr. Rasicot was a full time employee with NetSuite where he held the position of "Subject Matter Expert" and where he was working directly with NetSuite's sales force and professional services team, and where he would be shortly working directly with NetSuite's customers.

21. As set forth in far more detail in the affidavits of Gottfried Sehringer, Vice President of Marketing for Softrax, and of David Milligan, Vice President of Customer Services for Softrax, the position that Mr. Rasicot truly held with NetSuite (as opposed to the one he had falsely described to us as being his position), put Softrax in a still graver situation. Mr. Rasicot was now in a position where the confidential and proprietary information he had relating to Softrax's products, product strategies and customer requirements would necessarily be disclosed to NetSuite – to NetSuite's great benefit and to Softrax's great harm.

22. Mr. Rasicot says he will not 'tell' NetSuite any Softrax proprietary or confidential information. But the knowledge and expertise and information that I have referenced above, will necessarily and inevitably be communicated, even if without a direct intent to do so, to a determined rival of ours. The threatened damage to us is material, irreparable and impossible to address simply with dollars.

23. Moreover, I have to believe Mr. Rasicot knows this. When I spoke with him on his departure, and when he spoke to many others within the Company, he gave no indication of his plan to work for NetSuite. In fact, he affirmatively misled myself and others when he stated that he was planning to spend the summer thinking about what he wanted to do. He actively and deliberately hid his intentions thus making it impossible for us to forestall his actions.

24. When we subsequently confronted him on learning that he had taken a position with NetSuite, Mr. Rasicot again lied to us about the nature of his position. He has also apparently lied to NetSuite, at least to the extent that the description in the NetSuite Letter of Mr. Rasicot's job responsibilities at Softrax were based on Mr. Rasicot's representations to his new employer.

25. Given the pattern of deception and untrustworthiness which Mr. Rasicot has practiced to date, it would be unreasonable to now trust him when he says that he will take great care to protect the confidential and proprietary information of Softrax from disclosure to NetSuite – even were he capable of doing so.

26. Mr. Rasicot has the skills and experience to find employment with many companies other than our competitors. We have only asked that he do so.

Signed under the penalty of perjuries this 29th day of July, 2005.

Robert D. O'Connor, Jr.

A TRUE COPY
Attest: Mary C. Kenney
Deputy Assistant Clerk
9/1/05

Exhibit A

O'CONNOR AFFIDAVIT - EXHIBIT A

SOFTRAX CORPORATION

NONCOMPETITION, NONDISCLOSURE AND
INVENTIONS AGREEMENT

This Agreement is made among SOFTRAX Corporation, a Delaware corporation (the "Company"), and the undersigned employee of or consultant to the Company (the "Employee").

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the Employee hereby acknowledges and agrees as follows:

1. Introduction. As a result of his/her relationship with the Company, and because of the nature of his/her responsibilities, the Employee has acquired or hereafter will acquire valuable trade secrets, proprietary data and confidential information with respect to the Company and its business. In view of the foregoing, the Employee acknowledges that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company that the Employee undertakes the obligations contained in this Agreement.

2. Noncompetition. (a) The Employee shall not, at any time during the term of his/her employment with Company or during the "Noncompete Period" (as defined in paragraph (b) of this Section), directly or indirectly (either for his/her own account or as a stockholder, officer, director, employee, partner, consultant, joint venturer, lender or in any other capacity whatsoever), engage in or have any interest whatsoever in any "Prohibited Business" (as defined in paragraph (c) of this Section); provided, however, that the foregoing shall not preclude the Employee from acquiring or owning solely for investment purposes up to five (5%) percent of the combined voting power of the outstanding capital stock of a publicly held company. The Employee also shall not, during the term of his/her employment with Company or during the Noncompete Period, accept employment, either directly or indirectly, with any entity which, as of the Severance Date, was either a customer of the Company or had been directly solicited by the Company with a view toward establishing a customer relationship.

(b) For purposes of this Section, the term "Noncompete Period" shall mean the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the "Severance Date").

(c) For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

3. Nonsolicitation. The Employee shall not, at any time during the term of his/her employment with Company or during the Noncompete Period:

(a) directly or indirectly (except on behalf of the Company), solicit or attempt to solicit, divert or attempt to divert, handle or attempt to handle or service or attempt to service the account or business of any customer which as of the Severance Date or during the one (1) year period prior thereto was a customer of the Company or was directly solicited by the Company with a view toward establishing a customer relationship; or

(b) directly or indirectly recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company terminate his employment with, or otherwise limit or cease his relationship with, the Company; or

(c) directly or indirectly interfere or attempt to interfere in any way with the Company's relationships with any of its customers, sales representatives, suppliers, key advisors or consultants, including, without limitation, inducing or attempting to induce any customers, sales representative, supplier, key advisor or consultant to terminate or change the terms of its dealings with the Company.

4. Nondisclosure. The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the

Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information were communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company. The Employee agrees that such trade secrets, proprietary data and confidential information include but are not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements' and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives. Information that is proprietary or confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Notwithstanding the foregoing, the Employee may disclose such trade secrets, proprietary data and confidential information only to the extent that disclosure thereof is required (1) in the course of his/her performing services for or on behalf of the Company, or (2) by a court or other governmental agency of competent jurisdiction, provided the Employee promptly notifies the Company and cooperates fully with the Company in obtaining any available protective order or the equivalent prior to the disclosure of such information. This provision does not apply to any information which legally is or becomes generally known to the public from authorized sources other than the Employee.

5. Title to Certain Property. All tangible materials including, but not in any way limited to, printouts, specifications, models, books, records, manuals, sales literature, training materials, customer files, correspondence, documents, contracts, orders, memoranda, notes, agreements, invoices and receipts (and all copies and reproductions thereof) in the possession or control of Employee which in any way relate or pertain to the Company's business or the business of any Affiliate of the Company, whether furnished to the Employee by

the Company or prepared, compiled or acquired by the Employee shall be the sole property of the Company.

6. <u>Inventions: Disclosure, Assignment and Further Assurances</u>. If at any time or times prior to the Severance Date, the Employee shall (either alone or with others) make, conceive, discover, reduce to practice or become possessed of any invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "Inventions") that relates to the business of the Company, or any of the products or services being developed, manufactured or sold by the Company, or results from tasks assigned the Shareholders by the Company or results from the use of premises or equipment owned, leased or contracted for by the Company, such Inventions and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and the Employee shall promptly disclose to the Company (or any persons designated by it) each such Invention and hereby assigns any rights the Employee may have or acquire in the Invention and benefits and/or rights resulting therefrom to the Company and its assigns without compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto with all necessary plans and models to the Company.

The Employee shall promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, any other invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) made, conceived, discovered, reduced to practice or possessed by the Employee (either alone or with others) at any time or times prior to the Severance Date for the purpose of determining whether they constitute "Inventions," as defined herein.

Upon disclosure of each Invention to the Company, the Employee shall, at the request and expense of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:

(a) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

In the event the Company is unable, after reasonable effort, to secure the Employee's signature on any letters patent, copyright or other analogous protection relating to an Invention, whether because of the Employee's physical or mental incapacity or for any other reason whatsoever, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney-in-fact, to act for and in their behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

7. Absence of Restrictions Upon Disclosure and Competition. The Employee represents and warrants that his/her performance of all of the terms of this Agreement and of services on behalf of the Company does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by him/her in confidence or in trust prior to his/her becoming associated with the Company or refrain from competing, directly or indirectly, with the business of any previous employer or other party. The Employee has returned all documents and materials belonging to any of his/her former employers. The Employee will not disclose to the Company or induce any of the Company's employees to use proprietary information or trade secrets of any of their former employers. The Employee has not entered into, and hereby agrees that he/she will not enter into, any agreement either written or oral in conflict herewith.

8. Compliance with Company Nondisclosure Obligations. The Employee hereby acknowledges that the Company may hereafter be

subject to non-disclosure or confidentiality agreements with third parties pursuant to which the Company must protect or refrain from use of proprietary and/or confidential information which is the property of such third party or other party. The Employee hereby agrees upon the direction of the Company to be bound by the terms of such agreements in the event the Employee has access in the course of his/her relationship with the Company to the proprietary and/or confidential information protected thereunder to the same extent as if the Employee was an original individual signatory thereto.

9. Certain Remedies. In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled, in addition to any other legal rights or remedies which it may have, to maintain an action for preliminary and permanent injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate. In the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action; provided, however, that if there is no clear prevailing party in such action, the court or arbiter hearing such action will make the determination as each party's responsibility for paying such costs and expenses.

10. Reasonable Covenants. The Employee acknowledges and agrees that the restrictive covenants contained herein (a) are necessary for the reasonable and proper protection of the goodwill of the Company and its trade secrets, proprietary data and confidential information, (b) are reasonable with respect to length of time, scope and geographic area and (c) will not reasonably prohibit the Employee from engaging in other businesses or employment for the purpose of earning a livelihood following the termination of his/her relationship with the Company.

11. Severability. Each provision of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. If the

invalidity or unenforceability of any provision hereof is due to unreasonableness of the time or scope or geographic extent of any covenant or restriction, said covenant or restriction nevertheless shall be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction.

12. Assignment and Benefit. This Agreement shall be binding upon the Employee's heirs, executors and administrators. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors and assigns.

13. Waiver. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

14. Entire Agreement. The Employee acknowledges receipt of this Agreement, and agree that with respect to the subject matter hereof it is the entire agreement with the Company, superseding any previous oral or written communication, representation, understanding or agreement with the Company or any representative thereof.

15. Notice. All notices, requests, demands and any other communications hereunder shall be made in writing and shall be deemed to have been duly given if delivered in person or sent by registered or certified mail, postage prepaid, if to the Company addressed to the President of the Company at the Company's principal executive office, and if to the Employee at the address appearing beneath his/her signatures to this Agreement. Any party may change its or his/her address for notice hereunder by giving notice of change of address in the manner herein provided.

16. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law principles. The Employee hereby submits to the personal jurisdiction of the courts of the Commonwealth of Massachusetts and the Federal Courts of the United States of America located in such commonwealth in respect to the interpretation and enforcement of

the provisions of this Agreement and all transactions contemplated hereby.

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ THE FOREGOING EMPLOYEE NON-COMPETITION, NONDISCLOSURE AND INVENTIONS AGREEMENT AND UNDERSTANDS AND AGREES TO EACH AND EVERY PROVISION. THE EMPLOYMENT FURTHER ACKNOWLEDGES THAT THIS AGREEMENT WAS DRAFTED BY COUNSEL ON BEHALF OF THE COMPANY AND THAT HE/SHE HAS BEEN GIVEN THE OPPORTUNITY TO CONSULT COUNSEL OF HIS/HER OWN CHOOSING AND HAS EITHER DONE SO OR VOLUNTARILY CHOSEN NOT TO DO SO PRIOR TO THEIR EXECUTION HEREOF.

Dated: 3/13/04

EMPLOYEE:

[signature]
Signature

Patrick Rasicot
Printed Name

Address: 36 Cranberry Rd.
N. Attleboro, MA
02760

225627

Exhibit B

## O'CONNOR AFFIDAVIT - EXHIBIT B

**From:** Robert O'Connor
**Sent:** Wednesday, June 15, 2005 11:41 AM
**To:** SOFTRAX Global
**Subject:** Ode to Pat Rasicot...

Everyone:

I wanted to take a few minutes of your time to salute Pat Rasicot via email. The timing of his resignation does not afford us the luxury of well deserved public appreciation. His personal schedule has a conflict that prevents him from joining us in New Hampshire.

Pat has played an invaluable role in the company's history and growth. Pat joined the company as an implementation project manager and consultant. He dedicated himself to thoroughly learning Operations and Financials and implemented many of our earliest and most challenging customers. The success of each of these implementations was a requirement to getting our company off-the-ground.

Pat later decided to use his product knowledge to be one of our first product mangers. In this capacity, Pat proved a great resource to our customers as well as our development, customer care, services and other internal organizations. He has always been the "go-to-person" of areas of complex issues that our customers and prospects face. While we may not have gotten ideas and answers with "service and a smile", we always got the best solution after his thoughtful consideration. In addition to these duties, Pat maintained an unofficial HR function when he frequently hosted employees in his cube to discuss current world events or latest company development!

Pat has decided it's time for a change and will be spending the summer sailing. We've asked him to help in some transitional training so we hopefully have not seen the last of him. Please join me in thanking Pat for his countless contributions to the birth and growth of Softrax. We wish him well in future endeavors and know that he will always remain a close friend of the company.

Best regards,

Bob

3.3

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV 05 01342

| | |
|---|---|
| SOFTRAX CORPORATION, Plaintiff, | ) |
| v. | ) |
| PATRICK RASICOT, Defendant. | ) |

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

AFFIDAVIT OF GOTTFRIED SEHRINGER

I, Gottfried Sehringer, state under penalty of perjury as follows:

1. I am currently the Vice President of Marketing for Softrax Corporation ("Softrax" or the "Company") and have held this position since June 25, 2001.

Position and Job Responsibilities of Mr. Rasicot

2. Within approximately two months after my arrival at Softrax, the Company's Product Managers, including Patrick Rasicot, were moved into the Marketing department and began to report directly to me. The duties and responsibilities of Mr. Rasicot and the other Product Managers included writing software development specifications, understanding our customer base, prioritizing customer product interests, responding to customer concerns and product issues, developing product strategies and supporting the sales, pre-sales, implementation services and technical support services in closing sales and then supporting customer satisfaction during the post-sales period.

3. Shortly thereafter, in October 2001, Mr. Rasicot's title was changed to Senior Product Strategist. He continued to have the duties and responsibilities he had as a product manager, but the new title expressly recognized the senior and strategic role Mr. Rasicot played at Softrax. There was only one other Senior Product Strategist.

4. As Senior Product Strategist, Mr. Rasicot was the only product manager responsible for Softrax's three flagship product suites. His responsibility for these products was comprehensive. For example, Mr. Rasicot was responsible for: determining the product development direction for these products; defining the product specifications and functionalities for product extensions and enhancements; prioritizing the work on product functionalities and bug fixes; addressing customer issues during the pre-sales process, the implementation process and the post go-live period; training the sales, pre-sales and services people on the product functionality, new product developments and product positioning; supporting the sales and pre-sales group in providing product demonstrations to prospects; presenting and positioning the products and plans for future product development to customers and prospective customers during regional customer meetings and during our 2004 customer 'roadshow;' supporting the customer support group in resolving product issues; working directly with customers to solve customer issues; providing support to implementation services personnel in configuring and implementing the products to meet the customer's specific business process needs; troubleshooting product issues for sales, customer support and services people; and staying current on applicable legal and accounting rules and regulations in order to keep our revenue management products current and in compliance with the same. In fulfilling these responsibilities, Mr. Rasicot was immersed in confidential and proprietary information relating to Softrax's products and Softrax's customers' business information.

5. Mr. Rasicot's position required extensive involvement with our installed customer base as well as with our prospective customers – a fact which he not only acknowledged but vaunted. For example, in his self-evaluation (completed in the spring of this year as part of his 2005 Employee Performance Review and attached hereto as Exhibit A), Mr. Rasicot lists among his accomplishments:

- "Worked continually with customers on support issues so that Customer Support could be lauded. This included last-second, drop-everything, 'you're the only one that can help us' trips to customer sites.
- "Played a key role in securing numerous sales by working with sales, presales and the prospects up until the time of closure."

My recollection is that Mr. Rasicot also presented at all but one of our customer meetings during last year's roadshow, and that the reason he did not present at that one meeting was because he had to travel to a prospective customer's site in support of a potential sale.

6. Mr. Rasicot supported and worked with most of the other operational groups in the Company in connection with product development, customer support and satisfaction, and internal training on products and product positioning. For example, and again in his own words, Mr. Rasicot lists among his recent accomplishments in 2004-2005:

- "Spearheaded numerous major & point releases of the core products despite spending over 50% of my time assisting other areas of the organization in non-product management activities; . . .
- "Supported all VSOE, SOP, Revenue and general accounting design and QA for new products. Supported all of development, customer, customer support and professional services support and training – even though I have no background in any of this."

7. As a Senior Product Strategist, Mr. Rasicot was also responsible for understanding the needs of our different markets, developing product positioning and determining product development direction for our three core products. Among the "Job Objectives and Goals" identified in his 2005 Employee Performance Review were:

- "Support successful Softrax 8 roll-out
- Plan and communicate post 8.0 product strategy
- Continue to plan and execute the Contrax Roadmap . . .
- Assess and communicate market needs beyond customer request . . .
- Work with the entire team to support other key initiatives (revenue manager/BI)"

Mr. Rasicot has intimate knowledge not only of our customers, but also of our marketing and sales strategies and the nature of our sales cycles, and often stepped in to provide product demonstrations or other support during the sales process. Again, the bulk of this work required his drawing on extensive confidential and proprietary information relating to our products, our product strategies and our customers' business needs.

8. Mr. Rasicot was not only key to developing product strategy, he was also central to training our sales, pre-sales and services people on product functionality and product positioning. His training of the services organization was often taped so it could be more readily reviewed or used in the field. I cannot recall any national sales meeting (typically held on at least a quarterly basis) or any training session for new sales or pre-sales personnel, for which Mr. Rasicot was not on the training agenda, formally or informally, as a presenter of product functionality, product positioning, product development roadmaps or otherwise.

9. Mr. Rasicot was well compensated by Softrax. His annual salary at the time he left the Company in June 2005 was $101,850.

<u>Mr. Rasicot's Departure</u>

10. On June 3, 2005, I learned that Mr. Rasicot was resigning from the Company. When I asked him why and what he was planning to do, he told me that he was burned out, and wanted to take the summer off, think about life, and figure out what he wanted to do with his future. I was surprised by his resignation, and given his comprehensive and in depth knowledge of our products, our customers and our organization, knew that we would initially struggle to fill the gap. However, I appreciated and respected an individual's need to reassess his or her life at any given point. Mr. Rasicot and I worked out the plans for his departure which included leaving open the possibility of his returning to Softrax after his 'summer off.' I did not give the matter further thought until I learned that he had started working for NetSuite.

NetSuite Is a Direct Competitor to Softrax

11. NetSuite competes directly with Softrax in providing an enterprise software application that supports front and back office financial and operational functionality. NetSuite's target industries include software vendors and professional services companies; in fact NetSuite lists on its website software vendors at the top of the list of the industries to which it markets. Softrax has a strong market presence with both software vendors and in the area of professional services. Increasingly, we are encountering NetSuite as a competitor with prospective customers, particularly with prospects in the software industry.

12. As confirmed by NetSuite's own published statements, NetSuite software is designed for use by software companies, and is marketed and sold to software companies, For example, in a press release from May 2004 (a copy of which is attached as Exhibit B hereto), NetSuite announced its "continued penetration of the software vertical market." The release continues:

> "Additionally, NetSuite's advanced customization technology gives them [software vendors] the ability to tailor NetSuite to meet their specific needs in the software industry. . . .
>
> "Many features in NetSuite are tailor-made for the software industry including:
>
> - NetSuite Advanced Billing allows software companies to create unique billing schedules on a line item by line item basis; for instance, to bill for a software service on a monthly basis, but bill for consulting 100% up front.
>
>   . . .
> - "Later this year, NetSuite will add revenue recognition, a key accounting feature for software companies.
>
> NetSuite itself [a software company] runs all back-office and front-office operations on the product, and more than 100 software companies currently use the product . . ."

Also, as noted above, NetSuite also lists on its website software vendors as the first industry in the list of the industries to which it markets. Needless to say, the list is not alphabetical.

Mr. Rasicot's Position at NetSuite and
The Irreparable Harm It Poses to Softrax

13. On or about July 15, 2005, I learned that Mr. Rasicot may have been untruthful when he told me he was taking the summer off to think about life and his next direction. The following Monday, July 19, 2005, Jake Fennessy, Softrax's Chief Financial Officer told me he had heard that Mr. Rasicot may have become affiliated with NetSuite and, therefore had contacted Mr. Rasicot to see if the rumor was true, in which case, Mr. Rasicot would be his non-competition obligation to Softrax Mr. Fennessy reported that Mr. Rasicot said that he had started as an outside contractor (not an employee) for Net Suite, working two days a week performing implementations of NetSuiter software for customers in the manufacturing area. Mr. Rasicot repeated this representation to David Milligan, Softrax's Vice President, Customer Services, in a subsequent telephone call.

14. The information that Mr. Rasicot was working as a contractor for NetSuite was of serious and immediate concern to me. NetSuite is one of Softrax's most aggressive competitors. Only that week, we had learned that NetSuite had added to its website apparently in order to appear more competitive with our own. The additions included new functional product descriptions around the issues, for example, of revenue management, revenue recognition and renewals management. It also included new product positioning and value statements similar to ours and relating to the management of revenue recognition and complex billing for software companies. I also knew that NetSuite had tried, unsuccessfully, to hire two of our top sales representatives and in the process had made false statements about Softrax and Softrax's future. In addition, we had learned from customers, with whom we had successfully competed for business against NetSuite, that NetSuite was expressly hoping to take market share from Softrax in the area of revenue management software.

15. The fact that Mr. Rasicot said he was only working as a part time contractor and only implementing NetSuite software did little to allay my concerns. In that position, both his interaction with customers and his interaction with different groups within NetSuite to support the implementation process, would inevitably result in giving NetSuite a competitive boost because of the inside knowledge and expertise Mr. Rasicot had developed at Softrax. Using the confidential information of Softrax, he could help NetSuite deliver smoother implementations, be more responsive to customer needs and interests, bring financial and accounting domain knowledge to respond to customer and product issues, support product positioning with customers, and assist NetSuite internal personnel in the resolution of customer and product issues encountered during the implementation process.

16. In addition, the fact that Mr. Rasicot had lied to me and others in Softrax about his post-resignation plans, only deepened my concern. He knew that NetSuite was a direct competitor of Softrax and accordingly knew that Softrax would vehemently object to his having any affiliation with that company. His deception also confirmed my belief that he knew the 'value' he was bringing to NetSuite and that he intended to share it with them.

17. On July 27, 2005, I learned that Mr. Rasicot had again lied to Softrax regarding his activities. On July 19, 2005, Softrax's counsel sent a letter to Mr. Rasicot, demanding immediate compliance with his non-competition and non-disclosure agreement. A copy of the letter is attached hereto as Exhibit C. In response, Mr. Rasicot sent our counsel an email dated July 22, 2005, promising a substantive reply by July 27, 2005 (Exhibit D hereto). Mr. Rasicot did not reply as promised. Instead a lawyer for NetSuite sent our counsel a letter on July 27, 2005 (the "NetSuite Letter," copy attached hereto as Exhibit E). The NetSuite letter described Mr. Rasicot as a NetSuite "employee" and indicated that Mr. Rasicot was working full time, as his compensation was reported as "up to 50 greater than that to which he received at Softrax."

18. The news that Mr. Rasicot had again lied to us, this time with respect to the degree of his affiliation with NetSuite, appalled me on two fronts. First, here was a man who had benefited greatly from his years at Softrax, both professionally and financially, to whom Softrax had been consistently loyal and whom Softrax had, in all innocence, sent off to his future with best wishes and high accolades. The betrayal of trust and lack of integrity was

simply dismaying. Second, on a professional level, Mr. Rasicot's position with NetSuite, as described by NetSuite put Softrax in critical jeopardy.

19. According to the NetSuite Letter, and in direct contradiction to what Mr. Rasicot told the Company, Mr. Rasicot is an employee of NetSuite and holds the position of Subject Matter Expert. The NetSuite Letter contends that position is different than the position Mr. Rasicot held at Softrax. But the contention is based on NetSuite's erroneous understanding of Mr. Rasicot's position at Softrax. NetSuite says that at Softrax Mr. Rasicot

> "helped write certain specifications and worked with the product developers in their efforts to design Softrax's product. It is our understanding that he did not have broad knowledge of Softrax's customers and its sales methods and he rarely, if ever, worked directly with customers." (Ex E, p.2)

This description of Mr. Rasicot's position at Softrax is completely inaccurate, as demonstrated in paragraphs 4-8 above and stated explicitly in Mr. Rasicot's own words to Softrax. As Mr. Rasicot would be the primary source of NetSuite's knowledge regarding his responsibilities at Softrax, it appears Mr. Rasicot has also deceived his new employer.

20. Given that NetSuite's understanding of what Mr. Rasicot did at Softrax was entirely inaccurate, it is no surprise that NetSuite is likewise inaccurate in asserting that what Mr. Rasicot is now doing for NetSuite is "dramatically different. According to NetSuite, his position with them

> "requires him to analyze public laws and regulations and to work with members of NetSuite's sales force and professional services teams to educate them on how to show NetSuite's product to customers. Moreover, after he is trained on NetSuite's product, he will work directly with NetSuite's customers – something he did not do with Softrax." (Ex. E, p.2)

As demonstrated above, and confirmed in Mr. Rasicot's own words, Mr. Rasicot performed these precise functions at Softrax. Specifically, at Softrax Mr. Rasicot was responsible for understanding and analyzing financial reporting rules and regulations (including, without limitation certain requirements from the Sarbanes Oxley Act as well as SEC regulations on financial and other reporting requirements and published accounting rules, statements and interpretations) so as to ensure (a) that such regulations, rules and requirements were supported by our products, and (b) in order to help the sales and pre-sales personnel position our products for prospective customers. Using the precise language from the NetSuite Letter describing Mr. Rasicot's current position at NetSuite, Mr. Rasicot also, at Softrax, regularly worked with the "sales force and professional services teams to educate them on how to show NetSuite's [Softrax's] product to customers." Exhibit E, p. 2. Mr. Rasicot also worked directly, extensively and continually with Softrax's customers in both the pre-sales and post-sales stages.

21. To be clear, Mr. Rasicot's position at NetSuite makes him uniquely able to use confidential and proprietary knowledge regarding the domain, Softrax's customer base and market, and Softrax's products, -- in each case knowledge he gained through his employment with Softrax -- to train the NetSuite sales force and professional services team to compete against Softrax in the marketplace.

22. Mr. Rasicot has said to Softrax -- in the same conversations in which he misrepresented the nature and extent of his NetSuite association––that he does not intend to disclose any confidential or proprietary Softrax information to NetSuite. Given the string of deceptions he has practiced to date, this is hardly reassuring. Moreover, given the extent and nature of the proprietary information he obtained from Softrax relating to Softrax products and customers, Softrax's marketing and selling strategies including its product positioning, and Softrax's future product plans, it would be impossible for Mr. Rasicot not to disclose such information to NetSuite, to NetSuite's direct competitive advantage and to Softrax's direct and deeply injurious disadvantage.

Signed under the penalty of perjuries this 29th day of July, 2005.

Gottfried Sehringer

A TRUE COPY
Attest: Mary E. Kinney
Deputy Assistant Clerk
9/1/05

Exhibit A

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## General Instructions

This performance appraisal form provides company-wide standards for evaluating employee performance against specific criterion and is an important part of the ongoing process of employee development. It is a communication tool, which enables the employee and supervisor to measure performance against mutually agreed upon standards and objectives. This performance appraisal form should be completed as part of the annual review process for all employees, but may be used at any time to document performance.

To get the maximum benefit from performance appraisals, employees and supervisors should be equally involved in the appraisal process. This Evaluation Form include the following sections

I. Performance Criterion – Supervisor's Evaluation
II. Performance Criterion – Employee Self Evaluation
III. Accomplishments, Jobs Objectives and Goals
IV. Areas of Strength and Development
V. Career Planning
VI. Additional Comments
VII. Signature Page

Following are guidelines to assist you in this process:

1. The employee enters their identification information by clicking on the header of this page.
2. The employee completes Section II- Employee Self Evaluation and other sections as instructed by his/her supervisor. Once the sections are completed the employee submits the electronic copy of the form to his/her supervisor. The supervisor reads the Employee's Self Evaluation to ensure that the employee's feedback is considered, and then completes Section I-Supervisor's Evaluation. The Supervisor's and the Employee's Self Evaluation will be reviewed together at the"face to face" Performance Review Meeting.
3. Once the form is returned to the supervisor, the Performance Review Meeting will be scheduled with the supervisor and the employee. During this meeting, in addition to review the completed sections, all remaining sections will be completed and new job objectives will be agreed upon and documented.

**The following performance rating definitions should be used.**

Please place an "X" in the box to the right of the appropriate rating in each area in Section I and II.

**Consistently Exceeded (CE)** Performance has been outstanding. All job requirements were consistently exceeded which resulted in outstanding job performance.

**Often Exceeded Requirements (OE)** Performance has been fully satisfactory and often exceeds requirements. All job requirements were successfully met and were often exceeded.

**Fully Met Requirements (FM)** Individual successfully met job requirements. Performance has been satisfactory, meeting all key position requirements. Occasionally exceeded performance expectations in some areas.

**Partially Met Requirements (PM) *** Individual successfully met some but not all fundamental requirements of job. Performance improvement is needed to fully meet job requirements.

**Did Not Meet Requirements (DM)*** Job performance did not meet any key requirements of job. Performance must be improved to meet fundamental requirements of job.

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
|---|---|---|---|---|
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION I: PERFORMANCE CRITERION - SUPERVISOR'S EVALUATION

Following are job-related skills and abilities. Consider each characteristic separately and check the appropriate level of performance using the performance definitions as a guide. Please give comments and examples illustrating the reason for your ratings.

**Job Knowledge and Technical Skills:** Level of proficiency regarding content and procedures of the job and field of specialization. Includes ability to acquire and apply current as well as new knowledge and skills.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | X | | | | | | | | |

**Quality of Work:** Thoroughness, accuracy and attention to detail in executing job assignment and special projects.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Productivity:** Amount of work accomplished based on reasonable and expected levels.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Reliability:** Attendance and completion of job responsibilities within established time frames and with normal supervision.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Initiative:** Originates, develops and follow through on constructive tasks and responsibilities in a resourceful and logical manner.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Problem Solving Skills:** Effectively resolves situations and issues through accurate diagnosis, negotiation and execution.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | X | | | | | | | | |

**Organizing Skills:** Effectively plans, prioritizes and schedules workload to ensure on time completion of responsibilities.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Analytical Skills:** Ability to analyze and evaluate information in a logical and systematic manner.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Adaptability:** Productively adjusts to changes in the work situation, such as new people, ideas, assignments, procedures, etc.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Working Relationships:** Work effectively with others to achieve organizational objectives. Resolves issues appropriately. Recommendations are respected and readily considered by others.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | X | | | | |

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

**Communication/Documentation Skills:** Effectively communicates information verbally and in writing. This includes documentation of work such as records or reports, and presentation skills.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | | *FM | X | *PM | | *DM | |

**Judgment:** Ability to judge when to act independently, delegate downward, or refer situations to upper management. Actions are consistent with corporate direction and directives.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | X | *FM | | *PM | | *DM | |

**Employee Relations Skills:** Develops and maintains positive work climate for subordinates. Demonstrates consistency and fairness in administering policies and procedures.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | | *FM | X | *PM | | *DM | |

**Please comment on the overall value of the employee to your group.**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | | *FM | | *PM | | *DM | |

Pat, You are a key contributor to the marketing team. I rely on and trust your judgment and advice regarding product functionality and problem resolutions. You have jumped in and solved many customer issues on short notice and your expertise is valued greatly by many coworkers and customers. Thank you for your commitment and many important contributions to Softrax.

P.S.: I know those ratings scales are always hard to fill out. I tend to start more in the middle to leave some room for highlights and be able to differentiate somewhat between the different areas.

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION II: PERFORMANCE CRITERION - EMPLOYEE SELF EVALUATION

Following are job-related skills and abilities. Consider each characteristic separately and check the appropriate level of performance using the performance definitions as a guide. Please give comments and examples illustrating the reason for your ratings.

**Job Knowledge and Technical Skills:** Level of proficiency regarding content and procedures of the job and field of specialization. Includes ability to acquire and apply current as well as new knowledge and skills.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Quality of Work:** Thoroughness, accuracy and attention to detail in executing job assignment and special projects.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Productivity:** Amount of work accomplished based on reasonable and expected levels.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Reliability:** Attendance and completion of job responsibilities within established time frames and with normal supervision.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Initiative:** Originates, develops and follow through on constructive tasks and responsibilities in a resourceful and logical manner.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Problem Solving Skills:** Effectively resolves situations and issues through accurate diagnosis, negotiation and execution.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Organizing Skills:** Effectively plans, prioritizes and schedules workload to ensure on time completion of responsibilities.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Analytical Skills:** Ability to analyze and evaluate information in a logical and systematic manner.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Adaptability:** Productively adjusts to changes in the work situation, such as new people, ideas, assignments, procedures, etc.

| *CE | | *OE | X | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Working Relationships:** Work effectively with others to achieve organizational objectives. Resolves issues appropriately. Recommendations are respected and readily considered by others.

| *CE | | *OE | X | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

**Communication/Documentation Skills:** Effectively communicates information verbally and in writing. This includes documentation of work such as records or reports, and presentation skills.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Judgment:** Ability to judge when to act independently, delegate downward, or refer situations to upper management. Actions are consistent with corporate direction and directives.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Employee Relations Skills:** Develops and maintains positive work climate for subordinates. Demonstrates consistency and fairness in administering policies and procedures.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | X | *FM | | *PM | | *DM | |

**Please comment on your overall self-evaluation of your performance and it's value to the group.**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | | *FM | | *PM | | *DM | |

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | |
|---|---|---|---|
| Employee Name | Pat Rasicot | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | Dept.: | Marketing |
| Review Period | From June 2001 | To | February 2005 |

## SECTION III-A: ACCOMPLISHMENTS

List Accomplishments from previous period:

Spearheaded numerous major & point releases of the core products despite spending over 50% of my time assisting other areas of the organization in non-product management activities.

Played a major role in getting the quality of Op's, Fin's and Contrax to the level that they are now despite VERY limited resources.

Worked continually with customers on support issues so that Customer Support could be lauded. This included last-second, drop-everything, "you're the only one that can help us" trips to customer sites.

Supported all VSOE, SOP, Revenue and general accounting design and QA for new products. Supported all of development, customer, customer support & professional services support and training – even though I have no background in any of this.

Played a key role in securing numerous sales by working with sales, presales and the prospects up until the time of closure.

## SECTION III-B: JOB OBJECTIVES AND GOALS

Evaluate* accomplishments against goals and objectives established for previous period.

*Consistently Exceeded Requirements (CE) *Often Exceeded Requirements (OE) *Fully Met Requirements (FM) *Partially Met Requirements (PM) *Did Not Meet Requirements (DM)

## SECTION III-C: JOB OBJECTIVES AND GOALS

List New Goals and Objectives for period beginning________________ and ending ________________.

Support successful Softrax 8 roll-out

Plan and communicate post 8.0 product strategy

Continue to plan and execute the Contrax Roadmap

Re-engineer internal processes and communications to reduce the fire drills and improve your ability to work on the above points.

Assess and communicate market needs beyond customer request

Help make the extended development organization (Mindtree) work

Work with the entire team to support other key initiatives (revenue manager/ BI)

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | |
|---|---|---|---|
| Employee Name | Pat Rasicot | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | Dept.: | Marketing |
| Review Period | From June 2001 | To | February 2005 |

## SECTION IV: AREAS OF STRENGTH AND DEVELOPMENT

Identify areas of strength as well as those where improvement is needed. This section is to be discussed during the performance appraisal meeting.

### A. Areas of Strength:

Product knowledge
Ability to adjust to constantly changing priorities
Time management and prioritization
Coordinating projects and personnel from all areas in order to accomplish our objectives
Babysitter - I would call that fire fighter

### B: Areas of Development:

Pat, your are well respected and needed when "fires" need to be fought. However I do encourage you, with every fire, to look at root of the issue and work on avoiding the fire altogether. I know this will not be always possible. But I am convinced, that with persistence and pro-active communications this will get better

Related to the issues below, here are some more general areas:
Product strategy development
Market planning
Product and market promotion
Product Communications

### C. Plans for Development/Improvement (Be specific as to action plans and target dates):

**Action Plan** (including resources needed).

| Event | Resources | Target Date |
|---|---|---|
| Take product management course | | |
| | | |
| | | |
| | | |
| | | |

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION V: CAREER PLANNING

### A. Identify employee's career goals/ambitions.

Don't take this statement as negative – just a reality: I need to get "Director" on my resume – it's way overdue. I fully realize that there is no opportunity for this at Softrax – oh well, that's life. In the meantime, until an opportunity arises, I will just continue with what I'm doing.

Pat, I hear what you are saying, but you know that this would be difficult with the current structure and company size. If you are truly looking for the Product Management Director position I would encourage you to dive into some of the issues highlighted in the development area. Those will get you there. I think previously Lou, and no the to-be-hired Director could help you get that experience.

However it is also reasonable to stay more on the technical side. However when and if that could lead to the "Director" in the title I cannot say at this point.

### B. Identify ways to help employee achieve these goals.

Plans for Career Development

| Event for Career Development | Resources | Target Date |
|---|---|---|
| Take product management course<br><br>Proactively look for project to expand your current responsibilities | | |

## SECTION VI: EMPLOYEE ADDITIONAL COMMENTS

Never thought you'd actually ask --- and in the spirit of openness and honesty – here you go…..

The past fours years at Softrax have seen multiple new products & customer additions. These additions have obviously made the workload on the PM group grow increasingly larger. With these additions and growth in responsibilities came a decrease in the size and bandwidth of the PM group. This was to be expected due to the economic conditions of the company and the PM group continually stepped up to the task. Unfortunately, this also led to certain things not getting accomplished (product research etc) - this was looked upon negatively by the Management Team – thus, the hiring of Lou Pereira (please don't argue this point). Instead of having been recognized as stepping up and going the extra mile in the time of need, the opposite occurred and the perception was that we were either not willing or capable of accomplishing our objectives. This, accompanied by the constant lauding (at company meetings) of what "fantastic" jobs that the other groups in the company have done, have done nothing but bring the PM group down – especially when we spend over 50% of our time bailing out these other groups.

To add the icing to the cake – over the past few quarters, while other groups have been adding personnel, we have added nothing that will help us get out of the situation that we are in (HANDS-ON help). The group has given and given over the past few years – it's time for Softrax to step up and give a little back.

In conclusion, we are not blind – as a matter of fact we are probably the most "connected" of any group in the company. We see and hear who gets what in the way of compensation. We see the bonuses in development, we see the commissions to sales, pre-sales, LQM's, Marcom etc. These are justified and deserved by those departments. The issue is that, once again, who supports these departments? Who performs demo's for them? Who is constantly helping them out so that they can accomplish their objectives? To add insult to injury, the small reward system instituted last year relating to being compensated for pre-sales work was taken away – Thanks – that was really justified.

Thank you and good day.

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategistpecialist |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
|---|---|---|---|---|
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION VII - SIGNATURE PAGE

| | | | |
|---|---|---|---|
| Employee Name | Pat Rasicot | | |
| Employee Signature | [signature] | Date | 2-15-05 |

| | | | |
|---|---|---|---|
| VP Name | G. SEHRINGER | | |
| VP Signature | [signature] | Date | 2/15/05 |

| | | | |
|---|---|---|---|
| Human Resources Name | | | |
| Human Resources Signature | | Date | |

NOTE: The employee's signature confirms she/he has read the contents of this Employee Review Form.

Exhibit B

**SEHRINGER AFFIDAVIT – EXHIBIT B**

SOFTWARE COMPANIES STANDARDIZE ON NETSUITE

Rejecting the Difficulties of Using Multiple, Disconnected Systems to Run their Business, Hundreds of Software Companies Choose to Run their Entire Business on NetSuite.

SAN MATEO, CA – May 18, 2004 – NetSuite, Inc., today announced continued penetration of the software vertical market by signing up new customers, including San Mateo, CA-based Biz360® Inc. (replacing salesforce.com/Peachtree); Olympia, WA-based Retail Management Solutions (replacing MAS 90/Siebel OnDemand); Houston, TX-based Postmark DMS, LLC (replacing QuickBooks/Sales Cycle); and Bangkok, Thailand-based QTranslation (replacing salesforce.com/home-grown accounting software). These new wins add to the more than 100 software companies around the world who have standardized on NetSuite. NetSuite and its customers are holding a Webinar on May 19 at 11:00 a.m. PT / 2:00 p.m. ET to discuss the benefits of managing their business with a single, integrated Web-based solution to manage software business processes using new Web-based technology. For more information, please go to www.netsuite.com/sba. NetSuite's product offerings include NetSuite, NetERP, NetCRM, and Oracle® Small Business Suite. The Oracle Small Business Suite name is used under license from Oracle Corporation (NASDAQ: ORCL).

One commonality these companies had prior to using NetSuite is that they all used disparate software applications to run their business – one for financials, one for sales, one for customer service and support, one for inventory management, one for marketing. Frustrated with the cost and complexity of using different software packages, these companies chose NetSuite as the one solution to automate their business operations from financials, to inventory management, to lead management, to sales and marketing. Additionally, NetSuite's advanced customization technology gives them the ability to tailor NetSuite to meet their specific needs in the software industry. Also, because it is an on-demand, Web-based service, NetSuite eliminates the pain of managing, upgrading and maintaining traditional software.

Many features in NetSuite are tailor-made for the software industry including:

- The NetSuite Customer Center allows customers to easily check account status information, including bill paying, checking for new product releases, and logging support cases.
- The NetSuite Partner Center allows software companies to give third-party resellers the same functionality as they give internal sales reps. Leads can be distributed, forecasts can be updated, MDF can be tracked and used, and orders can be placed all through the NetSuite Partner Center.
- NetSuite's customer service functionality is powerful as it easily integrates with third-party defect tracking products, allowing support personnel to identify and

log newly discovered issues. As well, NetSuite allows customers to be updated quickly about the status of their reported issues and the target time for fixes. In a future release, a defect and issue tracking module will be included with NetSuite.

- NetSuite Advanced Billing allows software companies to create unique billing schedules on a line item by line item basis; for instance, to bill for a software service on a monthly basis, but bill for consulting 100% up front. This billing schedule then automatically percolates throughout the rest of the system, bringing revenue into the forecast as appropriate as well as generating invoices automatically when they are due to be paid.
- The NetSuite Dashboard contains multiple key performance indicators to allow software companies to monitor sales on a cash, bookings and billings basis in real-time.
- NetSuite customization allows NetSuite functionality to easily be extended to include capabilities like consulting job tracking so that consulting projects can be tracked and billed on the customer record.
- Later this year, NetSuite will add revenue recognition, a key accounting feature for software companies.

NetSuite itself runs all back-office and front-office operations on the product, and more than 100 software companies currently use the product to manage everything from financials, to logistics management to CRM, to eCommerce. Recently added customers include:

Biz360 Inc. (www.biz360.com) based in San Mateo, California, which provides Fortune 500 companies with real-time market intelligence, has standardized their business on NetSuite by replacing salesforce.com and Peachtree. Tamara Macduff, CFO of Biz360 said: "Using separate financial and CRM applications worked on a department level, but didn't give us the integrated view we really needed to understand our business. With NetSuite we will have everything in one place, and having a unified view of critical information will make all the difference."

Retail Management Solutions (www.rm-solutions.com), a provider of point-of-sale technology to the pharmacy industry based in Olympia, Washington previously used Peachtree and UpShot. They considered switching to MAS 90, but in the end they chose NetSuite. The clear reason is illustrated by CEO Brad Jones: "We have salespeople spread across North America, so having Web-based access to the same customer data has been our No. 1 requirement. We used Siebel OnDemand / UpShot for a year and a half, but it only had that one piece: SFA. On the ERP side I had used Peachtree and evaluated MAS 90 previously, but even that product could not do everything we needed. NetSuite has been all we had hoped for and more. From the Advanced Partner Center to the UPS integration to the marketing automation to the customization capabilities, I haven't seen anything in the market that can compete with this."

Postmark DMS, LLC (www.postmarkdms.com), an industry leading marketing company offering superior technology, products, tools and expert services for workshops and seminars, based in Houston, Texas, previously used QuickBooks. "Postmark is

experiencing rapid growth causing our business to need a flexible and effective system," said Roger Marksberry, Managing Partner, Postmark DMS. "Our goal was to find an integrated solution for accounting, financial planning, inventory management, CRM, customer care management, and employee productivity that could also become fully integrated with our own internal systems. NetSuite is the only system that can provide this level of sophistication for a business our size. Five months of operating experience has confirmed the NetSuite selection was a magnificent and profitable decision."

QTranslation (www.qtranslation.com), a growing Southeast Asian translation services firm based in Bangkok, Thailand – with operations in the USA, UK, Sweden, Spain, Singapore and Australia – and serviced by NetSuite Australia distributor Net Return (www.netsuite.com.au), has given up salesforce.com for NetSuite's one solution. Conor Bracken, managing director of QTranslation commented: "We were frustrated with having our data in different systems – salesforce.com, our own custom-built database, and multiple accounting processes. Apart from all the time wasted in data re-entry, we could not see a full picture of the company's performance. We look forward to how NetSuite will help us keep all our data integrated in one, Web-based application."

NetSuite enables companies to manage all key business operations in a single, integrated system, which includes customer relationship management; order management and fulfillment; inventory management; finance; e-commerce and Web site management; and employee productivity. NetSuite is delivered as an on-demand service, so there is no hardware to procure, no large, up-front license fee, and no complex set-ups. Finally, NetSuite's patent-pending "real-time dashboard" technology provides an easy-to-use user interface with role-specific portal views of the application.

For more information about NetSuite visit: www.netsuite.com.

###

Trademark
Oracle is a registered trademark of Oracle Corporation and/or its affiliates.

Exhibit C

EXHIBIT - C

DCG

Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
617.720.2880 ph.
617.720.3554 fx.
www.dcglaw.com

**T. Christopher Donnelly**
**tcd@dcglaw.com**

July 19, 2005

**BY UPS**

Patrick Rasicot
250 Staple Road
Cumberland, RI 02864

Re: Softrax Corporation

Dear Mr. Rasicot:

This firm is trial and litigation counsel to Softrax Corporation ("Softrax" or the "Company"). We are writing because your recent actions have put you in violation of the Noncompetition, Nondisclosure and Inventions Agreement ("Agreement") you signed when you were promoted to Product Manager in March 2000. The Company takes very seriously your violation of that Agreement and, as set forth below, is requiring immediate action from you.

Under the Agreement (copy enclosed for your reference), you specifically agreed not to compete with Softrax for two years following your Softrax employment. You also expressly committed not to serve as a consultant to any Softrax competitor. In addition, you agreed not to disclose or use any Softrax confidential information, trade secrets or proprietary data. You further specifically acknowledged and agreed that any breach of the Agreement's terms by you would cause Softrax to sustain substantial irreparable harm and that in any such event, Softrax would be entitled to seek preliminary injunctive relief as well as any other remedies and damages available at law or in equity. Upon Softrax's success in seeking legal relief, you further agreed that you, personally, "shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by [Softrax] in such action." *Agreement*, para. 9.

On June 3, 2005, you notified Softrax that you were leaving the employment of the Company effective June 17, 2005. For the past several years you had been a Product Manager, involved in all aspects of overseeing product development, from developing functional specifications at a very detailed level, to overseeing the development process, to, after general release, being involved in customer issues with the products, including prioritization of product enhancements and new functionalities and addressing customer

issues with the products. Softrax shared with you, in confidence, extensive, detailed knowledge concerning Softrax's products and products in development. Prior to your final day of employment, Softrax asked you directly about your future work plans. You affirmatively represented that you had not taken a new job and did not have specific plans in mind for your future. You communicated no plan or intention to work for a Softrax competitor.

It now appears that your representations to Softrax were not only false, but deliberately false and intended to mislead the Company. Softrax confirmed yesterday that you are serving as a consultant to NetSuite, a Softrax competitor. This employment is in direct breach of your contractual noncompetition and nondisclosure commitments in the Agreement. Given such breaches, the intensity of competition between Softrax and NetSuite, and your violation of trust when you discussed with Softrax your future plans, Softrax hereby formally demands:

- that you immediately and permanently cease and desist from violating the Agreement, and that you agree to comply with the terms of the Agreement going forward;
- that you immediately cease all consulting, contractual or other services for NetSuite and any other Softrax competitor;
- that you immediately account to Softrax for all Softrax confidential information, trade secrets and proprietary data you have provided to NetSuite or any other person; and
- that you immediately account for all monies you have earned in violation of the Agreement.

Please confirm in writing (or, if you are represented by counsel, have your attorney confirm) your compliance with each element in the foregoing demand promptly, but in no event later than July 22, 2005. Please understand that Softrax expressly reserves all claims, rights and remedies, including without limitation preliminary and permanent injunctive relief, damages, attorneys' fees and costs.

Thank you for your attention to the foregoing.

Very truly yours,

T. Christopher Donnelly

TCD/jlf
enclosure

bcc: Jennifer Grogan, Esq.

SOFTRAX CORPORATION

NONCOMPETITION, NONDISCLOSURE AND
INVENTIONS AGREEMENT

This Agreement is made among SOFTRAX Corporation, a Delaware corporation (the "Company"), and the undersigned employee of or consultant to the Company (the "Employee").

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the Employee hereby acknowledges and agrees as follows:

1. Introduction. As a result of his/her relationship with the Company, and because of the nature of his/her responsibilities, the Employee has acquired or hereafter will acquire valuable trade secrets, proprietary data and confidential information with respect to the Company and its business. In view of the foregoing, the Employee acknowledges that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company that the Employee undertakes the obligations contained in this Agreement.

2. Noncompetition. (a) The Employee shall not, at any time during the term of his/her employment with Company or during the "Noncompete Period" (as defined in paragraph (b) of this Section), directly or indirectly (either for his/her own account or as a stockholder, officer, director, employee, partner, consultant, joint venturer, lender or in any other capacity whatsoever), engage in or have any interest whatsoever in any "Prohibited Business" (as defined in paragraph (c) of this Section); provided, however, that the foregoing shall not preclude the Employee from acquiring or owning solely for investment purposes up to five (5%) percent of the combined voting power of the outstanding capital stock of a publicly held company. The Employee also shall not, during the term of his/her employment with Company or during the Noncompete Period, accept employment, either directly or indirectly, with any entity which, as of the Severance Date, was either a customer of the Company or had been directly solicited by the Company with a view toward establishing a customer relationship.

(b) For purposes of this Section, the term "Noncompete Period" shall mean the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the "Severance Date").

(c) For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

3. <u>Nonsolicitation</u>. The Employee shall not, at any time during the term of his/her employment with Company or during the Noncompete Period:

(a) directly or indirectly (except on behalf of the Company), solicit or attempt to solicit, divert or attempt to divert, handle or attempt to handle or service or attempt to service the account or business of any customer which as of the Severance Date or during the one (1) year period prior thereto was a customer of the Company or was directly solicited by the Company with a view toward establishing a customer relationship; or

(b) directly or indirectly recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company terminate his employment with, or otherwise limit or cease his relationship with, the Company; or

(c) directly or indirectly interfere or attempt to interfere in any way with the Company's relationships with any of its customers, sales representatives, suppliers, key advisors or consultants, including, without limitation, inducing or attempting to induce any customers, sales representative, supplier, key advisor or consultant to terminate or change the terms of its dealings with the Company.

4. <u>Nondisclosure</u>. The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the

Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information were communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company. The Employee agrees that such trade secrets, proprietary data and confidential information include but are not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements' and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives. Information that is proprietary or confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Notwithstanding the foregoing, the Employee may disclose such trade secrets, proprietary data and confidential information only to the extent that disclosure thereof is required (1) in the course of his/her performing services for or on behalf of the Company, or (2) by a court or other governmental agency of competent jurisdiction, provided the Employee promptly notifies the Company and cooperates fully with the Company in obtaining any available protective order or the equivalent prior to the disclosure of such information. This provision does not apply to any information which legally is or becomes generally known to the public from authorized sources other than the Employee.

5. <u>Title to Certain Property</u>. All tangible materials including, but not in any way limited to, printouts, specifications, models, books, records, manuals, sales literature, training materials, customer files, correspondence, documents, contracts, orders, memoranda, notes, agreements, invoices and receipts (and all copies and reproductions thereof) in the possession or control of Employee which in any way relate or pertain to the Company's business or the business of any Affiliate of the Company, whether furnished to the Employee by

the Company or prepared, compiled or acquired by the Employee shall be the sole property of the Company.

6. Inventions: Disclosure, Assignment and Further Assurances. If at any time or times prior to the Severance Date, the Employee shall (either alone or with others) make, conceive, discover, reduce to practice or become possessed of any invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "Inventions") that relates to the business of the Company, or any of the products or services being developed, manufactured or sold by the Company, or results from tasks assigned the Shareholders by the Company or results from the use of premises or equipment owned, leased or contracted for by the Company, such Inventions and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and the Employee shall promptly disclose to the Company (or any persons designated by it) each such Invention and hereby assigns any rights the Employee may have or acquire in the Invention and benefits and/or rights resulting therefrom to the Company and its assigns without compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto with all necessary plans and models to the Company.

The Employee shall promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, any other invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) made, conceived, discovered, reduced to practice or possessed by the Employee (either alone or with others) at any time or times prior to the Severance Date for the purpose of determining whether they constitute "Inventions," as defined herein.

Upon disclosure of each Invention to the Company, the Employee shall, at the request and expense of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:

(a) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

In the event the Company is unable, after reasonable effort, to secure the Employee's signature on any letters patent, copyright or other analogous protection relating to an Invention, whether because of the Employee's physical or mental incapacity or for any other reason whatsoever, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney-in-fact, to act for and in their behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

7. Absence of Restrictions Upon Disclosure and Competition. The Employee represents and warrants that his/her performance of all of the terms of this Agreement and of services on behalf of the Company does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by him/her in confidence or in trust prior to his/her becoming associated with the Company or refrain from competing, directly or indirectly, with the business of any previous employer or other party. The Employee has returned all documents and materials belonging to any of his/her former employers. The Employee will not disclose to the Company or induce any of the Company's employees to use proprietary information or trade secrets of any of their former employers. The Employee has not entered into, and hereby agrees that he/she will not enter into, any agreement either written or oral in conflict herewith.

8. Compliance with Company Nondisclosure Obligations. The Employee hereby acknowledges that the Company may hereafter be

subject to non-disclosure or confidentiality agreements with third parties pursuant to which the Company must protect or refrain from use of proprietary and/or confidential information which is the property of such third party or other party. The Employee hereby agrees upon the direction of the Company to be bound by the terms of such agreements in the event the Employee has access in the course of his/her relationship with the Company to the proprietary and/or confidential information protected thereunder to the same extent as if the Employee was an original individual signatory thereto.

9. Certain Remedies. In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled, in addition to any other legal rights or remedies which it may have, to maintain an action for preliminary and permanent injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate. In the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action; provided, however, that if there is no clear prevailing party in such action, the court or arbiter hearing such action will make the determination as each party's responsibility for paying such costs and expenses.

10. Reasonable Covenants. The Employee acknowledges and agrees that the restrictive covenants contained herein (a) are necessary for the reasonable and proper protection of the goodwill of the Company and its trade secrets, proprietary data and confidential information, (b) are reasonable with respect to length of time, scope and geographic area and (c) will not reasonably prohibit the Employee from engaging in other businesses or employment for the purpose of earning a livelihood following the termination of his/her relationship with the Company.

11. Severability. Each provision of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. If the

invalidity or unenforceability of any provision hereof is due to unreasonableness of the time or scope or geographic extent of any covenant or restriction, said covenant or restriction nevertheless shall be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction.

12. Assignment and Benefit. This Agreement shall be binding upon the Employee's heirs, executors and administrators. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors and assigns.

13. Waiver. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

14. Entire Agreement. The Employee acknowledges receipt of this Agreement, and agree that with respect to the subject matter hereof it is the entire agreement with the Company, superseding any previous oral or written communication, representation, understanding or agreement with the Company or any representative thereof.

15. Notice. All notices, requests, demands and any other communications hereunder shall be made in writing and shall be deemed to have been duly given if delivered in person or sent by registered or certified mail, postage prepaid, if to the Company addressed to the President of the Company at the Company's principal executive office, and if to the Employee at the address appearing beneath his/her signatures to this Agreement. Any party may change its or his/her address for notice hereunder by giving notice of change of address in the manner herein provided.

16. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law principles. The Employee hereby submits to the personal jurisdiction of the courts of the Commonwealth of Massachusetts and the Federal Courts of the United States of America located in such commonwealth in respect to the interpretation and enforcement of

the provisions of this Agreement and all transactions contemplated hereby.

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ THE FOREGOING EMPLOYEE NON-COMPETITION, NONDISCLOSURE AND INVENTIONS AGREEMENT AND UNDERSTANDS AND AGREES TO EACH AND EVERY PROVISION. THE EMPLOYMENT FURTHER ACKNOWLEDGES THAT THIS AGREEMENT WAS DRAFTED BY COUNSEL ON BEHALF OF THE COMPANY AND THAT HE/SHE HAS BEEN GIVEN THE OPPORTUNITY TO CONSULT COUNSEL OF HIS/HER OWN CHOOSING AND HAS EITHER DONE SO OR VOLUNTARILY CHOSEN NOT TO DO SO PRIOR TO THEIR EXECUTION HEREOF.

Dated: 3/13/04

EMPLOYEE:

[signature]

Signature

Patrick Rasicot

Printed Name

Address: 36 Cranberry Rd.
N. Attleboro, MA
02760

225627

Exhibit D

**SEHRINGER AFFIDAVIT – EXHIBIT D**

From: Pat Rasicot [mailto:pras2@verizon.net]
Sent: Friday, July 22, 2005 4:11 PM
To: T. Christopher Donnelly
Cc: pras2@verizon.net
Subject: Softrax Letter

Mr. Donnelly,

I have been on the road for the last couple of days and just received your letter regarding Softrax this morning. I have read the letter and am taking the matter very seriously. In light of this, I will need to give the matter some much further thought and will reply to you by next Wdednesday July 27, 2005.

Thank you,

Pat Rasicot

Exhibit E

EXHIBIT – E

545 Middlefield Road
Suite 230
Menlo Park, CA 94025

Tel 650 325 2400
Fax 650 325 2405
www.mcmahonlawgroup.com

July 26, 2005

*VIA FACSIMILE* **(617-720-5554)**
*EMAIL* **(ted@dcglaw.com)**

T. Christopher Donnelly, Esq.
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108

Re: *Patrick Rasicot*

Dear Mr. Donnelly:

This firm represents NetSuite, Inc. ("NetSuite"). We write in response to your letter of July 19, 2005 to Mr. Patrick Rasicot ("Letter"), which was recently provided to NetSuite by Mr. Rasicot.

**No Disclosure of Softrax Confidential Information:**

Please let me assure you that NetSuite takes very seriously Softrax Corporation's ("Softrax") allegations against NetSuite's employee. NetSuite takes numerous measures to assure that its employees comply with all existing confidentiality and other contractual obligations to former employers. For example, as a pre-condition to employment, NetSuite employees, including Mr. Rasicot, are expressly required to contractually agree not to disclose trade secret and/or other proprietary information of former employers. Specifically, Mr. Rasicot agreed:

> I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to such employer, person or entity unless consented to in writing by such employer, person or entity.

In addition, in response to being advised of your Letter, NetSuite has reminded Mr. Rasicot of his obligation not to disclose any such confidential information to NetSuite. More importantly, please convey to Softrax that Mr. Rasicot has not disclosed any such confidential information to NetSuite.

**Mr. Rasicot's Job With NetSuite Is Substantially Different Than With Softrax:**

Mr. Rasicot's position with NetSuite will not require him to consider Softrax's confidential information. Indeed, through this response NetSuite seeks to alleviate any misconception as to Mr. Rasicot's position with NetSuite. Softrax's apparent concern that in his role with NetSuite that Mr. Rasicot will reveal information about Softrax's products and products in development is absolutely unwarranted. As Softrax is aware, for the last five years of Mr. Rasicot's employment with Softrax he was a mid-level employee[1] with the title "Product Manager." In his Product Manager position, he helped write certain specifications and worked with the product developers in their efforts to design Softrax's product. It is our understanding that he did not have broad knowledge of Softrax's customers and its sales methods and he rarely, if ever, worked directly with customers.

His position at NetSuite is dramatically different. Specifically, in his position at NetSuite as a Subject Matter Expert, Mr. Rasicot is not involved in product management or product development at all. To the contrary, the position requires him to analyze public laws and regulations and to work with members of NetSuite's sales force and professional services teams to educate them on how to show NetSuite's product to customers. Moreover, after he is trained on NetSuite's product, he will work directly with NetSuite's customers - something he did not do with Softrax. As you can see, any knowledge which Mr. Rasicot may or may not have from is mid-level position with Softrax is not helpful to his new position with NetSuite. It is his knowledge of public laws which is necessary to his new job.

**Non-Competition Concerns:**

Your assertion that Mr. Rasicot has violated his Softrax Noncompetition, Nondisclosure, and Inventions Agreement ("Agreement") is flat wrong for two straightforward reasons. First, the Agreement is hopelessly ambiguous. The Agreement vaguely states that Mr. Rasicot cannot "engage in or have any interest whatsoever in any "Prohibited Business.[2]" What do the terms "engage in" or "any interest" mean? These terms appear to mean that Mr. Rasicot cannot start his own business that falls within the definition of "Prohibited Business." The Agreement does not plainly state that he cannot *work as an employee* of a "Prohibited Business."

---

[1] Mr. Rasicot reported to the Director of Product Management, who in turn reported to the Vice President of Marketing, who in turn reported to the President of Softrax.

[2] This phrase is extremely vague and ambiguous. Accordingly, it should be narrowly construed. *See e.g. Sentry Ins. v. Firnstein*, 14 Mass.App.Ct. 706 (1982)

McM

Second, even if, *arguendo*, the Agreement could be read to clearly mean (which it cannot) that this phrase means that he cannot *work* for a "Prohibited Business," a simple reading of the Agreement reveals that Mr. Rasicot's employment with NetSuite is not prohibited under the Agreement because NetSuite does not fall within the narrow definition of "Prohibited Business" under the Agreement, to wit: "Prohibited Business" is defined as:

> any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving, operations, project management or financial application software designed for use by software and information services companies.

Absolutely none of NetSuite's products are *primarily designed* for use by software and information services companies. Indeed, NetSuite's products are designed for small and medium sized businesses overall. While it is true that NetSuite has a very small percentage of customers (estimated to be less than 3%) who happen to be software companies – NetSuite's products are not specifically designed for use by these companies. As a result, NetSuite unequivocally falls outside the definition of "Prohibited Business," and thus, Mr. Rasicot's employment with NetSuite does not offend his Agreement with Softrax.

**Mr. Rasicot's Agreement Is Impermissibly Overbroad:**

The Agreement is also fatally flawed because it has no geographic restrictions whatsoever.

**Your Letter's False Assertions:**

Aside from the incorrect statements that your Letter alleges – there are also apparently intentionally false statements contained therein which must be addressed. First, Mr. Rasicot did not execute any Agreement "as part of a promotion." During his tenure with Softrax, Mr. Rasicot was twice passed over for promotion to Director of Marketing and his salary was cut twice (which were significant factors in his decision to accept employment with a salary up to 50% greater than that to which he received at Softrax).

Similarly, your allegations that Mr. Rasicot provided deliberately false information which was intended to mislead the Softrax is also completely without merit. While it is true that out of respect for Softrax, Mr. Rasicot did not boast about his new job with NetSuite to

many of his former colleagues at Softrax, he did inform certain key Softrax employees about his plans. Contrary to your allegation, he violated no one's trust at Softrax.

As briefly outlined in this letter, your allegations against NetSuite's employee (Patrick Rasicot) are meritless. Please be advised that NetSuite takes such baseless harassment of its employees very seriously and it will spare no expense to vigorously defend itself and its employees against any such frivolous actions. Similarly, although your Letter was addressed to Mr. Rasicot, NetSuite views your attack on Mr. Rasicot as a thinly veiled attempt to intentionally interfere with NetSuite's relationship with its employee out of spite for his departure from Softrax. Make no mistake -- NetSuite will not tolerate any further interference or harassment of its employee, and it will pursue all of its rights and remedies against Softrax unless and until such harassment ceases.

If you have any questions or comments, or you would like to discuss this matter further, please do not hesitate to contact me at 650-325-2446.

Very truly yours,

Peter C. McMahon

cc: Jim McGeever
Patrick Rasicot

3.4

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV 05 01342

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

AFFIDAVIT OF DAVID MILLIGAN

I, David Milligan, state under penalty of perjury as follows:

1. I am currently the Vice President, Customer Services, of Softrax Corporation ("Softrax" or the "Company"). In this capacity I have responsibility for the Account Management group, which handles the needs and interests of our installed base customers, the Customer Care group, which provides technical support for our customers, and the Technical Services group, which develops customized work for customers. For a number of years I also managed the Professional Services organization which was responsible for working with customers to implement and configure our software for their internal purposes. I have held my current position, or a comparable position, since helping to found the Company in 1985, under the name The RBS Group, Inc. The Company changed its name to Softrax Corporation in 1998.

Mr. Rasicot's History at Softrax

2. In 1996, I hired Patrick Rasicot to the position of implementation services professional in the Professional Services group where he reported directly to me. As stated above, the Professional Services organization was responsible for installing, configuring and implementing our software at a customer's site as well as for training the customer during and following the implementation process on the customer's use of the software. Because our software is designed to be highly configurable, so as to meet different business processes and models used by our customers, the implementation process requires our implementation personnel to become well versed both with the application architecture and database processing flows of our products as they need to

apply to our customer's business procedures and processes. Very often during the implementation process, customers will re-engineer their business processes to take advantage of functionality in our software in order to gain added productivity and revenue management capability for themselves.

3. Mr. Rasicot developed into a strong implementation professional and served as either the lead consultant or project manager in all of his implementations. He was able to quickly grasp what customers needed from our software and to understand their business practices. Likewise, he developed a comprehensive understanding of our software, its configurability as well as the key components of its database structure as they were impacted by application use. As a result, he was able to quickly identify or create ways to 'bridge' any functionality gaps a customer might experience with our software due to idiosyncratic business practices. Both the work he performed for customers, including the identification of "workarounds" and functional bridges, and the information he obtained from customers regarding their business processes, was considered highly confidential and proprietary in nature, which Mr. Rasicot knew and of which he and all our employees were and are periodically reminded.

4. In 2000, Mr. Rasicot transferred into the Software Development Department as a product manager. The transfer allowed Mr. Rasicot to exploit the understanding he had developed as an implementation professional of both customer needs and product capabilities. In 2001, the product management group was moved into the Marketing Department in order to centralize information relating to customer and market information so as to better anticipate customer needs and requirements and to ensure that product development dovetailed with our understanding of our customer base.

5. Throughout the time Mr. Rasicot was in product management, although he no longer reported directly to me, we continued to work together. This was because the different groups which reported to me, all of whom were intensively involved with our customers, also worked closely with the product management team on product issues, customer issues, customer requests for enhancements and product extensions and other matters of a similar confidential and proprietary nature.

Mr. Rasicot's Inside Knowledge and the Irreparable Harm
Caused by his Joining a Competitor

6. Among the primary responsibilities Mr. Rasicot had as a product manager were evaluating and prioritizing extensions and enhancements to existing products to increase their value for our customers and our larger market. Part of making and then implementing these determinations was extensive consulting with our software engineers to discuss the design alternatives for any specific functionality under consideration. This in turn included discussion of the advantages and disadvantages of each design in terms of flexibility, scalability, portability, interoperability with other functionality and other software, and the amount of resources it would take to develop and release the new functionality – or in the case of the Technical Services group, the specific customization project. With the Technical Services engineers, another factor that was often relevant in

discussing design alternatives was the ease or difficulty with which a customization might eventually be "productized" (incorporated as a standard feature in an existing product). All of these sessions, of course, involved and were understood to involve highly confidential and proprietary information not only of Softrax, but often also of Softrax's customers.

7. The kind of in-depth proprietary knowledge which Mr. Rasicot gained at Softrax and which would be of great value to a competitor included his understanding of how to position our products in the marketplace to their greatest advantage, his detailed understanding of the business requirements of our customers and prospective customers, and his in depth understanding of software architecture as it relates to implementing business processes.

8. Here is an example of the critical importance that Mr. Rasicot's understanding of Softrax's software architecture had in Softrax's competitive success and growth. Suppose a company had idiosyncratic billing process for which it wanted Softrax to develop specialized functionality. Mr. Rasicot understood from his confidential dealings with Softrax engineers and other employees:

- With how many other financial and operational processes this particular billing process would need to interact in order to identify the 'touch' points both for data flowing in and for revised data to flow out;
- Whether the new functionality should cause a prompt to the user and if so, in what contexts and with what control mechanisms;
- Whether the new functionality would result in the creation of different categories of data that could interfere with standard processing of other functionalities or trigger alarms in other functionalities;
- Whether auditing controls were appropriate for the new functionality and if so, in connection with which reporting paths they should be exhibited;
- What kind of reports should be generated for the new functionality and from what other operations should they draw data;
- Whether the new billing paradigm should be built into the central billing mechanism in the software or whether it should be kept as an ancillary model;
- Whether the new functionality would be attractive to other customers and if so, how it might be structured and tweaked so as to increase its saleability;
- What level of flexibility and scalability would be required within the functionality not only by this customer but by a larger market;

and so on. Mr. Rasicot's accreted knowledge would also give him an understanding of the level of demand on the Company's development resources which would be required to design and build the requested functionality – a consideration which would inherently affect the commercial feasibility of agreeing to the development work.

9. Mr. Rasicot's exposure to Softrax's proprietary and confidential approaches, methods and designs, and his extensive experience working with others at Softrax, would allow him to evaluate and consider, quickly and effectively, issues relating to product enhancements and customizations which more often than not had not occurred to the customer, but which the customer would almost certainly encounter when the

functionality was included in live production. This allowed a more efficient and effective design and production process and thus avoided the necessity of follow-on remedial or functional patches after the product was delivered to the customer. Finally and critically, Mr. Rasicot would be able to identify which attributes could be built into or around the requested functionality to make it more attractive to the larger customer base (as opposed to having appeal limited to the individual customer who requested the functionality in the first place); and conversely which such attributes would limit its attraction to other companies.

10. What I have described above provides an insight into how Mr. Rasicot's knowledge of our proprietary product capabilities and architecture, as well as the confidential approaches taken by our development team, could empower the design and development of a product as well as enhance its larger saleability (and so its revenue-generating capability). This type of inside, proprietary information could give any competitor a great boost.

11. Equally important, however, is that the same proprietary knowledge would allow Mr. Rasicot to quickly discount or dismiss different product enhancement requests or design alternatives. Mr. Rasicot would quickly be able to determine, for example:

- whether integrating a given functionality at a certain place within a product would slow overall performance of the product whereas inserting at a different place within the functionality flow would not affect the processing of transactions;
- whether the combination of a simpler coding bridge and workaround would provide the customer with equivalent functionality at a lower cost to the customer, allowing the customer to continue with a business practice which it may phase out but which is needed in the short term;
- whether expanding the functionality in certain directions would result in user confusion and resultant user error;
- whether the data from the functionality, when fed into other operational areas, could interfere with proper recognition of revenue in conformance with applicable accounting standards;
- whether structuring the functionality in a given way or ways should be avoided because of the interface issues such approach(es) would introduce to other functionalities; or
- whether the functionality should be bundled with certain other new functionality yielding both synergies in the engineering process and a more robust overall product enhancement.

12. Finally, in addition to all the benefits Softrax's inside, confidential and proprietary knowledge could give to a competitor's own product development path and strategy, the same knowledge could give an even greater benefit to a competitor in a different way. Specifically, Mr. Rasicot knows what Softrax did and did not do with its three flagship products--all three of which were within his responsibility before he left the Company. His comprehensive knowledge of the architecture and database structure of those products allows him to know in which direction the Company is more likely to extend the products; he knows what kinds of application processing and database designs

are limiting, and how, and which ones are most flexible, and why. All of this again, is information of a highly proprietary nature and of great competitive value.

13. Mr. Rasicot also knows, because he created them, the confidential and proprietary development plans and prioritization of development and technical projects, for each of Softrax's flagship products.

14. The nature and extent of the Softrax proprietary knowledge learned by Mr. Rasicot at Softrax make his affiliation with NetSuite particularly troubling. This is because, even if Mr. Rasicot did not 'intend' to disclose certain inside information which he has related to our products, our product plans, our product positioning and our customer issues and information, he would be unable not to disclose much of the most valuable kinds of information he has. Mr. Rasicot does not need to say that Softrax did "a, b and c" in its products, in order to use that information to advise NetSuite to do "x, y and z." He does not need to directly tell NetSuite what product designs worked more effectively for Softrax and which ones Softrax found to be dead ends, in order to advise NetSuite on how to proceed with their product design. Likewise, if, for example, Mr. Rasicot instructs a sales group to focus their presentation on A, B and C, they do not need to know (although they are likely to infer), that Softrax's product is weaker in areas A, B and C.

Mr. Rasicot's Consistent Misrepresentations Following
His Resignation from Softrax

15. My understanding is that Mr. Rasicot tendered his resignation to Softrax on June 3, 2005 and left the Company two weeks later. Approximately one week after he submitted his resignation, I approached him in his office to express my surprise at his decision and to inquire as to his plans. After expressing his concern that it had taken me over a week to talk to him (he was concerned that I was upset with him for leaving), Mr. Rasicot indicated that he was ready 'for a summer of boating and relaxing.' He mentioned that when he told his wife of his decision to resign and take time off, she indicated that he would have to purchase another dog and train him in order to have something to do over the summer as she was concerned that without some responsibility he would spend all of his time lying about. While I was not happy about his decision to leave, due to the skills and knowledge that we would be losing, I very much appreciated his desire to take a break from the intensity of his work requirements.

16. On the last day I would be in the office before he left, I wished him good luck and thanked him for his efforts on behalf of Softrax over the nine years since I had first hired him.

17. I did not speak to Mr. Rasicot again, until Tuesday, July 19, 2005, approximately one month later. The Company had found out the previous day that Mr. Rasicot had actually left Softrax, not to sail and 'find himself,' but to take a job with NetSuite, an active and aggressive competitor of Softrax. This knowledge resulted from a conversation Jake Fennessy, Softrax's Chief Financial Officer, had with Mr. Rasicot on

July 18 when Mr. Fennessy called him to determine if the rumor about Mr. Rasicot's joining NetSuite was true. I understood that Mr. Rasicot had told Mr. Fennessy that he was only working as an outside contractor for NetSuite, for approximately two days a week, implementing NetSuite's software for customers in the manufacturing area.

18. Due to the substantial threat that Mr. Rasicot's departure for a competitor caused Softrax, and given Mr. Rasicot's non-competition agreement, I knew the Company would take the matter very seriously. I was told that Softrax's outside counsel would be delivering a letter to Mr. Rasicot the very next day demanding him to abide by the terms of his non-competition agreement and to cease working with NetSuite immediately. It was also decided that I would call him, that afternoon, to tell him that the Company was seriously upset by his affiliation with NetSuite, that outside counsel would be delivering a demand letter to him the following day (Wednesday), but that we still hoped to resolve the situation in a civil manner.

19. I proceeded to call Mr. Rasicot on the morning of July 19 and received a call back from Mr. Rasicot that afternoon. During this call I informed him about the letter that was to be delivered the next day. He expressed surprise at the Company's reaction. He stated his role as a two-day a week consultant in no way overlapped his work or experiences at Softrax. He felt that after nine years of working for Softrax, we could "cut him some slack" and not use him as an example of our willingness to enforce our corporate policy and rules. He made a comment about not wanting to leave Softrax but needing a change and that this job gives him that fit for now. I asked him if he wanted to come back to Softrax, in a different position, as a way to potentially resolve the current situation. He indicated interest in the idea but made some vague allusions to lifestyle preferences and we did not pursue the topic. I offered a follow-up discussion should he want to discuss things the next day. He did not call me back.

20. On July 27, 2005, our outside counsel received a letter from NetSuite's outside legal counsel responding to the letter our lawyer had sent to Mr. Rasicot. The NetSuite letter indicated that Mr. Rasicot was an employee of NetSuite, held the position of "Subject Matter Expert," and was working primarily with NetSuite's sales force and professional services team, and soon with NetSuite's customers. The letter also indicated that Mr. Rasicot would be receiving a salary "up to 50% greater" than that which he received at Softrax. Mr. Rasicot was making a salary of a little over $100,000 at Softrax so this would mean he might be receiving a little over $150,000 from NetSuite.

21. The news from NetSuite's counsel was, of course, very troubling. The letter also contained a number of representations as to what Mr. Rasicot's job responsibilities had been while he was at Softrax which were incorrect. We could only assume that NetSuite's "knowledge" of Mr. Rasicot's job responsibilities at Softrax came from Mr. Rasicot which meant that there must have been some breakdown in the communications between Mr. Rasicot and his new employer due to the fact that NetSuite's description of Mr. Rasicot's job responsibilities while at Softrax do not reflect the depth and breadth of Mr. Rasicot's experience and ability nor the importance of his position within Softrax..

22. Mr. Rasicot told me on July 19, that he will not be disclosing Softrax proprietary and confidential information to NetSuite. As I explained above, however, that disclosure is inevitable. Given the deceptions Mr. Rasicot has practiced on us to date, it would be foolhardy to rely on his representations now.

Signed under the penalties of perjury this 1st day of August.

David Milligan

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

4.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT 05 01342
C. A. NO. MICV________

| | |
|---|---|
| SOFTRAX CORPORATION,<br>Plaintiff,<br>v.<br>PATRICK RASICOT,<br>Defendant. | **MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER** |

Pursuant to Mass. R. Civ. P. 4(c), plaintiff Softrax Corporation hereby moves for an Order appointing Thomas L. Savage of Disinterested Parties, Inc. as a special process server in the above-entitled action. The person to be appointed special process server is experienced in the service of process, 18 years of age or older and not a party to this action.

August 1, 2005
Motion allowed
Dortch-Okara, J.
Att. Kenny J. Delaney
Asst Clerk

SOFTRAX CORPORATION

By its attorneys,

T. C. Donnelly

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

Date: August 1, 2005

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/1/05

5.D

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
DOCKET NO. 05-1342

SOFTRAX CORPORATION, Plaintiff

v.

PATRICK RASICOT, Defendant.

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/3/05

Allowed. Fabricant J. 8/3/05

**EMERGENCY MOTION FOR CONTINUANCE**
**OF PRELIMINARY INJUNCTION HEARING**

Defendant Patrick Rasicot ("Rasicot") respectfully moves the Court to continue the hearing on Plaintiff's motion for a preliminary hearing which is currently scheduled in this matter for 2:00 PM on August 4, 2005, for one week, until August 11, 2005. As grounds for this motion, Rasicot states as follows:

1. On August 1, 2005, Plaintiff Softrax Corporation ("Softrax") filed its complaint in the above-captioned matter, along with a motion for preliminary injunction and three supporting affidavits. Plaintiff sought and obtained, *ex parte*, a short order of notice scheduling a hearing on its preliminary injunction motion for August 4, 2005.

2. Rasicot was not served with the summons, complaint and preliminary injunction papers until the afternoon of August 2, 2005.

3. As of the writing of this motion, Plaintiff has not yet filed or served a memorandum of law supporting the preliminary injunction motion, in clear contravention of Massachusetts Superior Court Rule 9A(a)(1) ("The moving party shall serve with the

motion a statement of reasons, including supporting authorities, why the motion should be granted." (Emphasis added.))

4. Rather than complying with the Rule 9A, Softrax merely states in its preliminary injunction motion that "[a] Memorandum in Support of Plaintiff's Motion for Preliminary Injunction will be filed in advance of the hearing."

5. The interests of justice and minimal notions of due process require that Rasicot be permitted a fair opportunity to respond to the legal arguments that Softrax may make in support its motion for preliminary injunction. However, no response is possible when the supporting arguments have not even been proffered in the first instance.

6. In order to respond adequately to Softrax's preliminary injunction package, Rasicot requires additional time in which to prepare responsive papers, including a memorandum of law and counter-affidavits, not only from Rasicot, but also from his present employer, NetSuite, Inc. ("NetSuite"), which is located in California. (The fact that NetSuite is located in California would be reason enough for a continuance of the hearing.)

7. There are substantial grounds to oppose the preliminary injunction motion, including that Rasicot's employment by NetSuite does not constitute competitive employment under the clear terms of the non-competition agreement at issue; that the non-competition agreement is not supported by consideration; that NetSuite cannot demonstrate that the enforcement of the restrictive covenant is necessary to protect any legitimate interest; and that Softrax is guilty of unclean hands.

8. Apart from its failure to comply with this Court's clear rules, Softrax cannot claim that a one-week continuance will seriously prejudice its interests, given that Softrax itself waited a full five days after its threatened deadline for filing suit before actually filing. See Exhibit A (e-mail from Softrax's attorney, T. Christopher Donnelly, stating "we will wait to hear from you or your counsel until 10:00 a.m. on Wednesday, July 28. In the absence of a resolution, Softrax has instructed me to be prepared to file court papers Wednesday afternoon."). As noted above, Plaintiff has still not filed a legal brief one week after this deadline.

WHEREFORE, Rasicot respectfully requests that the Court enter an order scheduling the preliminary injunction hearing in this matter for August 11, 2005, or any date thereafter that may be convenient for the Court.[1]

---

[1] By seeking the requested continuance, Rasicot does not waive his right to remove this case to federal court. All rights of removal are hereby expressly reserved.

**VERIFICATION**

The undersigned counsel verifies, under the pains and penalties of perjury, that all factual statements contained herein are true based upon his personal knowledge, information or belief.

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Dated: August 3, 2005

Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

**CERTIFICATE OF SERVICE**

I, Robert N. Feldman, counsel for the defendant, do hereby certify that on this 3rd day of August 2005, I caused to be served a true copy of the foregoing upon all parties by fax and by mailing same, first class mail, postage pre-paid, to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Robert N. Feldman

A

-----Original Message-----
From: T. Christopher Donnelly
To: Pat Rasicot [mailto:pras2@verizon.net]
Subject: RE: Softrax Letter

Mr. Rasicot, We will wait to hear from you or your counsel until 10:00AM on Wednesday, July 28. In the absence of a resolution, Softrax has instructed me to be prepared to file court papers Wednesday afternoon. Softrax continues to reserve all rights, claims and remedies.

T. Christopher Donnelly

-----Original Message-----
From: Pat Rasicot [mailto:pras2@verizon.net]
Sent: Friday, July 22, 2005 4:11 PM
To: T. Christopher Donnelly
Cc: pras2@verizon.net
Subject: Softrax Letter

Mr. Donnelly,

I have been on the road for the last couple of days and just received your letter regarding Softrax this morning. I have read the letter and am taking the matter very seriously. In light of this, I will need to give the matter some much further thought and will reply to you by next Wdednesday July 27, 2005.

Thank you,

Pat Rasicot

6.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
C. A. NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff,
v.
PATRICK RASICOT,
Defendant.

8/3/05 Request for TRO denied (Dortch-Okara J) att JMD

8/3/05
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

**PLAINTIFF'S OPPOSITION TO MOTION FOR CONTINUANCE OF PRELIMINARY INJUNCTION HEARING WITH ALTERNATIVE REQUEST FOR TEMPORARY RESTRAINING ORDER**

Plaintiff Softrax Corporation ("Softrax") opposes the Emergency Motion for Continuance of Preliminary Injunction Hearing served earlier today by defendant Patrick Rasicot ("Rasicot"). The grounds for this Opposition are as follows:

1. Softrax, a Canton software company, employed Rasicot as a senior product strategist until he voluntarily resigned effective June 17, 2005. Rasicot was a key employee at Softrax, immersed in extensive confidential and proprietary information relating to Softrax's products, product strategies and customer base. Accordingly, in March 2000, in connection with his promotion, Rasicot signed a Non-Competition, Non-Disclosure and Inventions Agreement (the "Agreement"). Rasicot promised for a period of two years after leaving Softrax's employ not to compete with Softrax.

2. At the time of his resignation, Rasicot told his managers that he planned to take the summer off and sail. In mid-July 2005, Softrax heard rumors that Rasicot may have--contrary to his promises--actually joined NetSuite, Inc. ("NetSuite"), a direct competitor of Softrax. Softrax promptly investigated and on July 18, 2005 spoke with Rasicot. Rasicot said he was consulting for NetSuite two days a week and limiting his services to implementation of products for manufacturing companies.

3. Immediately, on July 19, 2005, Softrax sent a cease and desist letter to Rasicot, demanding that he stop working for NetSuite in violation of the Agreement. Softrax requested Rasicot's response by Friday, July 22, 2005.

4. On July 22, Rasicot requested until Wednesday, July 27, 2005 to consider the matter, and he promised "[I] will reply to you by next Wednesday, July 27, 2005." *See* Exhibit A. to Rasicot Motion for Continuance.

5. Acting reasonably and in good faith, Softrax gave Rasicot the requested courtesy extension. Contrary to his promise, however, Rasicot did not reply by or after July 27, 2005. Softrax did receive a letter from NetSuite, which revealed that Rasicot was--again contrary to Rasicot's earlier statements--working for NetSuite on a full-time basis with responsibilities different than those Rasicot had described to Softrax a few days earlier. Because NetSuite's letter revealed new, different information, Softrax's filing against Rasicot was delayed for two business days.

6. Softrax swiftly prepared a complaint, motion for preliminary injunction (which included supporting reasons), and four detailed affidavits with exhibits. Softrax filed the papers on Monday, August 1, 2005, and a hearing was scheduled on the preliminary injunction motion for Thursday, August 4, 2005, at Softrax's request.

7. Rasicot's present motion, which excludes the foregoing background, is deceptive insofar as it says Rasicot was not served until the afternoon of August 2, 2005. In fact, the undersigned sent to Rasicot by email on Monday, August 1, 2005, immediately after the undersigned returned from Dedham, a full set of the papers. A copy of the email is attached hereto as Exhibit A.

8. Yesterday afternoon, Rasicot's counsel asked whether Softrax would assent to a continuance of the preliminary injunction hearing. The undersigned stated that Softrax would assent to a continuance so long as Rasicot *in that brief interim period agreed not to perform services for NetSuite.* Rasicot, however, has refused to take a few days off until the motion for preliminary is heard. *See* email attached hereto as Exhibit B.

9. As detailed in the four supporting affidavits filed by Softrax on August 1, 2005, Softrax has suffered and is continuing to suffer severe irreparable harm, including dissemination and abuse of its confidential and proprietary information, loss of goodwill and damage to its reputation.

10. The fact that plaintiff has not yet completed its supporting memorandum of law is a red herring. The legal grounds for the preliminary injunction are set forth in the plaintiff's Motion for Preliminary Injunction, which cites the leading case of *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 616-18 (1980). Often in these emergency situations--an emergency caused by Rasicot's refusal to stop violating his non-competition agreement, a refusal which persisted after Softrax acceded to his requested courtesy extension--a more detailed supporting memorandum is filed at or near the time of hearing.

**REQUEST FOR TEMPORARY RESTRAINING ORDER**

For all the above reasons, the preliminary injunction hearing scheduled for August 4 at 2:00 p.m. should proceed as scheduled. If, however, the Court is inclined to continue the hearing until August 11, 2005, a temporary restraining order should issue which enjoins Rasicot through August 11, 2005 from performing any services for NetSuite or its customers or prospects, and from otherwise violating the Agreement. As stated in paragraph 9 above, and detailed in the O'Connor, Sehringer, Fennessy and Milligan affidavits, Softrax will continue to suffer irreparable harm while Rasicot violates his non-competition agreement, absent immediate equitable relief. Rasicot, on the other hand, will not be harmed by four or five business days away from NetSuite--work that squarely violates his Agreement with Softrax.

A proposed form of Order is attached hereto as Exhibit C.

SOFTRAX CORPORATION

By its attorneys,

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Date: August 3, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/~~by hand~~ and by fax

Date: 8/3/05 T. C. D.

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

# EXHIBIT A

**T. Christopher Donnelly**

| | |
|---|---|
| **From:** | T. Christopher Donnelly |
| **Sent:** | Monday, August 01, 2005 4:35 PM |
| **To:** | 'Pat Rasicot' |
| **Cc:** | Paula McManus |
| **Subject:** | Softrax Corporation v. Patrick Rasicot, Norfolk Superior Court Civil Action No. 05-01342 |
| **Importance:** | High |
| **Attachments:** | Softrax v. Rasicot 8-1-05 court papers.pdf |

Mr. Rasicot, Attached is a copy of the Summons issued today by the Court, along with copies of Softrax's Complaint, motion for preliminary injunction, motion for short order of notice, and affidavits of Messrs. O'Connor, Fennessy, Milligan and Sehringer.

As you can see from the Summons, the Court has scheduled a hearing on Softrax's motion for preliminary injunction for Thursday, August 4, 2005 at 2:00 p.m.

T. Christopher Donnelly
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33d Floor
Boston, MA 02108
617-720-2880
617-720-3554 fax
tcd@dcglaw.com
www.dcglaw.com

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) delete the message. Legal advice contained in the preceding message is solely for the Donnelly, Conroy & Gelhaar LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

# EXHIBIT B

## T. Christopher Donnelly

**From:** T. Christopher Donnelly
**Sent:** Tuesday, August 02, 2005 9:22 PM
**To:** Scott A. Birnbaum
**Cc:** Paula McManus
**Subject:** Softrax v. Rasicot

Scott, For good order, I'm confirming that Softrax would assent to Mr. Rasicot's request for a continuance of the preliminary injunction hearing from Thursday, Aug 4 until Monday, Aug 8 or Tuesday, Aug 9, if he will agree in the interim not to work for NetSuite. You have said Mr. Rasicot is unwilling to take that 2-3 business-day break. In all the circumstances—particularly the facts that Softrax previously consented to Mr. Rasicot's July 22 request for an extension, Mr. Rasicot's subsequent failure to communicate with Softrax before or after the extended deadline of July 27, and the irreparable harm described in Softrax's four supporting affidavits—Softrax cannot agree to continue the hearing while Mr. Rasicot continues to work at NetSuite.

Please call if you wish to discuss further. I will be in my office tomorrow and would appreciate your prompt telephone or email notice of any application you make tomorrow.

Thank you,
Chris

T. Christopher Donnelly
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33d Floor
Boston, MA 02108
617-720-2880
617-720-3554 fax
tcd@dcglaw.com
www.dcglaw.com

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) delete the message. Legal advice contained in the preceding message is solely for the Donnelly, Conroy & Gelhaar LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

**EXHIBIT C**

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV____________

| | |
|---|---|
| SOFTRAX CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| PATRICK RASICOT, | ) |
| Defendant. | ) |

**[PROPOSED] TEMPORARY RESTRAINING ORDER**

Pursuant to Mass. R. Civ. P. 65(a), it is hereby ORDERED that defendant Patrick Rasicot is, through August 11,2005, HEREBY RESTRAINED from (i) performing any services for NetSuite, Inc. or its customers or prospects and (ii) otherwise breaching the Noncompetition, Nondisclosure and Inventions Agreement he entered into with plaintiff Softrax Corporation.

______________________________

Justice of the Superior Court

Docketed (Rec'd 8/14/05)

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/14/05

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
C. A. NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff,

v.

PATRICK RASICOT,
Defendant.

**PLAINTIFF'S OPPOSITION TO MOTION FOR CONTINUANCE OF PRELIMINARY INJUNCTION HEARING WITH ALTERNATIVE REQUEST FOR TEMPORARY RESTRAINING ORDER**

Plaintiff Softrax Corporation ("Softrax") opposes the Emergency Motion for Continuance of Preliminary Injunction Hearing served earlier today by defendant Patrick Rasicot ("Rasicot"). The grounds for this Opposition are as follows:

1. Softrax, a Canton software company, employed Rasicot as a senior product strategist until he voluntarily resigned effective June 17, 2005. Rasicot was a key employee at Softrax, immersed in extensive confidential and proprietary information relating to Softrax's products, product strategies and customer base. Accordingly, in March 2000, in connection with his promotion, Rasicot signed a Non-Competition, Non-Disclosure and Inventions Agreement (the "Agreement"). Rasicot promised for a period of two years after leaving Softrax's employ not to compete with Softrax.

2. At the time of his resignation, Rasicot told his managers that he planned to take the summer off and sail. In mid-July 2005, Softrax heard rumors that Rasicot may have--contrary to his promises--actually joined NetSuite, Inc. ("NetSuite"), a direct competitor of Softrax. Softrax promptly investigated and on July 18, 2005 spoke with Rasicot. Rasicot said he was consulting for NetSuite two days a week and limiting his services to implementation of products for manufacturing companies.

3. Immediately, on July 19, 2005, Softrax sent a cease and desist letter to Rasicot, demanding that he stop working for NetSuite in violation of the Agreement. Softrax requested Rasicot's response by Friday, July 22, 2005.

4. On July 22, Rasicot requested until Wednesday, July 27, 2005 to consider the matter, and he promised "[I] will reply to you by next Wednesday, July 27, 2005." *See* Exhibit A. to Rasicot Motion for Continuance.

5. Acting reasonably and in good faith, Softrax gave Rasicot the requested courtesy extension. Contrary to his promise, however, Rasicot did not reply by or after July 27, 2005. Softrax did receive a letter from NetSuite, which revealed that Rasicot was--again contrary to Rasicot's earlier statements--working for NetSuite on a full-time basis with responsibilities different than those Rasicot had described to Softrax a few days earlier. Because NetSuite's letter revealed new, different information, Softrax's filing against Rasicot was delayed for two business days.

6. Softrax swiftly prepared a complaint, motion for preliminary injunction (which included supporting reasons), and four detailed affidavits with exhibits. Softrax filed the papers on Monday, August 1, 2005, and a hearing was scheduled on the preliminary injunction motion for Thursday, August 4, 2005, at Softrax's request.

7. Rasicot's present motion, which excludes the foregoing background, is deceptive insofar as it says Rasicot was not served until the afternoon of August 2, 2005. In fact, the undersigned sent to Rasicot by email on Monday, August 1, 2005, immediately after the undersigned returned from Dedham, a full set of the papers. A copy of the email is attached hereto as Exhibit A.

8. Yesterday afternoon, Rasicot's counsel asked whether Softrax would assent to a continuance of the preliminary injunction hearing. The undersigned stated that Softrax would assent to a continuance so long as Rasicot *in that brief interim period agreed not to perform services for NetSuite.* Rasicot, however, has refused to take a few days off until the motion for preliminary is heard. *See* email attached hereto as Exhibit B.

9. As detailed in the four supporting affidavits filed by Softrax on August 1, 2005, Softrax has suffered and is continuing to suffer severe irreparable harm, including dissemination and abuse of its confidential and proprietary information, loss of goodwill and damage to its reputation.

10. The fact that plaintiff has not yet completed its supporting memorandum of law is a red herring. The legal grounds for the preliminary injunction are set forth in the plaintiff's Motion for Preliminary Injunction, which cites the leading case of *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 616-18 (1980). Often in these emergency situations--an emergency caused by Rasicot's refusal to stop violating his non-competition agreement, a refusal which persisted after Softrax acceded to his requested courtesy extension--a more detailed supporting memorandum is filed at or near the time of hearing.

**REQUEST FOR TEMPORARY RESTRAINING ORDER**

For all the above reasons, the preliminary injunction hearing scheduled for August 4 at 2:00 p.m. should proceed as scheduled. If, however, the Court is inclined to continue the hearing until August 11, 2005, a temporary restraining order should issue which enjoins Rasicot through August 11, 2005 from performing any services for NetSuite or its customers or prospects, and from otherwise violating the Agreement. As stated in paragraph 9 above, and detailed in the O'Connor, Sehringer, Fennessy and Milligan affidavits, Softrax will continue to suffer irreparable harm while Rasicot violates his non-competition agreement, absent immediate equitable relief. Rasicot, on the other hand, will not be harmed by four or five business days away from NetSuite--work that squarely violates his Agreement with Softrax.

A proposed form of Order is attached hereto as Exhibit C.

SOFTRAX CORPORATION

By its attorneys,

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Date: August 3, 2005

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/~~by hand~~ and by fax

Date: 8/3/05 T. C. Donnelly

A

**T. Christopher Donnelly**

| | |
|---|---|
| **From:** | T. Christopher Donnelly |
| **Sent:** | Monday, August 01, 2005 4:35 PM |
| **To:** | 'Pat Rasicot' |
| **Cc:** | Paula McManus |
| **Subject:** | Softrax Corporation v. Patrick Rasicot, Norfolk Superior Court Civil Action No. 05-01342 |
| **Importance:** | High |
| **Attachments:** | Softrax v. Rasicot 8-1-05 court papers.pdf |

Mr. Rasicot, Attached is a copy of the Summons issued today by the Court, along with copies of Softrax's Complaint, motion for preliminary injunction, motion for short order of notice, and affidavits of Messrs. O'Connor, Fennessy, Milligan and Sehringer.

As you can see from the Summons, the Court has scheduled a hearing on Softrax's motion for preliminary injunction for Thursday, August 4, 2005 at 2:00 p.m.

T. Christopher Donnelly
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33d Floor
Boston, MA 02108
617-720-2880
617-720-3554 fax
tcd@dcglaw.com
www.dcglaw.com

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) delete the message. Legal advice contained in the preceding message is solely for the Donnelly, Conroy & Gelhaar LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

B

**T. Christopher Donnelly**

**From:** T. Christopher Donnelly
**Sent:** Tuesday, August 02, 2005 9:22 PM
**To:** Scott A. Birnbaum
**Cc:** Paula McManus
**Subject:** Softrax v. Rasicot

Scott, For good order, I'm confirming that Softrax would assent to Mr. Rasicot's request for a continuance of the preliminary injunction hearing from Thursday, Aug 4 until Monday, Aug 8 or Tuesday, Aug 9, if he will agree in the interim not to work for NetSuite. You have said Mr. Rasicot is unwilling to take that 2-3 business-day break. In all the circumstances—particularly the facts that Softrax previously consented to Mr. Rasicot's July 22 request for an extension, Mr. Rasicot's subsequent failure to communicate with Softrax before or after the extended deadline of July 27, and the irreparable harm described in Softrax's four supporting affidavits—Softrax cannot agree to continue the hearing while Mr. Rasicot continues to work at NetSuite.

Please call if you wish to discuss further. I will be in my office tomorrow and would appreciate your prompt telephone or email notice of any application you make tomorrow.

Thank you,
Chris

T. Christopher Donnelly
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33d Floor
Boston, MA 02108
617-720-2880
617-720-3554 fax
tcd@dcglaw.com
www.dcglaw.com

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) delete the message. Legal advice contained in the preceding message is solely for the Donnelly, Conroy & Gelhaar LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. MICV___________

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

**[PROPOSED] TEMPORARY RESTRAINING ORDER**

Pursuant to Mass. R. Civ. P. 65(a), it is hereby ORDERED that defendant Patrick Rasicot is, through August 11,2005, HEREBY RESTRAINED from (i) performing any services for NetSuite, Inc. or its customers or prospects and (ii) otherwise breaching the Noncompetition, Nondisclosure and Inventions Agreement he entered into with plaintiff Softrax Corporation.

______________________________
Justice of the Superior Court

8.C

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss

SUPERIOR COURT
CIVIL ACTION

NO. 05-1342

SOFTRAX CORPORATION ......................, *Plaintiff(s)*

v.

PATRICK RASICOT ..........................., *Defendant(s)*

8/4/05
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

## SUMMONS AND ORDER OF NOTICE

To the above-named Defendant:

You are hereby summoned and required to serve upon T. Christopher Donnelly, Esquire of DONNELLY, CONROY & GELHAAR, LLP One Beacon St, 33rd Fl plaintiff's attorney, whose address is Boston, MA 02108 ......................, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house — at said Dedham — ~~at Boston in the county of Suffolk~~, — in the first session without jury of our said court on Thursday the 4th day of August A.D. 20 05., at 2:00 p.m. o'clock ~~A.M.~~, at which you may appear and show cause why such application should not be granted.

**BARBARA J. ROUSE, Esquire**

WITNESS, ~~SUZANNE V. DELVECCHIO, Esquire,~~ at Dedham ......................, the 1st day of August, in the year of our Lord two thousand and five.

A TRUE COPY
Attest: Mary E. Kinney
Deputy Assistant Clerk
9/1/05

[signature], Clerk

NOTES:

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-34

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on August 2nd, 2005, I served a copy of the within summons and order of notice, together with a copy of the complaint and * 15 in this action, upon the within named defendant, in the following manner. (See Mass. R. Civ. P. 4 (d) (1-5);

By Delivering To Him, in Hand, at His Last and usual Place of Abode To wit, 350 Shepher Road Conochano R.I.

Dated: 8-2, 2005

THOMAS L. SAVAGE
Special Process Server

**N.B. TO PROCESS SERVER:-**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

| 8-2, 2005 |
|---|

15 *

1. Civil Action Cover Sheet
2. Plaintiff's Motion for Preliminary Injunction
3. Plaintiff's Motion for Short Order of Notice on Motion for Preliminary Injunction
4. Affidavit of Robert D. O'Connor, Jr.
5. Affidavit of Gottfried Sehringer
6. Affidavit of David Milligan
7. Affidavit of Jake Fennessy
8. Motion/Order for Appointment of Special Process Server

**COMMONWEALTH OF MASSACHUSETTS**

NORFOLK, ss

SUPERIOR COURT
CIVIL ACTION
NO.

................................, *Plaintiff(s)*

v.

................................, *Defendant(s)*

**SUMMONS**
**(Mass. R. Civ. P. 4)**
**AND**
**ORDER OF NOTICE**
**ON**
**APPLICATION FOR PRELIMINARY INJUNCTION**

9.D

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
C. A. NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff,

v.

PATRICK RASICOT,
Defendant.

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/4/05

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Softrax Corporation ("Softrax") submits this memorandum in support of its motion for a preliminary injunction. Softrax's former employee Patrick Rasicot ("Rasicot"), a senior product manager who resigned voluntarily and told Softrax's managers that he had no plans to compete, is now working for a direct competitor of Softrax. Rasicot's conduct violates the express terms of his written Noncompetition, Nondisclosure and Inventions Agreement (the "Agreement"), including his covenant not to compete with Softrax. Absent swift entry of an order enjoining Rasicot from further breaching the Agreement, Softrax will certainly continue to suffer irreparable harm including dissemination and abuse of its confidential and proprietary information, loss of goodwill and damage to its reputation. The public interests in fair competition, enforcement of contracts and protection of trade secrets strongly support issuance of the requested preliminary injunction.

## FACTS

### Overview

Prior to voluntarily resigning in June 2005, Rasicot was a senior product strategist for Softrax, a Canton software company. Rasicot was a key player at Softrax and his position required him to be immersed in extensive confidential and proprietary information relating to Softrax's products, product strategies and customer base. In March 2000, in connection with a promotion to product manager, Rasicot signed the Agreement, whereby he promised for a period of two years after leaving Softrax's employ not to compete with Softrax. Since leaving Softrax in June, however, Rasicot has violated the Agreement by going to work for NetSuite, Inc. ("NetSuite"), a direct competitor of Softrax. By this action, Softrax seeks to enforce the contractual promises Rasicot made in the Agreement.

The detailed facts are set forth in the four supporting affidavits. A summary of those facts, with references to the affidavits, appears below.

### Softrax's Business

Softrax is a developer and seller of software designed to enhance revenue management functionality. *Affidavit of Robert D. O'Connor, Jr.* ("*O'Connor Aff.*") at ¶¶1-2. In addition to licensing the software, Softrax also provides professional services to implement the software at the customer's site and develops custom software for customers. *Id.* While Softrax initially focused its products and marketing on the software industry, in recent years it has begun expanding its software packages and related marketing to capture other markets. *Id.* at ¶4. Softrax's business is further described in the O'Connor Affidavit, ¶¶2-9.

**Rasicot's Duties and Responsibilities at Softrax**

In 1996, Rasicot was hired by Softrax as an implementation services professional. *Affidavit of David Milligan* ("*Milligan Aff.*") at ¶¶1-2. This position entailed installing, configuring and implementing Softrax's software at a customer's site as well as training the customer during and following the implementation. *Id.* An important component of this position was a comprehensive knowledge of the software and customer business practices and needs so as to configure the software to meet each customer's special requirements. *Id.* at ¶3.

Rasicot was promoted to product manager in March 2000. *Id.* at ¶4; *O'Connor Aff.* at ¶10. This new position required Rasicot to become further immersed in Softrax's confidential and proprietary information as the position encompassed the areas of product knowledge, customer issues, product development and market requirements. *O'Connor Aff.* at ¶11; *Milligan Aff.* at ¶6; *Affidavit of Gottfried Sehringer* ("*Sehringer Aff.*") at ¶¶1-2. As a product manager Rasicot was responsible for writing software development specifications, understanding and prioritizing customer needs, responding to customer concerns, developing product strategy, and supporting Softrax's staff and customers at all stages of sales and implementation. *Id.* at ¶2.

In recognition of Rasicot's importance to many groups within Softrax, his title was changed to Senior Product Strategist in October 2001. *Id.* at ¶3. There was only one other Senior Product Strategist, *id.*, and Rasicot was responsible for Softrax's three flagship products, *id.* at ¶4. Rasicot's responsibilities for these products were comprehensive and required him to be privy to confidential and proprietary information in a variety of areas. *Sehringer Aff.* at ¶¶4-9; *O'Connor Aff.* at ¶¶10-11; *Milligan Aff.* at

¶¶4-14. A significant portion of Rasicot's job at Softrax involved working with both Softrax's installed customer base and potential customers. *Sehringer Aff.* at ¶5.

**Rasicot's Non-Competition Agreement**

In light of Rasicot's importance to Softrax and the degree to which being a product manager required immersion in Softrax's confidential and proprietary information, upon his promotion to product manager, Softrax required Rasicot to sign the Agreement. *O'Connor Aff.* at ¶¶12-13 and Ex. A. Rasicot promised, for a period of two years, not to engage in any "Prohibited Business", i.e. he promised not to compete. *Agreement* §2. In addition, the Agreement contains a nondisclosure provision to protect Softrax's trade secrets, proprietary data and confidential information. *Id.* at §4. Moreover, Rasicot agreed that his breach of the Agreement could not be adequately compensated by money damages, and that Softrax could seek preliminary injunctive relief. *Id.* at §9. Rasicot and Softrax also agreed that in any action to enforce the Agreement, the non-prevailing party is responsible for all reasonable costs and expenses, including attorneys' fees. *Id.*

**Rasicot's Departure From Softrax And**
**Misrepresentations About His Future Intentions**

Rasicot voluntarily terminated his employment with Softrax as of June 17, 2005. *O'Connor Aff.* at ¶14; *Sehringer Aff.* at ¶10; *Milligan Aff.* at ¶¶15-16; *Affidavit of Jake Fennessy* ("*Fennessy Aff.*") at ¶¶1-3. His decision to leave came as a surprise to Softrax. Because Rasicot's domain knowledge and familiarity with customers and products were so central to Softrax, Softrax explored with him the possibility of his taking other positions at the company. *Id.* at ¶3. Rasicot declined these offers. *Id.* At his departure, Rasicot told Softrax's President that he planned to spend the summer sailing as he

considered what to do next. *O'Connor Aff.* at ¶14. Rasicot told two other Softrax officers that he was taking the summer off to think about his future. *Milligan Aff.* at ¶15; *Sehringer Aff.* at ¶10.

**<u>Softrax's Discovery That Rasicot Was Working For NetSuite</u>**

On or about July 14, 2005, Softrax heard that, despite the repeated statements Rasicot had made to Softrax that he was taking the summer off to sail, Rasicot may have actually joined NetSuite, an aggressive Softrax competitor. *Fennessy Aff.* at ¶¶4-10; *O'Connor Aff.* at ¶¶15, 18; *Milligan Aff.* at ¶¶17-22; *Sehringer Aff.* at ¶¶13-16. On July 18, 2005, Softrax confirmed that, in violation of the Agreement, Rasicot was in fact working for NetSuite. Rasicot claimed he was only consulting for NetSuite two days a week and limiting his services to implementation of products for manufacturing companies. *Fennessy Aff.* at ¶4; *O'Connor Aff.* at ¶18; *Milligan Aff.* at ¶19. He expressly asked Softrax to "cut him some slack." *Milligan Aff.* at ¶19. However, after Softrax sent a cease and desist letter to Rasicot, counsel for NetSuite sent a letter describing Rasicot as an employee of NetSuite who was working with NetSuite's sales force and professional services teams as a Subject Matter Expert and who would soon also be working with NetSuite's customers. *Sehringer Aff.* ¶17 and Ex. E; *Milligan Aff.* at ¶20; *O'Connor Aff.* at ¶¶19-20. In addition, NetSuite's letter contained several material and significant inaccuracies about Rasicot's job responsibilities while at Softrax, including the amount of customer contact Rasicot was required to perform. *Id.* at ¶¶21-25; *Sehringer Aff.* at ¶¶18-22; *Milligan Aff.* at ¶21. Rasicot is presumably the source of those inaccuracies.

**NetSuite Is A Direct Competitor Of Softrax**

NetSuite competes directly with Softrax in providing enterprise software applications that support front and back office functionality. *O'Connor Aff.* at ¶16 *Sehringer Aff.* at ¶¶11-12. According to NetSuite's own website and published statements, NetSuite's software is designed for use by software companies and marketed and sold to software companies. *Id.* In addition, NetSuite has been aggressively pursuing Softrax's top sales representatives and customers. *O'Connor Aff.* at ¶16.

**Rasicot Has Breached the Agreement**

Rasicot has breached the Agreement by working for NetSuite, a direct competitor of Softrax. *O'Connor Aff.* at ¶¶21-26. The Agreement's noncompetition provision prohibits Rasicot, for two years from the date his employment with Softrax ends, from engaging in any "Prohibited Business, defined as "any business engaged primarily in the development…[or] sale of…operations, project management and financial application software designed for use by software companies…." *Agreement* §2. NetSuite is engaged primarily in the development and sale of operations, project management and financial application software and directly competes with Softrax in providing such enterprise software. NetSuite markets its software as being "tailor made" for use by software companies and, NetSuite software is, in fact, marketed to, sold to and used by software companies. *Sehringer Aff,* at ¶12. NetSuite's website and press releases tout its market presence within the software industry. NetSuite, therefore, falls within the Agreement's definition of a "Prohibited Business" and Rasicot's employment is a substantial violation of the Agreement.

**Rasicot Is Not Credible And Cannot Be Trusted With**
**<u>Softrax's Confidential and Proprietary Information</u>**

Rasicot has purposely and repeatedly tried to deceive Softrax with respect to his relationship with NetSuite. When asked point blank by three different Softrax executives (one, the man who had originally hired him and who had worked with him for nine years) about his post-employment plans, Rasicot said he was taking off the summer to sail and think about life. *O'Connor Aff.* at ¶14; *Milligan Aff.* at ¶15; *Sehringer Aff.* at ¶10. In fact, Rasicot's plans were to work for a direct competitor of Softrax. Just weeks after his departure, rumors arose that Rasicot had become associated with NetSuite, a known direct competitor of Softrax. When confronted with those rumors, Rasicot continued to prevaricate. He represented to Softrax's management that he was only consulting two days per week, and that the consulting was limited to implementation of NetSuite's software for manufacturing companies. *Fennessy Aff.* at ¶4. In fact, as Softrax was subsequently to learn, although not from Rasicot, Rasicot was working full-time for NetSuite in a position far different, far more strategic and far more senior than the position he had described as having to Softrax. *Sehringer Aff.* at ¶17; *Milligan Aff.* at ¶20; *O'Connor Aff.* at ¶¶19-20.

In response to a prompt cease and desist letter delivered to him by Softrax on Wednesday, July 20, 2005, and of which he was given prior notice, Rasicot said "[I] will reply to you by next Wednesday, July 27, 2005." Rasicot did not keep his word. He never replied—not by July 27 or at any point thereafter.

Rasicot also apparently misrepresented to NetSuite his job activities at Softrax. NetSuite, with information from Rasicot, claimed Rasicot "did not have broad knowledge of Softrax's customers and its sales methods and he rarely, if ever, worked directly with

customers." *Sehringer Aff.*, Ex. E. The reality, as Rasicot himself asserts in his Softrax employee self-evaluation papers, was that he worked directly and "continually" with Softrax customers and also worked directly and extensively with the Softrax sales force and professional services teams regarding sale methods and customer needs and was "key" in closing sales. *Id.* at ¶¶ 2-9, 15-20 and Ex. A.

With this record of falsehoods, this Court should reject all testimony that Rasicot might offer. Furthermore, it would be foolhardy for Softrax to accept any promise by Rasicot to not disclose Softrax confidential and proprietary information.

## ARGUMENT

Under the familiar considerations of *Packing Industries Group, Inc. v. Cheney*, 380 Mass. 609, 616-18 (1980) -- (1) plaintiff's likelihood of success on the merits, (2) irreparable harm to plaintiff absent the requested relief, (3) the balancing of such hardship against any harm to defendant and (4) the public interest -- Rasicot should be preliminarily enjoined from competing with Softrax, including working for NetSuite, a Softrax competitor.

### I. SOFTRAX HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

As summarized above and detailed in the four supporting affidavits, there is no question that Rasicot's work for NetSuite, a Softrax competitor, violates Section 2 of the Agreement. Utterly without merit, as shown below, is any suggestion by Rasicot that the non-competition covenant is unenforceable. Therefore, Softrax is certain to succeed on its breach of contract claim against Rasicot.

A non-competition agreement is enforceable in Massachusetts if it (1) is necessary to protect a legitimate business interest of the employer, (2) is supported by

consideration, and (3) is reasonably limited in all circumstances, including time and geographic scope, and is otherwise consonant with public policy. *Bowne of Boston v. Levine*, 1997 WL 781444, *2 (Mass. Super. 1997) (copy attached in Appendix of Cases)[1] (*citing Whitinsville Plaza v. Kotseas*, 378 Mass. 85, 102-03 (1962)).

**A. The Agreement protects Softrax's legitimate business interests**

Massachusetts courts regularly enforce non-competition employment agreements where, as in this case, "they are necessary to protect the legitimate business interests of the employer." *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 287 (1974) (citation omitted); *New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 779-80 (1974). Massachusetts courts recognize as legitimate business interests the employer's protection of its goodwill, trade-secrets, and other confidential or proprietary information. *Marine Contractors*, 365 Mass. at 287. The Supreme Judicial Court has stated:

> If any or all of these interests are present in a given case in which a noncompetitive covenant is part of a contractual agreement, then in the absence of equitable factors which would mitigate against enforcement, a court of equity *will not deny enforcement* of a reasonable covenant.

*New England Canteen*, 372 Mass. at 674 (citation omitted) (emphasis supplied). Here, the Agreement expressly states that it designed to protect the goodwill, trade secrets, proprietary data and confidential information of Softrax. *Agreement* §1. Moreover the four supporting affidavits confirm that the non-compete covenant protects Softrax's interest in the proprietary and confidential information associated with product

---

[1] Copies of all Superior Court cases and unpublished cases cited herein appear in alphabetical order in Plaintiff's Appendix of Cases, filed herewith.

development, customer information and marketing strategies. *Philips Elec. North Amer. Corp. v. Halperin*, 2000 WL 33171040 (Mass. Super. 2000) (granting preliminary injunction enforcing two-year nationwide non-compete agreement in software industry).

First, the Agreement certainly protects Softrax's confidential information. In determining whether certain information is confidential and should be afforded protection, several factors are relevant, including:

> the extent to which the information is known outside the business; the extent of measures taken by the employer to guard the secrecy of the information; and the ease or difficulty with which the information could be properly acquired by others.

*Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 169-170 (1991) (internal quotation marks omitted) (*citing Jet Spray Cooler Inc. v. Crampton*, 361 Mass. 835, 840 (1972)).

For five years, Rasicot was a product manager at Softrax, a position that required him to understand the needs of Softrax's different markets, identify and address customer business requirements and to map software functionality against business processes, develop product positioning and determine product development direction for the company's three core products. For several years prior to his resignation, Rasicot was responsible for Softrax's three flagship products and his responsibilities for these products were both comprehensive and required him to be privy to confidential and proprietary information in a variety of areas. In addition, he was integral to training the sales, pre-sales and services staff on product functionality and positioning. Rasicot's position also required him to have extensive contact with both current and prospective customers.

Second, the Agreement protects Softrax's goodwill. Goodwill is a business' "positive reputation in the eyes of its customers or potential customers." *Bowne of Boston*, 1997 WL 78144, *4. Softrax's goodwill consists of its relationship with its customers including its knowledge of its customers and their specific needs and its ability to satisfy customers who will then support Softrax in subsequent sales. As product manager, Rasicot had significant customer contact and awareness of the specific needs of those customers and played a central role in developing customer relationships. Rasicot's employment by Softrax's direct competitor unquestionably constitutes an invasion of Softrax's customer goodwill. *See Borden & Remington Corp. v. Banisch*, 1999 WL 1266161, *3 (Mass. Super. 1999) (granting an injunction enforcing a non-competition agreement where violation of the agreement would result in loss of the plaintiff's customer goodwill); *Browne v. Merkert Enterprises, Inc.*, 1998 WL 151253, *5 (Mass. Super., 1998) (same); *Fortune Personnel Consultants v. Hagopian*, 1997 WL 796494, *3 (Mass. Super., 1997) (upholding a non-solicitation agreement which prohibited a former employee from contacting the firm's customers for a period of two years);

**B. The terms of the Agreement are supported by consideration.**

The requirement of consideration is satisfied where there is either a benefit to the promisor or a detriment to the promisee. *Marine Contractors*, 365 Mass. at 286. The Agreement was specifically entered into upon consideration of Rasicot's promotion to product manager and a salary increase at the time.

**C. The terms of the Agreement are reasonable.**

Under Massachusetts law, non-competition employment agreements, which are for a reasonable term (here, two years), are routinely enforced by injunction. *E.g.*,

*Blackwell v. Helides,* 368 Mass. 225, 228-30 (1975)(enforcing three year post-employment non-compete); *Marine Contractors*, 365 Mass. at 290 (1974) (three year non-compete reasonable); *New England Tree Expert Co., v. Russell*, 306 Mass. 504, 509-510 (1940)(same); *Sherman v. Pfefferkorn*, 241 Mass. 468, 475 (1922)(same); *United Rug Auctioneers, Inc. v. Arsalen*, 2003 WL 21527545 (Mass. Super. 2003) (enforcing two year restriction); ( *Philips Elec. N. Amer. Corp.*, 2000 WL 33171040 (preliminary injunction enforcing two year non-competition agreement covering United States); *Bowne of Boston*, 1997 WL 781444 (preliminary injunction enforcing two year non-competition agreement); *Affinity Partners, Inc. v. Drees*, 1996 WL 1352635 (Mass. Super. 1996)(preliminary injunction enforcing two year non-compete without geographic restriction); *Investors Bank & Trust Co. v. Gunes*, 1994 WL 879800 (Mass. Super. 1994)( preliminary injunction enforcing two year non-competition agreement).

The restrictions on Rasicot's post-employment activities are reasonable. As described above, the Agreement merely prevents Rasicot from working for Softrax's competitors. There remain myriad jobs in the software industry (and elsewhere) for which Rasicot is qualified and free to seek employment.

Given that the terms of the Agreement are reasonable and that the Agreement is necessary to protect Softrax's legitimate business interests, Softrax is certain to succeed on its complaint against Rasicot.

## II. SOFTRAX WILL BE IMMEDIATELY AND IRREPARABLY HARMED IF THE INJUNCTION IS NOT ISSUED.

As a result of Rasicot's conduct, Softrax has already suffered irreparable harm, and unless Rasicot is enjoined, Softrax will continue to suffer irreparable harm.

Irreparable injury exists when

> there is an immediate threat that [defendant] will utilize plaintiff's confidential and proprietary information for the benefit of [his new employer] and to the detriment of the plaintiff and thereby cause damages to the plaintiff which cannot be readily remedied by a monetary award.

*Investors Bank & Trust Co.*, 1994 WL 879800 * 1. Damage to a company's goodwill is "likely to be irreparable in that, once it occurs, it cannot be undone and its financial implications are almost impossible to measure." *Fortune Personnel Consultants*, 1997 WL 796494 *3. The facts here overwhelmingly demonstrate that Softrax will suffer irreparable harm unless Rasicot is enjoined from working for NetSuite and other Softrax competitors.

As a practical matter, the nondisclosure provisions of the Agreement and any confidentiality agreements Rasicot has made with NetSuite cannot adequately protect Softrax from the inevitable disclosure and use by Rasicot and NetSuite of Softrax's confidential and proprietary information. It is unrealistic and impractical to assume that Rasicot can work for NetSuite without, consciously or unconsciously, relying upon or being influenced by his intimate knowledge of all phases of Softrax's product development and marketing of its software. Recognizing that inevitable disclosures of confidential information by a former employee are a legitimate concern, United States District Judge Lindsay relied upon the following reasoning when issuing a preliminary injunction in favor of the former employer:

> the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure. The problem for [the former employer] is that when [the employee] goes to [the new employer] he does not go with a tabula rasa with respect to [the former employer's] products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive of how all the information stored in [the former employee's] memory can be set aside as he

> applies himself to a competitor's business and products. On the contrary, what [the employee] knows about [the former employer] is bound to influence what he does for [the new employer,] and to the extent it does, [the former employer] will be disadvantaged.

*Marcam Corp. v. Orchard*, 885 F. Supp.294, 297 (D. Mass. 1995). *See also C.R. Bard, Inc. v. Intoccia*, 1994 WL 601944, *3 (D. Mass., 1994)("[the employee] could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his new employer he will inevitably draw upon that knowledge"); *Investors Bank & Trust Co.*, 1994 WL 879800 at *1 (Court found there was an immediate threat that a former employee could use his employer's confidential and proprietary information for the benefit of his new employer and to the detriment of his former one, where it would be "difficult or impossible" for the employee not to use such information while working for the competitor).

The problem of the inevitable disclosure of Softrax's confidential and proprietary information is particularly compelling in the present context because Rasicot was integral to so many aspects of Softrax's business and it is inevitable that Rasicot will disclose and use Softrax's confidential and proprietary information during the course of his work for a direct competitor such as NetSuite.

Moreover, in the Agreement, Rasicot expressly agreed that in the event he breached any of the provisions therein, there would be substantial and irreparable harm to Softrax and an award of monetary damages would be inadequate. *Agreement* §9. *See Veridiem, Inc. v. Phelan*, 2003 WL 22481390 (Mass. Super. 2003) (issuing injunction for non-competition agreement where employee agreed that any breach will cause irreparable harm); *EMC Corp. v. Kempel*, 2001 WL 1763451, *4 (Mass. Super. 2001) (issuing injunction for non-competition agreement where "The Agreement itself, in plain

language, recites 'that any breach...will cause immediate and irreparable harm to [plaintiff] not compensable by monetary damages and that [plaintiff] will be entitled to obtain injunctive relief'); *Stone Legal v. Glebus*, 2003 WL 914994, *6 (Mass. Super. 2003) (issuing injunction where agreement itself stated breach would lead to irreparable injury); *Borden & Remington Corp. v. Banisch*, 1999 WL1266161, *5 (Mass. Super. 1999) (same), *EMC Corp. v. Allen*, 1997 WL 1366836, *4 (Mass. Super. 1997) (enforcing non-competition agreement by injunction where "the agreement itself provides that it is enforceable by injunction.").

## III. IF THE AGREEMENT IS NOT ENFORCED, THE INJURY TO SOFTRAX FAR OUWEIGHS ANY HYPOTHETICAL HARM TO RASICOT

The balancing of harms in this case tilts strongly in favor of Softrax. The injury Softrax will suffer if the agreed-upon non-competition covenant is not enforced decidedly outweighs any potential harm to Rasicot from requiring him to abide by the terms of the Agreement.

Weighing the harms should not focus on the "raw amount of irreparable harm" each party might suffer, "but rather the risk of such harm in light of the party's chance of success on the merits." *Packaging Industries Group*, 380 Mass. at 617. Softrax will be irreparably harmed by the disclosure of its confidential and proprietary information to a direct competitor and its loss of customer goodwill, and it is certain to succeed on the merits. Rasicot, on the other hand, will suffer no protectable injury if he is held to the terms of the Agreement. As the SJC in *Marine Contractors Co. v. Hurley* observed:

> The consequence of every covenant not to compete, however, is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable. [The former

> employee] has not established any *extraordinary hardship* which would be caused him by the enforcement of his promise not to compete.... *[The former employee] freely entered into the agreement not to compete....and there is no evidence of any subsequent change in circumstances which might cause him unanticipated hardship.*

365 Mass. at 289 (emphasis added).

Here, the non-competition provisions are narrow and only prevent Rasicot from working for a competitor to Softrax. A grant of injunctive relief enforcing the non-competition agreements *in no way prevents* Rasicot from earning a living in his chosen profession. There are countless jobs available to Rasicot at firms that do not compete with Softrax. *See Shipley Co. v. Kozlowski*, 926 F. Supp. 28, 29 (D.Mass. 1996) (awarding injunctive relief and enforcing non-competition clause because the clause did not prevent the defendant from working in his chosen occupation). Thus the balancing of the equities strongly favors Softrax and the granting of injunctive relief.

**IV. The Public Interest Will Be Served By Granting the Injunctive Relief.**

Applying Massachusetts law, the Massachusetts federal court has recognized:

> [i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged.

*New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929 *3 (D. Mass. June 4, 1996); *see also Shipley Co.*, 926 F. Supp. at 30 (granting injunctive relief because "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted"). Here, the public interest will be best served by requiring Rasicot to abide by the terms of the Agreement which he voluntarily and knowingly signed. *Philips Electronics*, 2000 WL 33171040, *4.

The public interest is also promoted by enforcement of contracts, such as the Rasicot-Softrax Agreement, that protect fair competition and protect legitimate business interests. *See* pp. 8-11 *supra*.

**CONCLUSION**

Softrax respectfully requests this Court to grant Softrax's Motion for Preliminary Injunction.

SOFTRAX CORPORATION

By its attorneys,

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Dated: August 4, 2005

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

CERTIFICATE OF SERVICE
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party ~~by mail~~/by hand
Date: 8/4/05

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
C. A. NO. 05-1342

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

**PLAINTIFF'S APPENDIX OF CASES**

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

# APPENDIX OF CASES

1. *Affinity Partners, Inc. v. Drees*, 1996 WL 1352635 (Mass. Super. Jan. 6, 1996)

2. *Borden & Remington Corp. v. Banisch*, 10 Mass.L.Rptr. 696, 1999 WL 1266161 (Mass. Super. Oct. 18, 1999)

3. *Bowne of Boston, Inc. v. Levine*, 7 Mass.L.Rptr. 685, 1997 WL 781444 (Mass. Super. Nov. 25, 1997)

4. *Browne v. Merkert Enterprises, Inc.*, 8 Mass.L.Rptr. 309, 1998 WL 151253 (Mass. Super. March 31, 1998)

5. *C.R. Bard, Inc. v. Intoccia*, 1994 WL 601944 (D. Mass. Oct. 13, 1994)

6. *EMC Corp. v. Allen*, 1997 WL 1366836 (Mass. Super. Dec. 15, 1997)

7. *EMC Corp. v. Kempel*, 14 Mass.L.Rptr. 131, 2001 WL 1763451 (Nov. 20, 2001)

8. *Fortune Personnel Consultants of Boston, Inc. v. Hagopian*, 8 Mass.L.Rptr. 49, 1997 WL 796494 (Mass. Super. Dec. 30, 1997)

9. *Investors Bank & Trust Company v. Gunes*, 1994 WL 879800 (Mass. Super. June 2, 1994)

10. *Marcam Corp. v. Orchard*, 885 F.Supp. 294 (D. Mass. 1995)

11. *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929 (D. Mass. June 4, 1996)

12. *Philips Electronics North America v. Halperin*, 13 Mass. L.Rptr. 10, 2000 WL 33171040 (Mass. Super. Dec. 12, 2000)

13. *Shipley Co. v. Kozlowski*, 926 F.Supp. 28 (D. Mass. 1996)

14. *Stone Legal Resources Group, Inc. v. Glebus*, 2003 WL 914994 (Mass. Super. Dec. 16, 2002)

15. *United Rug Auctioneers, Inc. v. Arsalen*, 16Mass. L.Rptr. 420, 2003 WL 21527545 (Mass. Super. April 11, 2003)

16. *Veridiem, Inc. v. Phelan*, 17 Mass.L.Rptr. 8, 2003 WL 22481390 (Mass. Super. Sept. 26, 2003)

C
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
AFFINITY PARTNERS, INC.,
v.
Stephen D. DREES.
**No. 952564.**

Jan. 6, 1996.

MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

COWIN.

*1 The plaintiff Affinity Partners, Inc. ("the company" or "Affinity") seeks a preliminary injunction restraining the defendant Stephen D. Drees ("Drees") from violating the noncompetition and nondisclosure clauses of the Employment Agreement ("the Agreement") which he executed before he began working for Affinity. Affinity seeks to enjoin Drees from a) interviewing with or working for a competitor and b) directly or indirectly utilizing or disclosing any proprietary or confidential information he obtained while employed at Affinity. This Court (Cowin, J.) entered a temporary restraining order on November 28, 1995. For the following reasons, plaintiff's motion for preliminary injunction is ALLOWED.

BACKGROUND

The parties have filed affidavits and memoranda and a hearing has been held. The following facts are taken from the parties' submissions.

Affinity finds and develops business relationships to market affinity and cobranded credit cards between nonprofit and corporate sponsors and the First USA Bank, a credit card company. An affinity card is a major credit card, such as MasterCard or Visa, that is sponsored or endorsed by a group such as an alumni association or charitable organization. A cobranded card credit card is sponsored or endorsed by another corporation such as the GM MasterCard, the Shell MasterCard, or the Walden Books VISA. The affinity card and cobranded credit card market are the fastest growing parts of the credit card market.

Affinity has an exclusive arrangement with First USA Bank and its affiliates ("First USA") to develop and negotiate affinity and cobranded marketing agreements for MasterCard and VISA credit cards issued by First USA. First USA is Affinity's sole client. The relationship between First USA and Affinity is governed by an agreement ("First USA Agreement") which requires Affinity to "take whatever action is necessary or appropriate to ensure that its employees ... comply with the provisions of ... Section 6" of the First USA Agreement. Section 6 provides that:

(a) All customer and prospective customer lists (unless clearly identified by the disclosing party as being nonconfidential), all business plans, all marketing strategies and programs (including advertising), all information relating to an identifiable customer's credit card account, the terms and conditions of this Agreement, and all information specifically designated as being confidential that is conveyed by either party to the other shall be deemed confidential.

First USA has the second largest market share of affinity and cobranded credit card programs in the country, measured by number of relationships or credit card partnerships. The largest share belongs to MBNA, America, a Delaware corporation.

Affinity has spent substantial resources developing strategies, pricing structures and marketing plans. Affinity requires every sales and management employee [FN1] to sign an agreement containing noncompetition and nondisclosure clauses prior to becoming an employee.

FN1. Fifteen of Affinity's twenty-seven employees are in sales and management.

*2 Drees worked for MasterCard International ("MCI") for about three years before being hired by Affinity. At MCI Drees developed new approaches to partnership credit card marketing and acquired an international reputation in that area. In 1993 he became MCI's Vice President for cobranded Sales and Marketing.

Later in 1993, the principals of Affinity hired Drees as the Senior Vice President, Cobranding. His salary was set at an annualized draw of $100,000. [FN2] Before Drees accepted the new position, MCI asked him to reconsider his decision and offered him more money and further opportunities. Drees' change in position was noted in several trade journals.

FN2. The papers do not explain what an "annualized draw" is.

On October 19, 1993, Affinity and Drees executed the Agreement containing *inter alia* the noncompetition and nondisclosure clauses. These clauses provide as follows:

> For so long as Employee is employed by the Company and for the period of time (the "Non-competition Period") as set forth in Schedule C, Employee will not, without the prior express written consent of the Company, directly or indirectly, engage in, participate in, or assist, as owner, part owner, partner, director, officer, trustee, employee, agent, advisor, or consultant, or in any other capacity, any business organization whose activities are directly or indirectly competitive with or whose activities or services are similar to the activities or services of the Company then existing or then under development or proposed, as may reasonably be determined by the Company acting in good faith.
>
> Employee recognizes that by reason of his affiliation and employment with the Company he has had, or will have, contact with and gained knowledge of certain confidential information, including analyses of the Company's prospects and opportunities, customer lists and potential customer lists, the Company's plans for present and future development and other proprietary information not available to the public which gives the Company special competence in its field of endeavor, all of which have been or will be acquired at considerable expense to the Company ("Proprietary Information"). Employee understands that as part of his/her employment, Employee is expected to make contributions of value to the Company. Employee acknowledges that the terms of this employment and his/her position with the Company create a relationship of confidence and trust between Employee and the Company with respect to the Proprietary Information. For purposes of this Agreement, Proprietary information shall not include information and data which at the time of disclosure to Employee is generally available to the public on an unrestricted basis or subsequently becomes so available by reason other than Employee's breach of this Agreement.
>
> Employee will not, during any time after the term of his/her employment by the Company, disclose any Proprietary Information, or anything relating to it, to any person, firm, corporation, association, partnership or other entity or individuals for any reason or purpose whatsoever.

*3 The minimum noncompetition period agreed to by Drees and Affinity, pursuant to the Agreement, is 24 months following termination.

The Agreement provided that Drees could be terminated without cause. In such event, he could continue his then current cash draw for six months, plus family health benefits.

On May 19, 1995, Affinity terminated Drees for failure to generate business. Drees has received $50,000.00 since his termination date. The noncompetition period began on May 19, 1995 and ends May 18, 1997.

During his employment, Drees learned the strategies that the company and First USA use to find customers; the contract terms between the company's customers and First USA; First USA's minimum pricing requirements and the identity of Affinity partners and customers. Affinity claims that this information is highly confidential. Before leaving Affinity, Drees voluntarily had all Affinity information copied from his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

laptop computer onto a disk and deleted it from his hard drive. The disk was turned over to Affinity.

In an affidavit filed with the Court, Drees states that he has never disclosed any of Affinity's confidential or proprietary information and that he "has no intention" of disclosing any information about the contracts or deals with which he was involved while at Affinity or about potential licensors "engaged in serious discussion or negotiations with Affinity."

Drees interviewed at MBNA shortly before he was terminated by Affinity. Before the meeting was held he revealed the terms of the Agreement to MBNA. MBNA is in direct competition with Affinity, but is larger than and engages in many more activities than Affinity.

Plaintiff now seeks to enforce the nondisclosure and noncompetition clauses, claiming it will be irreparably harmed should Drees disclose information regarding Affinity partners and customers and/or the terms of First USA's contract with Affinity and First USA's pricing and marketing structure.

DISCUSSION

In order to obtain preliminary injunctive relief, plaintiff must demonstrate:

> 1) a likelihood of success on the merits; 2) irreparable injury to the plaintiff if the injunction is not granted; 3) that the injury to the plaintiff outweighs any harm which granting injunctive relief would inflict on the defendant; and 4) that the public interest will not be adversely affected by the granting of the injunction. Noncompetition agreements are enforceable to the extent that they are reasonable and necessary to protect the employers' legitimate interest. *Packaging Industries Group v. Cheney*, 380 Mass. 609 (1980).

Both the circumstances under which the agreement was made and the circumstances of the termination of the employment relationship are relevant to the determination of reasonableness. Equitable considerations, such as unequal bargaining power, may weigh against enforcement of agreements such as the one in issue because they are often the product of unequal bargaining power. See, for example, *Sentry Ins. v. Firstein*, 14 Mass.App.Ct. 706, 707 (1982).

*4 In the instant case, however, Drees apparently was recruited by Affinity. It would appear that Drees was in a position to bargain for, and obtain, favorable terms in the Agreement. By his own admission, he could have remained with MCI in a beneficial position. He chose instead to work for Affinity and to accept the terms of employment that it imposed. He was not hired as a low-salaried clerk.

The circumstances of the termination also favor enforcement of the covenants. Affinity claims that Drees was terminated for failure to generate business. Drees claims he was terminated because of personality conflicts among Affinity's principals. It is impossible, at this point in the proceedings, to determine exactly how helpful Drees was to the company. There is clearly room for dispute on the issue. Whatever the reason for his termination, Drees' right to a continuing draw (here amounting to $50,000), and health premiums for six months helps to render the circumstances of the termination reasonable.

In regard to the proprietary information clause, an employer may legitimately seek to protect the following by means of an employment agreement: (1) trade secrets; (2) confidential information; and (3) good will. *New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977) and cases cited. There is no meaningful distinction between "trade secrets" and "confidential information ." *Chomerics, Inc. v. Ehrreich*, 12 Mass.App.Ct. 1, 10 n. 17 (1981); *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 165 (1979). A trade secret may consist of:

> any formula, pattern, device or compilation of information which is used in one's business, and which gives him [sic] an opportunity to obtain an advantage over competitors who do not know or use it. It may be ... a list of customers ... RESTATEMENT OF TORTS, Section 757, comment b (1939).

However, to warrant protection, information must indeed be confidential. The following 6 step analysis is applied to determine whether information is in fact confidential:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* [FN3]

FN3. The growth of the legal fields of Unfair Competition and Trade Regulation has rendered the liability principles relating to unfair trade practices, covered by § 757, decreasingly dependent upon the tort law in which they were rooted. Consequently, Section 757 of the Restatement of Torts was omitted from the Second Restatement.

Having considered the above definition and applying the analysis to the facts of this case, Affinity has shown that it has a reasonable likelihood of establishing that the information concerning Affinity partners and customers and the terms of the Affinity First USA contract and First USA's pricing and marketing structure are confidential information. The information gives Affinity an advantage over competitors and Affinity made efforts to keep the information confidential. Indeed, Affinity was required to do so under its agreement with First USA. Affinity took reasonable measures to keep its information confidential. Affinity is likely to establish that the nondisclosure clause of the agreement is reasonable.

*5 Concerning the noncompetition clause, a covenant restricting competition is not invalid and may be enforced if it is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest. Whether such a covenant is reasonable in time and space depends upon the facts of each case. *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 716 (1961). Here, Affinity seeks to enforce its noncompetition covenant for a period of two years.

In determining whether a restriction is reasonable, a court is to consider the nature of the plaintiff's business and the character of the employment, the situation of the parties, the necessity of the restriction for the employer's protection and the employee's right to work and earn a living. *Richmond Brothers, Inc. v. Westinghouse Broadcasting Co., Inc.*, 357 Mass. 106, 110 (1970).

When any covenant not to compete is enforced, the covenantor is deprived of a possible means of earning a living. That fact alone, however, does not render such covenants unenforceable. *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280 (1974). Affinity has a reasonable likelihood of establishing that the two-year covenant is reasonable. This is particularly true in view of the generous benefits Drees received during the first six months of that period.

Although the covenant is labeled a noncompetition one, it restricts Drees not only from working for any competitors of Affinity, but also from working for any company whose activities or services are *similar* to those of Affinity. This provision appears to be unreasonable. It does not seem that Affinity would be likely to succeed in establishing that such an extensive noncompetition restriction is reasonable. There is nothing in the present record that would render this agreement unreasonable (other than the part above stated), absent a decision that such covenants are per se void as against public policy. This is not the current state of the law.

It is noted that Drees stated in his affidavit that he has never disclosed any confidential or proprietary information of Affinity and has no intention of doing so. In this Court's opinion, however, an injunction enforcing solely the nondisclosure covenant is of little value to the plaintiff. It would seem to be impossible for plaintiff to ascertain if there is ever a violation. If material is disclosed to a competitor for whom Drees may work, Affinity would have no means of ascertaining (or proving) that fact. Affinity could lose business to a competitor as a result and be unable to determine that it was due to the disclosure of its protected information.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For purposes of a preliminary injunction plaintiff has convinced this court that it has a reasonable likelihood of prevailing. Plaintiff has shown that it will be harmed if the injunction is not granted. The defendant undoubtedly will be harmed by the allowance of this injunction. However, he knowingly accepted the terms of this agreement and he has accepted the benefits of the six-month severance package. The injunction will issue. [FN4]

FN4. At the preliminary injunction hearing, the Court offered a speedy trial (i.e. in February) to the parties. The company indicated it could be ready by then; defendant wished time for discovery and to prepare counterclaims and could not be ready for trial for about six months. Accordingly, the Court ordered trial rescheduled for June 1996.

PRELIMINARY INJUNCTION

***6** In accordance with the above, it is hereby ORDERED that defendant, Stephen D. Drees, be and he hereby is, enjoined from directly or indirectly engaging in, participating in, or assisting as owner, partner, director, officer, trustee, employee, agent, advisor, or consultant or in any other capacity, any business organization whose activities are directly or indirectly competitive with the Affinity Partners, Inc., and it is FURTHER ORDERED that defendant, Stephen D. Drees, be and he hereby is enjoined from directly or indirectly disclosing any proprietary information of Affinity Partners, Inc., or anything relating to it, to any person, firm, corporation, association, partnership or other entity or individuals for any reason or purpose whatsoever.

1996 WL 1352635 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

Superior Court of Massachusetts.
BORDEN & REMINGTON CORPORATION,
v.
Thomas J. BANISCH, et al.
**No. A9901270.**

Oct. 18, 1999.

MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

BURNES.

***1** This action is before this Court on the plaintiff Borden & Remington Corporation's ("B & R") request for a preliminary injunction. B & R argues that its former employee, defendant Thomas J. Banisch ("Banisch"), violated the non-competition and confidentiality provisions of an Employment Agreement entered into by B & R and Banisch in connection with an Asset Purchase Agreement, whereby B & R agreed to purchase assets owned and operated by Banisch for $300,000. B & R asks this Court to enforce the non-competition and confidentiality provisions of the Employment Agreement by issuing a Preliminary Injunction. Banisch opposes the motion, arguing that: (1) B & R breached the Asset Purchase Agreement by not paying the entire $300,000; (2) the non-competition agreement is unreasonable in duration and geography; and (3) the requirements for a grant of a preliminary injunction have not otherwise been met. For the reasons set forth below, B & R's Motion for a Preliminary Injunction is ALLOWED.

*BACKGROUND*

The plaintiff B & R, a Massachusetts corporation, is a manufacturer and distributor of industrial chemicals operating in Fall River, Massachusetts. On May 4, 1999, B & R and Banisch, president of Kensington and T.D. Mack, executed an Asset Purchase Agreement and an Employment Agreement. B & R and Banisch agreed to an arrangement whereby Banisch transferred his customer lists, supplier agreements, product lines, returnable plastic drums, and related licenses, permits and agreements relating to such assets, in exchange for $300,000 payable as follows: (i) $100,000 at the closing; (ii) $100,000 on June 4, 1999; and (iii) $100,000 on July 13, 1999. B & R did not purchase capital stock, existing inventory or products, accounts receivable, machinery and equipment, owned or leased real property or other assets.

One of the conditions for B & R's entering into the Asset Purchase Agreement was Banisch's contemporaneous signing of an Employment Agreement. The Employment Agreement covers the time period from May 4, 1999 to May 3, 2004, and includes the following pertinent provisions:

Section 9. *Confidentiality and Non-competition.* In consideration of the mutual promises contained herein, and to preserve the goodwill of [B & R, Banisch] agrees as follows:

(a) [Banisch] will not at any time, directly or indirectly, disclose, divulge or make use of, except as required in connection with the performance of his duties for [B & R], any Confidential Information acquired by him during or in connection with his affiliation with or employment by [B & R].

(c) During the term of this Agreement, or, if this Agreement is terminated earlier pursuant to Section 10, until May 3, 2004, [Banisch] will not, directly or indirectly, individually or as a consultant to, or employee, officer, director, stockholder, partner or other owner of or participant in any business entity, engage in or assist any other person to engage in any business which sells, distributes, trades, barters and otherwise deals in chemicals and chemical products anywhere in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, New York, New Jersey or Pennsylvania. Notwithstanding the foregoing, it is agreed [Banisch] may be ... (ii) the owner of an internet business, tentatively called "Chemswap.com" ...

***2** (d) Prior to accepting or engaging in any other

business activity on or before May 3, 2004, [Banisch] agrees to provide written notice to [B & R] and obtain [its] consent to such business activity ...

(f) [Banisch] acknowledges that a breach of any of the covenants contained in this Section 9 could result in irreparable injury to [B & R] for which there might be no adequate remedy at law, and that, in the event of such a breach or threat thereof, [B & R] shall be entitled to obtain a temporary restraining order and/or a preliminary injunction and a permanent injunction restraining him from engaging in any activities prohibited by this Section 9.

Upon the execution of both agreements, Banisch became a B & R employee. Banisch worked as B & R's Marketing Director, where his responsibilities included integrating the Purchased Assets into B & R's business and maintaining and expanding customer and supplier relationships for B & R's benefit.

On August 12, 1999, B & R terminated Banisch's employment citing his breach of the Employment Agreement. B & R alleges that Banisch violated the Employment Agreement when he purchased supplies from Ashland Chemical without B & R's consent. According to the Verified Compliant, B & R alleges that this purchase was evidence of Banisch's attempt to compete with B & R. B & R did not make the final $100,000 payment to Banisch on July 13, 1999 as agreed in Section 1.03 of the Asset Purchase Agreement. According to the Verified Complaint, B & R alleges that Banisch continues to contact and solicit business from B & R customers in violation of the Employment Agreement.

*DISCUSSION*

To obtain a preliminary injunction the moving party must demonstrate both a likelihood of success on the merits of the claim, and a substantial risk of irreparable harm in the absence of an injunction. *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617, 405 N.E.2d 106 (1980). If these factors are established, the court must balance them against the harm that the injunction will inflict on the opposing party, including impact on the public interest. See *T & D Video, Inc., v. City of Revere*, 423 Mass. 577, 580, 670 N.E.2d 162 (1996). The inquiry should not focus on determining the "raw amount of irreparable harm" each party might suffer, "but rather the risk of such harm in light of the party's chance of success on the merits." *Packaging Industries Group*, 380 Mass. at 617, 405 N.E.2d 106.

A. Likelihood of Success on the Merits

An employer may enforce the terms of a non-solicitation agreement with a former employee when it demonstrates that the agreement is (a) necessary to protect a legitimate business interest of the employer, (b) is supported by consideration, (c) is reasonably limited in all circumstances, including time and space, and (d) is otherwise consonant with public policy. *Whittinsville Plaza v. Kotseas*, 378 Mass. 85, 102-03, 390 N.E.2d 243 (1979). See also *Blackwell v. E.M Helides, Jr., Inc.*, 368 Mass. 225, 228, 331 N.E.2d 54 (1975); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778, 308 N.E.2d 481 (1974).

*3 B & R argues that the agreement is enforceable because it is necessary to protect its goodwill and confidential information, is supported by consideration, is reasonable in duration and geography, and is consonant with public policy. On the other hand, Banisch argues that he was not given access to confidential records and information, that B & R did not pay the full consideration for assets purchased, that the agreement is unreasonable in duration and geography, and that B & R will not suffer immediate and irreparable harm if the injunction is denied.

1. Goodwill

Goodwill is considered a legitimate business interest that an employer is entitled to protect. *Kroeger v. Stop & Shop Cos., Inc.*, 13 Mass.App.Ct. 310, 316, 432 N.E.2d 566, rev. den. 386 Mass. 1102, 440 N.E.2d 1175 (1982). Goodwill is the company's positive reputation in the community, particularly in the eyes of its customers and potential customers. See *Bowne of Boston, Inc. v. Levine & Merrill Corp.*, 7 Mass.L.Rptr. 685, 1997 WL 781444, *2 (Mass.Super.). This is the core of what B & R purchased in this deal: customer, supplier and vendor relationships and the agreements which support them.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Banisch's close associations with B & R's new customers and suppliers in his former role as President of Kensington and T.D. Mack coupled with the nature of the business leads the court to find that there is a strong likelihood that Banisch will injure B & R's goodwill if he is not restrained from violating the non-competition provisions of the Employment Agreement. If Banisch is not restrained from violating the Employment Agreement, he would have a good chance of acquiring back what he sold to B & R without paying for it. The non-competition provisions of the Employment Agreement are necessary to protect B & R's goodwill.

*2. Confidential Information*

The following six factors are relevant to the court's determination of whether information is confidential:

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the employer to guard the secrecy of the information;

(4) the value of the information to the employer and to his competitors;

(5) the amount of effort or money expended by the employer in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921 (1972); *Warner-Lambert Co. v. Execuquest Corp.,* 427 Mass. 46, 49 n. 5, 691 N.E.2d 545 (1998). Banisch argues that he never received any confidential pricing information and, therefore, could not have violated the confidentiality provision of his Employment Agreement. B & R's Verified Compliant contradicts Banisch by stating that Banisch, as a member of the management team, did receive a list of B & R's inventory of chemicals that included the prices of the products in addition to pricing strategies, identities of customers, and B & R's general marketing plans and strategies, Banisch admits that he received a "slow moving inventory list" which contained pricing and that he also made efforts to engage in business dealings he thought would be of interest to B & R.

*4 Here, the information on prices, pricing strategies, identities of customers, and general marketing plans is not likely to be known outside of B & R. The information would be highly valuable to competitors. Only those in management or sales are given access to this information and they are forbidden from divulging this information to those outside of B & R. The court concludes that the information B & R seeks to protect is likely to be confidential. See *Marine Contractors Co. Inv. v. Hurley,* 365 Mass. 280, 287, 310 N.E.2d 915 (1974). B & R has established that it is likely to succeed in showing that it is entitled to protect its confidential information.

*3. Consideration*

Banisch contends that the Employment Agreement is void because he did not receive full consideration under the Asset Purchase Agreement. The mechanism for determining whether Banisch is entitled to the final payment is arbitration, as provided in the Employment Agreement. B & R is entitled to a preliminary injunction to protect the status quo pending a decision by the arbitration panel. Certainly Banisch has already received substantial consideration in the amount of $200,000.

*4. Reasonableness*

"Any covenant restricting competition is to be enforced only to the extent that it is reasonable in time and space, necessary to protect legitimate interests, and not an obstruction of public interest." *Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 498, 488 N.E.2d 22 (1986). The party seeking to enforce the covenant has the burden of proving the existence of the requisite facts and circumstances. *New England Canteen Services, Inc. v. Ashley,* 372 Mass. 671, 675, 363 N.E.2d 526 (1977).

Banisch argues that the provisions in the Employment Agreement relating to duration and geography are unreasonable. According to the agreement, Banisch is prohibited from conducting business in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, New York, New Jersey, or Pennsylvania. He is not to conduct chemical business dealings in this geographic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area until May 3, 2004. In this case, B & R is likely to be able to prove that the five year time period is reasonable. This time period has been upheld in other cases involving the enforcement of non-competition covenants. *Alexander & Alexander*, 21 Mass.App.Ct. at 498, 488 N.E.2d 22; *Southern New England Ice Co. v. Ferrero*, 295 Mass. 446, 447, 450, 4 N.E.2d 359 (1936); *Walker Coal & Ice Co. v. Love*, 273 Mass. 564, 565, 567, 174 N.E. 199 (1931). Both Banisch and B & R were represented by counsel when they entered into the agreements. *Wells v. Wells*, 9 Mass.App.Ct. 321, 324-325, 400 N.E.2d 1317 (1980). Under the Employment Agreement, Banisch may continue to work in the industry as owner and operator of his internet business "Chemswap.com." Hence, the agreement is enforceable because it does not unreasonably curtail Banisch's right to earn a living. Moreover, B & R's reasonable need to protect its goodwill and confidential information outweighs the restraint imposed on Banisch.

*4. Public Policy*

*5 A covenant not to compete is enforceable to the extent it is consonant with the public interest. *Alexander & Alexander, Inc.*, 21 Mass.App.Ct. at 501, 488 N.E.2d 22. As stated previously, the Employment Agreement is reasonable in scope and was the product of negotiation. Public policy will not be ill-served by enforcement of this agreement.

B. Irreparable Harm

Irreparable harm is a loss of rights that cannot be vindicated should the party seeking an injunction prevail after a full hearing on the merits. *Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue*, 406 Mass. 701, 710, 550 N.E.2d 1361 (1990). In this Commonwealth, the loss of goodwill has been recognized as being particularly hard to quantify, giving rise to the need for equitable relief. *Kroeger*, 13 Mass.App.Ct. at 322, 432 N.E.2d 566. Furthermore, the parties agreed that a violation of the Employment Agreement would constitute irreparable harm.

Based on the foregoing discussion, the Court concludes that B & R will suffer irreparable harm in the nature of lost goodwill and disclosure of confidential information if the agreement is not enforced.

C. Balance of the Harm

Lastly, the balance of harm weighs in favor of B & R. As discussed above, B & R stands to suffer a loss of goodwill and risks having confidential information about the company disclosed by Banisch. The court recognizes that the agreement imposes a significant restraint on Banisch, but it does not prevent him from working in the chemical industry all together. Thus, this Court finds that B & R is likely to prevail in this litigation, and that, on balance, the risk of irreparable injury to B & R from denying the preliminary injunction exceeds the risk of irreparable injury to Banisch from granting the requested relief.

ORDER

For the reasons stated above, Borden & Remington's motion for a preliminary injunction is ALLOWED. It is hereby ORDERED that Banisch is preliminarily enjoined for a period of five years from the date of the Employment Agreement from:

(1) using or disclosing Borden & Remington's confidential information and/or trade secrets,

(2) engaging directly or indirectly in chemical business dealings as described in Section 9(c) and 9(e) of the Employment Agreement, and

(3) representing himself as or in any way acting or holding himself out as an agent, employee, servant, or related entity or affiliate of Borden & Remington with respect to Borden & Remington customers, prospective customers, suppliers, prospective suppliers, or any other person or entity.

10 Mass.L.Rptr. 696, 1999 WL 1266161 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Superior Court of Massachusetts.
BOWNE OF BOSTON, INC.
v.
Ian LEVINE and Merrill Corporation
**No. CIV.A. 97-5789A.**

Nov. 25, 1997.

*MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

BURNES, Justice.

***1** This action is before this Court on the plaintiff, Bowne of Boston, Inc.'s ("Bowne"), request for a preliminary injunction. Bowne argues that a former employee, defendant Ian Levine ("Levine"), violated the terms of a non-solicitation agreement signed by Levine while in the employ of Bowne. Bowne asks this Court to restrain Levine from violating the terms of the agreement. Levine opposes the motion, arguing that the agreement does not protect a legitimate business interest of Bowne, that the agreement is unreasonable in scope, and that the requirements for a grant of a preliminary injunction have not otherwise been met. For the reasons set forth below, Bowne's Motion for a Preliminary Injunction is *ALLOWED.*

## I. BACKGROUND

The facts were gathered from Bowne's verified complaint, the parties' memoranda and supporting affidavits.

Bowne is a Massachusetts corporation engaged in the business of providing financial printing, corporate printing, multimedia multilingual document-building solutions, and other printing services. Defendant Merrill Corporation ("Merrill"), Levine's current employer, is a direct competitor of Bowne, providing essentially the same printing services. Both companies serve entities in the corporate world, providing their printing services for public offerings, mergers and acquisitions, and corporate compliance needs. In addition to offering similar services, both Bowne and Merrill use substantially similar printing technology.

Levine became an employee of Bowne on December 16, 1985. Initially hired as a salesman, Levine eventually attained the status of vice president of sales. As a member of Bowne's sales team, Levine was responsible for servicing Bowne's existing clients and generating new business. In an effort to retain old clients and develop new ones, Bowne, like its competitors, expected its sales representatives to entertain old and prospective clients. At Bowne, Levine was provided with an unlimited expense account for those purposes. By virtue of his position at Bowne, Levine entertained clients and potential clients by taking them out to dinner, to theatrical productions, to professional sporting events, and to Foxwoods Casino in Connecticut.

On April 17, 1994, in exchange for Bowne's agreement to establish a minimum level of annual compensation for Levine, he signed an Employee Non-competition Agreement ("Agreement"). The Agreement included a non-solicitation clause that reads as follows:

> [W]ith respect to the two years immediately after your employment terminates for any reason, you agree not to help a competitor of Bowne solicit the business of any customer, client (such as an outside attorney, investment banker or other professional adviser) or individual who worked for a customer or client, who was assigned to you as a potential source of business or for whom you received sales credit during the two years prior to your leaving Bowne. Nor will you, during those two years after your employment terminates, use or permit the use in competition with Bowne of either your personal relationship with such customer, client or individual or the information you acquired during your employment about any of them. However, you will not be prohibited otherwise from accepting employment with a competitor of Bowne.

***2** On September 22, 1997, Bowne provided its sales

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

staff, including Levine, with a list of 23 current clients whose accounts had been dormant for a significant period. In anticipation of the closing of Bowne's fiscal year on October 31, 1997, Bowne asked its staff, including Levine, to evaluate the dormant accounts, to close the accounts not likely to generate new business, and to identify accounts likely to generate new business. During Levine's evaluation of the list, he instructed Joseph King, Customer Service Manager, to keep the account of Focal, Inc. ("Focal") open in expectation of future business. However, two days later, on September 24, 1997, Levine instructed Mr. King to close Focal's account.

On October 6, 1997, Levine resigned from Bowne to accept the position of President of Merrill's New England operations. As President, Levine assumed sole responsibility for the management of Merrill's New England operations, overseeing and having ultimate responsibility for sales representatives in Merrill's New England offices.

On October 16, 1997, Bowne learned that Focal had become a client of Merrill.

II. DISCUSSION

To obtain preliminary injunctive relief, Bowne must satisfy a threefold inquiry: (1) that it has a reasonable likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunctions is not granted; and (3) that the harm Bowne will suffer if the injunction is denied outweighs the injury the defendants will suffer if the injunction is granted. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-617, 405 N.E.2d 106 (1980). See also, T & D Video, Inc. v. Revere, 423 Mass. 577, 580, 670 N.E.2d 162 (1996); Town of Brookline v. Goldstein, 388 Mass. 443, 447, 447 N.E.2d 641 (1993).

*1. Likelihood of success on the merits.*

An employer may enforce the terms of a non-solicitation agreement with a former employee when it demonstrates that the agreement (a) is necessary to protect a legitimate business interest of the employer, (b) is supported by consideration, (c) is reasonably limited in all circumstances, including time and space, and (d) is otherwise consonant with public policy. Whittinsville Plaza v. Kitseas, 378 Mass. 85, 102-103, 390 N.E.2d 243 (1962). See also, Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228, 331 N.E.2d 54 (1975); All Stainless, Inc. v. Colby, 364 Mass. 773, 778, 308 N.E.2d 481 (1974).

*A. Necessary to protect a legitimate business interest.*

The appellate courts of this Commonwealth have recognized goodwill as a legitimate business interest. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674, 363 N.E.2d 526 (1977); New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940); Kroeger v. Stop & Shop Cos., Inc., 13 Mass.App.Ct. 310, 316, 432 N.E.2d 566 (1982), review denied 386 Mass. 1102, 440 N.E.2d 1175 (1982). The covenant is, however, unenforceable if its application protects the employer from ordinary competition. Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 310 N.E.2d 915 (1974); Richmond Bros., Inc. v. Westinghouse Broad. Co., 357 Mass. 106, 256 N.E.2d 304 (1970).

*3 In its verified complaint, Bowne alleges that its goodwill has been damaged by the defendants and that because of Levine's position at Merrill, its goodwill remains vulnerable to further harm. As a threshold matter, therefore, Bowne must establish that its business involves goodwill, and that the goodwill belongs to Bowne. All Stainless, 364 Mass. at 779, 308 N.E.2d 481.

After careful review of the facts and relevant law, this Court holds that the corporate printing business does indeed involve goodwill and that the goodwill belongs to Bowne. Employer goodwill has been defined as the employer's positive reputation in the eyes of its customers or potential customers. Marine Contractors Co., 365 Mass. at 287-289, 310 N.E.2d 915. Goodwill is generated by repeat business with existing customers or by referrals to potential customers. *Id.* Bowne has shown that it has nurtured goodwill, through the work of Levine, in the customers covered by the non-solicitation agreement. Bowne provided Levine with an unlimited expense account to entertain clients *on behalf of the company.* Lastly, Bowne hired Levine to use his knowledge, skill and personality to cultivate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relationships with clients *on behalf of Bowne.* In sum, the goodwill generated with respect to clients first introduced to Levine by Bowne, and new clients retained by Levine while employed at Bowne, belongs to Bowne.

Furthermore, Levine is in a position to appropriate Bowne's goodwill. See *All Stainless,* 364 Mass. 779-780 (the court must determine whether the former employee is in a position to appropriate the employer's goodwill). An employee is in a position to appropriate an employer's goodwill when the employee's close association with the former employer's customers might cause the customers to associate the service or products at issue with the employee, rather than with the employer. *Id.* at 780 citing Blake, *Employee Agreements not to Compete,* 73 Harv. L.Rev. 625, 658-659 (1960). Both parties agree that it was Levine's responsibility to entertain clients, and to use his personality and skill to get further business from existing clients and to solicit new clients. In sum, it can be inferred that many clients may have inadvertently associated Bowne's products with Levine. However, this Court cannot overlook the fact that Levine's entertainment expenses were paid for by Bowne and that Bowne hired Levine to use his skill and personality on behalf of Bowne.

This case is factually similar to *Marine Contractors Co. v. Hurley,* 365 Mass. 280, 310 N.E.2d 915 (1974) and *All Stainless, Inc. v. Colby,* 364 Mass. 773, 308 N.E.2d 481 (1974). In *Marine Contractors,* the Supreme Judicial Court held that an employer's goodwill is threatened when a former employee accepted work from past and then current customers of a former employer in the marine repair work industry. *Marine Contractors,* 365 Mass. 288-289. Further, in *All Stainless,* the Supreme Judicial Court held that an employer's goodwill is threatened when a salesman would be calling on his former employer's customers to solicit purchases on behalf of a new employer. *All Stainless,* 364 Mass. at 774-777, 308 N.E.2d 481. The non-solicitation agreement in this case goes no further than to protect Bowne's goodwill from the threat identified by the *Marine Contractors* and *All Stainless* Courts. By virtue of his various sales positions at Bowne, Levine was able to develop business relationships and contacts with the Bowne's clients. In addition to having access to customer lists, Levine was vice president of sales for a period before his resignation. Thus, there is a significant likelihood that Levine would have the ability to deflect clients from Bowne to Merrill. In light of the foregoing, this Court holds that the non-solicitation agreement is necessary to protect Bowne's goodwill.

*B. Consideration.*

*4 There is no question that the non-solicitation agreement was supported by consideration. Levine signed the agreement in exchange for Bowne's agreement to establish a minimum level of annual compensation. Thus, this is a case where the employer provided some clear additional benefit to the employee. See, e.g., *Marine Contractors Co.,* 365 Mass. at 285-286, 310 N.E.2d 915.

*C. Reasonable in all circumstances, including time and space.*

A non-solicitation agreement will be enforced only if it is reasonable, based on all of the circumstances. *All Stainless,* 364 Mass. at 778, 308 N.E.2d 481; *New England Tree Expert Co., Inc.,* 306 Mass. at 510, 28 N.E.2d 997. A determination of the reasonableness of the restrictive covenant requires a fact-sensitive inquiry. *Novelty Bias Binding Co. v. Shevrin,* 342 Mass. 714, 717, 175 N.E.2d 374 (1961); *Sherman v. Pfefferkorn,* 241 Mass. 468, 474, 135 N.E. 568 (1922). If a covenant is too broad in space, time or any other respect, it will be enforced only to the extent that it is reasonable and to the extent that it is severable for the purposes of enforcement. *All Stainless,* 364 Mass. at 778, 308 N.E.2d 481; *Novelty Bias Binding Co.,* 342 Mass. at 718, 175 N.E.2d 374; *Cedric G. Chase Photographic Labs., Inc. v. Hennessey,* 327 Mass. 137, 139, 97 N.E.2d 397 (1951). Any restraint must be consistent with the protection of the goodwill of the employer. *All Stainless,* 364 Mass. at 779, 308 N.E.2d 481.

The defendants challenge the non-solicitation agreement first with respect to its temporal sweep, arguing that the agreement is unreasonable, either rendering it unenforceable, or mandating a narrowing of its scope. In deciding the reasonableness of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

restriction as to time, a court must consider (1) the nature of the plaintiff's business, (2) the type of employment involved, (3) the situation of the parties, (4) the employer's legitimate business interests, and (5) the employee's right to work and earn a livelihood. *All Stainless,* 364 Mass. at 778, 308 N.E.2d 481. This Court finds nothing in the facts indicating that the two year duration of the non-solicitation agreement is unreasonable. Massachusetts courts have consistently enforced covenants of up to two years, even as great as five years duration, if they are otherwise reasonable under the circumstances. *Id.* at 779, 308 N.E.2d 481; *Richmond Bros.,* 357 Mass. at 110-111, 256 N.E.2d 304.

To bolster its argument that the agreement is unreasonable in scope, the defendants point this Court to the clause in the agreement prohibiting Levine from using any "personal relationship" with any "customer, client or individual," "who was assigned to [Levine] as a source of business or for whom [he] received sales credit during the two years prior to ... leaving Bowne" or any "information ... acquired during [Levine's] employment about any of them." This Court does not agree with defendants' view that the foregoing language is too broad. Rather, the provision further protects Bowne's legitimate interest in its goodwill. The provision specifically precludes Levine from using in competition with the Bowne the "personal relationship[s]" developed at Bowne's expense. Further, enforcement of the agreement will not unreasonably diminish Levine's right to work and earn a livelihood. The Agreement specifically allows him to work for a competitor, thereby permitting him to use, as the law allows, the skills and experience he developed while at Bowne. In addition, presumably, the pool of potential clients in the industries served by Bowne and Merrill is enormous. While enforcement of the agreement will obviously reduce the pool of potential clients available to Levine and Merrill, the reduction does not rise to a level of being unreasonable. Levine's right to work and earn a livelihood, therefore, is not unreasonably curtailed by enforcement of the agreement.

*D. Public policy.*

*5 A covenant not to compete is enforceable to the extent it is consonant with the public interest. *Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 501, 488 N.E.2d 22 (1986). It is in the public interest to allow an individual to participate in his or her trade freely and without monopolization. *Woolley's Laundry v. Silva,* 304 Mass. 383, 387, 23 N.E.2d 899 (1939).

The defendants offer no reason why enforcement of the agreement would violate public policy, and this Court can think of none. [FN1]

FN1. In the course of researching this opinion, this Court could find no Massachusetts case in which a court struck down a non-competition or non-solicitation clause because it jeopardized public policy, except in those cases dealing with agreements between doctors, lawyers or securities brokers. See, e.g., *Marine Contractors Co.,* 365 Mass. at 288-289, 310 N.E.2d 915; *Alexander & Alexander,* 21 Mass.App.Ct. at 501, 488 N.E.2d 22. Compare, G.L. c. 112, sec. 12X (1997 ed.); S.J.C. Rule 3:07, DR 2-108(A); *Meehan v. Shaughnessy,* 404 Mass. 419, 431, 535 N.E.2d 1255 (1989); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. DeForest,* No. 94-6784, slip op. at 4 (Suffolk Super. Ct. Dec. 23, 1994) (Quinlan, J.).

*2. Irreparable harm*

Irreparable harm is a loss of rights that cannot be vindicated should the party seeking an injunction prevail after a full hearing on the merits. *Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue,* 406 Mass. 701, 710, 550 N.E.2d 1361 (1990).

As indicated above, principally at issue here on the part of Bowne is the loss and potential loss of goodwill as a result of the activities of Levine. In this Commonwealth, the loss of goodwill has been recognized as being particularly hard to quantify, giving rise to the need for equitable relief. See, e.g., *Kroeger,* 13 Mass.App.Ct. at 322, 432 N.E.2d 566.

*3. Whether the harm Bowne will suffer if the injunction*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*is denied outweighs the injury the defendants will suffer if the injunction is granted.*

Lastly, the balance of harm weighs in favor of Bowne. As discussed above, Bowne stands to suffer a loss of goodwill from the close association between Levine and Bowne's clients. On the other hand, the grant of the preliminary injunction does not foreclose Levine or Merrill from pursuing any number of potential clients.

*ORDER*

Based upon the foregoing reasons, it is hereby *ORDERED* as follows:

That defendant Ian Levine is preliminarily enjoined, until October 6, 1999, from soliciting business, directly or indirectly, personally or through any other person or entity, from any customer, client or individual who worked for a customer or client, who was assigned to Mr. Levine by Bowne as a potential source of business or for whom he received sales credit during the two years prior to his leaving Bowne.

7 Mass.L.Rptr. 685, 1997 WL 781444 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4

C

Superior Court of Massachusetts.
Theodore BROWNE,
v.
MERKERT ENTERPRISES, INC.
**No. CIV. A. 98-386.**

March 31, 1998.

*MEMORANDUM AND ORDER ON CROSS MOTIONS FOR INJUNCTIVE RELIEF*

DOERFER.

*1 This action is before the Court pursuant to requests by both parties for injunctive relief relating to a non-competition agreement. Plaintiff Theodore Browne ("Browne"), a former employee of Merkert, seeks a judgment declaring that the non-compete agreement he entered with Merkert Enterprises, Inc. ("Merkert") is void and unenforceable and requests that the Court enjoin Merkert from enforcing the agreement. He wishes to accept employment with Pezrow New England, Inc. ("Pezrow") a competitor of Merkert. Browne argues that he signed the agreement under duress, the agreement does not protect a legitimate business interest of Merkert, and that the agreement is unreasonable in scope. Merkert has responded by requesting that the Court enforce the agreement and enjoin Browne from engaging in conduct that violates the agreement. Merkert argues that the agreement protects its legitimate business interest in preserving its good will and confidential information, that the agreement is reasonable in scope and that Merkert will suffer irreparable harm if the agreement is not enforced. The issues set forth in the opposing motions are the same. For the reasons stated herein, the Court finds that Merkert has a reasonable likelihood of establishing at trial that the agreement is valid and enforceable. Furthermore, Merkert has satisfied the other conditions justifying the issuance of a preliminary injunction. Merkert's motion for a preliminary injunction is ALLOWED [FN1] and Browne's motion is DENIED.

FN1. The Court held a hearing on this matter March 19, 1998, upon return of a short order of notice. No temporary restraining order had entered, but the offer to Browne for new employment had been withdrawn by Pezrow pending resolution of this issue. Thus, the court had before it motions for preliminary injunction.

BACKGROUND

The facts set forth in the submissions by the parties are as follows:

Merkert is a Massachusetts corporation in the business of providing brokerage services to various manufacturers of goods and foods. Merkert assists manufacturers (also referred to as Principals) in marketing their products to retailers such as supermarkets and drug stores [FN2]. The nature of the business requires Merkert to develop strong relationships with both the Principals and the retail customers.

FN2. For example, Merkert markets and distributes goods from manufacturers such as Duracell to retailers such as Stop & Shop and Star Market.

Browne was employed by Merkert from 1984 until March, 1998. In 1994, Browne became the Business Manager for Unilever, an important Principal of Merkert since 1983. In October of 1996, he was appointed Director of Merkert's Health and Beauty Care/General Merchandise (HBC/GM) division. In December of 1996, Browne was promoted to Vice President of HBC/GM. Browne's duties included, *inter alia,* maintaining and targeting Principal relations, maintaining relationships with retailers, developing and planning sales and determining services for price setting. Browne continued to act as Business Manager to Unilver when he became Vice President of HBC/GM. When Browne was promoted he was required to sign a non-competition/non-disclosure

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreement. In connection with his promotion and with the expectation that he sign the agreement, Merkert gave Browne a 14.8% raise. After consulting with his attorney, Browne proposed some revisions to the agreement. Some changes were made and Browne signed the agreement. The agreement provides, *inter alia*, as follows:

***2** 13. Restrictive Covenant

(b) The Employee covenants and agrees that, during the period of his or her employment by the Employer and for a period of six (6) months following the termination of such employment ... the Employee will not, directly or indirectly, individually or as a consultant, advisor, agent, partner, employee, officer, director, stockholder, trustee, beneficial owner, creditor or in any other capacity,

(i) engage in a Restricted Business....

... the term "engage in Restricted Business" shall mean: "conduct, or become associated with or have any financial interest in any individual or entity that is engaged in, any business which is competitive with (1) a business conducted by the Employer ... within any state where a division of the employer to which the Employee has been assigned conducts such business ..., or (2) any business known to the Employee to be identified in the Employer's business strategy for commencement by the Employer within two (2) years from the Employee's termination date, within any area so identified by the Employer."

(ii) contact or otherwise solicit any employee of the Employer with the intention or effect of encouraging such employee to terminate his or her employee to terminate his or her employment with the Employer; or

(iii) contact or otherwise solicit any principal, supplier or customer of the Employer (or of any such principal) with which the Employee has had contact, on behalf of the Employer, during the period of the Employee's employment with the Employer, with the intention or effect of encouraging such principal, supplier or customer to terminate or reduce the volume of its business with the Employer (or such principal) or to place any portion of such business elsewhere.

14. Confidential relationship

The Employee acknowledges and agrees that all conversations,correspondence, records, files, customer lists, price lists, sales date, know-how, business confidences and other information ... of the Employer, its Principals, packers, suppliers, affiliates, and its and their customers are confidential information of the Employer. (The parties agree that confidential information does not include the general skill and knowledge that the Employee acquired during the course of his employment with the Employer.) The Employee agrees that during the period of his or her employment by the Employer and at all times thereafter, he or she shall not directly or indirectly use any such information for his or her own benefit or divulge, disclose or communicate any such information, not previously made public or known to the recipient, to any person, firm or entity without prior written authorization of the Employer. The Employee further agrees that at the termination of his or her employment with the Employer ... he or she will immediately deliver to the Employer (i) all originals and copies of documents then in the possession or under the control of the Employee containing any such confidential information, and (ii) all other property belonging to the Employer then in the possession or under the control of the Employee.

***3** On February 9, 1998, Browne submitted a letter of resignation to Merkert. Browne wishes to work for Pezrow, a direct competitor of Merkert. Merkert contends that Browne would be in violation of the non-compete/non-disclosure agreement if he were to accept employment at Pezrow. Pezrow has withdrawn its offer of employment to Browne pending resolution of this matter. Browne requests, at this time, that the agreement be declared void. Merkert, in turn, requests that the agreement be enforced.

DISCUSSION

A preliminary injunction is warranted if the moving party establishes both a likelihood of success on the merits of the claim, and a substantial risk of irreparable harm in the absence of an injunction. *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617, 405 N.E.2d 106 (1980). If these factors are established, the Court must balance them against the harm that the injunction will inflict on the opposing party, including impact on the public interest. See *T & D Video, Inc. v. City of Revere*, 423 Mass. 577, 580,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

670 N.E.2d 162 (1996). The inquiry should not focus on determining the "raw amount of irreparable harm" each party might suffer, "but rather the risk of such harm in light of the party's chance of success on the merits." *Packaging Industries Group, Inc. v. Cheney* at 617, 405 N.E.2d 106.

A. Likelihood of Success on the merits.

A non-competition/non-disclosure agreement is enforceable against a former employee if it is "necessary to protect a legitimate business interest of the employer, (b) is supported by consideration, (c) is reasonably limited in all circumstances, including time and space, and (d) is otherwise consonant with public policy." *Bowne of Boston, Inc. v. Levine & Merrill Corp.,* 1997 WL 781444 (Mass.Super.) citing *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 102-103, 390 N.E.2d 243 (1979); *Blackwell v. E.M. Helides, Jr. Inc.,* 368 Mass. 225, 228, 331 N.E.2d 54 (1975); *All Stainless, Inc. v. Colby,* 364 Mass. 773, 778, 308 N.E.2d 481 (1974).

In the present case, Merkert argues that the agreement is necessary to protect its goodwill and confidential information, that it is supported by consideration, it is reasonable in scope and it is consonant with public policy. In contrast Browne argues that the agreement is void because it was signed under duress, it covers information that was not adequately protected as confidential, it does not legitimately protect Merkert's goodwill, it was not supported by adequate consideration, it is unreasonable in time and space, and that it is not consonant with public policy.

1. Duress

To establish the contract was obtained by duress, Browne must demonstrate that he was "in fact coerced and deprived of his freedom of will by a wrongful influence which [impelled] him to enter into an agreement ... that he would not have entered into ... in the exercise of his free will and deliberate, independent judgment." See *Rosenbloom v. Kaplan,* 273 Mass. 411, 416, 173 N.E. 522 (1930). Browne alleges that he was told that his continued employment required that he sign the non-compete/non-disclosure agreement and that the agreement would not be enforced unless he attempted to pirate other employees. In addition, he contends that other similarly situated employees did not have to sign such an agreement and that if he had known that others were not required to sign agreements he would not have signed.

*4 Merkert denies that Browne was told that the contract would not be enforced. In light of the detailed negotiations for the provisions of the agreement, it seems unlikely that Merkert represented that the agreement would not be enforced. Browne raises issues that should be resolved at trial. For the purposes of the request for injunctive relief, Merkert has established a likelihood of success on the merits regarding the issue of duress. The requirement that Brown sign the agreement was consistent with his having received a promotion. Further, Browne consulted an attorney and negotiated the terms of the agreement. There is nothing on the record to suggest that Browne was subjected to duress in a legal sense. Thus, the Court will not declare the agreement void on that basis.

2. Confidential Information

To determine whether information is confidential, Massachusetts Courts look to the facts of each case in light of the following factors set forth in *Jet Spray Cooler, Inc. v. Crampton:*

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921 (1972); *Warner-Lambert Co. v. Execuquest Corp.,* 427 Mass. 46, 49 n. 5 (1998). Browne argues that the agreement is unenforceable because the information Merkert seeks to protect is not actually confidential. Browne alleges that Business

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Managers, who were not required to sign agreements, had access to the information Merkert seeks to protect. Accordingly, Browne argues that Merkert is not entitled to the protection of the agreement because it did not adequately protect the confidentially of the information at issue.

Merkert has submitted an affidavit contradicting Browne's argument demonstrating that Merkert did take steps to ensure the confidentiality of the information at issue. Documents and information on Principals were identified as confidential, kept in isolated areas and limited to review by certain employees. The fact that not every employee was required to sign an agreement is not dispositive of the confidentiality issue. See *New England Overall Co., Inc. vs. Woltmann,* 343 Mass. 69, 78, 176 N.E.2d 193 (1961)(where the employer guarded the secrecy of its costs and strategy, a former employee was properly enjoined from disclosing such information even though he did not sign a written non-disclosure agreement). Here, the information on price setting, sales, and financial condition of the Principals was not likely to be known outside of Merkert, the information would be highly valuable to competitors, and Merkert has spent significant time and money acquiring the information by cultivating close relationships with the Principals. The Court concludes that the information Merkert seeks to protect is likely to be confidential. Preservation of confidential information is a legitimate business interest. See *Marine Contractors Co. Inc. v. Hurley,* 365 Mass. 280, 287, 310 N.E.2d 915 (1974). Merkert has established a likelihood of success on the merits with respect to this issue.

3. Goodwill

*5 Massachusetts Courts consider goodwill to be a legitimate business interest that an employer may protect with a covenant not to compete. *Kroeger v. Stop & Shop Cos., Inc.,* 13 Mass.App.Ct. 310, 316, 432 N.E.2d 566, review denied 386 Mass. 1102, 440 N.E.2d 1175 (1982). This court adopts the analysis of goodwill articulated by Judge Burnes in *Bowne of Boston, Inc. v. Levine & Merrill Corp.,* 1997 WL 781444, *2 (Mass.Super.) and finds that it is likely that the food brokerage business involves goodwill and that the goodwill belongs to Merkert. Merkert trained Browne and gave him accounts that enabled him to cultivate strong relationships with Merkert's Principals. Based on the nature of the business and the fact that Browne had close associations with Merkert's customers in his capacity as Business Manager and Vice President, there is a strong likelihood that Browne will injure Merkert's goodwill if he is allowed to work immediately for a competitor of Merkert. Accordingly, the non-compete/non-solicitation agreement is likely to be necessary to protect Merkert's goodwill and confidential information.

4. Consideration

Browne contends that the agreement is void because it is not supported by adequate consideration. It is undisputed that Browne received a promotion and a raise in connection with his signing the agreement. This additional benefit to Browne satisfies the requirement for consideration. It is not likely that, after a trial, the Court would declare the agreement to be void for lack of consideration.

5. Reasonableness

A valid non-competition agreement must be reasonable in duration and geographic scope. *All Stainless, supra,* 364 Mass. at 778, 308 N.E.2d 481; See *Pettingell v. Morrison, Mahoney & Miller,* 426 Mass. 253, 256, 687 N.E.2d 1237 (1997). In determining whether the provisions in a covenant not to compete are reasonable and therefore enforceable, "the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and the public interest. *All Stainless, supra* at 778, 308 N.E.2d 481.

Browne argues that the provisions in the agreement relating to geographic scope and the six month time period are unreasonably broad. The agreement covers the geographic area in which Brown was assigned and prohibits Browne from working for a competitor for a period of six months. Specifically Browne may not engage in a Restricted Business which means conduct or association with an entity that is engaged in business

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which is competitive with any (1) business conducted by Merkert within any state in which there is a division of Merkert to which Browne was assigned, or (2) any business known to Browne to be identified in Merkert's business strategy for commencement by Merkert within two years from Browne's termination date. Further, he may not contact or solicit Merkert employees with the purpose of encouraging Merkert employees to terminate employment with Merkert, or contact principals or customers of Merkert with the intention of encouraging the same to terminate or reduce the volume of its business with Merkert. He shall not disclose, at any time, information that the parties agree is confidential, and he must return all documents and property belonging to the employer.

***6** Although the agreement prohibits Browne from working for a competitor in a brokerage capacity, the time period is short. Browne would not be prohibited from working for a Principal in sales or consulting. Browne is not completely prohibited from exercising his skill in the industry. His right to earn a living is not unreasonably curtailed by this agreement. Moreover, the reasonable needs of Merkert in protecting its goodwill and confidential information outweigh the restraint to be imposed on Browne.

6. Public Policy

A covenant not to compete is enforceable as long as it is consonant with public policy. *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 647, 358 N.E.2d 804 (1977). As stated previously, this agreement is reasonable in scope and was the product of negotiation. Public policy will not be ill-served by enforcement of this agreement.

B. Irreparable Harm

Based on the foregoing discussion, the Court concludes that Merkert will suffer irreparable harm in the nature of lost goodwill and disclosure of confidential information if the agreement is not enforced. The Court recognizes that the agreement imposes a significant restraint on Browne for six months, however, the balance of harm in light of likelihood on the merits weighs in favor of Merkert.

ORDER

For the reasons stated above, Merkert's motion for injunctive relief is ALLOWED. It is hereby ORDERED that Browne is enjoined for a period of six months from the date of his termination from:

(1) engaging in a Restricted Business as defined in paragraph 13 of the covenant agreement,

(2) contacting or soliciting Merkert's employees with the purpose of encouraging any Merkert employee to terminate his or her employment with Merkert, or

(3) contacting or soliciting any principal, supplier or customer of Merkert with which Browne has had contact on Merkert's behalf, with the intention of encouraging such principal, supplier or customer to terminate or reduce the volume of its business with Merkert or such principal or to place any portion of such business elsewhere.

Browne may not, at any time:

(4) use or disclose confidential information, as defined in paragraph 14 of the agreement, without written authorization from Merkert.

Browne must:

(5) return to Merkert all documents and property, as described in paragraph 14.

8 Mass.L.Rptr. 309, 1998 WL 151253 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
C.R. BARD, INC.
v.
Alfred P. INTOCCIA.
**Civ. A. No. 94-11568-Z.**

Oct. 13, 1994

MEMORANDUM AND ORDER

ZOBEL, District Judge.

*1 Plaintiff C.R. Bard, Inc. ("Bard") brought this action to enforce a noncompetition agreement ("Agreement") with its former employee, defendant Alfred P. Intoccia, and now seeks a preliminary injunction to prevent him from working for Minntech Corporation ("Minntech"). The parties' disagreement focusses on two issues: (1) whether Minntech is "engaged in competition with" plaintiff as that phrase is used in the Agreement; and, if so, (2) whether plaintiff acted reasonably in withholding approval for defendant to work for Minntech. Overlaying these issues is the question whether plaintiff has met the criteria for the issuance of a preliminary injunction. [FN1]

Based on the evidence adduced at the hearing on plaintiff's motion, these are the facts.

Bard, a New Jersey corporation, develops, manufactures and markets medical devices. One of its units, the Cardiopulmonary Division, based in Billerica, Massachusetts, markets a product known as the hollow fiber membrane oxygenator. It accounts for 95% of the profits for this division.

The hollow fiber membrane oxygenator is a device used during open heart surgery to replace temporarily the functioning of the lungs and heart. In the course of the surgery blood is transferred from the patient's body to a reservoir. From there it flows into the oxygenator where oxygen is added and carbon dioxide, extracted. Ultimately, the blood is transferred to a heat exchanger [FN2] before being returned to the patient's body.

Eight models of the device compete in the international market with sales of about $200 million annually. Bard has never manufactured its own hollow fiber membrane oxygenators. Rather, since June 11, 1986, it has been the sole distributor of oxygenators manufactured by Minntech. Pursuant to an agreement between Bard and Minntech, this arrangement continues until December 31, 1995.

The Minntech/Bard agreement necessarily meant a splitting of profits between the two companies. Accordingly, Bard, in the Fall of 1992, decided to develop its own hollow fiber membrane oxygenator and related products. Unbeknownst to Minntech and in great secrecy Bard embarked upon market and later technical research under the code name "Blackstone Project."

Given the function of oxygenators, namely, to perform the work of a patient's lungs, certain characteristics define the efficacy of a particular model. The device must efficiently perform the gas exchange function (the addition of oxygen and the subtraction of carbon dioxide) and the heat exchange function. In addition, it is desirable to have low priming volume (the amount of blood or other fluid needed to fill the system) and small pressure drop (the difference in the pressure at which the blood flows into and out of the system). These characteristics tend to be interdependent in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that improving one may devalue another. A final consideration in the balancing of functions is relative cost. The objective of the Blackstone Project was the development of the most effective and marketable oxygenator. Bard budgeted $3 million and projected the endeavor to take three years. A substantial portion of the funds allocated to the project was spent conducting market research with perfusionists, the technical personnel in the operating room in charge of the oxygenator, and the proper functioning of the extracorporeal flow of blood. Bard conducted the survey blind; that is, the perfusionists questioned were not told of Bard's role in the survey. The results of this exercise formed the basis of the technical decisions made in designing the Blackstone Oxygenator. This device features some more or less novel solutions, although no major technological breakthroughs. At this time the design process has been virtually completed.

*2 Minntech also has been engaged in developing a second generation oxygenator. Although it has not completed work on a number of peripheral parts, such as the reservoir, its basic device is currently awaiting approval by the Food and Drug Administration. Nevertheless, the evidence showed that it is still possible to make adjustments to the device without delaying the administrative process.

Mr. Intoccia became an employee of Bard in 1979. At that time he signed an "Agreement Relating to Inventions, Trade Secrets and Confidential Information" which barred him from using or disclosing any confidential information or trade secrets for a period of five years following the termination of his employment. As his responsibilities increased, [FN3] he, in 1986, signed a "Covenant Not to Compete," styled a Rider to the Confidentiality Agreement. [FN4]

When Bard inaugurated the Blackstone Project, it appointed defendant as the Program Manager. In that capacity he was charged with proposing and developing the business and project plans for the Bard Oxygenator and managing the sixteen people supporting this development. He also served as a member of the Cardiopulmonary Division's Management Board. He was thus privy to all strategic, marketing and technical knowledge of Bard.

In mid-1994 Minntech recruited defendant to supervise the marketing of its existing products and to develop a business plan for products to be introduced in 1996, including eventually the new Minntech Oxygenator. He was also to service the Bard account. Defendant left the employ of Bard in August 1994 and was to begin work at Minntech immediately. Bard filed this action to enjoin defendant upon learning his plans. Although defendant asserts that his duties at Minntech are altogether different from the research and development he did at Bard, the evidence showed that, particularly with respect to oxygenator products, marketing information drives the technical solutions. Knowledge of the demands of the market is therefore crucial not only to making marketing decisions, but also to the design of the product.

The first issue raised by the motion is whether Minntech is "engaged in competition with" plaintiff with respect to a product worked on by defendant and which is scheduled in the noncompetition agreement. Defendant does not dispute that he worked on the Blackstone Project and that it is listed in Schedule "A" of the Agreement. Although he had declined to endorse that addition to the Schedule, I find that he is bound by it as he had knowledge thereof and because his employment at Bard was admittedly conditioned on his acceptance of that Agreement. Defendant argues that the two companies are not now engaged in competition as they do not both sell their own oxygenator products and, indeed, will not do so until at least the beginning of 1996, when their distributor agreement terminates. Nevertheless, I find that they are engaged in a race for the development and Federal Drug Administration approval of the next generation of oxygenators and are, in that respect, in competition with each other. The company with the better, more cost effective products will unquestionably have an edge in the market, and those qualities are being defined now in the process of the products' development. Moreover, the market is limited and the parties will compete for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their respective shares of that finite market based on the design decisions made now. They continue to adjust the basic features of the oxygenator, and both are still engaged in working out the contours of the ancillary equipment, such as the reservoir.

*3 The covenant does provide for Bard's consent to employment of a former employee by a competitor under certain circumstances. Upon receiving assurances by the competitor that the employee will not engage in activity competitive with Bard, the latter may not unreasonably withhold such consent. The second question, therefore, is whether Bard's refusal to consent in this case was unreasonable. I find that it was not. Bard has so far spent over $2 million and two years developing a product that, it hopes, will be sold at a highly competitive price and will satisfy the customers [perfusionists]. Defendant had detailed knowledge of all phases of Bard's development and marketing strategy. Although I fully credit his testimony that he took no documents that could in any way compromise the plaintiff, he could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his new employer he will inevitably draw upon that knowledge. As noted earlier, design decisions were based on market research. Moreover, as Minntech's distributor, Bard has substantially greater marketing know-how than does Minntech, which has yet to develop its marketing strategy and techniques with respect to this product. The evidence permits the inference, which I draw, that Minntech's purpose in hiring defendant was to fill that void in its organization and that Bard's consent was not, therefore, unreasonably withheld.

Plaintiff has shown that it is entitled to the relief it seeks under the terms of the Agreement. Defendant nevertheless argues that it is not likely to succeed on the merits because the Agreement is unreasonable in that it prevents defendant from using his own skills and, in any event, should not be enforced to reach the possible disclosure of what is essentially public information. However, under Massachusetts law it is not merely the restraint on the employee that determines the reasonableness of a noncompetition agreement, but also the employer's need for protection against harmful conduct by the employee. *All Stainless, Inc. v Colby*, 364 Mass. 773, 778, 308 N.E.2d 481, 485 (Mass 1974). The covenant at issue does reasonably accommodate the needs of both parties. Although defendant may not use his skills in the precise field in which he worked at Bard, he is not prevented from using them with an employer or a product not in competition with Bard or the oxygenator. To the extent he is unable to find such a position, Bard is required to pay his salary for the entire year.

Defendant seeks to minimize the importance and confidential nature of the information he has learned as manager of the Blackstone Project. While it is certainly possible to duplicate Bard's efforts to understand the needs of the market, the data Bard has gathered is not therefor public information. Bard expended substantial monies and effort and, as noted earlier, its technical and design decisions reflect its learning about market needs and conditions. This is confidential information, even though it does not represent a major scientific breakthrough or, in a technical sense, a trade secret. It is, accordingly, entitled to protection. It is for these reasons that I find plaintiff has also satisfied the remaining criteria for the issuance of a preliminary injunction. Bard will be irreparably harmed if the project manager of its major project joins its competitor and, given the protections of the agreement for defendant, the harm to him is outweighed by the harm to plaintiff.
I further find that the public interest is not adversely affected by the protection of plaintiff's confidential information.

*4 Plaintiff's counsel shall submit a form of order enjoining defendant from performing any work for Minntech Corporation until August 7, 1995 and disclosing any of Bard's confidential information. Plaintiff shall further file a bond in the amount of $100,000.

FN1. Plaintiff must show (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which granting injunctive relief would inflict on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant; and (4) that the public interest will not be adversely affected by the granting of the injunction *Camel Hair and Cashmere v. Associated Dry Goods,* 799 F.2d 6, 12 (1st Cir.1986).

FN2. The patient's blood is cooled during surgery and warmed at its conclusion

FN3. Though Bard claimed that defendant was requested to sign the noncompetition agreement because of his position in the organization, other employees similarly situated did not have to endorse such agreements, allegedly as a result of managerial oversight or neglect.

FN4. That covenant states that:
For a period of one (1) year following the effective date of termination of my employment with the Company (irrespective of by whom or for what reason) I will not without the express written consent of the Company, consult or accept employment with, or render services to, any organization engaged in competition with the Company with respect to subject matters worked on by me as listed on the attached Schedule A, or such additions to Schedule A as shall be made during my employment so as to keep the subject matters worked on complete for purposes of this Agreement, provided that the Company shall not unreasonably withhold said consent upon receiving assurances from said organization that my employment by it will not involve any activity which is competitive with the Company with respect to said matters and that no Confidential Information of the Company as to any matter will be disclosed by me to my subsequent employer.

1994 WL 601944 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

- 1:94CV11568 (Docket) (Aug. 04, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Only the Westlaw citation is currently available

Superior Court of Massachusetts.
EMC CORPORATION,
v.
Jeffrey E. ALLEN.
**No. 975972B.**

Dec. 15, 1997.

MEMORANDUM AND ORDER ON EMC'S MOTION FOR A PRELIMINARY INJUNCTION

KOTTMYER

*1 This action is before the Court on EMC Corporation's ("EMC") Motion for Preliminary Injunction seeking to enforce a non-competition agreement which the defendant Jeffrey Allen ("Allen") executed when he began working at EMC in October of 1993. Allen resigned from EMC on November 7, 1997 to take a position as "Vice President 16" with Sun Microsystems, Inc. ("Sun"). Sun is a direct competitor of EMC in the open-systems storage market and EMC alleges that Allen's employment at Sun violates his non-competition agreement with EMC. After hearing and after consideration of the briefs, affidavits and exhibits filed in this matter, for the reasons set forth below, EMC's motion for preliminary injunction is granted.

A. Allen's Employment at EMC

Allen was hired by EMC as a Vice President for Marketing and Business Planning in October 1993, in EMC's Open Systems Group. When he resigned in 1997, he was Vice-president, Channel Marketing and Support. Throughout his employment at EMC, Allen worked in senior marketing positions. Allen had access to confidential proprietary information concerning, *inter alia,* the capabilities of products being developed by EMC, projected release dates for these products, EMC's marketing strategies and the terms and conditions of EMC's agreements with resellers. Allen was compensated over $1 million dollars in salary, bonuses and stock options. EMC's offer of employment to Allen was contingent upon Allen's execution of the Key Employee Agreement which is the subject of this request for relief.

B. Enforceability of the Covenant

A covenant not to compete will be enforced as necessary to protect the employer's legitimate business interests to the extent that it is reasonable in scope under the circumstances. The restriction must not be for an unreasonable length of time. In this case, in view of Allen's position at EMC and access to confidential and proprietary information relating to EMC's product and marketing plans for 1998, a restriction of one year is reasonable.

The geographic area covered by the covenant must also be reasonable. Here, the covenant is unrestricted. The market for open storage products in which EMC and Sun compete is worldwide. As stated by Allen in his resume, Allen's responsibilities at EMC were "worldwide." Accordingly, the Agreement, although not restricted to a geographic area, is reasonable in scope. The covenant is therefore enforceable to the extent necessary to protect EMC's legitimate business interests.

C. Applicability of the Covenant

Allen strenuously argues that language of the covenant does not cover the position he has taken with Sun. In the covenant, Allen agreed that for a period of one year after termination of his employment by resignation or otherwise, he would not directly or indirectly develop, produce, market, solicit or sell products or services competitive with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

products or services being offered by [EMC].

There is no question that Allen will be marketing products by Sun which are in direct competition with EMC's data storage products. That fact does not end the inquiry, however, because the agreement goes on to provide you shall not be considered in competition unless you have an ownership interest amounting to at least 1% in the competing enterprise ... or an officership, directorship or other policy-making executive position with a competing enterprise.

*2 By letter dated October 31, 1997, as amended by letter dated November 6, 1997, Sun offered Allen the position "Vice President 16." At Sun Allen will direct marketing for the Storage Products Group, a sub-product group with the Enterprise Storage & Service Group.

Sun, a company of over 21,000 employees, has approximately 110 Vice Presidents. At Sun, Allen will be responsible for world-wide marketing of Sun's storage products, including open systems products, his area of specialty for EMC. He will be the spokesperson for the Storage Products Group. Allen's compensation package is consistent with that of an officer, a sign-on bonus of $115,000, a base salary of $215,000, participation in the Vice President's Bonus Program (with a targeted payment of 42% of annual salary), stock options (subject to approval of the Board Directors) and relocation benefits. The offer was accepted by Allen on November 11, 1997 [FN1] Even assuming a higher cost of living and average per-capita income in Silicon Valley, the compensation package is commensurate in value and in the type of compensation and benefits with that of an officer.

FN1. By memorandum dated November 2, 1997, Allen commented on various provisions of the offer letter. In that memorandum, he referred to discussions with Steve Rein (the recruiter) and Sun's Kathleen Holmgren regarding the potential need for Sun to defend him in the unlikely event that "EMC decides to try and enforce their non-compete clause." In the amended offer, EMC undertook to pay Allen's legal fees and expenses "in the event that EMC initiates action against you to enforce their limited Non Competition Clause." Sun also agreed that, in the event an injunction was granted, Allen would receive alternate employment at Sun.

The defendant argues that under Delaware law, Allen is not an officer of Sun. The Agreement is silent as to the controlling law. Based on the facts, Massachusetts law controls the interpretation of the agreement which arose out of an Agreement for employment in Massachusetts. Massachusetts law therefore governs the interpretation of the word "officer" as used in the Agreement. The plain meaning of that word includes an individual who holds a position as vice president.

The defendant argues that under Massachusetts choice of law, Delaware law controls the determination whether Allen is an officer of Sun. If defendant's argument were correct, the meaning of the word "officer" as used in the covenant would vary depending on, and would require analysis of, the law of the state of incorporation and bylaws of the company in question. This result reinforces my view that had the drafters not intended that the word "officer" be given its plain and ordinary meaning, they would have defined the term.

The defendant argues that Allen is not an officer of Sun, as that term is used in the Agreement, because the Agreement applies only to officers who are also policy-makers or to those executives involved in making policy. He contends that at Sun he will not make policy and therefore even if he were an officer of Sun, he would not be in violation of the covenant not to compete because it covers only those officers who make policy. Because Allen's position at Sun involves policy-making at an executive level, this is a distinction without a difference, but I will address briefly each of Allen's contentions given the existence and implications of Allen's agreement with Sun for alternate employment in the event that the injunction is granted.

First, I do not find the agreement ambiguous. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

language "officer, director or other policy-making executive position" refers to all corporate officers, all directors and all other executives holding policy-making positions. This interpretation does not render the word "other" superfluous. The word "other" performs the function of signifying the author's understanding that officers and directors occupy policy-making positions. The omission of the word "other" would create the implication that officers and directors are not policy-making executives.

*3 Nor does this interpretation render superfluous the words "officer" and "director." The language attempts to draw a bright line presumably for the dual purpose of 1) providing, to the extent feasible, clear guidelines for the job-hunting covered employee and 2) avoiding, to the extent feasible, disputes over the applicability to particular situations of the more amorphous phrase "policy-making executive position." The inclusion of the language "other policy-making executive" ensures that an enterprising employee cannot avoid the reach of the covenant by taking a highly compensated high-level position and foregoing the title which would ordinarily accompany the position.

For these reasons, I conclude that an officer of a corporation, like a Vice President, is a covered employee.

Even if Allen were not an officer with the meaning of the agreement, there is a substantial likelihood that EMC will succeed at trial in establishing that the position he has accepted at Sun, "Vice President 16," is a policy-making executive position within the meaning of the agreement. According to the offer letter, Allen is expected to bring "leadership and expertise to [EMC's] management team." At Sun, Allen "will be in charge of setting objectives consistent with higher level policy decisions and make sure that plans are created and implemented to achieve these objectives." (Charbrier Decl. ¶ 19 ) The evidence submitted establishes that Allen would have responsibility for all marketing activities of the Sun's Storage Products Group and would be a "key member" of the storage business strategy team. His responsibilities for the position are described in the recruitment memorandum to include responsibility for developing the department's marketing strategy by setting objectives, identifying target markets and customers, establishing competitive pricing plans, developing plans to foster growth in revenues and personnel and acting as liaison with other marketing groups. According to the recruitment memorandum, evaluation of Allen's performance will be based on revenues, market share and team management and leadership, among other things. Allowing for some "puffing" by the recruiter, the memorandum and ¶ 19 of the Charbrier Decl. describe essentially the same executive position. While the affidavits submitted by Allen establish that there are at least two levels between Allen and those with final say over issues like price, I do not read the Agreement as applying only to executives charged with final decision-making authority. In a multi-faceted company like Sun those final decision-makers must rely heavily on the recommendations made by executives of individual groups or departments in question. Allen will be one of the highest ranking managerial employees and the spokesperson for Sun's storage products group, a leader of the management team. He will develop and implement the marketing strategy for products which are in direct competition with EMC. He will be one of only 110 Vice Presidents at Sun. As such, in my view, he will be a policy-making executive in a competing company within the meaning of the Agreement.

D. EMC's Legitimate Business Interests

*4 A covenant not to compete will be enforced only to the extent that it protects an employer's legitimate business interests. In this case, EMC has demonstrated a substantial likelihood that it will succeed in establishing that Allen's employment at Sun will involve the use of EMC's confidential and proprietary information on a competitor's behalf. It is undisputed that Sun and EMC are in head-to-head competition in the open systems storage marketplace. Further, Allen would be in charge of marketing systems in competition with EMC's systems in the world-wide market. As an officer of EMC with substantial responsibility for marketing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

storage systems, Allen had access to a wealth of information concerning product development, pricing and marketing plans which is confidential and proprietary to EMC. For example, Allen had access to EMC's Monthly Engineering Reports which provide detailed information concerning EMC's ongoing engineering projects. While some of the information in these reports is highly technical in nature, much of the information is clearly within Allen's ken [FN2] Examples include the nature of products under development and priority assigned to them, the problems encountered in developing them, what they will and will not do and their projected release dates. In addition, Allen is knowledgeable about the terms and conditions of EMC's agreements with its business partners. Although Allen could be enjoined from dealing with EMC's partners, his knowledge of the terms of EMC's partnership agreements, including pricing, support and the like, and current marketing strategies of EMC and its partners, including amounts budgeted for 1998 and the allocation of these amounts, would provide a significant advantage to Sun in formulating its own marketing plans and enable Sun to harm EMC in the market or with other EMC partners.

FN2. One of Allen's functions at Sun will be to "serve as a key conduit of information to technical groups within SMCC from the SMCC sales force and customer base and from commercially available research." Charbrier Decl. ¶ 19.

I further find that no injunction can feasibly be drafted and enforced which will protect EMC's legitimate business interest in protecting its confidential and proprietary information from disclosure. In performing his duties at Sun, Allen's decisions and recommendations will necessarily be informed by his knowledge of EMC confidential and proprietary information. Given the fact that EMC and Sun are in direct competition to fulfill the same need in the same marketplace, Allen's employment at Sun will irreparably harm EMC.

E. The Relative Equities/Public Interest

The agreement is enforceable and applicable. EMC will suffer irreparable harm if the agreement is not enforced. The agreement itself provides that it is enforceable by injunction. Enforcement will create a personal hardship for Allen and his family because the process of relocating his family has begun and the job at Sun offers Allen a substantial career opportunity.

Apart from the distance involved, however, the harm to Allen is no different from that suffered by the employee in virtually every case in which a covenant not to compete is enforced. If personal hardship like that which will result from enforcement in this case constituted irreparable harm overcoming the employer's legitimate business interests, the protection afforded by covenants not to compete would be meaningless.

*5 The public interest favors enforcement of contractual obligations voluntarily entered into for consideration. Allen was recruited by EMC. During his four-year employment Allen received over $1 million in compensation from EMC. He was employed when he received EMC's offer of employment. The offer made the terms of Agreement a condition of his employment at EMC. He had the option of rejecting the offer and continuing in his current employment.

2. Unclean Hands

The record in this case will not support denial of the injunction on the basis of unclean hands on the part of EMC or judicial estoppel. EMC's conduct in the Goldberg case and its pursuit of a litigation position in that case which is inconsistent with the position taken in this case is a matter of concern to the Court. However, given the length of time which has elapsed since the Goldberg case and the differences in the facts of the two cases, application of the doctrine of unclean hands is not appropriate in this case. There is no evidence that Allen was aware of or relied upon the position taken by EMC in the Goldberg matter. Further in his affidavit in the Goldberg case, EMC's Chairman did not address the question whether Goldberg was an officer. [FN3] The Court does not hereby adopt EMC's argument

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that, as a matter of law, its conduct *vis a vis* employees of its competitors covered by covenants not to compete is not relevant to the question whether it is entitled to seek relief from a court of equity when its own covenants are violated.

FN3. An unambiguous statement by EMC that Goldberg, a Vice President of EMC, was not an officer within the meaning of the non-compete clause in issue in the Goldberg case would constitute evidence of EMC's understanding of the meaning of that term as used in Allen's Agreement given the similarity of the language in the two Agreements. Because in my view the language of the Agreement is not ambiguous, however, the inquiry does not go beyond the plain and ordinary meaning of the word.

CONCLUSION

For the reasons stated herein, I find that EMC has demonstrated a likelihood of success on the merits and that it will be irreparably harmed if Allen's covenant not to compete is not enforced. Accordingly, it is hereby ORDERED:

The defendant Jeffrey E. Allen be and hereby is enjoined from

1) using or disclosing any EMC information not already lawfully available to the public concerning any EMC products, product development, business strategy, financial information, customer lists, or other information which EMC treats as confidential and/or proprietary;

2) being an officer or director or having any other policy-making executive position with Sun Microsystems, Inc. or any other company which produces, markets, solicits or sells products competitive with or services being offered by EMC for the twelve-month period following his resignation from EMC.

1997 WL 1366836 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

Superior Court of Massachusetts.
EMC CORPORATION,
v.
Doron KEMPEL et al.
**No. 014631BLS.**

Nov. 20, 2001

MEMORANDUM AND ORDER ON PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

VAN GESTEL, J.

*1 This matter is before the Court on the application of the plaintiff, EMC Corporation ("EMC"), for a preliminary injunction against the defendant Doron Kempel ("Kempel"). [FN1]

FN1. SANgate Systems, Inc. has been permitted to intervene in this action as a party defendant.

BACKGROUND

Kempel first began working with EMC in the spring of 1998, on a consulting basis. For about three years prior thereto, Kempel served as Vice President of Sales and Marketing for Imedia Corporation ("Imedia"). Imedia was a privately held company, based in San Francisco, that developed and sold video compression and statistical multiplexing technology. In his position with Imedia, Kempel developed an expertise in a field known in the information technology industry as "rich media." Rich media refers to video, audio, and imaging, as contrasted with plain digital consisting of text and numbers.

Based upon his expertise in video and related markets and given his contact base with customers in this space, Kempel provided EMC with consulting services regarding video-related products that EMC had under development--in particular, a video server and video compression technology. His role, among other things, was to evaluate the projected market for rich media; determine what EMC would have to do to retain its leadership position in the overall data storage marketplace, given the assumption that rich media would, in the future, become a significant portion of the overall digital market; and recommend an implementation strategy.

Kempel ultimately recommended that EMC establish a new, independent business unit that would focus solely on the rich media markets, and that this unit should lead and orchestrate all EMC's activities in that space. His recommendations were accepted fully, and Kempel was asked by EMC to become a full-time employee and lead the implementation of his proposed strategy. Specifically, EMC asked him to assume the role of a general manager and establish a new business unit that would operate as an autonomous organization, sheltered from EMC's core sales, marketing, engineering and other mainstream divisions. The new unit was called the Media Solutions Group ("MSG").

Kempel reported directly to EMC's head of engineering, Moshe Yanai ("Yanai"), and to the head of EMC's Business Development. MSG had a separate budget and was managed by Kempel as an independent profit and loss center.

Kempel was not a mid-level manager but rather a highly compensated high-level executive employee having received about $2 million in economic rewards in the past two years. In his position he had access to a broad range of significant and confidential strategic EMC business and product information.

Upon joining EMC as a full time executive employee, Kempel executed the EMC Key

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Employee Agreement (the "Agreement"). Among other things, the Agreement provides:

1. *Non-Competition* ... For the twelve-month period following the effective date of your termination, for any reason, from the Company, you agree not to directly or indirectly compete with the Company in any manner, including but not limited to directly or indirectly developing, producing, marketing, soliciting or selling products or services being developed, produced, marketed or sold by the Company as of the date of your termination. For purposes of the immediately preceding sentence you shall not be considered to be competing with the Company unless you have an ownership interest amounting to at least 1% in the competing enterprise (whether direct or indirect by way of stock options (vested or unvested) or otherwise) or an officership, directorship or other policymaking position with the competing enterprise.

***2** ...

7. *Miscellaneous* .. (d) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Company not compensable by monetary damages and that the Company will be entitled to obtain injunctive relief, in addition to other relief in any court of competent jurisdiction, to enforce the terms of this Agreement.

(e) No failure by the Company to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission by the Company in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights ...

The Agreement is said to be "governed by and construed in accordance with the laws of the Commonwealth of Massachusetts ..." The Agreement also contains provisions regarding customer and vendor confidentiality and confidentiality of company records.

Kempel was contacted at some time prior to August of 2001 by a start-up company called SANgate Systems, Inc. ("SANgate"), or investors on its behalf, who were apparently seeking to find a person to become its chief executive officer. At that time, the situation at EMC was changing in ways that caused Kempel concern about the future of his MSG venture. He began to pursue with EMC changes in his position and let it be known that he would consider leaving EMC unless he was given an alternative position that would meet his career aspirations.

At one time during this period. Kempel told his superior, Moshe Yanal, that he was considering joining SANgate if things could not be worked out for him at EMC. Yanai later, but unofficially, provided Kempel with a note or memorandum dated "8/20/01" that reads in its entirety:

To: Doron Kempel
From: Moshe Yanai
Subject: Your Leaving of EMC

I am very sorry to hear about your intentions to leave EMC and see it as a great loss for us. I still hope that you will change your mind at the last minute and would not leave us.

You also inquired about your intention that if you leave us you will move to be the CEO of SANGATE corporation. Per my knowledge about their work, I don't see it as a problem to EMC.

Moshe
/s/ Moshe Yanai
VP ENGINEERING

It was later in the day on August 20, 2001, that Kempel was advised by EMC that it would not be able to create for him a position of the kind that he sought. When given that advice by EMC's Chief Executive Officer, Kempel handed him a letter of resignation, outlining that his last day of employment at EMC would be on September 2nd or 3rd. Later, on that same day, Kempel signed an agreement accepting a position with SANgate as its CEO and Chairman.

On the following day, August 21, 2001, Kempel was advised by General Counsel for EMC that EMC viewed SANgate as a competitor and that he would be in violation of his non-competition clause if he were to join SANgate as Chairman and CEO.

In his affidavit filed in this matter--from which much of the foregoing information has been taken--Kempel says at paras 26 and 27, among other things:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> *3 26. As Chairman and CEO at SANgate I am expected to devise a strategy, establish an organization that will develop, sell and support certain information technology products (described below, and in more detail in the Affidavit of Alex Winokur) through a series of alliances with product and services companies.
>
> 27. SANgates's router/switch-like product will address the Enterprise market place, offering complementary performance and interoperability enhancements to existing architectures and products. Generally speaking, this product will enable a company to network its storage devices, supporting SANgate and/or third party software applications, including the functionalities of point in time copying, data migration, and mirroring, using multiple vendors' storage systems.

EMC designs, manufactures, markets and supports a wide range of computer storage-related hardware, software and service products. EMC's systems, software and services store, manage, and retrieve data from all major computing platforms, including mainframe and open systems environments, and allow for common management, protection and sharing of information.

According to the affidavit of David A. Donatelli, Senior Vice President of Corporate Marketing and Business Development at EMC, data storage systems must be able to operate reliably around the clock. Storage solutions that meet this need have been described as "mission critical" storage systems. Fundamental to any effective mission critical storage solution is the ability (1) to copy data to remote facilities for disaster recovery purposes ("remote mirroring"); (2) to make multiple copies of data within one storage unit for back-up purposes ("point-in-time copying"); and (3) to move data from one location to another without disrupting normal business operations or data availability ("data migration").

Donatelli affirms that EMC offers products that allow for remote mirroring ("Symmetrix Remote Data Facility"), for point-in-time copying ("TimeFinder" and "Snap View"), and for data migration ("Symmetrix Data Migration Services").

It is in the software for information storage, not the information storage systems themselves, that EMC and SANgate bump into each other. According to EMC's most recent Form 10-Q filing with the Securities and Exchange Commission, its information storage software business increased from $620,245,000 for the six months ended June 30, 2000, to $965,057,000 for the six months ended June 30, 2001. While relatively small in the overall business for EMC, it is hardly a casual side effort.

Although SANgate does not yet have any product ready for sale, it is developing a system called the Enterprise Storage Appliance ("ESA"). In its Internet web page, SANgate says: "The SANgate ESA enables you to perform remote mirroring, point-in-time copying and data migration using any vendor's storage subsystem."

In an article from Computerwire dated July 9, 2001, also featured on SANgate's web page, and not disputed by SANgate, it is said:

> *4 In the first quarter next year, Sangate--founded in May 1999 and backed with $18.25m financing in two rounds--says it will ship a radical appliance which will allow remote mirroring, point-in-time copying and data migration across any combination of IBM Shark, Hitachi Lightening and EMC's Symmetrix or Clariion storage arrays.
>
> Sangate will also relieve EMC's customers of the need to buy EMC's somewhat expensive software for the key tasks of mirroring, migration and point-in-time copying.

DISCUSSION

In order to prevail on its request for preliminary injunctive relief, EMC bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Kempel and SANgate from Kempel's being enjoined. *GTE Products Corp. v. Stewart,* 414 Mass. 721, 722-23 (1993); *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616-17 (1980). Before assaying these issues, it is appropriate to canvass the relevant elements of the Massachusetts law dealing with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enforcement of non-competition and confidentiality agreements.

> Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. *Novelty Bias Binding Co. v. Shevrin,* [342 Mass. 714, 716 (1961) ]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with its customers. See *All Stainless, Inc. v. Colby,* [364 Mass. 773, 779-80 (1974) ]. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. *Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc.,* 357 Mass. 106, 111 (1970).

*Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 287-88 (1974).

Kempel's position at EMC was sufficiently high that EMC has a justifiable interest beyond that of just ordinary competition in seeking to enforce the non-competition and other covenants of the Agreement with Kempel. The Agreement itself, in plain language, recites "that any breach ... will cause immediate and irreparable harm to [EMC] not compensable by monetary damages and that [EMC] will be entitled to obtain injunctive relief."

A non-competition agreement, however, to be enforceable, must be reasonable in geographical scope and length of time. See, e.g., *Blackwell v. F.M. Helides, Jr., Inc.,* 368 Mass. 225, 228 (1975); *All Stainless, Inc., supra,* 364 Mass. at 779-80; *Becker College of Business Admn. & Secretarial Science v. Gross,* 281 Mass. 355 (1933). Here, the scope and the one-year time limit involved in the EMC Agreement are certainly reasonable for the protection of the matters in issue. *Blackwell, supra,* 368 Mass. at 229; *Marine Contractors Co., Inc., supra,* 365 Mass. at 289.

*5 The principal issue that must be examined is whether Kempel, on the record before this Court, is violating the non-competition part of the Agreement. The Agreement's plain language becomes critical. Here, the Court observes that the word "compete" is broadly defined by the directly following words: "including but not limited to directly or indirectly *developing,* producing, marketing, soliciting or selling products or services competitive with products or services being *developed,* produced marketed or sold by [EMC] at the time of your termination." (Emphasis added.) With the inclusion of the word "developing," it is not necessary for EMC to show that SANgate has a product that competes with those of its own or that those of its own are in a state beyond "being developed." Rather, the fact that SANgate is developing a product that competes with one being developed by EMC is enough to ensnare Kempel.

Kempel argues in his supplemental affidavit that he did not work on or know about any product at EMC that competes with any proposed product at SANgate. This misses the point however. The Key Employee Agreement prohibits, among other things, "directly or indirectly compet[ing] with [EMC] in any manner, including but not limited to directly or indirectly developing .... products or services competing with products or services being developed, produced, marketed or sold by [EMC] as of the date of [his] termination." Kempel, by the limiting language of the Agreement, would not be considered competing unless he held an officership, directorship or other policy-making position "with the competing enterprise." It is, thus, what SANgate--"the competing enterprise" now under Kempel's leadership--is doing, not what Kempel did at EMC, that is critical.

Kempel also argues that a new EMC product called "AutoIS"--which he implies does compete with SANgate's anticipated ESA product--was not announced and available for sale until October 29, 2001. Consequently, Kempel argues that this is after the "date of his termination" and, therefore, not reached by the Agreement. Kempel's proffer is a press release by EMC stating, among other things, that "EMC began delivering major elements of AutoIS [on October 29, 2001]." Again the Court must focus on the language of the Agreement relating to products being "developed" by EMC on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the date of Kempel's leaving. If AutoIS was being delivered to customers on October 29, 2001, of necessity it must already have been developed and marketed well before that date. The Court, of course, does not know when the development or marketing of AutoIS started at EMC, but it would be surprised to learn that it began after August 31, 2001, less than two months before the first deliveries to customers.

On the issue of "competition" the Agreement also has a clear and definite exclusion. It reads: "[Y]ou shall not be considered to be competing with [EMC] unless you have an ownership interest amounting to at least 1% in the competing enterprise (whether direct or indirect by way of stock options (vested or unvested) or otherwise) or an officership, directorship or other policymaking position with the competing enterprise."

*6 The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. *116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co.*, 433 Mass. 373, 376 (2001); *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998). A contract provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation, supra*, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. *Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995).

When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. *MacDonald v. Gough*, 326 Mass. 93, 96 (1950). "The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose." *USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. *Starr v. Fordham*, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. *Gross v. Prudential Ins. Co. of America, Inc.*, 48 Mass.App.Ct. 115, 119 (1999).

Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. *City of Haverhill v. George Brox, Inc.*, 47 Mass.App.Ct. 717, 720 (1999).

In construing the Key Employment Agreement in issue here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. *Starr, supra*, 420 Mass. at 190; *Shea v. Bay State Gas Co.*, 383 Mass. 218, 224-25 (1981).

Here, where EMC, a sophisticated and knowledgeable entity, chose to embody its relationship with its key employees in a detailed and carefully crafted written instrument, perhaps more than in other situations it is entitled to and should be held to the contractual language it chose. Similarly, Kempel is not unsophisticated, and he too must be held to the same kind of contractual interpretation. Nor, of course, can SANgate effectively plead its innocence of the reach of the language in Kempel's Agreement with EMC. The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument modify its expressed statements. "Courts cannot ... [, for example,] use commercial context to override express provisions of a contract." *Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc.*, 18 Mass.App.Ct. 364, 369 (1984).

*7 Contracts drafted by employers to limit the employment prospects of former employees--even those at a very high level--must be construed narrowly against the employer. *Sentry Ins. Co. v. Firnstein*, 14 Mass.App.Ct. 706, 707 (1982). At the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

same time, clear language must be given a clear application.

Here, in order to be considered competing--using EMC's own language--Kempel must have "an ownership interest amounting to at least 1% in" SANgate "or an officership, directorship or other policy making position with" SANgate. As Chairman and CEO of SANgate, Kempel is clearly in "an officership ... or other policy making position with" SANgate. There is no one in a higher position at that company than Kempel.

As is apparent above, EMC and SANgate are competitors for the purpose of Kempel's Agreement. They each are developing, and EMC is marketing, software for point-in-time copying, data migration, and remote mirroring applications for use in data storage systems.

There are other elements to the Key Employee Agreement that seem entitled to enforcement as well. The Court speaks of the provisions relating to customer and vendor confidentiality and to the confidentiality of EMC's materials. EMC has demonstrated that it is entitled to protection on these issues.

Kempel agreed "not to use or disclose any ... customer or vendor information" and to "return all such materials to" EMC. Further, he agreed not to use for his own benefit, divulge or disclose to anyone, "any information not available to the public" concerning EMC or any of its customers or suppliers, all as outlined in Section 3 of the Key Employee Agreement.

Kempel and SANgate plead hardship should this Court enjoin Kempel from acting as SANgate's Chairman and CEO for the balance of the year from the date he voluntarily chose to leave EMC to enhance his career aspirations. Kempel was not fired by EMC, nor was he taken off the MSG project that produced his $2 million dollar compensation over the past two years. Kempel will lose his job at SANgate for a little over nine months, and SANgate will lose Kempel as its Chairman and CEO for the same period. Until August 31, 2001, each of Kempel and SANgate survived without the other--Kempel exceedingly well, it appears, and SANgate, with $18.25 in venture capital money, not too badly, either.

> The consequence of every covenant not to compete, however, is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable.

*Marine Contractors Co., Inc., supra,* 365 Mass. at 289.

Nor, as Kempel and SANgate argue, were this case and its application for a preliminary injunction brought too late. The Agreement itself addresses this very issue in Section 7(e). Further, with (1) Kempel leaving EMC on August 31, 2001, (2) SANgate issuing its press release announcing his hiring as Chairman and CEO on September 24, 2001, and (3) suit having been filed on October 10, 2001, even absent the contractual provision excusing any delay, no argument can be made that the request for injunctive relief came too late.

***8** Lastly, the Court is wholly unconvinced that the August 20, 2001 note/memorandum from Moshe Yanai to Kempel can be elevated to the level of a waiver by or estoppel against EMC in proceeding as it is. Nothing in Yanai's note demonstrates that he was speaking for EMC, that he knew all there was to know about competition between EMC and SANgate in the development area, or that he understood the legal reach of the non-competition aspects of the Agreement. This is not meant to criticize Yanai, but rather to reflect that this Court must act on the law which may or may not have been known to him at the time he penned the note.

CONCLUSION

For the foregoing reasons, this Court enters the following preliminary injunction:

The defendant Doron Kempel is preliminarily enjoined and restrained from having any employment relationship with SANgate Systems, Inc. as an officer, director or in any other policy-making position until August 31, 2002, or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

until any further order of this or any appellate Court, whichever first occurs

The defendant Doron Kempel is hereby further enjoined and restrained from using or disclosing any customer and vendor information of EMC Corporation to any person, firm or entity and from divulging or disclosing to any person, firm or entity, any information not already lawfully available to the public concerning EMC Corporation or any of its customers or suppliers, including any products, product development, business strategy, financial information, or customer or employee lists, technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product, specification, or plan for a new, revised or existing product, or any business plan, marketing, financial or sales order, or the present and future business or products of EMC Corporation

The foregoing preliminary injunction shall remain in full force and effect until further order of this or any appellate court.

14 Mass.L.Rptr. 131, 2001 WL 1763451 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

C

Superior Court of Massachusetts.
FORTUNE PERSONNEL CONSULTANTS OF BOSTON, INC., Plaintiff,
v.
Melanie HAGOPIAN, Defendant.
**No. CIV. A. 97-24440-A.**

Dec. 30, 1997.

SUPERIOR COURT, CIVIL ACTION, No. 97-24440-A

*MEMORANDUM OF DECISION REGARDING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION*

RICHARD E. WELCH III, Justice of the Superior Court.

***1** After hearing, this Court grants, to a limited extent, the plaintiff's request for a preliminary injunction.

This is a case in which the plaintiff is seeking, among other things, to enforce a non-competition agreement with its former employee, defendant Melanie Hagopian. The plaintiff Fortune is a personnel recruitment firm that specializes in finding employees in the bio-technology and pharmaceutical industries. The defendant Melanie Hagopian was employed by Fortune from December, 1996 to December 4, 1997 when she voluntarily resigned. Prior to being employed by Fortune, defendant Hagopian had no background in personnel recruitment, instead she was employed as a lawyer by the Commonwealth of Massachusetts.

As a condition of her employment, the defendant signed a confidentiality agreement and a covenant not to compete. The defendant was hesitant to sign this covenant because she fully understood its scope and import. Nevertheless, after due consideration, she did sign the covenant not to compete. The covenant not to compete prohibited Ms. Hagopian, following her termination of employment from Fortune, from: (a) working for a competing company (including self-employment) for a period of four months following termination within fifty miles of Fortune's office; (b) contacting any clients or candidate whose account she handled within two years of termination of her employment with Fortune; and (c)disclosing to a third party or use in her own or another person's business at any time any confidential information acquired while employed by Fortune.

Ms. Hagopian was trained by Fortune. This included at least one training seminar and in-office training. Defendant Hagopian was also provided various business leads and a copy of a directory of the American Association of Pharmaceutical Scientists which was heavily annotated by another Fortune employee reflecting prior communications with and information about potential candidates.

Hagopian was assigned to recruit candidates in the field of "formulations". Formulations is a pharmaceutical and bio-technology speciality which mixes various compounds to obtain the most effective delivery system for the treatment of various diseases. Defendant Hagopian was the only recruiter at Fortune having formulations as a speciality. Prior to defendant Hagopian taking over the recruitment of formulations professionals, this area had been handled by another Fortune employee by the name of Ms. Aline Wildes. Currently, Fortune is seeking to hire a new recruiter to take over the formulations area.

Defendant Hagopian was successful as a personnel recruiter in the formulations area. At times, she performed some of her personnel recruiting for Fortune from her home. In order to do this, she took various pieces of property owned by Fortune (including potential client lists, computer software, and other documents) to her home. This was done with the full knowledge and consent of Fortune. The defendant Hagopian has not returned any of this property. Some of this property is likely to be confidential information possessed by Fortune.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*2 After being employed by Fortune for slightly less than one year, the defendant resigned on December 4, 1997. The defendant made the voluntary decision to resign. One of the reasons that the defendant resigned was that she found that the business offices of Fortune were too cramped for her to comfortably and successfully recruit clients. Defendant Hagopian immediately became self-employed as a personnel recruiter specializing in the formulations area.

During her employment with Fortune, defendant Hagopian had certain conversations with Fortune's president, Joseph Genovese, regarding the covenant not to compete. Mr. Genovese opined that perhaps the covenant would not be legally enforceable. In addition, the defendant conversed with Mr. Genovese upon her departure from the company. She informed Mr. Genovese that she was, at that time, still working on certain potential personnel placements that she had begun while in the employ of Fortune. She suggested to Mr. Genovese, as to these ongoing personnel recruitment matters, that she split the recruitment fee according to the same percentage formula that applied during her employment at Fortune. There is little doubt that these were potential clients initially developed while defendant Hagopian was employed by Fortune. Defendant Hagopian seeks, by way of a cross motion, a injunction from this Court enjoining the plaintiff from interfering with her ongoing personnel recruitment of these and other individuals.

"If an employer wishes to restrict post-employment competitive activities of a key employee, it may seek that goal through an non-competition agreement." *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172, 565 N.E.2d 415 (1991). Employee covenants not to compete are enforceable as long as they protect a legitimate business interest of the employer and are reasonable in scope. See *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 358 N.E.2d 804 (1976); *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 310 N.E.2d 915 (1974). Massachusetts courts have enforced covenants not to compete in order to protect the former employer's goodwill. See *All Stainless, Inc. v. Colby*, 364 Mass. 773, 308 N.E.2d 481 (1974). In the field of personnel recruitment, the recruiter plainly plays a critically important role in "gaining and maintaining the goodwill of his employer's customers [or clients] in a competitive sales [or recruiting] environment." *Id.*

This is not a case where the defendant had previously been employed by other personnel recruiting firms and had developed either an expertise or a stable of clients prior to her employment with Fortune. Instead, she was trained by Fortune during her approximately one year period of employment. She also trained herself, while being employed by Fortune, in certain areas of the personnel recruiting business. While Fortune cannot prevent the defendant from utilizing any "general skill or knowledge acquired during the course of employment", a covenant not to compete may prevent the defendant from taking any confidential information from a former employer or damaging that former employer's goodwill. See *Dynamics Research Corp. V. Analytical Sciences Corp.*, 9 Mass.App.Ct. 254, 267, 400 N.E.2d 1274 (1990), quoting *Junker v. Plummer*, 320 Mass. 76, 79, 67 N.E.2d 667 (1946). Splitting the difference between allowing the defendant to utilize her "general skill or knowledge" and preventing any undue harm to the former employer's goodwill may require the Court to enforce only a portion of the covenant not to compete. This Court has the authority to modify terms of a non-competition agreement so as to make it reasonable. *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass.App.Ct. 310, 312, 432 N.E.2d 566 (1982).

*3 Taking a potential client who has been developed while under the employ of Fortune, certainly would constitute an invasion of Fortune's good will. A personnel recruiting firm's good will is its relations between potential employees and various potential employers. By taking away current clients of Fortune, even though they have not yet finalized any employment transaction, the defendant is indeed damaging the plaintiff's goodwill. Thus, the portion of the covenant not to compete which prevents the defendant from contacting any client or candidate whose account she handled, in any way, while employed by Fortune,(for a period within two years of her termination of employment from Fortune) is reasonable in scope and is reasonably drafted to protect the plaintiff's goodwill. Such damage to goodwill is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

likely to be irreparable in that, once it occurs, it cannot be undone and its financial implications are almost impossible to measure. Thus, the defendant is preliminary enjoined from having any ongoing contact with any potential client or candidate that she initiated contact with while employed with Fortune. This plainly includes any of the potential candidates that she discussed with president Genovese upon her departure.

To the extent that the defendant has taken any materials from Fortune, such as software programs or other information, she is to return that property immediately to Fortune. She is also prohibited from utilizing any copies of that information as it may presently exist on her home computer.

Questions exist, at this preliminary juncture, whether the remainder of the covenant not to compete is reasonable in scope. Thus, the remainder will not be enforced by a preliminary injunction. Therefore, the defendant is entitled to utilize her general knowledge and skills as a personnel recruiter and she can continue to recruit professionals in the formulations field. Her potential clients or candidates, however, cannot be any that she had personal dealings with (at least for the next two years) while employed at Fortune.

8 Mass.L.Rptr. 49, 1997 WL 796494 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9

**C**
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
INVESTORS BANK & TRUST COMPANY,
v.
Ismail GUNES and State Street Bank & Trust Company et al.
**No. 94-2567F.**

June 2, 1994.

PRELIMINARY INJUNCTION

FREMONT, J.

FINDINGS

***1** After hearing on plaintiff's motion for a preliminary injunction, and in consideration of the verified complaint, affidavits, and arguments of counsel, the court finds that the criteria for issuance of a preliminary injunction are met, in that plaintiff has shown a reasonable likelihood of success on the merits, a threat of irreparable injury if the injunction does not issue, and that the equities tip in favor of the plaintiff.

There is a reasonable probability that the plaintiff will prove at trial that the defendant State Street Bank & Trust Company's mutual funds division has, for some time, engaged in an effort to hire away key employees of the plaintiff, which is a direct competitor of the defendant State Street Bank & Trust Company, that State Street hired the defendant Ismail Gunes with full knowledge of the noncompete agreement which Gunes, for fair consideration, had entered into with the plaintiff, that the defendant Ismail Gunes was privy to trade secret and confidential information of the plaintiff, including information relating to plaintiff's prices and profits which would be of competitive advantage to State Street Bank in competing with the plaintiff for the business of providing securities processing services to the mutual fund and related industries, that during his employment at State Street it would be difficult or impossible for Gunes not to use such confidential and proprietary information gained while employed with plaintiff or its predecessor corporation and that unless Gunes is enjoined from working for State Street, there is an immediate threat that Gunes will utilize plaintiff's confidential and proprietary information for the benefit of State Street and to the detriment of the plaintiff and thereby cause damages to the plaintiff which cannot be readily remedied by a monetary award. The court further finds that the plaintiff had a valid and enforceable contract with Gunes prohibiting his employment with State Street and other specified competitors for a period of two years after the termination of his employment with the plaintiff, and that such restriction on his employment is reasonable in scope and duration and will not, as a practical matter, prevent him from finding other employment with noncompetitors of plaintiff in the industry.

ORDER

Accordingly, Ismail Gunes is preliminarily enjoined, pending a trial, from directly or indirectly working for the benefit of the defendant, State Street Bank & Trust Company, or for any other person or entity identified in paragraph one of the noncompete Agreement, and from directly or indirectly revealing or using any of the plaintiff's confidential or proprietary information for the benefit of any person or entity including, but not limited to, State Street Bank & Trust Company. State Street Bank & Trust Company is preliminarily enjoined from continuing, directly or indirectly, the employment of Ismail Gunes and from receiving or using any confidential or proprietary information of the plaintiff.

***2** This preliminary injunction shall become effective upon the filing by plaintiff of a bond in the amount of $150,000 securing Ismail Gunes from any damages should it later be determined that the injunction was improvidently granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 879800 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States District Court,
D. Massachusetts.
MARCAM CORPORATION, Plaintiff,
v.
Frank E. ORCHARD and Datalogix International, Inc., Defendants.
**Civ. A. No. 95-10527-RCL.**

April 3, 1995.

Employer brought action in state court against former employee to enforce noncompetition provision of employment agreement and against employee's current employer for intentional interference with contractual relations between employer and former employee and for violation of state law. Action was removed. Employer filed motion for preliminary injunction to prevent former employee from working for current employer in its operations within United States during term of noncompliance covenant and from using or disclosing employer's trade secrets and other proprietary or otherwise confidential business information. The District Court, Lindsay, J., held that employer was entitled to preliminary injunction.

Motion granted.

West Headnotes

**[1] Injunction 🔑138.1**
212k138.1 Most Cited Cases
Party moving for preliminary injunction must establish four things before relief may be granted: (1) that movant will suffer irreparable injury if injunction is not granted; (2) that such injury outweighs any harm that opposing party would suffer if injunction was granted; (3) that there is likelihood that movant will succeed on the merits at trial; and (4) that public interest will not be adversely affected if injunction is granted.

**[2] Injunction 🔑138.39**
212k138.39 Most Cited Cases
Employer was entitled to preliminary injunction to prevent former employee from working for current employer in its operations within United States during term of non-compliance covenant of noncompetition agreement and from using or disclosing employer's trade secrets and other proprietary or otherwise confidential business information; employer would suffer irreparable harm as employee's knowledge of employer's software product and employer was bound to influence what he would do for current employer, and to extent it would, employer would be disadvantaged; harm to employer, should injunction not be granted, would be substantial and irreparable and would outweigh any harm that would flow to employee if injunction was granted; employer was likely to succeed on the merits as it was likely that employer would establish that employer offered employee 110% of salary offered by current employer, as provided in non-competition agreement, and that geographic restriction of covenant was reasonable as employer had a national market for its products; employee offered no reasons why injunction would harm public interest and district court found none.

**[3] Contracts 🔑116(1)**
95k116(1) Most Cited Cases
Under Massachusetts law, non-competition agreement may be enforced to protect company's reputation and its relationship with its customers.

**[4] Contracts 🔑116(2)**
95k116(2) Most Cited Cases
Under Massachusetts law, non-competition agreement is enforceable as long as it is necessary to protect legitimate interests of employer, and is not designed to protect employer from ordinary competition.

**[5] Contracts 🔑117(2)**
95k117(2) Most Cited Cases
Under Massachusetts law, to be enforceable, non-competition agreement must be reasonable in terms of its restrictions as to time, location, and other respects.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[6] **Contracts** 🔑**117(3)**
95k117(3) Most Cited Cases
Under Massachusetts law, a geographic restriction in a non-competition agreement is reasonable as long as it restricts former employee from doing business in an area which company itself conducts business.
***295** Adam P. Forman, Testa, Hurwitz & Thibeault, Boston, MA, for plaintiff.

Paul Whitby, Lowenthal, Landau, Fischer & Ziegler, New York City, David S. Mortensen, Diane J. Perlowski, Tedeschi, Grasso & Mortensen, Boston, MA, for defendants.

MEMORANDUM AND ORDER

LINDSAY, District Judge.

The plaintiff, Marcam Corporation, has brought this action to enforce the non-competition provisions of an employment agreement between it and its former employee, defendant Frank Orchard. Marcam also has made claims against Orchard's current employer, Datalogix International, for intentional interference with the contractual relations between Marcam and Orchard and for violation of Mass.Gen.L. c. 93A. Marcam seeks injunctive relief and damages (including damages under Mass.Gen.L. c. 93A) against Orchard and damages (including damages under Mass.Gen.L. c. 93A) against Datalogix.

Now before the court is Marcam's motion for a preliminary injunction [FN1] to prevent Orchard from working for Datalogix in its operations within the United States during the term of the non-competition covenant, and from using or disclosing Marcam's trade secrets and other proprietary or otherwise confidential business information. After a review of the papers, and after a hearing, the court grants Marcam's motion.

FN1. This suit was originally filed in Middlesex (Massachusetts) Superior Court on March 10, 1995, and removed to this court on March 14, 1995, under 28 U.S.C. § 1332. The defendant, Orchard, has waived any defense that this court lacks personal jurisdiction over him. Both parties concede that Massachusetts law applies to this dispute.

*Facts*

The following facts appear from the pleadings and affidavits filed by the parties.

***296** Marcam and Datalogix are competitors, engaged in the development and licensing of software in the "process" manufacturing industry. Process manufacturers produce products (such as food, beverages, and pharmaceuticals), by controlling chemical reactions through such procedures as mixing, separating, heating and refining. Marcam's PRISM software directly competes with software products of Datalogix called CIMPRO and GEMMS in the process manufacturing market.

In April of 1991, Orchard was hired as Marcam's Director of Development. He later became Marcam's Vice-President of Development, the position he last held with Marcam.

When he was first hired by Marcam, Orchard signed an employment agreement which contained non-competition provisions that Orchard would not compete with Marcam or accept employment with a competitor of Marcam for one year if, within five days of being notified by Orchard of his intention to resign, Marcam offered to pay him 110% of the salary offered by the competitor during that restricted year. [FN2] The agreement further provided that Orchard would not disclose proprietary information or material relating to Marcam's business.

FN2. Section 10(b) of Orchard's employment agreement reads:
If, prior to the first (1st) anniversary of the termination of my employment with the Company for any reason whatsoever, I am offered employment, effective prior to that anniversary, by any person that is, or was, a customer or client of the Company or that is, or would be, engaging in competition with the Company, before accepting that offer, I will inform the Company, in writing, of the identity of the potential employer and the duties and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> salary involved. I will not accept that offer if, within five (5) business days after being so informed, the Company agrees, in writing, to pay me periodically, until that anniversary, amounts equal to the difference between one hundred ten percent (110%) of that salary and whatever lesser income I earn from suitable employment I am able to secure by diligent efforts, which I will exert.

For the past fourteen months, Marcam has been developing and marketing a new software product for use in the process manufacturing industry, PRISM Client/Server. Orchard was directly responsible for the research and development of PRISM Client/Server, and was involved in all other significant aspects of the product, including budget and marketing decisions.

As Director, and later Vice President of Development, Orchard was responsible for a staff of approximately sixty employees in the areas of product development, product assurance, and technical consulting with respect to several of Marcam's PRISM products. He was also responsible for managing the budget of Marcam's Development Committee--a budget in excess of one million dollars. Orchard was also involved in Marcam's sales efforts for PRISM products (especially PRISM Client/Server); and he conducted numerous sales presentations and demonstrations of such products to prospective customers.

For three and a half years Orchard was privy to top-level discussions concerning Marcam's research and development efforts pertaining to its current products, as well as to its future products. This information provided Orchard with an intimate understanding of Marcam's plans for future development and of its sales and marketing strategies.

On February 22, 1995, Orchard announced his intention to resign from Marcam, effective February 24, 1995. At that time, he advised Marcam that he had received an offer from Datalogix. Marcam informed Orchard that it wished to invoke the non-competition provision in his employment agreement and would pay him 110% of the salary offered by Datalogix. Marcam now contends that Orchard breached the employment agreement by accepting employment with Datalogix after Marcam agreed to pay 110% of the salary offered by Datalogix. Orchard contends that Marcam failed to offer him the full 110% of the salary he expected from Datalogix, and that he was therefore free to leave Marcam and enter into an employment relationship with Datalogix.

*Standard for Granting a Preliminary Injunction*

[1] A party moving for a preliminary injunction must establish four things before ***297** that relief may be granted: (1) that the movant will suffer irreparable injury if the injunction is not granted, (2) that such injury outweighs any harm that the opposing party would suffer if the injunction were granted, (3) that there is a likelihood that the movant will succeed on the merits at trial and (4) that the public interest will not be adversely affected if the injunction is granted. *Jackson v. Fair,* 846 F.2d 811, 814-15 (1st Cir.1988). As to each of these matters the court's analysis of this case follows.

*Irreparable Harm*

[2] Marcam argues that the knowledge that Orchard has of its products and operations will provide Datalogix with critical proprietary and confidential information that Marcam has spent years and millions of dollars to develop. As Director of Development, and later as Vice President of Development, Orchard was privy to information pertaining to all aspects of the development and marketing of PRISM Client/Server and to significant confidential information concerning other products of Marcam.

Orchard's claim, in response, that his knowledge of Marcam's products is not translatable to Datalogix's products, because the Datalogix products use a different computer language, is not persuasive. Whether Orchard's knowledge of PRISM products is directly applicable to Datalogix's product is too narrow an inquiry. Orchard knows intimately, for example, the evolution of PRISM Client/Server, including its strengths and weaknesses. This information may be used to inform Datalogix's strategies in developing and promoting its competing GEMMS product,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

notwithstanding the fact that the two products use different computer languages.

Moreover, Orchard has knowledge of Marcam's marketing strategies and its plans for future development. Even if Orchard thinks he is keeping Marcam's secrets, he will, as Datalogix's employee inevitably, even if inadvertently, be influenced by the knowledge he possesses of all aspects of Marcam's development efforts. That knowledge will provide an advantage to Datalogix as it contemplates its own strategies regarding future development of products that compete with PRISM Client/Server, and with Marcam's other products.

As Judge Zobel of this District said in a recent decision, in which she granted a preliminary injunction in favor of an employer which had a similar non-competition agreement with an employee:

> [The plaintiff] has so far spent over $2 million and two years developing a product that, it hopes, will be sold at a highly competitive price and will satisfy the customers. Defendant had detailed knowledge of all phases of [the plaintiff's] development and marketing strategy. Although I fully credit his testimony that he took no documents that could in any way compromise the plaintiff, he could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his new employer he will inevitably draw upon that knowledge.

*Bard v. Intoccia,* 1994 WL 601944 (D.Mass.1994).

Here, as in *Bard,* the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure. The problem for Marcam is that when Orchard goes to Datalogix he does not go with a *tabula rasa* with respect to Marcam's products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive how all of the information stored in Orchard's memory can be set aside as he applies himself to a competitor's business and its products. On the contrary, what Orchard knows about Marcam is bound to influence what he does for Datalogix, and to the extent it does, Marcam will be disadvantaged.

In addition to its interest in protecting against the inevitable use of confidential information, Marcam has a legitimate interest in protecting the good will of its customers. *Wells v. Wells,* 9 Mass.App.Ct. 321, 400 N.E.2d 1317, 1319 (1980). As the person responsible for the production and development of PRISM Client/Server, Orchard enjoyed an "industry-wide reputation" for his efforts in developing PRISM Client/Server. ***298** Marcam's customers relied on Orchard to the extent that some insisted upon conferring with him personally prior to negotiating over the licensing of PRISM Client/Server.

[3] It is well-settled that a non-competition agreement may be enforced to protect a company's reputation and its relationship with its customers. *New England Tree Expert Co. v. Russell,* 306 Mass. 504, 28 N.E.2d 997, 1000 (1940); *Kroeger v. Stop & Shop,* 13 Mass.App.Ct. 310, 432 N.E.2d 566, 570 (1982). In light of Orchard's close association with PRISM Client/Server, his departure from Marcam will likely harm that product's reputation in the eyes of Marcam's customers. In promoting Datalogix's competing product, Orchard would be directly or indirectly disparaging Marcam's product. Whether Orchard publicly criticizes PRISM Client/Server, or simply promotes the competing product without explicit criticism, his association with the competing product would be enough to raise doubts in the eyes of Marcam's customers as to the relative value of PRISM Client/Server.

*Balance of Harm*

The Court finds that the harm to Marcam, should the injunction not be granted, would be substantial and irreparable, and would outweigh any harm that would flow to Orchard if the injunction were granted.

The terms of the non-competition provisions would prevent Orchard from working for a competitor of Marcam in the United States, its possessions and territories, for one year, provided Marcam agreed to pay 110% of the salary offered by the competitor. If this provision were enforced, through the injunction that Marcam seeks, Orchard would retain the option of working for Datalogix in its London office for one year

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(an option that Datalogix has extended to Orchard), or of seeking employment within the United States with a non-competitor of Marcam. Should Orchard choose employment with a non-competitor, Marcam is obligated to compensate Orchard for the difference between 110% of the salary offered by Datalogix and the salary Orchard is able to obtain with the non-competitor. Of course, after a year no employment possibility would be foreclosed to Orchard by the non-competition covenant: he would be free to work for Datalogix, or any other company, within the United States or anywhere else.

For all of these reasons, the court finds that the harm to Marcam in the absence of an injunction outweighs any harm to Orchard flowing from the granting of the injunctive relief sought by Marcam.

*Likelihood of Marcam's Success on the Merits*

On the merits, the dispute between the parties centers on two questions: (1) did Marcam's offer constitute 110% of the salary offered by Datalogix, and (2) is the geographic restriction in the non-competition agreement so broad as to be unenforceable?

As to the first question, Orchard contends that when he told Marcam of his intention to resign, Marcam failed to offer him 110% of the salary offered by Datalogix, as required by the non-competition agreement, thereby relieving Orchard of his obligation to decline employment with Datalogix.

By letter of March 3, 1995, Datalogix offered Orchard a *total compensation package* that included a yearly salary of $177,200, a $15,000 bonus, and 180,000 of Datalogix incentive stock options. Of these stock options, 30,000 were to vest sixty days after Orchard commenced employment with Datalogix, and the remainder would vest incrementally beginning fourteen months after his employment began. The offer to Orchard also provided that if, for any reason, Orchard did not receive the promised stock options, within six months after beginning his employment, he would receive "as additional salaried compensation" a certain value for the stock options. That value would be calculated in accordance with a formula set out in the offer letter.

Orchard contends that because Datalogix would guarantee a cash payment in lieu of the stock options, that *possible* payment should be considered part of his salary. Orchard's argument is based on an inappropriately expansive definition of "salary".

The payment in lieu of stock options is dependent upon whether Orchard receives ***299** those options; and whether he receives them is a matter within the control of Datalogix. Because the payment in question is contingent on the occurrence of an event of doubtful certainty, the court finds that it is likely that Marcam will establish at trial that it is not an offer of "salary" to Orchard, as that term was understood by Marcam and Orchard at the time they entered into the employment agreement. [FN3]

FN3. The contingent nature of the payment in lieu of stock options, made it impossible for Marcam to know whether it needed to offer Orchard anything in order to fulfill its obligation under the non-competition provision. Orchard has suggested no reason to the court why Marcam should conclude otherwise than that the stock options would be given to Orchard, and that therefore no payment to him in their stead would be made by Datalogix.

[4][5] As to the second issue, one starts with the proposition that, under Massachusetts law, a non-competition agreement is enforceable as long as it is necessary to protect the legitimate interests of an employer, and is not designed to protect an employer from ordinary competition. *Marine Contractors Co, Inc. v. Hurley*, 365 Mass. 280, 310 N.E.2d 915, 920 (1974); *Richmond Bros., Inc. v. Westinghouse Bdcst. Co*, 357 Mass. 106, 256 N.E.2d 304 (1970). The court has concluded above, in the discussion of the harm to Marcam in the absence of an injunction, that Marcam has a legitimate interest which it seeks to protect with injunctive relief. To be enforceable, however, a non-competition agreement must be reasonable in terms of its restrictions as to time, location, and other respects. *All Stainless, Inc. v. Colby*, 364 Mass. 773,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

308 N.E.2d 481 (1974).

Orchard challenges the non-competition agreement only with respect to its territorial sweep. He argues that the geographic restriction in the agreement is too broad, either rendering the agreement unenforceable, or mandating a narrowing of its scope. *All Stainless, Inc. v. Colby,* 364 Mass. 773, 308 N.E.2d 481 (1974). Under the terms of the agreement Orchard is precluded from working "in the geographical area of the United States of America (including its possessions and territories) in which [Marcam] conducts its business ..." Orchard argues that, to be enforceable, the restriction must be narrowed to permit him to work in the state of New York, where Marcam has no office.

[6] A geographic restriction is reasonable as long as it restricts a former employee from doing business in an area in which the company itself conducts business. *Kroeger v. Stop & Shop,* 13 Mass.App.Ct. 310, 432 N.E.2d 566, 570 (1982). In *Kroeger,* the Massachusetts Appeals Court said that "[r]estraints upon the competitive activity of a key executive may range beyond the precise geographical area of activity at the time of the employee's departure." *Id.,* at 570. [FN4]

FN4. The court held in that case, however, that Stop & Shop, (which had sought to prevent its former employer from competing anywhere east of the Mississippi, except for Florida, Georgia, Alabama, Mississippi, and Louisiana) could enforce a geographic restriction only as to New York, New Jersey and New England, the general areas in which it operated.

Marcam's headquarters are located in Newton, Massachusetts, but it maintains a customer base and does business throughout North America. Marcam has established direct sales and support offices in the following North American metropolitan areas: Atlanta, Boston, Chicago, Cleveland, Dallas, Los Angeles, Minnesota, West Orange (New Jersey), Philadelphia, and Toronto. Because Marcam has a national market for its products, it is likely to succeed at trial in justifying its broad geographic restrictions on employment of Orchard with Marcam competitors.

*Public Interest*

Orchard offers no reason, and the Court can think of none, why the public interest would be harmed if the injunction were granted.

*Conclusion*

For the foregoing reasons, the plaintiff Marcam's request for a preliminary injunction is granted as follows, effective upon Marcam's filing of a bond in the amount of $200,000 and its giving notice to the defendants of such filing:

The defendant, Frank E. Orchard, shall be enjoined, until further order of the court:

***300** (1) from working for, or continuing in the employment of, Datalogix International, Inc., or any entity related to Datalogix International, Inc., including successors and assigns of Datalogix International, Inc. or related entities, within the United States, its territories or possessions;

(2) from entering into any form of business relationship with Datalogix International, Inc. (or any entity related to Datalogix International), within the United States, its territories or possessions, directly or indirectly, including, but not limited to, as a consultant, independent contractor, or as a vendor; and

(3) from using or disclosing any and all of Marcam's confidential and proprietary business information and trade secrets to Datalogix International, Inc., or any entity related to Datalogix International, Inc.

So ordered.

885 F.Supp. 294

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
NEW ENGLAND CIRCUIT SALES, INC., Plaintiff
v.
Scott RANDALL and the Internet Shopping Network, Inc., Defendants.
**No. 1:96CV10840.**

June 4, 1996.

MEMORANDUM AND ORDER

HARRINGTON, D.J.

*1 This matter is before the Court on the Plaintiff's, New England Circuit Sales, Inc. ("NECX"), Motion for a Preliminary Injunction against the Defendants, Scott Randall and the Internet Shopping Network, Inc. NECX is in the business of purchasing and selling electric components, focusing mainly on computer chips. NECX Direct was founded in 1995 as a division of NECX and is involved in the retail sale of computer electronic equipment over the Internet. The Defendant, Scott Randall, began working for NECX on June 27, 1994 as Director of New Business Development. He later was promoted to become General Manager of NECX Direct. On July 5, 1994, Randall signed an Employment Agreement which contained non-disclosure and non-competition clauses. On November 29, 1994, Randall signed another Employment Agreement for on-line service employees which contained identical non-competition and non-disclosure clauses. Pursuant to the Agreements, Randall agreed not to work for a competitor business for one year after the termination of his employment with the plaintiff and agreed not to disclose any trade secrets or confidential business information. These Agreements were necessary due to the competitive nature of the business and the fact that Randall would necessarily be privy to confidential information in the performance of his high level job. In February, 1996, Randall informed NECX that he was resigning. In March, 1996, Randall accepted an offer to be the President and Chief Operating Officer at the Internet Shopping Network, Inc., a direct competitor of the plaintiff's. Because the Defendant Randall breached the Employment Agreements by accepting the offer to become the President and Chief Operating Officer at the Defendant Internet Shopping Network, the plaintiff seeks to enjoin and restrain the Defendant Randall from working or being employed by the Internet Shopping Network, Inc., a direct competitor of the plaintiff, for a period of one year from the date of the termination of his employment with NECX and to order the Defendants Randall and Internet Shopping Network not to use, distribute, disclose or disseminate any confidential business information. For the following reasons, the Court hereby grants the Plaintiff's Motion for a Preliminary Injunction.

In order to grant a preliminary injunction, the burden is on the plaintiff to show "(1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Jackson v. Fair*, 846 F.2d 811, 814-15 (1st Cir.1988). The plaintiff has met this burden.

The Plaintiff, NECX, will suffer irreparable injury if the injunction is not granted because the plaintiff does not have an adequate remedy at law. If confidential information is allowed to be revealed, the damage will have already occurred. There is no way to assess the amount of loss that the plaintiff will sustain due to the dissemination of highly confidential material. Similarly, with regard to the non-competition clause, it would be almost impossible to measure the plaintiff's damage if the defendant is allowed to go to work for a competitor. As Chief Judge Tauro pointed out in a similar case, "the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one." Shipley Co., Inc. v. Clark, 728 F.Supp. 818, 827 (D.Mass.1990) (quoting Kroeger v. Stop & Shop Companies, Inc., 432 N.E.2d 566, 573 (Mass.App.Ct.1982). Furthermore, if a preliminary injunction is not granted, enforcement of the non-competition clause will be circumvented. The clause forbids the defendant from competing for a one-year period; since the trial will occur after the one-year period has expired, the clause will no longer be enforceable.

*2 The potential injury to plaintiff outweighs any harm which granting injunctive relief would inflict on the defendant. The Agreement protects the legitimate business interests of the plaintiff and is reasonable in scope and time. This type of restriction does not prevent the defendant from working in the business industry, it only forbids him from working for a business which is *substantially* similar to or competitive with that of the plaintiff for a limited *one-year* period.

The plaintiff has exhibited a likelihood of success on the merits. Non-competition agreements are enforceable in Massachusetts if they protect a legitimate business interest and are reasonable in scope. The defendant was exposed to highly confidential information relating to this currently fast-emerging, even revolutionary, industry, and therefore, the non-competition and non-disclosure clauses are necessary to protect the plaintiff's legitimate business interests. In deciding whether certain information is confidential and should be afforded protection, several factors are relevant including "the extent to which the information is known outside of the business, the extent of measures taken by the employer to guard the secrecy of the information, and the ease or difficulty with which information could be properly acquired by others." (Augat, Inc. v. Aegis, 409 Mass. 165, 169-170 (1991) (quoting *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972)). Through his employment with the plaintiff, the defendant learned all of the techniques NECX used to compete effectively in the on-line marketplace. The defendant became familiar with the computer programs and used them to assist in the collecting, organizing, re-formatting and re-presentation of the data and information--all part of the content management aspect of the business. The successful content management techniques that the plaintiff has developed and the defendant has learned allow the plaintiff to market over 25,000 products in a way that is generally considered within the industry to be superior. Many Massachusetts courts have held that similar confidential information should be afforded protection as trade secrets. *See, e.g., Marcam Corp. v. Orchard,* C.A. No. 95-10527, Slip Op. at 5 (D.Mass.1995); Kroeger v. Stop & Shop, 432 N.E.2d 566, 571 (Mass.App.Ct.1982). The defendant plans to use the confidential information which he acquired while working for the plaintiff in his new capacity as President and Chief Operating Officer at the Internet Shopping Network, as evidenced by the April 30, 1996 press release relating to the Internet Shopping Network. The press release stated that the Internet Shopping Network was undergoing "a major site redesign." A portion of the press release reads:

> The redesign includes changes in site navigation, graphics, format and content.
>
> ISN has designed a completely new Home Page that provides a better way for a customer to find and browse over 25,000 computer hardware and software products. This helps customers easily and quickly find the products they want to purchase.
>
> *3 Overall site navigation has also been upgraded to help customers find products by "Subject Category" or by using an enhanced "Power Search" feature that will produce a list of the most relevant product or products, depending on the customer's interests.
>
> "The new interface places primary importance on speed and ease-of-use from our customer's prospective," said Bill Rollinson, vice president of marketing. Customers can use the "information," "Power Search," "Order Status" and "Edit Account" features on any page by "clicking" on the navigational bar.
>
> Product information has been re-organized according to customer needs, and 12 additional "What's New" and "Hot Deals" sections have been included for every product category. Customers can find useful and up-to-date information in the "What's New" sections, as well as leading products for sale in each "Hot Deals" section.
>
> ISN has reorganized product pages to offer the customer detailed and timely information on specific

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products. When viewing a product page, the customer receives complete specification information on that particular product, along with similar models, accessories and a complete product description as well as pricing, shipping and inventory availability information.

"We can't do enough to supply the demand that our customers have for specific product information, delivered in a clear, easy-to-use fashion," said Rollinson.

This is the first phase of ISN's complete site redesign aimed at giving customers the power and the information they need to purchase products quickly and easily from ISN.

The defendants behavior violates both the non-disclosure and non-competition provisions of the Agreement, and thus, entitles the plaintiff to injunctive relief.

Finally, the public interest will be served by granting the preliminary injunction. It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged.

For the above reasons, the Court hereby grants the Plaintiff's Motion for a Preliminary Injunction against the Defendants, Scott Randall and Internet Shopping Network, Inc.

SO ORDERED.

1996 WL 1171929 (D.Mass.)

**Motions, Pleadings and Filings** (Back to top)

• 1:96CV10840 (Docket)
(Apr. 23, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12

C

Superior Court of Massachusetts.
PHILIPS ELECTRONICS NORTH AMERICA CORP., d/b/a Philips Speech Processing North America,
v.
Judith N. HALPERIN et al. [FN1]

FN1. SpeechWorks International, Inc.

**No. 005251.**

Dec. 12, 2000.

MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

HOUSTON.

***1** Plaintiff Philips Electronics North America Corp., doing business as Philips Speech Processing North America ("Philips"), seeks a preliminary injunction restraining defendant Judith N. Halperin ("Halperin") from violating the terms of a Restrictive Covenant and Employment Agreement ("Employment Agreement") and Separation Agreement executed by the parties. Philips alleges that Halperin violated the terms of the Employment and Separation Agreements by accepting a position with defendant Speech Works International, Inc. ("Speech Works") subsequent to being laid off by Philips. For the following reasons, Philip's motion for preliminary injunction is *ALLOWED*.

BACKGROUND

On or about May 13, 1996, Halperin, who holds bachelors' degrees in Computer Science and Computational Linguistics, as well as a master's degree in Computer Science, commenced employment with Voice Processing Corporation ("VPC") as a Vocabulary Development Engineer at its Cambridge, Massachusetts facility. VPC is a predecessor-in-interest to Philips. Philips is a provider of speech recognition software. In consideration for her employment with VPC, Halperin entered into the Employment Agreement, which she executed in Massachusetts on October 21, 1996. Among the terms of the Employment agreement is a two year non-competition clause. The Employment Agreement provides in relevant part:

1. You [Halperin] agree that both during and after your employment with Voice Processing that you will not use or disclose to anyone outside of Voice Processing any confidential information of the Company ... Confidential information includes all trade secrets, research, business, financial and product secrets, research, business, financial and product information and all other proprietary information of the Company ...

5. You agree that if you leave the Company for any reason, then for a period of *two years* after you leave the Company you will not deal with, solicit business from, or perform services for any actual or prospective clients, customers or suppliers of the Company in any manner which would hinder or harm the business of the Company. In addition, *for that period you agree not to enter or engage in competition with the Company* in the development, deployment, sales or marketing of speech recognition technology *in the United States* either as an individual on your own, or as a partner or joint venturer, or as an employee, consultant, agent, officer or director for any other person or entity, or otherwise.

(Emphasis added.)

Halperin continued to work for VPC and its successors-in-interest (including Philips) for almost four years. While working at Philips, Halperin acquired knowledge of Philips' confidential and proprietary information relating to its speech recognition technology, customer accounts, and marketing strategies.

On July 31, 2000, Philips closed its Cambridge, Massachusetts operation and consolidated with its Dallas, Texas headquarters. As a result of the consolidation, Halperin was offered the opportunity to relocate to Dallas. Halperin rejected the offer of relocation and was instead provided with a separation package by Philips. Under the Separation Agreement with Philips, Halperin again agreed to maintain the confidentiality of Philips' proprietary information, and reaffirmed the Employment Agreement she signed on October 21, 1996. The Separation Agreement provides in relevant part:

***2** 3. It is stipulated and agreed that all information contained or possessed by you relative to the activities of ... [Philips] ... which is of a secret or confidential nature, which may include but is not limited to customers' lists, pricing, and technical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and production knowhow, developments, inventions, processes, or administrative procedures, is the property of ... [Philips] ... and you shall not during the term of this agreement or thereafter, use for the benefit of others or disclose to others such information so long as its secret or confidential nature be preserved by ... [Philips] ...

4. Ms. Halperin ... agrees to abide by the terms of the Restrictive Covenant and Employment Agreement dated October 21, 1996.

On October 25, 2000, Halperin accepted employment at Speech Works, a direct competitor of Philips in the voice recognition technology field. On November 15, 2000, however, Halperin's employment was terminated by Speech Works when it was served with this lawsuit.

Philips contends that Halperin violated the terms of the non-competition clause contained in the Employment Agreement and reaffirmed in the Separation Agreement when she accepted employment with SpeechWorks, and that despite the fact that Halperin was terminated by SpeechWorks, an injunction is necessary to require Halperin to abide by the Employment and Separation Agreements. Conversely, Halperin contends that injunctive relief is inappropriate because the Employment and Separation Agreements do not bind her, considering the fact that she did not voluntarily quit her position at Philips, but was laid off. Halperin also contends that injunctive relief is inappropriate because the non-competition clause is unenforceable.

## DISCUSSION

To obtain preliminary injunctive relief, Philips must satisfy a fourfold inquiry: (1) that it has a reasonable likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is not granted; (3) that the harm Philips will suffer if the injunction is denied outweighs the injury Halperin will suffer if the injunction is granted; and (4) that the public interest will not be adversely affected by the granting of the injunction. See *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616-17 (1980).

Applying these principles, we find that Philips has met its burden as to all four required elements and that an injunction should issue.

I. Likelihood of Success on the Merits

As a threshold matter, Halperin contends that the terms of the non-competition clause do not bind her because she did not quit, but was laid off. The clause states that if Halperin "leave[s] the Company for any reason," she will be prohibited from working for a competitor for two years. In essence, Halperin contends that she did not leave the company, but that the company left her.

We do not think Halperin's interpretation is likely to prevail because it contradicts the language of the Separation Agreement. "It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible." *Tupper v. Hancock,* 319 Mass. 105, 109 (1946). Since the Separation Agreement explicitly states that Halperin was to abide by the terms of the Employment Agreement, which included the non-competition clause, and the Separation Agreement was entered into with the knowledge that Halperin was severing her employment with Philips, it is illogical to construe the non-competition clause as inapplicable to Halperin because she was laid off. Accepting Halperin's interpretation of the non-competition clause would render meaningless the portion of the Separation Agreement that reaffirms the Employment Agreement. Accordingly, Halperin's contention that the non-competition clause does not bind her is unlikely to prevail.

***3** We now turn to Halperin's contention that Philips is unlikely to succeed on the merits because the non-competition clause is unreasonable. Massachusetts courts enforce the terms of a non-competition agreement with a former employee when the company demonstrates that it (1) is necessary to protect a legitimate business interest of the employer, (2) is supported by consideration, (3) is reasonably limited in all circumstances, including time and geographic scope, and (4) is otherwise consonant with public policy. See *Bowne of Boston, Inc. v. Levine,* 7 Mass .L.Rptr. 685, 687, Civil No 97-5789A (Suffolk Super.Ct. Nov. 25, 1997) (citing *Whittinsville Plaza v. Kotseas,* 378 Mass. 85, 102-03 (1962)).

In this case, Philips has a reasonable likelihood of success on the merits because the Employment and Separation Agreements appear to be enforceable. First, Philips has demonstrated that the non-competition clause is necessary to protect a legitimate business interest. Massachusetts courts have recognized as legitimate business interests an employer's protection of its goodwill, trade-secrets, and other confidential information. See *Marine Contractors Co., Inc., v. Hurley,* 365 Mass. 280, 287

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1974). Here, the Employment and Separation Agreements protect Philips' product development, customer information, and marketing strategies through a confidentiality clause and a two year non-competition clause. None of this information, according to Philips' verified complaint, is generally known outside of the company. Thus, by definition, protection of this information serves a legitimate business interest.

Second, the Employment and Separation Agreements appear to be supported by adequate consideration. The requirement of consideration is satisfied where there is either a benefit to the promisor or a detriment to the promisee. See *Marine Contractors,* 365 Mass. at 286. Here, Halperin was compensated for the performance of her duties, thus the Employment Agreement is supported by consideration. The Separation Agreement is also supported by consideration because Halperin was provided eleven weeks salary as severance pay.

Third, it is likely Philips will prove that the terms of the Employment and Separation Agreements are, reasonable. "A covenant not to compete contained in a contract for personal services will be enforced if it is reasonable, based on all the circumstances." *All Stainless, Inc. v. Colby,* 364 Mass. 773, 778 (1974). "If the covenant is too broad in time, in space or in any other respect, it will be enforced only to the extent that is reasonable ..." *Id.* Here, there is nothing in the record for the court to conclude that the non-competition clause is unreasonable. Indeed, the non-competition clause appears to be a reasonable attempt by Philips to protect its sensitive information from national competitors such as Speech Works. As to the two year duration, "Massachusetts courts have consistently enforced covenants of up to two years, even as great as five years duration, if they are otherwise reasonable under the circumstances." *Bowne of Boston,* 7 Mass.L.Rptr. at 687 (citing *All Stainless,* 364 Mass. at 779; *Richmond Bros.,* 357 Mass. 106, 110-11 (1970)). Furthermore, as to the geographic scope of the clause covering the entire United States, this too appears reasonable considering that Halperin is only barred from working in the narrow field of voice recognition software technology. Thus, under the circumstances, the terms of the Employment and Separation Agreements do no appear to be over broad.

*4 Finally, the public interest will be served by granting injunctive relief. "It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged." *New England Circuit Sales, Inc. v. Randall,* 1996 WL 1171929 *3 (D.Mass. June 4, 1996). See also *Shipley Company v. Kozlowski,* 926 F.Supp. 28, 30 (D.Mass.1996) (granting injunctive relief because "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted."). In this case, the public interest will best be served by requiring Halperin to abide by the terms of the Employment and Separation Agreements which she executed.

II. Irreparable Harm

In order for Philips to obtain injunctive relief, Philips must show that it is "likely to suffer irreparable injury before a decision is rendered on the merits." *Sierra Club v. Larson,* 769 F.Supp. 420, 422 (D.Mass.1991). Philips must establish "injury that is not remote or speculative, but is actual and imminent." *Id.* "An injunction will not be issued to prevent the possibility of some remote future injury; a presently existing actual threat must be shown." *Id.*

Originally, Philips brought this motion for injunctive relief against not only Halperin, but Speech Works as well, a competitor of Philips that hired Halperin subsequent to her being laid off. Philips, however, has dropped its request for injunctive relief against SpeechWorks because when Speech Works was served with this action, SpeechWorks terminated Halperin's employment.

Hence, Halperin contends that because she no longer works for SpeechWorks, Philips cannot show actual, imminent injury necessary to support the issuance of a preliminary injunction. Halperin, in essence, contends that her termination by SpeechWorks rendered Philips' motion seeking injunctive relief moot.

Contrary to Halperin's contention, we find that Philips' motion is not moot and that Philips has shown the requisite imminent injury necessary to warrant injunctive relief. Although Halperin's employment has been terminated by SpeechWorks, Halperin's acceptance of employment with Speech Works along with her contention that she is not bound the Employment and Separation Agreements reveal that she is unlikely to abide by the terms of the parties' agreements. Thus, despite the fact that Halperin no longer works for SpeechWorks, Philips has shown imminent injury. This result is similar to situations where courts have refused to hold a case

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moot based on a defendant's voluntary cessation of allegedly wrongful conduct. See, e.g., *Wolf v. Commissioner of Public Welfare*, 367 Mass. 293, 299 (1975) (holding that in order to establish mootness in a case where the defendant has voluntarily ceased his allegedly wrongful conduct, "a defendant bears a heavy burden of showing that there is no reasonable expectation that the wrong will be repeated"). Although in this instance Halperin's employment with Speech Works was not terminated voluntarily, it is clear from the record that there is a very real danger that Halperin will seek employment with a competitor. Accordingly, Philips should not have to wait until the damage sought to be prevented in the parties' Employment and Separation Agreements is done in order to obtain injunctive relief.

III. Balance of Harms

***5** The balancing of harms in this case tilts in favor of Philips. The inquiry concerning the balancing of the harms should not focus on the "raw amount of irreparable harm" each party might suffer, "but rather the risk of such harm in light of the party's chance of success on the merits." *Packaging Indus. Group*, 380 Mass. at 617. Here, Philips will be irreparably harmed by the disclosure of its confidential and proprietary information, its loss of customer goodwill, and loss of revenue. Conversely, Halperin has not established any extraordinary or unanticipated hardship which would preclude injunctive relief. In *Marine Contractors,* the Supreme Judicial Court upheld a covenant barring a defendant from engaging in marine repair work for five years, noting that:

> The consequences of every covenant not to compete ... is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable. [The defendant] has not established any *extraordinary hardship* which would be caused by him by the enforcement of his promise not to compete ... [The defendant] freely entered into the agreement not to compete ... and there is no evidence of any subsequent change in circumstances which might cause him *unanticipated hardship.*

365 Mass. at 288 (emphasis added). Although Halperin may suffer harm by not being able to work in the field of voice recognition technology for two years, this alone is insufficient to render a non-competition clause unenforceable. Extraordinary or unanticipated hardship has not been shown. See *Marine Contractors*, 365 Mass. at 288. Therefore, balancing the risk of harm to each party in light of each party's likelihood of success on the merits, the court finds that Philips will suffer more harm if the injunction is not granted.

IV. Public Interest

As discussed earlier, [FN2] the public interest is best served by enforcing the Employment and Separation Agreements that were, from all indications in the record, voluntarily entered into and accepted. Therefore, having met all the requisite elements, Philips is entitled to injunctive relief.

FN2. See *supra* p. 7.

ORDER

For the reasons stated above, plaintiff's motion for preliminary injunction is *ALLOWED*. It is hereby *ORDERED* that:

1. Defendant Judith N. Halperin and all persons acting for or on her behalf, is hereby temporarily enjoined from taking, receiving, divulging, transferring, copying or otherwise using confidential and proprietary information belonging to Philips;

2. Defendant Halperin is hereby temporarily enjoined, for a period of two (2) years following the termination of her employment (i.e., until July 31, 2002), from directly or indirectly, in any capacity whatsoever, entering or engaging in competition with Philips in the development, deployment, sales or marketing of speech recognition technology in the United States either as an individual, or as a partner or joint venturer, or as an employee, consultant, agent, officer, or director for any other person or entity, or otherwise; and

***6** 3. Defendant Halperin, and all persons acting for or on her behalf or in concert with her, is temporarily enjoined, for a period of two (2) years following the termination of her employment (i.e., until July 31, 2002), from soliciting business from, or performing services for any actual or prospective clients, customers or suppliers of Philips in any manner which would hinder or harm the business of Philips.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**WEST'S CONNECTICUT RULES OF COURT**
**RULES OF PRACTICE**
**RULES FOR THE SUPERIOR COURT**
**GENERAL PROVISIONS**
**CHAPTER 5. TRIALS**

Copr. © 2005 Thomson/West.

Current with amendments received through 3/15/2005.

§ 5-2. Raising Questions of Law Which May Be the Subject of an Appeal

Any party intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief under Section 5-1 or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. If the party fails to do this, the judicial authority will be under no obligation to decide the question.

Practice Book 1998, § 5-2

CT R SUPER CT GEN § 5-2

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1

Westlaw.



926 F.Supp. 28
Briefs and Other Related Documents

United States District Court,D. Massachusetts.
SHIPLEY COMPANY, L.L.C., Plaintiff,
v.
Alan E. KOZLOWSKI and Sumitomo Chemical America, Inc., Defendants.
**Civil Action No. 96-10388-EFH.**

May 29, 1996.

Employer in the photoresist industry moved for preliminary injunction to enforce noncompetition agreement and thereby enjoin employee from working for employer's competitor for one year and from disclosing or using employer's trade secrets.
The District Court , Harrington, J., held that employer was entitled to preliminary injunction because employer would suffer irreparable injury if injunction was not granted and employer demonstrated likelihood of success on the merits.

So ordered.

West Headnotes

[1] **Injunction 212 ⚷138.39**
212k138.39 Most Cited Cases
Employer in the photoresist industry was entitled to preliminary injunction to enforce non-compete agreement and thereby enjoin employee from working for employer's competitor for one year and from disclosing or using trade secrets regarding employer's production process and materials; employer would suffer irreparable injury if injunction was not granted since employer did not have adequate remedy at law, agreement protected legitimate business interests of employer and was reasonable in scope and time, employer exhibited likelihood of success on the merits, and it was in society's interest to recognize and enforce agreement which was voluntarily entered into and accepted.

[2] **Injunction 212 ⚷147**
212k147 Most Cited Cases
To obtain preliminary injunction, burden is on plaintiff to show that plaintiff will suffer irreparable injury if injunction is not granted, that such injury outweighs any harm which granting injunctive relief would inflict on defendant, that plaintiff has exhibited likelihood of success on the merits, and that public interest will not be adversely affected by granting of the injunction.

[3] **Contracts 95 ⚷2**
95k2 Most Cited Cases
Federal district court would not disregard Massachusetts choice of law provision in noncompetition agreement and instead apply California law; although California law disfavored noncompetition provisions, California did not have fundamental policy barring all noncompetition clauses, California statute invalidating provisions of employment contracts prohibiting employee from working for competitor after completion of his employment unless they are necessary to protect employer's trade secrets was applicable since trade secrets were in issue in case involving employer in the photoresist industry, and absent choice of law provision in the contract, Massachusetts law would still apply. West's Ann.Cal.Bus. & Prof.Code § 16600 ; Restatement (Second) of Conflict of Laws § 187(2)(b).

[4] **Contracts 95 ⚷116(1)**
95k116(1) Most Cited Cases
Noncompetition agreements are enforceable in Massachusetts if they protect legitimate business interest and are reasonable in scope.

***28** Laurence H. Reece, III , Heidlage & Reece, Boston, MA, for Shipley Company, L.L.C.
Nathan L. Kaitz , Allison B. Kaplan , Morgan, Brown & Joy, Boston, MA, for Alan E. Kozlowski.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Steven M. Swirsky , Marks & Murase , New York City, Mark E. Schreiber , Peter F. Trotter , Gadsby & Hannah, Boston, MA, for Sumitomo Chemical America, Inc.

***MEMORANDUM AND ORDER***

HARRINGTON, District Judge.

[1] This matter is before the Court on the Plaintiff's, Shipley Company, L.L.C., Motion for a Preliminary Injunction against the Defendant, Alan Kozlowski. The defendant worked for the plaintiff for more than thirteen years in the photoresist industry. This ***29** industry, which has a world market of approximately $500 million, is highly competitive with relatively few companies competing against each other. Due to the competitive nature of this type of business, at the commencement of his employment with the plaintiff, the defendant was given an Employment Agreement to which he signed in Massachusetts.

In accordance with the terms of the Agreement, the defendant agreed not to work for a competitor of the plaintiff's for a period of one year following the end of his employment with the plaintiff. The Agreement also contained a non-disclosure provision which prohibited the defendant from ever divulging any confidential information regarding the plaintiff's company. On February 26, 1996, the defendant informed the plaintiff that he was resigning and would be going to work for a competitor of the plaintiff's, Sumitomo Chemical America, Inc. Because the Defendant Kozlowski breached the Employment Agreement, the plaintiff seeks to enjoin and restrain the defendant (1) from working for or being employed by Sumitomo Chemical America, Inc., a direct competitor of the plaintiff, until February 26, 1997, (2) from disclosing or using any trade secrets or confidential information of the plaintiff's, including, without limitation, information regarding the plaintiff's production processes and materials, formulae, research techniques or accomplishments, customers, suppliers, price lists and the business strategies and business plans of the plaintiff, and (3) from failing to promptly return to the plaintiff all the materials that the defendant received from the plaintiff. For the following reasons, the Court hereby grants the plaintiff's Motion for a Preliminary Injunction.

[2] In order to grant a preliminary injunction, the burden is on the plaintiff to show "(1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Jackson v. Fair,* 846 F.2d 811, 814-15 (1st Cir.1988). The plaintiff has met this burden.

The Plaintiff, Shipley, will suffer irreparable injury if the injunction is not granted because the plaintiff does not have an adequate remedy at law. If confidential information is allowed to be revealed, the damage will have already occurred. There is no way to assess the amount of loss that the plaintiff will sustain due to the dissemination of this highly confidential material. Similarly, with regard to the non-competition clause, it would be almost impossible to measure the plaintiff's damage if the defendant is allowed to go to work for a competitor. As Chief Judge Tauro pointed out in a similar case, "the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one." *Shipley Co., Inc. v. Clark,* 728 F.Supp. 818, 827 (D.Mass.1990) (quoting *Kroeger v. Stop & Shop Companies, Inc.,* 13 Mass.App.Ct. 310, 432 N.E.2d 566, 573) (1982) . Furthermore, if a preliminary injunction is not granted, enforcement of the non-competition clause will be circumvented. The clause forbids the defendant from competing for a one-year period; since the trial will occur after the one-year period has expired, the clause will no longer be enforceable.

The potential injury to plaintiff outweighs any harm which granting injunctive relief would inflict on the defendant. The Agreement protects the legitimate business interests of the plaintiff and is reasonable in scope and time. This type of restriction does not prevent the defendant from working in the chemical industry, it only forbids him from working for *competitors* of the plaintiff for a *one-year* period.

[3] The plaintiff has exhibited a likelihood of success on the merits. In accordance with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

choice-of-law provision in the Agreement, the " Agreement shall be construed both as to validity and performance and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflict of law thereof." (Agreement, Paragraph 18). The Court shall apply Massachusetts law and rejects the defendant's argument that California law should apply. The Court recognizes that under Section 187(2)(b) of the Restatement (Second) of Conflict of Laws, a ***30** Court must disregard a choice-of-law provision in an agreement if: (1) the other state involved has a fundamental policy against the non-compete agreement; (2) that state has a materially greater interest than the designated state in the determination of the issue of enforcement of the non-competition agreement; *and* (3) the other state's law would have applied in the absence of the choice-of-law provision in the employment agreement. *See Shipley,* 728 F.Supp. at 825.

The Court, however, finds that these three conditions have not been satisfied. California law does disfavor non-competition provisions, but California does not have a fundamental policy barring all non-competition clauses. The California Supreme Court addressed this issue stating that California Business and Professions Code, Section 16600 "invalidates provisions in employment contracts prohibiting an employee from working for a competitor after completion of his employment or imposing a penalty if he does so . .. unless they are necessary to protect the employer's trade secrets." *Muggill v. Reuben H. Donnelley Corp.,* 62 Cal.2d 239, 242, 42 Cal.Rptr. 107, 398 P.2d 147 (1965). Because trade secrets are in issue, this limited exception would apply. FN1

FN1. The defendant explicitly stated that he would not oppose the plaintiff's motion for a preliminary injunction which seeks to restrain the defendant from disclosing or using any trade secrets or confidential information.

In addition, Massachusetts has a materially greater interest in the matter since the contract was executed in Massachusetts, the defendant worked in Massachusetts for two years and continues to have contact with the state through his employment, the plaintiff's principal place of business is in Marlborough, Massachusetts, one of the plaintiff's three manufacturing facilities is located in Massachusetts, and more than half of the plaintiff's employees work in Massachusetts. Based on these same facts, absent a choice-of-law provision in the contract, Massachusetts law would still apply.

[4] Non-competition agreements are enforceable in Massachusetts if they protect a legitimate business interest and are reasonable in scope. The defendant violated the non-competition provision of the Agreement by accepting employment with a competitor of the plaintiff's within one year of his termination from the plaintiff's company. Furthermore, within days of leaving the plaintiff's company to work for a competitor, the defendant suspiciously accessed and copied confidential information from the plaintiff's computerized data base. The plaintiff believes that the defendant intends to use and disseminate this information while employed with the competitor company. This behavior violates the non-disclosure provision of the Agreement, and thus, entitles the plaintiff to injunctive relief.

Finally, the public interest will be served by granting the preliminary injunction. It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged.

For the above reasons, the Court hereby grants the Plaintiff's Motion for a Preliminary Injunction against the Defendant, Alan Kozlowski.

**SO ORDERED.**

D.Mass.,1996.
Shipley Co., L.L.C. v. Kozlowski
926 F.Supp. 28

Briefs and Other Related Documents (Back to top)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

926 F.Supp. 28
**(Cite as: 926 F.Supp. 28)**

• 1:96cv10388 (Docket) (Feb. 27, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

<P ALIGN=JUS

14

**C**
Only the Westlaw citation is currently available.

Superior Court of Massachusetts
STONE LEGAL RESOURCES GROUP, INC.,
v.
Martin R. GLEBUS, Jr., et al.
**No. CA025136.**

Dec. 16, 2002

*MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

NONNIE S.BURNES, Justice of the Superior Court.

***1** This action is before this Court on the plaintiff, Stone Legal Resources Group, Inc.'s ("Stone Legal"), request for a preliminary injunction. Stone Legal argues that a former employee, Martin R. Glebus, Jr. ("Glebus"), violated the terms of a non-compete and confidentiality provision within an Employment Agreement ("Agreement"), signed by Glebus while employed at Stone Legal. Stone Legal requests that this Court enjoin Glebus from improperly competing with Stone Legal, from soliciting Stone Legal's clients, professionals, candidates, and employees, and from using and disclosing Stone Legal's confidential and proprietary business information. Stone Legal also requests this Court to enjoin defendant, All Pro Personnel, Inc., d/b/a Advance Legal Placement ("Advance"), from using the confidential and proprietary business information that Glebus has allegedly misappropriated and from tortiously interfering with the Agreement. For the following reasons Stone Legal's Motion for a Preliminary Injunction is *ALLOWED*, in a limited form.

BACKGROUND

The facts were gathered from Stone Legal's verified complaint and the parties' supporting affidavits. Stone Legal has an office located in Boston and is engaged in the business of recruiting and placing lawyers, paralegals, legal secretaries, legal assistants, and other personnel on a temporary and permanent basis throughout New England. Stone Legal has been in the legal placement business for approximately 20 years. Advance is a recent start-up company located in Boston and is also engaged in the business of recruiting and placing legal personnel in the New England area.

Stone Legal hired Glebus on or about August 19, 1999, as a business development employee. Prior to working for Stone Legal, Glebus worked as a salesperson for IKON copying services and had no prior experience in the staffing industry. When Glebus was hired, he received training and was tutored by Stone Legal's management personnel in the legal recruiting and placement fields. Glebus later became a placement consultant, handling both recruiting and sales functions for Stone Legal. In January 2002, Glebus was promoted to the position of manager. While employed with Stone Legal, Glebus was responsible for building and developing client relationships, and earning commissions for placements with Stone Legal's clients. On or about September 6, 2002, Glebus voluntarily resigned from Stone Legal. Shortly thereafter, Glebus began working for Advance.

At the beginning of his employment with Stone Legal, Glebus signed an Agreement, and in consideration for his employment and training by Stone Legal, and Stone Legal's entrustment to him of confidential and proprietary information, Glebus agreed to be bound by non-competition, non-solicitation, anti-raiding, and non-disclosure covenants. The Agreement specifically contained non-competition and confidentiality provisions. The Agreement's non-competition provision provides:

***2** *NON-COMPETITION AGREEMENT.* During the period of employment and for eighteen

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

months thereafter, the Employee will not, directly or indirectly, engage in (or own an interest in any entity which engages in) activities in competition with the business of the Company, namely providing (i) temporary and permanent attorneys, paralegals, legal assistants, legal administrative or other personnel and/or (ii) consulting services to law firms or corporate legal departments within a radius of one hundred miles of any office(s) and/or area(s) to which the Employee was assigned and/or managed for the Company. For the same eighteen-month period, the Employee will not solicit, provide services to or attempt to solicit or provide services to the Company's current customers at the Employee's termination, customers for whom the Company has provided services within eighteen months prior to the date of termination of employment, and prospective customers at the time of the Employee's termination ..

In addition, the confidentiality provision in the Agreement provides:

*PRESERVATION OF CONFIDENTIAL INFORMATION.* Employee agrees that, during and after his employment by the Company, he will not use any Confidential Information [FN1] for himself or others or disclose or communicate any Confidential Information to any third party for any purpose whatsoever without the Company's express prior written consent ...

FN1. Confidential Information as defined by Stone Legal consisted of "lists and resumes of candidates and consultants (placed, active and inactive), lists of customers who have listed job orders from customers and financial information of the Company."

For the purposes of Glebus' position in building and developing client relationships, he had access to confidential and proprietary business information through Stone Legal's computer database. This information included client data such as contact names, e-mail addresses, telephone numbers, methods of job pricing, and fee information. The database also contained names of individuals who had been interviewed and approved for potential placement. This information included names, addresses, telephone numbers, e-mail addresses, specialties, professional references, and resumes. Stone Legal opened the database to all employees and encouraged employees to freely share information.

Stone Legal alleges that, since Glebus began employment with Advance he has been directly soliciting Stone Legal's Clients, specifically: (1) Davis, Malm and D'Agostine, (2) Butters, Brazilian and Small, (3) Corporate Communications Broadcast Network ("CCBN"), (4) Choate, Hall and Stewart, (5) Edwards and Angell, and (6) Gilmartin, Magence & Ross, PC. The evidence before this Court reflects that Advance had no prior placements with either Butters, Brazilian and Small, or CCBN but that Advance did have prior placements with Davis, Malm, and D'Agostine, Choate, Hall and Stewart, Edwards and Angell, and Gilmartin, Magence & Ross. While Glebus was employed with Stone Legal, he worked with Peter Clark ("Clark"), the hiring contact at Butters, Brazilian and Small. In or about late September 2002, Glebus contacted Clark and solicited business from Butters, Brazilian and Small on behalf of Advance. Also, while Glebus was employed with Stone Legal, he had contacts with a company, CCBN, and upon leaving Stone Legal, contacted CCBN on behalf of Advance, and placed Julian S. Jordan as a contractor from mid-October through mid-November 2002.

*3 On November 14, 2002, Stone Legal filed a Verified Complaint against Glebus and Advance. On December 5, 2002, Stone Legal filed this Motion for Preliminary Injunction.

DISCUSSION

To obtain a preliminary injunction, Stone Legal must satisfy a threefold inquiry showing that the moving party: (1) has a reasonable likelihood of success on the merits; (2) will suffer irreparable harm if the injunction is not granted; and (3) the harm it will suffer if the injunction is denied outweighs the injuries the non-moving party will suffer if the injunction is granted. *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616-17

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1980).

I. Likelihood of Success on the Merits

An employer may enforce the terms of a non-competition agreement with a former employee when it demonstrates that the agreement: (a) is necessary to protect a legitimate business interest of the employer; (b) is supported by consideration; (c) is reasonably limited in all circumstances including time and space; and (d) is otherwise consonant with public policy. *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 102-03 (1979). See also *Blackwell v. E.M. Helides, Jr., Inc.,* 368 Mass. 225, 228 (1979); *All Stainless, Inc. v. Colby,* 364 Mass. 773, 778 (1974).

A. Necessary to Protect a Legitimate Business Interest

1. Goodwill

Massachusetts courts have held that restrictive covenants may protect legitimate business interests including goodwill. See *New England Canteen Service, Inc. v. Ashley,* 372 Mass. 671, 674 (1977). However, there is not a legitimate business interest when the purpose of a restrictive covenant is to protect the employer from ordinary competition. See *Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 287-88 (1974). Goodwill has been defined as "the employer's positive reputation in the eyes of its customers or potential customers ... [and] is generated by repeat business with existing customers or by referrals to potential customers." *Bowne of Boston, Inc., v. Levine,* No. 97-5789A, 1997 WL 781444, at *3 (Mass.Super.1997) (Burnes, J.) (7 Mass. L. Rptr. 685), citing *Marine Contractors Co, Inc.,* 365 Mass. at 287-89.

Stone Legal asserts that its goodwill will be damaged if Glebus, while an employee of Advance, is allowed to continue contacting his former clients from Stone Legal. Stone Legal argues that Massachusetts courts have enjoined former employees in similar situations on the basis of goodwill. See e.g., *All Stainless, Inc.,* 364 Mass. at 777 ("the goodwill of All Stainless could be harmed by a former salesman's calling on an All Stainless customer, with whom he had previously dealt, to solicit purchases on behalf of a new employer"); *Darwin Partners, Inc. v. Signature Consultants, LLC,* No. 00-0277, 2000 WL 33159238, at *4 (Mass.Super.2000) (Burnes, J.) ("Soliciting a potential client company whose relationship has been developed by the individual defendants, while under the employ of [the former employer], certainly would constitute an invasion of [the former employer's] good will").

***4** This Court concludes that Glebus' position at Stone Legal allowed him to develop relationships and contacts with Stone Legal's clients. Prior to joining Stone Legal, not only did Glebus lack contacts, but he also had no placement experience. These relationships developed only at Stone Legal would be beneficial for a start-up company such as Advance, and would be a great disadvantage to Stone Legal if Glebus were to use his contacts to deflect business from Stone Legal to Advance. Therefore, Stone Legal's goodwill needs to be protected; however, this protection is limited.

Stone Legal relies upon three Superior Court cases for the proposition that when an employee leaves one employer and begins working for a competitive employer, a broad restriction is appropriate because of the competitive nature of the recruiting industry. See *Darwin Partners, Inc.,* 2000 WL 33159238, at *3-4. See also *Modis, Inc. v. The Revolution Group, Ltd.,* No. 99-1104, 1999 WL 1441918 (Mass.Super.1999) (Welch, J.) (11 Mass. L. Rptr. 246); *Bowne of Boston, Inc.,* 1997 WL 781444, 7 Mass. L. Rptr. 685. However, these cases are distinguishable from the matter before this Court. In this case, Advance had already established relationships with some of the firms prior to Glebus' employment with Advance. [FN2] Therefore, Stone Legal will only be protected to the extent of the harm Glebus, individually, could inflict upon it. Thus, Glebus will be enjoined from utilizing contacts he personally established while at Stone Legal. Additionally, Advance is enjoined from using Glebus' contacts in attempting to place, or placing individuals with firms with which it previously had no active business relations.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Stone Legal alleges that Advance has solicited and hired its employees prior to Glebus. However, if Stone Legal wanted to protect its interest regarding these employees, it should have brought an action earlier.

2. Confidentiality Provision

Along with goodwill, courts have also recognized a legitimate business interest in confidential and proprietary information. See *New England Canteen Service, Inc.*, 372 Mass. at 674. Confidential information consists of a "compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970). See also *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840 (1972) (outlining six factors which are relevant to the court's determination of whether information is confidential).

Stone Legal has taken reasonable steps to ensure that its clients' information remains confidential. The company informs its employees about the confidentiality provision and each employee agrees and signs a provision stating that they will not disclose confidential information. The fact that other companies can obtain this information independently, and Stone Legal employees discuss freely the information, does not diminish the fact that this information is confidential, and any disclosure is a breach of the confidentiality provision. See *Darwin,* 2000 WL 33159238, at *4 ("The fact that certain Darwin company clients are well known corporations ... does not diminish the fact that this constitutes confidential information ...." Thus, Stone Legal is entitled to protect its confidential information.

B. Consideration

*5 A non-competition provision is enforceable if there is consideration. See *Marine Contractors Co., Inc.*, 365 Mass. at 287. When a non-competition provision is signed at the beginning of employment there is sufficient consideration. See *Slade Gorton & Co. v. O'Neil,* 355 Mass. 4, 9 (1968). It is clear that the non-competition provision signed by Glebus at the beginning of his employment on August 19, 1999, was supported by consideration because he signed the Agreement in exchange for employment. Advance contends that the Agreement between Glebus and Stone Legal became void when Stone Legal altered Glebus' salary and commission structure. The Agreement, however, is not dependent on a set salary or commission, and further, the Agreement does not guarantee a set salary or commission. [FN3] Therefore, this Court concludes that sufficient consideration exists and the non-competition provision is enforceable.

FN3. The Agreement specifically provides, "[i]n consideration and as part of the terms of the employment of the Employee by the Company, the compensation paid and to be paid by the Company to the Employee and the Company's entrusting to the Employee of Certain of the Company's trade secrets acknowledged, the Employee and the Company agree as follows: ..."

C. Reasonableness in All Circumstances, Including Time and Space

Restrictive covenants will be enforced if the terms are reasonable. *All Stainless, Inc.*, 364 Mass. at 778. In determining whether the time limit is reasonable, this Court will "consider the nature of the business and the character of the employment involved, as well as the situation of the parties, the necessity of the restriction for the protection of the employer's business and the right of the employee to work and earn a livelihood ..." *Richmond Bros., Inc. v. Westinghouse Broadcasting Co., Inc.*, 357 Mass. 106, 109 (1970).

Considering these factors, this Court concludes that the eighteen-month restriction is not unreasonable. Stone Legal trained Glebus and entrusted him with all of its client information. In such a competitive area, Glebus could apply his knowledge of the confidential information and infringe on Stone Legal's goodwill. Furthermore, courts have held that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

durations longer than eighteen months are reasonable. See e.g., *All Stainless, Inc.*, 364 Mass at 779 (two years); *Frank D. Layne Assoc. v. Lussier*, 16 Mass.App.Ct. 986, 989 (1983) (two years); *Middlesex Neurological Assoc., Inc. v. Cohen*, 3 Mass.App.Ct. 126, 131 (1975) (two years). Therefore, the eighteen-month restriction is reasonable.

This Court also concludes that the geographic restriction is reasonable. [FN4] The non-competition provision signed by Glebus, restricted his employment to a 100-mile radius around Boston. This is reasonable because it "restricts a former employee from doing business in an area in which the company itself conducts business." *Marcam Corp. v. Orchard*, 885 F.Sup. 294, 299 (D.Mass 1995). Here, Glebus worked at Stone Legal's Boston office and obtained confidential information on clients who use that office. Pursuant to and without violating the Agreement, Glebus can continue to work in the legal placement field, as long as he is 100 miles from Boston. Thus, he is not prevented from working in the placement and recruiting industry.

FN4. Stone Legal is not seeking to enjoin Glebus from working in the placement industry and has not asked this Court to order a geographic restriction. This Court is only discussing the geographic restriction to support its conclusion that the non-competition provision is valid and enforceable.

D. Public Policy

*6 A restrictive covenant is also enforceable if it does not obstruct public interest. See *Whitinsville Plaza, Inc.*, 378 Mass. at 102-03. This Agreement does not obstruct public interest since it is reasonable in scope and is supported by adequate consideration. Furthermore, Stone Legal trained Glebus and provided him with confidential information. The legal placement industry is competitive and, if this information is used to improve Advance's situation in the industry, it would adversely affect Stone Legal's goodwill.

II. Irreparable Harm

Stone Legal will suffer irreparable harm if it loses "rights that cannot be vindicated should it prevail after a full hearing on the merits." *Planned Parenthood League of MA, Inc. v. Operation Rescue*, 406 Mass. 701, 710 (1990). In this matter, the principal issue is whether Stone Legal's loss of goodwill was a result of Giebus' alleged breach of the Agreement. The Agreement specifically states that "disclosure of Confidential Information is likely to cause irreparable injury ... to the Company." Moreover, in Massachusetts, "the loss of goodwill has been recognized as being particularly hard to quantify, giving rise to the need for equitable relief." *Bowne*, at *5, citing *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass.App.Ct. 310, 322 (1982). Therefore, because Stone Legal has demonstrated a loss of goodwill, it has established irreparable harm.

III. Balance of the Harm

Lastly, the balance of the harm weighs in favor of Stone Legal. Stone Legal has demonstrated that enforcement of the Agreement will prevent irreparable harm. Stone Legal is likely to establish that Advance and Glebus have been using confidential information to acquire contacts that were made while at Stone Legal. Furthermore, enforcement of the Agreement will not infringe on Glebus' right to work and earn a livelihood. See *Marine Contractors Co., Inc.*, 365 Mass. at 289 ("The consequences of every covenant not to compete ... is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable ... [Glebus must] establish ... extraordinary hardship."). Since Stone Legal has not requested this Court to enforce the geographic scope of the Agreement, Glebus may maintain his position at Advance and is only limited to whom he may contact. Thus, Glebus and Advance will not suffer any substantial harm from the issuing of the injunction.

ORDER

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For the reasons stated above, it is hereby *ORDERED* that, for fifteen months (three months have passed since Glebus resigned from Stone Legal), from the date of entry of this injunction, Advance and Glebus are preliminary enjoined as follows:

1. Advance and Glebus are enjoined forthwith to return to Stone Legal any and all information of Stone Legal taken or received from Stone Legal in any manner, whatsoever, including, without limitation, lists and records of customers, clients, professionals and candidates, preferred vendor pricing information and materials that Stone Legal or its clients provided to Glebus.

*7 2. Advance and Glebus, are enjoined, on behalf of themselves or in the service or on behalf of others, from divulging to any other person or entity, or use on behalf of themselves or in the service or on behalf of others, any of Stone Legal's confidential information, including, but not limited to, pricing information, billing history, lists or compilations of customers, professionals and candidates; information regarding Stone Legal's methods of operation, and information which Stone Legal or its clients provided to Glebus.

3. Advance and Glebus are enjoined to terminate any business obtained by Advance which was derived from the confidential information of Stone Legal, where Advance had never previously attempted to or actually provided placements to that client.

4. Advance and Glebus are enjoined from soliciting further business through confidential information obtained by Stone Legal.

5. Advance and Glebus are enjoined to terminate business relations with (1) Butters, Brazilian and Small, and (2) CCBN.

2003 WL 914994 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15

H

Superior Court of Massachusetts.
UNITED RUG AUCTIONEERS, INC.,
v.
Arie ARSALEN, et al.
**No. CA03-0347.**

April 11, 2003.

PATRICK F. BRADY, Justice of the Superior Court.

Background

***1** The plaintiff seeks injunctive relief prohibiting the defendants from working in and/or conducting the business of selling oriental and Persian rugs and of divulging any proprietary and/or confidential information of the plaintiff. The complaint was filed on January 24, 2003. On February 4, 2003, after hearing, I granted plaintiff's request for preliminary injunction and, in view of the possibility that the defendants might be financially harmed because of their temporary inability to conduct rug sales pending trial, I advanced the case for a speedy trial on March 17, 2003. Counsel to their credit acted cooperatively with respect to discovery, and the trial (delayed briefly due to plaintiff's counsel's illness) began on Friday, March 29, 2003 and concluded on April 2, 2003. For reasons stated on the record, I imposed what I considered to be reasonable time limits on the presentation of evidence. [FN1]

> FN1. The court has inherent power and wide discretion to set reasonable limits on the direct and cross-examination of witnesses. *Chandler v. FMC Corporation,* 35 Mass.App.Ct. 332, 338 (1993); *Borges v. Our Lady of the Sea Corp.,* 935 F.2d 436, 442 (1st Cir.1991); *General Signal Corp. v. MCI Telecommunications Corp.,* 66 F.3rd 1500, 1507-09 (9th Cir.1995). Of course time limits must not be arbitrary. *Clark v. Clark,* 47 Mass.App.Ct. 737, 746 (1999). In setting time limits, I took into account my familiarity with this case from the time of the preliminary injunction hearing to the present, and more particularly my review of the extensive joint pre-trial memorandum filed by counsel prior to trial.

The evidence was sharply conflicting. On the credible evidence before me, I find and rule as follows.

Findings

1. The plaintiff United Rug Auctioneers, Inc. (United) is a Massachusetts Corporation whose business is the liquidation of oriental and Persian rugs. The principals are three brothers: Ronen, Joseph, and Nir Drory.

2. The defendant Allied Rug International Auctioneers, LTD (Allied) is a Delaware corporation incorporated on December 5, 2002. As will be discussed hereafter, the defendants Arie Arsalen, Edmon Mamane and Beth Reed are three individuals who are associated with Allied. The defendant Ario, Inc. is an alter ego of Allied.

3. Ronen Drory (age 27) is the prime mover of United. Born in Framingham, his family moved to Israel when he was very young. In 1993 he returned to the U.S. and began to work in the oriental rug business. After working for several years for a rug company which went out of business, he started his own rug business in about 1996. His brothers Joseph and Nir Drory eventually joined him in the business. Ronen Drory encountered some difficulties at the beginning, but eventually evolved a business strategy which, by 2002, was proving to be very successful.

4. United's business is to conduct liquidation sales of oriental and Persian rugs by auction and otherwise on weekends at various temporary locations in Massachusetts and other nearby states. United operates out of a warehouse in Canton. It purchases its rugs from three vendors in New York City, primarily Sam Shamoulian. Picking locations from which to sell is of paramount importance. Basically, Ronen Drory determines sales locations based on cities or towns whose average per capita income in the town and in the surrounding vicinity is high. The rugs are handmade, relatively expensive, and thus most sales locations are in affluent suburbs. When Ronen Drory determines the location, he will schedule a facility from which to conduct the sale or auction. A few weeks prior to the sale, United advertises by direct mail flyers to households within certain nearby zip codes. The flyers are generally headed by bold captions such as "Liquidation Auction" or "Federal Notice Auction" and contain language emphasizing that the rugs are forced to be sold immediately at substantial discounts.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***2** 5. The defendant Arie Arsalen grew up with the Drory brothers in a suburb of Jerusalem. On several occasions beginning about 1995, Arsalen traveled to the U.S. to visit Ronen Drory and to work with him in the rug business. While in the U.S. he would live with Ronen in his apartment in Canton. The rug work that he did consisted primarily of manual labor, loading and unloading rugs and occasionally running errands. From time to time he would accompany Ronen Drory to New York City to purchase rugs. For a period of time in about 1998 Arsalen also worked with Joseph Drory as a mechanic in Florida.

6. In February 2002 Arsalen again returned to the United States and was living in California. Ronen Drory called him and asked him to come to Massachusetts to work with him in the rug business. Arsalen was willing, but made it clear that he did not want to do mainly physical labor; rather he wanted to acquire knowledge about the rug business and to work as a salesman. Ronen Drory agreed; Arsalen then came to Massachusetts in early March, again taking up residence with Ronen in Canton.

7. With Arsalen's arrival, Ronen Drory purchased a new truck which he assigned to Arsalen. United typically will send out four or five trucks of rugs to different locations for the weekend sales. One or two United employees accompany the truck and run the sale. Thus Arsalen began to become intimately acquainted with the details, including the profitability, of United's business.

8. Arsalen worked for United from early March 2002 to early October 2002, when he quit. He attended and participated in approximately twenty-one weekend sales or auctions, usually with Joseph Drory but occasionally with Nir Drory or Ronen Drory. For the first few weeks his duties were much as before, namely loading and unloading the trucks. Gradually, the Drory brothers taught him the job of salesman. At core, an effective salesman must be very familiar with the details of oriental and Persian rugs, including quality, origin, size and cost. The Drorys gave Arsalen pricing authority. Arsalen knew precisely what each rug cost and for what price he could sell the rug to interested customers. He became privy to all aspects of United's business.

9. The location of the sales is vitally important to the success of the business. As indicated, the most affluent suburbs are targeted, but there are other locations which do not rank at the top of the average income scale which also have proven to be profitable. Wrentham is one such location. Likewise, the facility to be used for the sale is important. Over the years, the Drorys have built up relationships with various managers of facilities which they are able to rent for a weekend sale, and whom they can trust to keep the information confidential.

10. For each rug sale location United maintains a historical file which contains information such as directions to the site, vendor's licenses required, contact persons, and summaries of prior sales. The file for each location is stored securely at the company warehouse in Canton; it accompanies the salesmen to the location of the sale. On Sunday evening following a sale, the salesman will return the file to Ronen's apartment.

***3** 11. In June 2002 Ronen Drory, who regarded his method of doing business as confidential and proprietary, decided that it would be prudent to require his key non-family employees to sign confidentiality and non-competition agreements. United's lawyer prepared a form agreement which several of United's employees were required to sign.

12. On June 19, 2002 Ronen Drory and United secretary Kim Bevins presented such an agreement to Arsalen at the warehouse in Canton. Arsalen's first language is Hebrew, but he speaks fluent English and is able to read English. He spent several minutes reviewing the form. Kim Bevins explained the nature of the contract to Arsalen. He signed it. Thereafter, Bevins made a photocopy of the three-page contract and gave the original to Ronen Drory. While making the photocopy, the machine jammed after the first two pages. Ms. Bevins used a fax machine to copy the third (signature) page. Ronen Drory took the original home with him and placed it in his closet. When the events which gave rise to this lawsuit came to his attention, Ronen Drory was unable to locate the original.

13. The defendant Edmon Mamane is an acquaintance of the Drorys through their uncle, Moishe Attias. Arsalen met Mamane several years ago at a social event at Attias' house. Mamane came to the United States from Israel in 1983. He is now age forty-five. He is an experienced businessman, and has run several businesses before. He had some modest prior experience in selling oriental rugs on consignment for a rug company in Boston in the 1990s. He formally changed his last name from "Mamane" to "Hamane" in 1984. He seems to find it expedient to use two names, and two social security numbers as well.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14. In the fall of 2002, Mamane and Arsalen renewed their acquaintanceship. At some point they decided to go into the rug business together to compete with the Drorys. Arsalen was well aware that he had entered into a non-competition and confidentiality agreement, and asked Ms. Bevins for a copy of it in late September prior to leaving United. Mamane and Arsalen, together with Mamane's girlfriend, Beth Reed (whom he describes as his partner for life), then embarked on a course of action to conduct a business that would mirror United's.

15. In particular, Arsalen and Mamane did the following:

a. Traveled to New York City to meet several times with Sam Shamoulian, United's primary vendor. Shamoulian knew Arsalen from prior trips to New York City with Ronen Drory to purchase rugs. According to Shamoulian, whose testimony I credit, Arsalen told Shamoulian that they wanted to purchase the same selection, or "mix," of rugs as he sold to United, and for the same price. Arsalen was well versed in the technical details of rugs, and participated to a much greater extent than Mamane who appeared to Shamoulian to lack knowledge about rugs. Arsalen asked Shamoulian not to tell Ronen that they were there.

b. Scheduled several rug sales at locations and facilities used by United in the past, namely Wrentham, Wellesley, Hingham, Concord, Stowe (Mass.), and Northboro.

***4** c. Conducted a rug sale on January 18-19, 2002 in Wrentham. Arsalen worked as a rug salesman at the show.

d. Utilized the same method of direct mail advertising as United did, with flyers substantially similar to the flyers put out by United. Mamane told one of his advertising agencies, Advo, Inc., that he wanted the flyers to look exactly like United's.

e. Solicited several employees of United (Panagua, Gonsalves, and Izakof) to leave United and work for Allied at a higher rate of pay.

16. Defendants all deny any concerted activity to "copy" United's business. Mamane insists that he did his own research and investigation without input from Arsalen. I do not find his testimony credible. Examples of evidence to the contrary:

a. Telephone records reflect literally hundreds of calls between Arsalen and Mamane from late October 2002, through January 2003. These are two men of dissimilar ages and experience who have little in common beyond their native language, Hebrew. I infer that these numerous communications were primarily concerning the rug business.

b. Mamane seems to have no compunctions about misstating the truth. At the same time he was actively engaged in starting Allied, he answered an interrogatory put to him by his wife in their divorce proceeding denying that he was attempting to start any business, and claiming that his physical and mental health inhibited the stamina and concentration needed to engage a new business.

c. Mamane paid Arsalen $1450 in January 2003, around the time of the Wrentham auction, which he claimed was for work done by Arsalen in cleaning a warehouse and tagging rugs. More likely these payments were for Arsalen's work done at the auction. Several attendees of the auction identified Arsalen as a salesman.

d. James Picard, business manager of the American Legion Hall in Northboro, dealt with Mamane and Arsalen regarding the rental of the Legion Hall for a prospective rug sale on March 22-23, 2002.

e. Sergeant Fulcher from the Easton police department testified credibly that, in connection with a district court case involving allegations by the Drorys that Mamane and Arsalen had threatened them, he spoke to Mamane and Arsalen who told him that they were starting a competing rug business together and for that reason the Drorys were making these "baseless" allegations.

## Discussion

The amended complaint is in seven counts. The essence of plaintiff's claim is that Arsalen breached his Employee Confidentiality and Non-Competition Agreement (the Agreement) with United by going into a competing business with the other defendants and divulging confidential and proprietary information to them. With respect to the other defendants, plaintiff alleges primarily that they misappropriated confidential and proprietary information by planning, organizing, forming and operating a business to directly compete with the plaintiff. Plaintiff seeks injunctive relief only, and attorneys/experts fees and costs on its c. 93A claim.

***5** Defendants counterclaim basically on the allegation that plaintiff fraudulently obtained a temporary restraining order and a preliminary injunction prohibiting them from conducting liquidation rug sales by the use of a forged document, namely Arsalen's Agreement, and that this constituted a violation of c. 93A and c. 93, § 5 (Massachusetts Anti-Trust Act). The defendants waived Count VI, a federal Sherman Anti-Trust Act claim, at the beginning of trial.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Paragraph one of Arsalen's Agreement dated June 19, 2002, provides as follows:

1. *Nondisclosure of Company's Confidential Information*

In the course of Employee's employment with the Company and because of the nature of Employee's duties and responsibilities, Employee will acquire knowledge of the Company's confidential and proprietary information not previously known to Employee and not known to the general public. Such confidential and proprietary information includes, but is not limited to, the following: business and financial information, marketing strategies, lists of the Company's customers and prospective customers and lists of the Company's vendors and other sources of supply, all hereafter referred to as "Proprietary Information." Employee will also acquire information respecting Proprietary Information which is generally known to the public, but whose use by the Company or its affiliates is not generally known and which, if the same was known to the Employee prior to employment with the Company, is hereafter also called "Proprietary Information." Employee agrees that Employee will not, while in the employ of the Company or at anytime thereafter, directly or indirectly, communicate, divulge, disclose or make known, or use for the benefit of Employee or of any other person, firm, association or corporation, any Proprietary Information, whether or not such information is produced by Employee's own efforts, without the prior written permission of the Company, except that Employee may disclose such matters to the extent disclosure is required (a) in the course of Employee's employment with the Company to further the interests of the Company or (b) by a court or governmental agency of competent jurisdiction.

Paragraph four of the Agreement provides:

4. *Non-competition for Twenty-four Months after Employment*

For a period of twenty-four (24) months following the termination of employment with the Company for any reason, Employee agrees that Employee shall not, anywhere in the territory consisting of the states of Massachusetts, Rhode Island, Connecticut, New York, and New Jersey and in addition thereto, any territory into which the Company extends and carries on its business by expansion of its present activities, engage, directly or indirectly, or be employed by any person, firm, association or corporation engaged in the business of selling rugs by auction or public sale at a temporary location.

Furthermore, paragraph six (a) of the Agreement provides that for one year after the termination of the Employee's employment, he will not "solicit, induce, attempt to hire, or hire any person employed by the Company within six (6) months prior to such termination, or assist in such hiring by any other person, firm, or association or corporation, or encourage any employee of the Company to terminate his or her employment with the Company."

*6 A trade secret may consist of any compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know how to use it. Restatement of Torts, § 757, Comment b (1939). Trade secrets and confidential information are essentially identical concepts. *Jet Spray Cooler, Inc. v. Crompton,* 377 Mass. 159, 165 (1979); *Chromerics v. Ehrreich,* 12 Mass.App.Ct. 1, 10 n. 17 (1981). It makes no difference that Arsalen entered into the Agreement in June 2002, after he had been working for two and one half months. See *Marine Contractors Co., Inc. v. Burley,* 365 Mass. 280, 288 (1974) (enforcing a non-competition agreement executed upon the employee's termination as necessary to protect the good will of the employer). The Agreement was necessary to protect United's confidential business information.

I find and rule that information concerning United's vendors, places of sale, times of sale, prices and mix of rugs, and financial information are confidential and proprietary. Internally, the Drorys treated this information as confidential and proprietary, took reasonable steps to keep it secure, and did not share it with anyone other than those necessary employees. They kept important files in secure locations. They entered into Confidentiality and Non-Compete agreements with other key employees.

Although information such as sale locations might seem public and non-confidential, whether and to what extent a location is profitable is highly confidential. United determined the most propitious sites largely by trial and error over time. It would substantially assist a competitor to know precisely what United knew about the profitability of various locations, and when United had conducted sales/auctions there.

United's method of promotion is likewise confidential. Although flyers once sent out are widely dispersed and easily available, how many to send out and to what zip codes is proprietary information. Likewise, what "mix" of rugs [FN2] to include in the

sale is proprietary and confidential.

> FN2. There are a wide variety of oriental and Persian rugs available.

Mamane himself admitted that such things as sales locations, inventory and pricing are confidential and proprietary.

The evidence in this case is overwhelming that the defendants were doing nothing more than precisely copying United's modus operandi, and that they operated the business utilizing the information furnished to them by Arsalen in violation of his Agreement. That he shared all of his relevant information with Mamane I have no doubt. Furthermore, I infer from the substantial circumstantial evidence that Mamane knew that Arsalen had a confidentiality and non-compete agreement with United. He is quite familiar with such agreements and even has a lawsuit in the Middlesex Superior Court to enforce such an agreement. Mamane's transparent assertions that he had virtually nothing to do with Arsalen in the rug venture, in the face of overwhelming evidence to the contrary, strongly indicates to me that he knew all along that Arsalen was constrained by a confidentiality/non-compete agreement, and that his affiliation with Arsalen could be the subject of a substantial legal challenge. It is more than a mere coincidence that Allied 1) went to Sam Shamoulian to buy rugs in the same "mix" and for the same price as United; 2) chose locations (towns and facilities) used by United to conduct its sales; and 3) and used the same promotional system used by United, and asked one advertising agency to practically duplicate United's flyer. That the defendants attempted to hire three of United's employees is further significant evidence that the information held by United was what Allied was after.

***7** In the Commonwealth non-competition agreements must be reasonable in scope and duration. *All Stainless, Inc. v. Colby*, 364 Mass. 773 (enforcing two-year restriction). Arsalen's agreement is for two years and covers the states of Massachusetts, Rhode Island, Connecticut, New York and New Jersey. The states are all covered by United, and Arsalen participated in sales in each of them. Two years is a reasonable duration.

Concerning defendants' counterclaim, all counts must fail because plaintiff has persuaded me of the main pillars of its lawsuit. Of course, if I were persuaded that United's claim was based on a forged document, the case would stand on different footing. I am satisfied, however, that Arsalen's agreement, Exhibit 2 is genuine. Two witnesses (Ronen Drory, Kim Bevins) testified that they observed Arsalen sign the document. The two handwriting experts who testified, Ms. Nugent for the plaintiff and Mr. Rice for the defendants, reached opposite conclusions. Rice said Bevins' and Arsalen's signatures are forged; Nugent opined that they are genuine. Each expert made a good impression and articulated plausible reasons for his/her opinions. Mr. Rice has somewhat more impressive credentials than Ms. Nugent, having participating in several high profile investigations. Handwriting analysis is, however, imprecise and not guided by uniform, widely accepted objective standards. There is a fair amount of "ipse dixit" in each expert's testimony. For instance, in concluding that Arsalen's signature on Exhibit 2 was forged, Mr. Rice points to numerous "stops" of the pen in the final loop that distinguishes Arsalen's signature. These "stops" are based on wavy lines, or "ink blots," that appear throughout; yet, as plaintiff's counsel points out, the signature *line* itself is "wavy." Thus these features may be nothing more than artifacts of the paper rather than proof of a slowly manufactured, forged, signature. Although both experts were well prepared and helpful in some respects, neither experts' testimony engenders in me sufficient confidence to base a conclusion. Ultimately, with the humble acknowledgment that historical truth is often difficult to determine, I base my conclusion that exhibit 2 was not forged, either with respect to Bevins' or Arsalen's signature, upon Ms. Bevins' testimony. She is a part-time secretary earning $15,000 per year for United. Her husband, Mr. Isakof, works for United. Potentially these employment relationships might bias her in favor of United, and this could have affected her testimony, but I find it hard to accept that she would come into court and flatly perjure herself, subjecting herself to possible criminal penalties, on a subject which, to a layperson at least, might be determinable by handwriting analysis. If she were willing to take that rather drastic step, it would seem more plausible simply for her to notarize the fictitious signature in the first place.

On the specific counts of the amended complaint and counterclaim, I find and rule as follows.

***8** Count I (v. Arsalen for breach of contract)--Arsalen breached his Agreement by divulging confidential and proprietary information, competing with plaintiff, and attempting to hire plaintiff's employees.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Count II (v. all defendants; interference with advantageous business relations)--all defendants attempted to interfere with plaintiffs' employment relationships with Messrs. Panaqua, Gonsalves and Isakof by soliciting violation of Arsalen's Agreement with United.

Count III (v. all defendants; violation of c. 93A)--All defendants violated c. 93A, § 11 by misappropriating plaintiffs' confidential and proprietary information.

Count IV (v. defendants Mamane and Reed; tortious interference with Contract)--Defendants Mamane and Reed, knowing the defendant Arsalen had an Agreement with United, nonetheless received confidential and proprietary information from him in order to start a competing, mirror-image business, and engaged with Arsalen in an attempt to hire United's employees in violation of Arsalen's contract.

Count V (v. all defendants; misappropriation of confidential information)--All defendants misappropriated confidential information from United.

Count VI (v. all defendants; conversion)--Plaintiff has not pressed this theory and I deem it waived.

Count VII (v. all defendants; accounting and imposition of a constructive trust)--plaintiff has not pressed this count and I deem it waived.

Count VIII (v. all defendants; injunctive relief)--plaintiff is entitled to injunctive relief.

Counterclaims

1. *Threats:* Violation of c. 93A--Defendant have not proved threats and, therefore. I find for plaintiff.

2-5. *Obtaining TRO:* violation of c. 93A--The plaintiff was entitled to the temporary relief obtained. I find for plaintiff on those counts.

6. *Sherman Anti-Trust Act*--waived during trial.

7. *Violation of Massachusetts Antitrust Act*--For reasons stated, I find for the plaintiff.

Order

Judgment shall enter for the plaintiff enjoining the defendants, and each of them, and any persons or entities acting on their behalf, for a period of twenty-four (24) months from October 7, 2002 to and including October 6, 2004, from holding, participating or taking part in rug liquidation sales, by auction or public sale at temporary locations in the states of Massachusetts, Rhode Island, Connecticut, New York, and New Jersey.

Judgment shall enter for the plaintiff on defendants' counterclaims 1-5 and 7.

Such costs as are allowed by law will be awarded to the plaintiff including reasonable attorneys fees and expert witness fees. Plaintiff may have until April 21, 2003 to file and serve an application for fees and costs and supporting material. Defendants may have until April 28, 2003 to file and serve an opposition.

16 Mass.L.Rptr. 420, 2003 WL 21527545 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16

C

Superior Court of Massachusetts
VERIDIEM, INC.,
v.
William L. PHELAN.
**No. 034418BLS.**

Sept. 26, 2003.

MEMORANDUM AND ORDER ON REQUEST FOR PRELIMINARY INJUNCTION

ALLAN van GESTEL, Justice of the Superior Court.

*1 This matter is before the Court on a request for preliminary injunctive relief brought by the plaintiff, Veridiem, Inc. ("Veridiem"), against the defendant, William L. Phelan ("Phelan").

BACKGROUND

On September 2, 2003, shortly after being offered a raise in compensation and an enhanced job title that he requested, Phelan abruptly tendered his resignation and announced his intention to join Unica Corporation ("Unica"), a competitor of Veridiem.

Both Veridiem and Unica are in a relatively small industry providing software applications and consulting in what is called market resource management ("MRM"), a fact conceded by Phelan's counsel in oral argument. MRM entails processes and capabilities that enhance an enterprise's ability to orchestrate and optimize the use of marketing resources. MRM applications improve an enterprise's ability to plan, coordinate execution and measure the impact of marketing efforts

In 1998, Phelan co-founded Veridiem (then called Cimetry Incorporated), and continued to be employed by Veridiem until his recent resignation. Phelan served in multiple senior capacities at Veridiem, most recently carrying the title of Director of Auto Services Solutions.

Veridiem develops and licenses software and provides services that enable companies to better manage their marketing resources. It is a young company in a highly competitive marketplace, and has succeeded so far by effective planning, development and innovation. In doing so it carefully protects its business plans, strategies and technical information.

Veridiem's software and services are used primarily by companies in the automotive, consumer packaged goods, and, more recently, financial industries.

During his tenure at Veridiem, Phelan held a variety of roles. At various times in the company's history, he was responsible for: product management; product positioning and planning; marketing communications management; team selling of Veridiem's services and products; and customer solution and contract development He was not deeply involved in engineering the software applications or writing software code for Veridiem products. He was, in short, much more in the marketing end of Veridiem's business and as such had significant contact with customers and potential customers. Thus, good will, more than technical trade secret type information, is significant with him. Also, of course, of necessity he possesses considerable knowledge about Veridiem's business and other plans in process and for the future.

While Phelan's compensation package at Unica was not presented at oral argument, Veridiem's counsel reported that he was offered in the vicinity of $160,000 as an annual salary to stay at Veridiem.

Phelan, like his fellow founders, executed employee non-competition and non-disclosure agreements.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

His non-competition agreement, in Paragraph 2, reads:

During the term hereof, you will not, without the Company's prior written consent, directly or indirectly, alone or as a partner, joint venturer, officer, director, employee, consultant, agent, independent contractor or stockholder of any company or business, engage in any business activity which is directly or indirectly in competition in the United States with any of the products or services being developed, marketed, distributed, planned, sold or otherwise provided by the Company at such time.

*2 Paragraph 1 sets the "term" of this agreement as follows:

The Term of this Agreement shall be for a period commencing on the date hereof and ending on the first anniversary of the date on which your employment with the Company terminates for any reason, whether voluntarily or involuntarily.

By Paragraph 6 of the agreement, Phelan agrees that any breach will cause irreparable harm to Veridiem and that injunctive relief, among others, is appropriate relief to prevent violations

DISCUSSION

In order to prevail on its request for preliminary injunctive relief, Veridiem bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Phelan from his being enjoined. *GTE Products Corp. v. Stewart*, 414 Mass. 721, 722-23 (1993); *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616-17 (1980) Before assaying these issues, it is appropriate to canvass the relevant elements of the Massachusetts law dealing with the enforcement of non-competition and confidentiality agreements.

Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. *Novelty Bias Binding Co. v. Shevrin*, [342 Mass. 714, 716 (1961) ]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with its customers. See *All Stainless, Inc. v. Colby*, [364 Mass. 773, 779-80 (1974)). Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. *Richmond Bros., Inc. v. Westinghouse Bdcst. Co., Inc.*, 357 Mass. 106, 111 (1970).

*Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 287-88 (1974).

Phelan's position at Veridiem was sufficiently high that Veridiem has a justifiable interest beyond that of just ordinary competition in seeking to enforce the non-competition and other covenants of the agreements with Phelan. As noted above, the non-competition agreement itself recites that injunctive relief, among others, is appropriate for a violation.

A non-competition agreement, however, to be enforceable, must be reasonable in geographical scope and length of time. See, e.g., *Blackwell v. E.M. Helides, Jr., Inc.*, 368 Mass. 225, 228 (1975); *All Stainless, Inc., supra*, 364 Mass. at 779-80; *Becker College of Business Admn. & Secretarial Science v. Gross*, 281 Mass. 355 (1933). Here, the scope of the United States and the one-year time limit involved in the Veridiem agreement are reasonable for the protection of the matters in issue *Blackwell, supra*, 368 Mass. at 229; *Marine Contractors Co., Inc., supra*, 365 Mass. at 289.

*3 Contracts drafted by employers to limit the employment prospects of former employees--even those at a very high level--must be construed narrowly against the employer. *Sentry Ins. Co. v. Firnstein*, 14 Mass.App.Ct. 706, 707 (1982). At the same time, clear language must be given a clear application. This is particularly so here with Phelan being one of the founders of Veridiem.

Phelan argues that preventing him from working for Unica Corporation will constitute a hardship But it was Phelan, not Veridiem, who decided to leave and violate the agreement by joining a competitor in a relatively small industry.

The consequence of every covenant not to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> compete .... is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable.

*Marine Contractors Co., Inc., supra,* 365 Mass at 289.

Mass.R.Civ.P. Rule 65(c) directs that unless the Court, for good cause shown, shall otherwise order, no preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined. Given Veridiem's relative youth in the market resource management business, such security seems appropriate here.

PRELIMINARY INJUNCTION

For the foregoing reasons the Court enters the following preliminary injunction:

Upon the posting of security in a manner satisfactory to the Court in the amount of $100,000, the defendant, William L. Phelan, for the period through September 5, 2004, is enjoined and restrained from directly or indirectly, alone or as a partner, joint venturer, officer, director, employee, consultant, agent, independent contractor or stockholder of any company or business, engaging in any market resource management business activity which is in competition in the United States with any of the products or services being developed, marketed, distributed, planned, sold or otherwise provided by Veridiem, including in particular Unica Corporation; and from disclosing any of Veridiem's confidential and proprietary business information and trade secrets to any third party.

17 Mass.L.Rptr. 8, 2003 WL 22481390 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

10

8/10/05

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
DOCKET NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff

v.

PATRICK RASICOT,
Defendant.

8/10/05
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
8/11/05

**MEMORANDUM OF LAW IN OPPOSITION TO**
**SOFTRAX'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant Patrick Rasicot ("Rasicot") is a former employee of Plaintiff Softrax Corporation ("Softrax"). After having suffered pay cuts, been lied to about the possibility of promotion, and then passed over for a promotion by a less qualified, younger employee, Rasicot tendered his resignation from Softrax in June 2005, and began working with NetSuite, Inc. ("NetSuite") shortly thereafter. By this lawsuit, and its Motion for Preliminary Injunction (the "Motion"), Softrax is attempting to get this Court to give it more than it bargained for with defendant Patrick Rasicot. Softrax seeks to prevent Rasicot from continuing to work for his new employer NetSuite, by invoking a supposed non-competition covenant, which Softrax contends prevents Rasicot from being employed by NetSuite.

However, a simple reading of the narrowly drafted covenant clearly demonstrates that Rasicot is within his rights in working for NetSuite. Indeed, perhaps that is why Softrax shies away from the controlling language from the covenant in its papers to the Court. Instead, Softrax repeatedly paraphrases the actual language thereby distorting its

context and presenting it as if it states something other than what the actual language clearly indicates.

Similarly, Softrax glosses over any demonstrable harm that it may suffer. Assuming arguendo that Softrax could even show that the narrowly drafted covenant somehow applied to NetSuite (which it cannot), Softrax has nonetheless utterly failed to meet its heavy burden of demonstrating that the enforcement of the non-competition covenant is necessary to protect any protectable interests of Softrax, or that it will suffer any irreparable harm should an injunction not issue, let alone that its speculative harm would outweigh the harm to Rasicot who would be deprived of his livelihood.[1] Softrax's overreaching and its blatant misrepresentation of the actual language of the narrow non-competition clause should not be condoned by the Court. Softrax's Motion should be denied.

## FACTUAL BACKGROUND

### Rasicot's Employment with Softrax

Rasicot was employed by Softrax from September 1996 until he resigned in early June 2005. Throughout his tenure at Softrax, the overwhelming majority of Softrax's customers were software companies. See Affidavit of Patrick Rasicot (August 10, 2005) ("Rasicot Aff."), ¶¶ 3, 13.

When Rasicot started at Softrax, there were only 10 to 15 people working there and Softrax was releasing its first full product offering, Softrax Operations & Financials.

---

[1] By opposing Softrax's Motion for Preliminary Injunction and seeking to preserve the status quo, Rasicot does not waive his right to remove this case to federal court. All rights of removal are hereby expressly reserved.

The product performed specialized Renewal Maintenance Billing related to the software industry, as well as order management, inventory, shipping and financial processing. See id. ¶ 4.

In his first position at Softrax, Rasicot was given the title of Professional Services Project Manager. In that position, he helped implement the software at customer sites. He was also responsible, over time, for building Softrax's Professional Services Department. For three and a half years, as Project Manager, Rasicot managed and consulted on end-user implementations of the Operations & Financials products. During this period, Softrax's Professional Services Department grew to approximately twenty employees. Rasicot consistently received complimentary performance reviews and two Outstanding Contributor awards for his performance as a Project Manager and as the driving force behind the growth of Professional Services. Only one other person in Softrax's history had twice won the Outstanding Contributor award. See id. ¶¶ 5-6.

As a Project Manager, Rasicot's immediate supervisor was David Milligan, who was the Vice President of Professional Services and one of the principals of Softrax. In the fall of 1999, Mr. Milligan was forced to relinquish that position because of his demeaning treatment of customers and employees, including Rasicot. Even though Rasicot had played a key role in successfully building the Professional Services group from the ground up, he was not considered for the job of replacing Mr. Milligan. Rasicot was told, instead, that the company was intending to go public and wanted someone with "outside experience." See id. ¶¶ 7-8.

In early 2000, having been passed over for a promotion and growing weary of an intense travel schedule, Rasicot began exploring job opportunities outside of Softrax. He found one that seemed like a good fit, but just before accepting it, Mr. Milligan told Rasicot that one of two existing Product Managers had been fired, and persuaded Rasicot to take the position. Rasicot accepted and moved from the Professional Services group to the Product Management group in March 2000, with the title of Product Manager. This was a lateral move, not a promotion. In fact, as a result of the lateral transfer to Product Management, Rasicot's annual compensation actually decreased, as he took a cut in bonus potential. Specifically, his annual compensation went from $110,905 in 2000 down to $101,165 in 2001. See id. ¶¶ 9-10.

Even Mr. Milligan describes Rasicot's change in position as a "transfer," not a promotion. See Affidavit of David Milligan (Aug. 1, 2005), ¶ 4.

As a Product Manager, Rasicot was responsible for heading up Softrax's three main product lines. Within Softrax, he interacted with Development, Customer Service, Professional Services, and Marketing Groups. His primary responsibility was to gather information related to product enhancement requests that could be put into the product. These primarily came through the Customer Support and Professional Services group – not from direct interaction with customers. (The sheer number of requests did not allow for direct interaction with the customers.) Rasicot would then put the information into business specifications, so that the Development team Product Manager, in turn, could write detailed functional specifications for the software product. See Rasicot Aff., ¶ 16.

Throughout Rasicot's time as a Product Manager, direct customer interaction was rare. Rather, Customer Service, Account Management, or Professional Services teams interacted directly with the customer and reported the information to Product Management. On rare occasions (fewer than five times a year, on average), Rasicot did interact directly with certain existing or prospective customers. Since mid-2004, the extent of involvement with customers was further reduced as the Vice President of Marketing determined that members of the project management group should no longer be interacting with customers. See id. ¶ 17.

**The Softrax Non-Competition Agreement**

Over three and a half years after he began working at Softrax, during which time Rasicot was exposed to much of the information that Softrax now claims is confidential, Rasicot was asked to sign the Softrax Corporation Noncompetition, Nondisclosure and Inventions Agreement dated March 13, 2000 (the "Agreement"). Rasicot did not receive any additional consideration in exchange for signing the Agreement.[2] See id. ¶ 12.

He did not retain a lawyer to review the Agreement and no lawyer was provided to him for that purpose. See id. He was not offered the opportunity to negotiate the terms of the Agreement, which purports to prevent Softrax employees from working for a "Prohibited Business" for two year after their Softrax employment terminates. See Agreement, § 2(a). In turn,

> the term **'Prohibited Business' shall mean any business engaged primarily** in the development, manufacture,

[2] While Rasicot did receive a salary increase based on his annual merit review in or about 2000-2001, he was scheduled to receive that increase any way based upon his performance evaluation. This increase was not tied to his move to the Product Management group. See Rasicot Aff., ¶ 12.

> production, sale, distribution, licensing or other disposition . . . of **products or services** involving operations, project management or financial application software designed **for use by software and information services companies**.

Agreement, § 2(c) (emphasis added). Softrax's limitation of the companies proscribed by the Agreement – i.e., those targeting primarily software and information services companies – was deliberate and made perfect sense given Softrax's customer base, which consisted almost entirely of such companies.[3]

**Softrax's Discriminatory Conduct and Hostile Work Environment**

In 2001 and 2002, unable to meet sales quotas, Softrax implemented company-wide bonus freezes and pay cuts. In late 2001, the Product Management group was transferred to the Marketing group, where Rasicot reported to Gottfried Sehringer, the Vice President of Marketing. Mr. Sehringer changed Rasicot's title to "Senior Product Strategist" and asked the people in his group to assume more duties related to market research and other traditional marketing functions. See Rasicot Aff., ¶¶ 18-19.

In 2002, Softrax's Financial Product Manager – a Certified Public Accountant – was laid off, and Rasicot was given all of his responsibilities, but no additional compensation. Over the next two years, he repeatedly asked Mr. Sehringer what was required to advance within the company. Mr. Sehringer repeatedly said that there was no place for Rasicot to grow within the company. See id. ¶¶ 20-22.

In late summer 2004, a new Director of Product Management was hired from outside the company. Rasicot and his colleagues in the Product Management group were

---

[3] By Rasicot's estimate, as of March 2000, approximately 95% of Softrax's customers were in the business of developing, manufacturing, and/or selling software. See Rasicot Aff., ¶ 13.

not told of this position until the day before the new hire started working. See id. ¶ 22. The new Director stayed for just three months, before he resigned. In Rasicot's view, the new Director's resignation was triggered by his frustration with the way Softrax operated. Given the open seat left by the quick resignation, in March of 2005, Softrax was looking for another Director of Product Management. Rasicot again asked Mr. Sehringer what was needed to be considered for that promotion. Mr. Sehringer again replied that that was not an option for Rasicot. Nevertheless, in May 2005, Softrax promoted to Director one of the other Product Managers, who was younger than Rasicot (who at the time was 43 years old) and whose performance track record was inferior to Rasicot's. See id. ¶¶ 2, 23-24.

Softrax's decision to promote a younger, less-qualified Product Manager than him – while telling Rasicot he could not even be considered for the position – constitutes actionable age discrimination. Such conduct would not be out of character for Softrax management, as other Softrax employees had made complaints about discrimination in the workplace. See id. ¶ 25.

**Rasicot's Resignation from Softrax and Employment with NetSuite**

After being passed over for the promotion to position of Director, Rasicot concluded that he needed to leave Softrax. He no longer wanted to be in a hostile work environment where employees were treated unfairly and discriminatorily, with little prospect for advancement or competitive compensation. See id. ¶ 26.

Rasicot began looking for other positions with other companies and eventually discovered the opportunity to work with NetSuite, Inc. ("NetSuite"). He pursued that

opportunity, as he believed he was free to do under the terms of the Agreement, because NetSuite does not sell primarily to software or information services companies. See id. ¶ 27.

Contrary to Softrax's papers, Rasicot never said he was taking the summer off to go sailing, or to "find himself," or anything else to that effect. Rather, during the first week of June 2005, he announced his resignation to the new Director of Product Managers, Josh Roffman, and told him that he was looking at his options and that he was going to take some time off. At the time of that conversation, he had not yet accepted NetSuite's offer. See id. ¶ 29.

Rasicot ultimately accepted NetSuite's offer to join NetSuite in the position of "Subject Matter Expert" and, on June 9, 2005, he signed the Netsuite, Inc. Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "NetSuite Agreement"), in which he expressly agreed that:

> I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

NetSuite Agreement, § 2(b). See Rasicot Aff., Exhibit A; Affidavit of Jim McGeever (August 2005) ("McGeever Aff."), ¶ 5.

Rasicot ended up taking four days off before starting with NetSuite. Once he joined NetSuite, he underwent initial training for several weeks. While still in training, in July 2005, Rasicot received a call from Softrax employee Jake Fennessy. Rasicot told

Mr. Fennessy truthfully that he was working for NetSuite, and that up to that point he had only been working on-and-off. See Rasicot Aff., ¶ 31.

**NetSuite and Rasicot's Position at NetSuite**

NetSuite is an Application Service Provider ("ASP"), which licenses its integrated Enterprise Resource Planning ("ERP"), Customer Relationship Management ("CRM"), and eCommerce solutions to small and mid-sized companies of all types through its hosted products. The products are not "designed for use by software companies." The products are specifically designed for small and mid-sized companies of all types. See McGeever Aff., ¶ 2.

Generally speaking, an ASP is a third party that manages and distributes software-based services and solutions to customers across a wide area network (e.g., the Internet) from a central data center. All NetSuite customers access NetSuite's Service via the Internet. The customer logs into the Service, and the customer's identification and password are authenticated by NetSuite's computers. Following authentication, the customer accesses their "Home Screen" and commences their use of the Service. See id.

Softrax, on the other hand, is a very different type of company than NetSuite. It is not an Application Service Provider with a hosted environment for its customers. To the contrary, Softrax is a standard software company, where customers purchase the software and load it onto their servers and computers for use within the company. See id. ¶ 3.

While it is true that NetSuite has some customers who are software companies, such companies comprise but a miniscule portion of NetSuite's business and NetSuite's product is not designed specifically for software companies. Since its inception in 1998,

NetSuite has successfully licensed its products to approximately 11,000 customers. Of those 11,000, only 212 – **less than 2%** – are software companies. See id. ¶ 4. Of the 260 press releases NetSuite has issued since 1999, only one (May 18, 2004) has ever specifically mentioned software companies. See Affidavit of Mei Li (August 9, 2005) ("Li Aff."), ¶ 6.[4] NetSuite's customers range from telecommunications and wireless companies, to insurance, to consumer goods, to manufacturing, and also include wholesale distribution, real estate, architecture and design, and service companies. See id. ¶ 4. All of these customers use the same, generic NetSuite product. See Rasicot Aff., ¶ 32.

Softrax manipulates the facts to support its implication that Softrax and NetSuite compete directly in all levels of their respective businesses. NetSuite's records show that of the 212 software companies that NetSuite gained as customers (out of the universe of some 11,000 customers), NetSuite has only "competed" directly with Softrax on fewer than 20 of those customers. See McGeever Aff., ¶ 4. Indeed, NetSuite's Vice President of Corporate Communications had never even heard of Softrax until she read Softrax's affidavits in this matter. See Li Aff., ¶ 7. On the infrequent occasions when NetSuite does compete for a customer with Softrax, it is usually in combination with other vendors such as Great Plains, SalesForce.com, and/or Siebel. See McGeever Aff., ¶ 4. In fact, NetSuite more often competes against companies other than Softrax whenever it does sell to software companies. See id.

---

4 Similarly, of the 18 "featured success stories" on NetSuite's "customers" web page, only one is about a software company; and of the nine industry segments listed on NetSuite's web page as the industries to which NetSuite markets its products, just one is software. See Li Aff., ¶¶ 4, 5 and Exhibits A, B.

In his position as a Subject Matter Expert at NetSuite, Mr. Rasicot's primary responsibility is to assist NetSuite Sales Representatives in describing the NetSuite product to prospective customers and to work with such prospective customers to identify the customer's needs as related to compliance with public laws and accounting standards such as those mandated by the Sarbanes-Oxley Act, Generally Accepted Accounting Procedures ("GAAP") compliance, Standard Operating Procedures for accounting, and other similar regulations. He has no particular influence on product development direction, defining product specifications and functionalities and bug fixes, or prioritizing the work on product functionality. See Rasicot Aff., ¶¶ 32-33; Affidavit of Melissa D. Saunders ("Saunders Aff."), ¶¶ 4-5.

In his job at NetSuite, Rasicot relies on knowledge of public accounting rules and regulations and not on any of Softrax's proprietary information. In fact, information about Softrax's products and services is of no use to Rasicot whatsoever in performing his job responsibilities at NetSuite. He has no involvement in attempting to differentiate NetSuite's products from Softrax's or in persuading customers to purchase NetSuite's products over Softrax's. See Rasicot Aff., ¶ 34; McGeever Aff., ¶ 8; Saunders Aff., ¶¶ 6-8.

The degree to which Rasicot's job functions at NetSuite are independent of Softrax is demonstrated by the fact that his new responsibilities at NetSuite were formerly performed by NetSuite's Chief Financial Officer, Jim McGeever, because of his accounting expertise. Rasicot was hired to replace Mr. McGeever in that role so that he

could devote his time and energies to other CFO functions. See Rasicot Aff., ¶ 35; McGeever Aff., ¶ 8.

NetSuite takes the protection of confidential information and trade secrets very seriously, as NetSuite's business depends on such information. Consequently, NetSuite is highly sensitive to Mr. Rasicot's obligations to Softrax in that regard. NetSuite employees, including Mr. McGeever, have personally reminded Rasicot not to disclose any confidential Softrax information to anyone at NetSuite, and that, as indicated above, he has a contractual obligation with NetSuite not to do so. See McGeever Aff., ¶ 6.

Rasicot has never disclosed to anyone, much less anyone at NetSuite, anything that can remotely be considered to be Softrax's confidential information. He has no intention of ever disclosing any such information, and every intention of abiding by his commitments -- in agreements with both Softrax and Netsuite -- to keep such information confidential. Rasicot did not go to NetSuite to harm Softrax or its business. He can readily perform his functions at NetSuite without disclosing anything about Softrax's products, strategies, or other sensitive data. See Rasicot Aff., ¶ 36; McGeever Aff., ¶ 7; Saunders Aff., ¶ 9.

Rasicot is dependent on his position with NetSuite for his own and his family's livelihood. His family relies upon his salary, and will suffer if he is prohibited from working at NetSuite. He currently has no other employment prospects. Prior to accepting to the position at NetSuite, he had been looking for another position for months and NetSuite's was the only offer he received. See Rasicot Aff., ¶ 37.

## ARGUMENT

As demonstrated below, the Court should deny the preliminary injunction motion because (1) Softrax is not likely to succeed on the merits of its claims; (2) Softrax has failed to demonstrate that it will suffer irreparable harm if the injunction is not issued; and (3) any speculative, illusory harm that Softrax claims would result from maintenance of the status quo pales in comparison to the actual, immediate harm to Rasicot that would result from issuance of the requested injunction. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).

### I. Softrax Is Unlikely To Prevail On Its Claim Of Breach Of The Non-Competition Agreement.

#### A. By Its Own Terms, The Agreement Is Not Applicable.

The non-competition covenant at issue purports to prohibit Rasicot, for a period of two years following his severance date, from working for, or having any interest in a "Prohibited Business." Complaint, ¶ 11 (quoting Agreement, § 2(a)-(b)). Softrax's failure to provide any analysis of the full, clear language of the Agreement is telling: Softrax knows that the non-competition covenant does not apply to Rasicot's employment with NetSuite and that is why it conveniently omits the actual language of the Agreement from its legal argument to the Court. The noncompetition covenant specifically defines the term "Prohibited Business as follows:

> For purposes of this Section, the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retain, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information service companies.

Complaint, ¶ 11 (quoting Agreement, § 2(c)). For a business to be a "Prohibited Business," therefore, it must be engaged "primarily" in the business of selling or developing a class of software that is "designed for use by software and information service companies." This narrow definition makes perfect sense because, as Rasicot testifies in his Affidavit (at ¶ 13), at the time he signed the noncompete, in March 2000, the overwhelming majority of Softrax's customers, over 90%, were software companies. Even today, Softrax's customers are predominantly software and information service companies. See Rasicot Aff., ¶ 13.

In stark contrast, NetSuite cannot be considered a "Prohibited Business" under the Agreement's definition, because it is not primarily engaged in selling software that is designed for software and information service companies. NetSuite is now, and has always been, a company that markets and sells to a wide variety of small and mid-sized companies, with software companies accounting for a tiny percentage – less than 2% – of its sales. See McGeever Aff, ¶ 4. Regardless of whether Softrax's customer base has expanded into other areas, the language of the Agreement remains the same, and clear on its face.

The term "primarily" "is not an ambiguous or difficult word to understand." In re Stewart, 175 F.3d 796, 808 (10th Cir. 1999). In numerous contexts, courts have considered primarily to mean, at a minimum, more than half. See, e.g., id. ("Finding no cases to the contrary, we therefore define 'primarily' in the context of § 707(b) [of the Bankruptcy Code] as meaning consumer debt exceeding fifty percent of the total debt."); Malat v. Riddell, 383 U.S. 569, 572 (1966) (in tax context of determining capital gain,

defining "primarily" to mean "of first importance" or "principally"); Bohn v. Park City Group, Inc., 94 F.3d 1457, 1461 (10th Cir. 1996) (recognizing that the Department of Labor, as a "good rule of thumb," defines "primary duty" to mean the "major part, or over fifty percent, of the employee's time"); Schrader v. State, 517 A.2d 1139, 1146 (Md. Ct. App. 1987) (in criminal context of determining existence of pyramid scheme: "[w]e believe the word 'primarily,' as used in § 233D(a)(4), possesses a common and generally accepted meaning. . . . In quantifiable terms, 'primarily' is commonly understood to suggest a figure representing more than 50 percent.").

Thus, Softrax's argument that the clause it drafted encompasses NetSuite as a "Prohibited Business" falls at least 48 percentage points short. See McGeever Aff., ¶ 4. On its face, therefore, the Agreement does not apply to prevent Rasicot's employment with NetSuite.

It is irrelevant that Softrax now has more non-software customers, or that, with the benefit of hindsight, a broader definition of "Prohibited Business" would make more business sense to Softrax. Under Massachusetts law, "[c]ontracts drafted by employers to limit the employment prospects of former employees – even those at a very high level – must be construed narrowly against the employer." EMC Corp. v. Gresham, No. 012084-BLS, 2001 WL 1763449, * 4 (Mass. Super. Nov. 14, 2001) (citing Sentry Ins. Co. v. Firnstein, 14 Mass. App. Ct. 706, 707 (1982)).[5]

---

[5] While Massachusetts case law permits courts to "blue pencil" or modify agreements, that exercise is only conducted to narrow the scope of a noncompetition covenant that would otherwise be unreasonably broad in duration or geographic scope, thus making the covenant less restrictive for the employee. See Kroger v. Stop & Shop Co., Inc., 13 Mass. App. Ct. 310, 311 (1982).

**B. The Agreement Cannot Be Enforced On These Facts.**

Even if the Agreement did apply, which Rasicot has shown it clearly does not, it should not be enforced to prevent Rasicot from continuing his employment with NetSuite. It has long been the law in Massachusetts that post-employment agreements that restrict or restrain employment will only be enforced in the special circumstances of each particular case. See Novelty Bias Binding Co. v. Sherman, 342 Mass. 714, 716 (1961). Contracts such as the one at issue here "are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood." Sentry Ins. v. Firnstein, 14 Mass. App. Ct. 706, 707 (1982) (quoting Restatement (Second) of Contracts § 188, comment g (1981)).

In order to establish the enforceability of such an agreement, an employer must satisfy a difficult four-part test, showing that the agreement is: (1) supported by consideration; (2) necessary to protect a legitimate interest of the employer; (3) reasonable in duration and geographic scope; and (4) consonant with the public interest. See Marine Contractors, Inc v. Hurley, 365 Mass. 280, 287 (1974). Essentially, "the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and the public interest." All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974).

Applying these principles here, it is readily apparent that the noncompetition agreement cannot be enforced because it was unsupported by adequate consideration; and its enforcement is not necessary to protect any legitimate interest of Softrax.

**1. The Agreement Was Not Supported By Consideration.**

Though case law is not unanimous, the better-reasoned view is that "in order for a restrictive covenant to withstand scrutiny, some additional consideration ought to pass to an employee upon the execution of a post-employment agreement." Ikon Office Solutions, Inc. v. Belanger, 59 F. Supp.2d 125, 131 (D. Mass. 1999). As in Ikon, Rasicot here signed the Agreement well after – over three and a half years after – his employment with Softrax began, and he received no additional consideration upon his signing of the Agreement. Where there is no consideration to support such a disfavored agreement, particularly where it has been drafted by the employer with no opportunity for negotiation of terms, courts will decline to enforce a covenant not to compete. See generally Sentry Ins. v. Firnstein, 14 Mass. App. Ct. 706 (1982); First Eastern Mortgage Corp. v. Gallagher, No. 943727F, 1994 WL 879546 (Mass. Super. July 21, 1994).

To the extent Softrax claims that the consideration for the Agreement was Rasicot's continued employment or his so-called "promotion" (see Softrax's Memorandum of Law in Support of Preliminary Injunction ("Pl.'s Br."), at 11), such consideration is defective. Mere continuation of employment does not suffice. See Engineering Management Support, Inc. v. Puca, No. 200501082L, 2005 WL 1476462, at *1 (Mass. Super. April 11, 2005) ("Keeping one's job is insufficient consideration in this case for either the non-competition or confidentiality covenant."); Rellstab v. John

Hancock Fin. Servs., Inc., No. 011281B, 2004 WL 1050748, at *1 (Mass. Super. March 24, 2004) ("Indeed, 'the courts now appear to refuse to enforce non-competition and non-solicitation agreements when the only purported consideration is the employee's continued employment.'") (quoting Ikon, 59 F. Supp.2d at 131). Moreover, not only was the "promotion" that Softrax claims Rasicot received nothing more than a lateral move (see Milligan Aff., ¶ 4 (describing the move to Product Manager as a "transfer")), it was also accompanied by a reduction in his bonus potential. See Rasicot Aff., ¶ 10. Under such circumstances, the Agreement is unenforceable for lack of consideration.

### 2. The Agreement Is Not Necessary To Protect Softrax's Legitimate Business Interests.

Softrax has the burden of demonstrating, "by a clear showing," that the noncompetition agreement is enforceable. See Lajoie Investigations, Inc. v. Griffin, No. 951794B, 1996 WL 1186792, at *2 (Mass. Super. Mar. 11, 1996). "Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer." Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287 (1974) (citing Novelty Bias Binding Co., 342 Mass. at 716). Massachusetts law recognizes only a narrow range of legitimate business interests – namely, the protection of business good will and the protection of confidential or trade secret information. See New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977); Banner Indus. v. Bilodeau, No. 3-236-C, 2003 WL 831974, at *2 (Mass. Super. Feb. 27, 2003). Softrax cannot demonstrate that these interests will be harmed if Rasicot is permitted to continue working for NetSuite.

**a. Rasicot's Non-Disclosure Of His New Employer Cannot Provide A Legal Basis To Prevent Him From Working.**

The centerpiece of Softrax's argument in support of its Motion to prohibit Rasicot from working at NetSuite is its erroneous and irrelevant allegations about Rasicot's non-disclosure to Softrax of his future employment plans. As noted above, when asked about his future plans, Rasicot made an off-hand comment about taking some time off. He did not say he would take the summer off, or that he was planning to go sailing. See Rasicot Aff., ¶ 29. What is more significant, however, is that Rasicot had no legal obligation to inform Softrax of his employment plans. See Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (an at-will employee "has no general duty to disclose his plans to his employer"). In any event, Rasicot's unwillingness to be more forthcoming with Softrax concerning his plans was entirely appropriate given the shabby way in which he was treated, including receiving pay cuts, being lied to about eligibility for promotion, and then being passed over by a less, qualified, younger employee.

By repeatedly emphasizing the circumstances of Rasicot's departure, Softrax attempts to obscure the more relevant facts that Rasicot's employment with NetSuite does not jeopardize Softrax's goodwill or endanger any confidential information of Softrax, and that Rasicot, who consistently received positive work evaluations and twice won awards for his commendable contributions to the company – will not (and has no reason to) disclose or use Softrax's confidential information as a NetSuite employee.

**b. No Confidential Information Is At Stake.**

A noncompetition restriction cannot be used to prohibit an individual from applying his general skills, knowledge and experience in an effort to earn a livelihood.

Richmond Bros., Inc. v. Westinghouse Broad. Co., 357 Mass. 106, 111 (1971) (citing Club Aluminum Co. v. Young, 263 Mass. 223 (1928)); Hurwitz Group, Inc. v. Ptak, No. 02-2599, 2002 WL 32717868, at *3 (Mass. Super. June 27, 2002). Softrax has not sustained its burden of demonstrating that Rasicot's continued employment at NetSuite in any way jeopardizes any Softrax confidential information. See Sentry Ins., 14 Mass. App. Ct. at 708 (no basis to enforce restrictive covenant protecting confidential information where no evidence that employee used or disclosed any such information).[6]

As a Subject Matter Expert, Rasicot has been, and will continue to use his general knowledge about public accounting rules and regulations to assist NetSuite Sales Representatives in describing the NetSuite product to prospective customers and to work with such prospective customers to identify their needs. See Saunders Aff., ¶¶ 5-8; McGeever Aff., ¶ 8; Rasicot Aff., ¶ 32. Unlike at Softrax, Rasicot has nothing to do with product development, writing software development specifications, or developing product strategies. See Saunders Aff., ¶ 4; McGeever Aff., ¶ 8; Rasicot Aff., ¶ 33. In fact, the person who formerly performed the functions for which Rasicot is now responsible was NetSuite's Chief Financial Officer, who hired Rasicot so he would have

---

[6] Softrax's argument that Rasicot is destined inevitably to disclose Softrax's confidential information only highlights the absence of any actual evidence that such information has been disclosed. As the court in CSC Consulting, Inc. v. Arnold observed,

> [i]f this Court followed the plaintiff's reasoning, any employee who was exposed to confidential information during his or her employment would be barred from working for a competitor, regardless of contractual obligations. Even if Massachusetts law permitted a claim of breach to be premised on a theory of inevitable disclosure, the plaintiff has failed to adequately show that [defendant] has threatened to disclose CSC trade secrets or that she will eventually do so.

CSC Consulting, Inc. v. Arnold, No. 001800, 2001 WL 1174183, at *3 (citation omitted).

more time to perform more typical CFO tasks. See McGeever Aff., ¶ 8; Rasicot Aff., ¶ 35.

NetSuite has specifically informed Rasicot that he is not permitted to disclose any confidential information belonging to any former employer, requiring Rasicot to execute an employment agreement containing the following provision:

> I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

Netsuite Agreement, § 2(b). On multiple occasions, NetSuite's CFO has reminded Rasicot not to disclose any Softrax confidential information, consistent with his obligations both under the Softrax Agreement and the NetSuite Agreement. See McGeever Aff., ¶ 6.

Softrax has not demonstrated that Rasicot has gone, or will go, beyond his right to use his general skills, knowledge and experience with public accounting rules and regulations, as distinct from specific knowledge of Softrax's confidential data. See CSC Consulting, Inc. v. Arnold, No. 001800, 2001 WL 1174183, at *3 (Mass. Super. July 12, 2001) (citing Chomerics, Inc. v. Ehrreich, 12 Mass. App. Ct. 1, 6-7 (1981)). Softrax cannot restrain Rasicot from bringing his many years of expertise in analyzing public accounting rules and regulations to NetSuite, merely because Softrax does not want NetSuite to capitalize on Rasicot's skills and talents.

Moreover, Softrax has not adequately demonstrated that it has any protectable confidential information at stake. In fact, Softrax only pays minimal lip service to such important factors as (1) the extent to which the allegedly confidential information is known outside of Softrax's business; (2) the extent to which the information is known to employees and others involved in the business; (3) the measures allegedly taken by Softrax to guard the secrecy of that information; (4) the value of the information to Softrax and its competitors; (5) the amount of effort or money expended by Softrax in developing the information; and (6) how difficult it would be for others properly to acquire the information. See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972).

For example, Softrax has not even alleged, much less demonstrated, that it has diligently taken steps to ensure that its purportedly confidential information remains confidential. Indeed, Rasicot was not asked to sign any sort of confidentiality agreement until years after he started working at Softrax, although he was exposed to much of the same information during the first three and a half years as he was thereafter. Rasicot Aff., ¶¶ 12, 14. Courts have routinely held that in such circumstances allegedly confidential information is not entitled to legal protection. See, e.g., Chiswick, Inc. v. Constas, No. 200400311, 2004 WL 1895044, *3 (Mass. Super. June 17, 2004) (information not entitled to protection because, inter alia, plaintiff did not take proper and reasonable steps to protect the identity of its customers); Alder Food Distribs., Inc. v. Keating, No. 0000748, 2000 WL 33170823, *7-8 (Mass. Super. June 6, 2000) (information is not a protectable trade secret when, inter alia, defendant and others in the

industry could readily learn identity of plaintiff's suppliers); Danieli v. Braverman, No. 9306532, 1994 WL 879855, *3, 5 (Mass. Super. Jan. 20, 1994) (when plaintiff disclosed that it did work for clients in a variety of publications, the identity of those clients is not confidential).

c. **Softrax's Good Will Is Not At Risk.**

While at Softrax, Rasicot had very limited customer contact. Rasicot Aff., ¶ 17. Subsequent to executing the non-compete, Rasicot interacted directly with customers only on rare occasions, and did not deal directly with each of Softrax's customers. Id. As a result, Rasicot did not develop protectable good will that he carried with him on departure from Softrax. Due to the extremely limited nature of his interaction with customers, any good will Rasicot may have helped to develop for Softrax remained with Softrax, and was not associated with Rasicot individually. Such good will, to the extent it exists, resides with Softrax's sales and customer support personnel. See FLEXCon Co., Inc. v. McSherry, 123 F. Supp.2d 42, 45 (D. Mass. 2000).

All that Rasicot brings with him to NetSuite is his years of experience analyzing and interpreting public rules and regulations, and his desire to move on from Softrax. These are the protected personal abilities of Rasicot, not Softrax. See Sentry Ins. v. Firnstein, 14 Mass. App. Ct. at 707 ("The objective of a reasonable non-competition clause is to protect the employer's good will, not to appropriate the good will of the employee."). As such, Softrax has failed to identify any specific good will it claims would be protected by enforcement of the Agreement to prevent Rasicot's employment

with NetSuite. Softrax's bare allegation that it will suffer a loss of good will has no probative value.

## II. Softrax Has Not Demonstrated That It Will Suffer Irreparable Harm In The Absence Of A Preliminary Injunction.

Softrax also fails to demonstrate irreparable harm. Softrax is harmed by Rasicot's employment with NetSuite only to the extent that it means Softrax no longer has the benefit of his experience and strong performance, and only to the extent Softrax is harmed by fair competition flowing from Rasicot's expertise in interpreting public regulations and other information relating to accounting. Such "harm" does not provide the basis for an injunction.

Softrax provides no evidence whatsoever that it has lost or is likely to lose any of its existing business if Rasicot works for NetSuite. Softrax's rank speculation is not a sufficient indicator of irreparable harm to deprive Rasicot of his employment. See Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991) (to show irreparable harm, plaintiff must establish "injury that is not remote or speculative, but is actual and imminent").[7] Even if Softrax had specified an actual injury, such injury would be economic in nature and insufficient to satisfy the requirement of irreparable harm. See Tri-Nel Mgmt., Inc. v. Bd. of Health, 433 Mass. 217, 227-28 (2001) ("Economic harm alone . . . will not suffice as irreparable harm unless 'the loss threatens the very existence

---

[7] Instead, Softrax posits a pie-in-the-sky inevitable disclosure theory. See Pl.'s Br. at 13-14. Softrax has not, however, shown that Rasicot has misappropriated or disclosed any of Softrax's trade secrets or confidential information, or that he is likely to do so. In the absence of such evidence, irreparable harm cannot be found. See CSC Consulting, 2001 WL 1174183, at *3 ("The mere fact that a person assume[s] a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose trade secret information' so as to 'demonstrate irreparable injury.'") (quoting Pepsico, Inc. v. Redmond, Jr., 54 F.3d 1262, 1269 (7th Cir. 1995)).

of the movant's business.'") (quoting Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987)).

## III. The Balance Of Equities Weighs Heavily In Rasicot's Favor.

Given that the worst harm Softrax could incur would be that resulting from fair competition, as contrasted to the disastrous effects the restrictive injunction would have on Rasicot's career, reputation, and family, the balance of harms leans indisputably toward Rasicot. Softrax's discriminatory conduct only further tips the scale of equities in Rasicot's favor.

### A. The Requested Injunction Threatens Rasicot's Livelihood.

Softrax seeks to prevent Rasicot from practicing his chosen profession with an employer who is interested in his skills. Rasicot was searching for jobs over a period of months before he found the NetSuite position. See Rasicot Aff., ¶ 37. To grant the injunction would be to deprive not only Rasicot, but his family members who depend on his earnings, of the income needed to sustain their livelihood. See id.

Weighing the speculative, if not illusory harm to Softrax in maintaining the status quo against the actual harm Rasicot would suffer if the injunction were to issue, Softrax has not made the requisite showing of need for an injunction depriving Rasicot and his family of his livelihood.

### B. Softrax Has Unclean Hands.

It is well-settled law that "he who comes into equity must come with clean hands." Precision Instr. Mfg. Co. v. Automotive Maint. Mach. Co., 324 U.S. 806, 814 (1945); see also Texaco PARR v. Dept. of Consumer Affairs, 60 F.3d 867, 880 (1st Cir.

1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands."). Courts will refuse to grant injunctive relief to "one tainted with the inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Precision Instr. Mfg Co., 324 U.S. at 814; see also Minnesota Muskies, Inc. v. Hudson, 294 F. Supp. 979, 989-90 (M.D. N.C. 1969) (refusing to grant injunctive relief where plaintiff had unclean hands).

Softrax's unfair and discriminatory conduct towards Rasicot demonstrates that it has unclean hands which alone should prevent it from obtaining the equitable relief it now seeks. Not only did Softrax place an unwarranted glass ceiling over the head of one of its first, and most-valued employees, but Softrax management outright lied to Rasicot in telling him there was no possibility of advancement and then discriminated against him by turning around to promote a younger, less experienced, less qualified inside employee. See Rasicot Aff., ¶ 24. It is well known that historically, Softrax has a record of complaints against it regarding discrimination in the workplace. See id. ¶ 25. Under such circumstances, it can hardly be said that Softrax "acted fairly and without fraud or deceit as to the controversy in issue," and the injunction it seeks should be denied for that reason alone. Precision Instr. Mfg. Co., 324 U.S. at 814-15.

**CONCLUSION**

For the foregoing reasons, defendant Patrick Rasicot respectfully requests that the Court deny plaintiff Softrax's Motion for Preliminary Injunction, and allow him to continue to earn his livelihood with a new employer.

If the Court denies Softrax's Motion for Preliminary Injunction, Rasicot respectfully requests that the Court award him the attorneys fees and costs incurred in opposing Softrax's Motion, pursuant to Section 9 of the Agreement, which provides that, "[i]n the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action."

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Melissa M. Longo

Scott A. Birnbaum (BBO# 543834)
Melissa M. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

Dated: August 10, 2005

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

**CERTIFICATE OF SERVICE**

I, Melissa M. Longo, counsel for the defendant, do hereby certify that on this 10th day of August 2005, I caused to be served a true copy of the foregoing upon all parties by hand to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Melissa M. Longo

1" fax signature

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
DOCKET NO. 05-1342

| | |
|---|---|
| SOFTRAX CORPORATION, Plaintiff | ) |
| v. | ) |
| PATRICK RASICOT, Defendant. | ) |

**AFFIDAVIT OF PATRICK RASICOT**

I, Patrick Rasicot, being duly sworn, do hereby depose and state as follows:

1. I submit this Affidavit, which, except where otherwise indicated, is based upon my personal knowledge, in opposition to the Motion for Preliminary Injunction filed by Softrax Corporation ("Softrax").

2. I was employed by Softrax from September 1996 until I resigned in early June 2005. At the time of my resignation I was 43 years old.

3. Throughout my tenure at Softrax, the overwhelming majority of Softrax's customers were software companies.

4. When I started at Softrax, there were only 10 to 15 people working there and Softrax was releasing its first full product offering, Softrax Operations & Financials. The product performed specialized Renewal Maintenance Billing related to the software industry, as well as generic order management, inventory, shipping and financial processing.

5. I was given the title of Professional Services Project Manager. In that position, I helped implement the software at customer sites. I was also responsible, over time, for building Softrax's Professional Services Department.

6. Over the next three and a half years, as Project Manager, I managed and consulted on end-user implementations of the Operations & Financials products. During this period, Softrax's Professional Services Department grew to approximately twenty employees. I consistently received complimentary performance reviews and two Outstanding Contributor awards for my performance as a Project Manager and as the driving force behind the growth of Professional Services. Only one other person in Softrax's history had twice won the Outstanding Contributor award.

7. My immediate supervisor was David Milligan, who was the Vice President of Professional Services and one of the principals of Softrax. I understand and believe that in the fall of 1999, Mr. Milligan was forced to relinquish that position because of his demeaning treatment of customers and employees, including me.

8. Even though I had played a key role in successfully building the Professional Services group from the ground up, to my surprise and disappointment, I was not considered for the job of replacing Mr. Milligan. I was told, instead, that the company was intending to go public and wanted someone with "outside experience."

9. In early 2000, having been passed over for a promotion and growing weary of an intense travel schedule, I began exploring job opportunities outside of Softrax. I found one that seemed like a good fit, but just before I accepted, Mr. Milligan told me that one of two existing Product Managers had been fired, and he persuaded me

to take the position. I accepted and moved from the Professional Services group to the Product Management group in March 2000, with the title of Product Manager. This was a lateral move, not a promotion.

10. In fact, as a result of the lateral transfer to Product Management, my annual compensation actually *decreased*, as I took a cut in bonus potential. Specifically, my annual compensation for 2000 was $110,905, whereas my annual compensation for 2001 was $101,165.

11. I was not required to sign a non-compete or any other confidentiality or employment agreement with Softrax when I was first hired, or at any time during the first three and a half years of my employment with Softrax.

12. In March of 2000, I was asked to sign the Softrax Corporation Noncompetition, Nondisclosure and Inventions Agreement (the "Agreement") attached as Exhibit A to Softrax's complaint. I was not offered any additional compensation or consideration of any kind in exchange for signing it, nor did I receive any. I did not retain a lawyer to review the Agreement and no lawyer was provided to me for that purpose. I was not offered the opportunity to negotiate the terms of the Agreement. As I had decided to stay with Softrax, I signed the Agreement.

13. At the time I signed the Agreement, Softrax's customer base was composed predominantly of software companies. I would estimate that, as of March 2000, something like 95% of Softrax's customers were in the business of developing, manufacturing, and/or selling software. Even today, the majority of Softrax's customers are still software and information service companies.

14. I was exposed to much of the same information about Softrax's products during the first three and a half years at Softrax as I was in the years after I signed the Agreement.

15. While I did receive a raise at this time, I was scheduled to receive that raise anyway as a result of my performance evaluation. The increase in compensation was not tied in any way to the transfer to the signing of the noncompetition agreement or my lateral transfer to the product management group.

16. As a Product Manager, I was responsible for heading up Softrax's three main product lines. I interacted with Development, Customer Service, Professional Services, and Marketing. My primary responsibility was to gather information related to product enhancement requests that could be put into the product. These primarily came through the Customer Support and Professional Services group – not from direct interaction with customers. The sheer number of requests (approximately 500 at any given time) did not allow for direct interaction with the customers. I would then put the information into business specifications, so that the Development team Product Manager, in turn, could write detailed functional specifications for the software product.

17. Throughout my time in Product Management, direct customer interaction was rare. Rather, Customer Service, Account Management, or Professional Services teams interacted directly with the customer and reported the information to Product Management. On rare occasions (fewer than five times a year, on average), I did interact directly with certain existing or prospective customers. Since mid-2004, the extent of my involvement with customers was further reduced as the Vice President of Marketing

determined that members of the product management group should no longer be interacting with customers directly.

18. In 2001 and 2002, unable to meet sales quotas, Softrax implemented company-wide bonus freezes and pay cuts.

19. In late 2001, the Product Management group was transferred to the Marketing group, where I reported to Gottfried Sehringer, the Vice President of Marketing. Mr. Sehringer changed my title to Senior Product Strategist and asked the people in my group to assume more duties related to market research and other traditional marketing functions.

20. In 2002 the Financial Product Manager – a Certified Public Accountant – was laid off, and I was given all of his responsibilities, but no additional compensation.

21. Over the next two years, I repeatedly asked Mr. Sehringer what was required to advance within the company. He repeatedly told me and others that there was no place to grow within the company.

22. In spite of that repeated representation, in late summer 2004, a new Director of Product Management was hired from outside the company. My colleagues and I in the Product Management group were not told of this position until the day before the new hire started working.

23. The new Director stayed for approximately three months, before he resigned. I believe that his resignation was triggered by his frustration with the way Softrax operated.

24. In March of 2005, Softrax was looking for another Director of Product Management. I again asked Mr. Sehringer what was needed to grow within the organization to the Director position, and he replied to me and other Product Managers that that was not an option for us. Nevertheless, in May 2005, Softrax promoted to Director one of the other Product Managers, who was younger than me (and under 40 years of age) and whose performance track record was inferior to mine.

25. From my perspective, Softrax's decision to promote a younger, less-qualified Product Manager than myself – while telling me I could not even be considered for the position – appeared to me as discrimination based on my age. I am aware that other Softrax employees have made complaints about discrimination in the workplace.

26. At that point, I concluded that I needed to leave Softrax. The primary reason that I decided to leave Softrax was that it was a hostile work environment in which employees were treated unfairly and discriminatorily, with little prospect for advancement or competitive compensation.

27. I began looking for other positions with other companies and I discovered the opportunity to work with NetSuite, Inc. ("NetSuite"). I pursued that opportunity, as I believed I was free to do under the terms of the Agreement, because NetSuite is not engaged primarily in creating or providing products or services designed for use by software or information services companies.

28. I deeply resent and strongly dispute the accusations in Softrax's papers that I have been dishonest with them. The fact is that I gave nine years of dedicated, loyal service to Softrax, for which I was "rewarded" with increasing responsibilities at

less pay, told I would have no possibility for promotion, and then passed over for promotion by a less qualified, less experienced younger employee. Under these circumstances, I did not believe that I had any obligation to inform Softrax of my future employment plans.

29. Contrary to Softrax's papers, I did not say I was taking the summer off to go sailing, or to "find myself," or anything else to that effect. Rather, during the first week of June 2005, I announced my resignation to the new Director of Product Managers, Josh Roffman, and told him that I was looking at my options and that I was going to take some time off. At the time I had this conversation, I had not yet accepted NetSuite's offer.

30. I ultimately accepted NetSuite's offer to join them in the position of "Subject Matter Expert" and, on June 9, 2005, I signed the Netsuite, Inc. Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "NetSuite Agreement"). In that Agreement I expressly acknowledged that I would not share any proprietary information I had obtained from any previous job. A true and correct copy of the NetSuite Agreement is attached hereto as Exhibit A.

31. I ended up taking four days off before starting with NetSuite. Once I joined NetSuite, I underwent initial training for several weeks. While I was still in training, in July 2005, I received a call from Softrax employee Jake Fennessy. I told Mr. Fennessy that I was working for NetSuite, and that up to this point I had only been working on-and-off. Mr. Fennessy said that I was in violation of my non-compete, but I

explained to him that NetSuite has many different areas of concentration beyond software and that none of NetSuite's confidential information was at risk.

32. As a Subject Matter Expert at NetSuite, my primary responsibility is to assist NetSuite Sales Representatives in describing the NetSuite product to prospective customers and to work with such prospective customers to identify customers' needs as they relate to compliance with public laws and accounting standards such as those mandated by the Sarbanes-Oxley Act, Generally Accepted Accounting Procedures ("GAAP") compliance, Standard Operating Procedures for accounting, and other similar rules and regulations. NetSuite's customers span a variety of industries beyond software companies, and all of its customers use the same, generic NetSuite product.

33. At NetSuite, I have absolutely nothing to do with product development, writing software development specifications, or developing product strategies. I have no influence on product development direction, defining product specifications and functionalities and bug fixes, or prioritizing the work on product functionality.

34. In my job at NetSuite, I rely on knowledge of public accounting rules and regulations and not on any of Softrax's proprietary information. In fact, information about Softrax's products and services is of no use to me whatsoever in performing my job responsibilities at NetSuite. I have no involvement in attempting to differentiate NetSuite's products from Softrax's or in persuading customers to purchase NetSuite's products over Softrax's.

35. The functions I have at NetSuite were formerly performed by NetSuite's Chief Financial Officer because of his accounting expertise. He hired me to replace him in that role so that he could devote his time and energies to other CFO functions.

36. I have never disclosed to anyone, much less anyone at NetSuite, anything that can remotely be considered to be Softrax's confidential information. I have no intention of ever disclosing any such information, and every intention of abiding by my commitment to keep such information confidential.

37. I am dependent on my position with NetSuite for my own and my family's livelihood. My family relies upon my salary, and will suffer if I am prohibited from working at NetSuite. I currently have no other employment prospects. As noted above, I had received a pay cut from Softrax at the same time I was given additional responsibilities, I was told that there was no possibility for advancement within Softrax, and then after I was falsely told that an insider would not be considered for the position of Director of Product Development, I was passed over for promotion by a younger, less experienced and less qualified co-worker. Prior to accepting to the position at NetSuite, I had been looking for another position for months and NetSuite's was the only offer I received.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 10th DAY OF AUGUST, 2005.

Patrick Rasicot

A

# NETSUITE, INC.
## EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with NetSuite, Inc., its subsidiaries, affiliates, successors or assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

1. **At-Will Employment**. I understand and acknowledge that my employment with the Company is for an unspecified duration and constitutes "at-will" employment. I also understand that any representation to the contrary is unauthorized and not valid unless obtained in writing and signed by the President of the Company. I acknowledge that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice.

2. **Confidential Information**.

(a) **Company Information**. I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly, in writing, orally or by drawings or observation of parts or equipment. I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

(b) **Former Employer Information**. I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) **Third Party Information**. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for

certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. **Inventions.**

(a) **Inventions Retained and Licensed**. I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively referred to as "Prior Inventions"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or machine.

(b) **Assignment of Inventions**. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(f) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such invention. I also agree that I will not use, disclose, reproduce, transfer or otherwise exploit any Company Inventions for any purpose other than for the benefit of the Company in the fulfillment of my duties during my employment with the Company.

(c) **Inventions Assigned to the United States**. I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

(d) **Maintenance of Records**. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and

any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

(e) **Patent and Copyright Registrations**. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

(f) **Exception to Assignments**. I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and are not otherwise disclosed on Exhibit A.

4. **Conflicting Employment**. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

5. **Returning Company Documents**. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to paragraph 3(d). In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

6. **Notification of New Employer**. In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7. **Non-Solicitation**. I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or any customers, clients, or other entities to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees, customers, or clients of the Company, either for myself or for any other person or entity.

8. **Conflict of Interest Guidelines**. I agree to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D hereto.

9. **Representations**. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

10. **Arbitration and Equitable Relief**.

(a) **Arbitration**. In consideration of my employment with NetSuite, Inc. (the "Company"), its promise to arbitrate all employment-related disputes and my receipt of the compensation, pay raises and other benefits paid to me by the Company, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder or benefit plan of the Company in their capacity as such or otherwise) arising out of, relating to, or resulting from my employment with the Company or the termination of my employment with the Company, including any breach of this Agreement, shall be subject to binding arbitration under the arbitration rules set forth in California Code of Civil Procedure Section 1280 through 1294.2, including Section 1283.05 (the "Rules") and pursuant to California law. Disputes which I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the California Fair Employment and Housing Act, the California Labor Code, claims of harassment, discrimination or wrongful termination and any statutory claims. I further understand that this Agreement to arbitrate also applies to any disputes that the Company may have with me.

(b) **Procedure**. I agree that any arbitration will be administered by the American Arbitration Association ("AAA") and that a neutral arbitrator will be selected in a manner consistent with its National Rules for the Resolution of Employment Disputes. I agree that any arbitration under this section shall be conducted in San Mateo. The arbitration proceedings will allow for discovery according to the *AAA National Rules for the Resolution of Employment Disputes,* or the Rules. I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss

and demurrers, prior to any arbitration hearing. I agree that the arbitrator shall issue a written decision on the merits. I also agree that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law. I understand the Company will pay for any administrative or hearing fees charged by the arbitrator or AAA except that I shall pay the first $200.00 of any filing fees associated with any arbitration I initiate. I agree that the arbitrator shall administer and conduct any arbitration in a manner consistent with the Rules and that to the extent that the AAA's National Rules for the Resolution of Employment Disputes conflict with the Rules, the Rules shall take precedence.

(c) **Remedy**. Except as provided by the Rules, arbitration shall be the sole, exclusive and final remedy for any dispute between me and the Company. Accordingly, except as provided for by the Rules, neither I nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration. Notwithstanding, the arbitrator will not have the authority to disregard or refuse to enforce any lawful company policy, and the arbitrator shall not order or require the Company to adopt a policy not otherwise required by law which the Company has not adopted.

(d) **Availability of injunctive relief**. In addition to the right under the Rules to petition the court for provisional relief, I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of the Employment, Confidential Information, Invention Assignment Agreement between me and the Company or any other agreement regarding trade secrets, confidential information, nonsolicitation or Labor Code §2870. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys fees.

(e) **Administrative relief**. I understand that this Agreement does not prohibit me from pursuing an administrative claim with a local, state or federal administrative body such as the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission or the Workers' Compensation Board. This Agreement does, however, preclude me from pursuing court action regarding any such claim.

(f) **Voluntary nature of agreement**. I acknowledge and agree that I am executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. I further acknowledge and agree that I have carefully read this Agreement and that I have asked any questions needed for me to understand the terms, consequences and binding effect of this Agreement and fully understand it, including that I AM WAIVING MY RIGHT TO A JURY TRIAL. Finally, I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement.

11. **General Provisions**.

(a) **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(b) **Entire Agreement.** This Agreement constitutes the entire agreement and understanding between the Parties concerning the subject matter of this Agreement and all prior representations, understandings, and agreements concerning the subject matter of this Agreement have been merged into this Agreement.

(c) **Severability**. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d) **Successors and Assigns**. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

Date: 6-9-05

[signature]
Signature

PATRICK RASICOT
Name of Employee (typed or printed)

Witness

**Exhibit A**

# LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
| --- | --- | --- |

✓ No inventions or improvements

____ Additional Sheets Attached

Signature of Employee: [signature]

Print Name of Employee: PATRICK RASICOT

Date: 6-9-05

**Exhibit B**

# CALIFORNIA LABOR CODE SECTION 2870
# INVENTION ON OWN TIME – EXEMPTION FROM AGREEMENT

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Exhibit C

# NETSUITE, INC.

## TERMINATION CERTIFICATION

### (To be completed at time of termination of employment.)

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to NetSuite, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Employment, Confidential Information, Invention Assignment and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Date: ______________________________

______________________________
(Employee's Signature)

______________________________
(Type/Print Employee's Name)

**Exhibit D**

# NETSUITE, INC.

## CONFLICT OF INTEREST GUIDELINES

It is the policy of NetSuite, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations which must be avoided. Any exceptions must be reported to the President and written approval for continuation must be obtained.

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The Employment, Confidential Information, Invention Assignment and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions which are the subject of patent claims of any other person or entity.

13. Engaging in any conduct which is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C.A. NO. 05-1342

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

AFFIDAVIT OF JIM MCGEEVER

I, Jim McGeever, state under penalty of perjury as follows:

1. I am the Chief Financial Officer ("CFO") at NetSuite, Inc. ("NetSuite"), which is located at 2955 Campus Drive, Suite 100, in San Mateo, California. I have been employed with NetSuite since January 2000. Unless otherwise indicated, I have personal knowledge of the following facts, and if called upon as a witness, I could and would competently testify to them.

2. In my capacity as the CFO, I am generally familiar with the standard practices that NetSuite utilizes in its business practices and I am specifically aware of NetSuite's customer base and its so-called "competition" with Softrax Corporation ("Softrax"). NetSuite is an Application Service Provider, which licenses its integrated Enterprise Resource Planning ("ERP"), Customer Relationship Management ("CRM"), and eCommerce solution to small and mid-sized companies of all types through its hosted products. The products are not "designed for use by software companies." The products are specifically designed for small and mid-sized companies.

Generally speaking, an ASP is a third-party that manages and distributes software based services and solutions to customers across a wide area network (*e.g.* the Internet) from a central data center. All NetSuite customers access the Service via the Internet. The customer logs into the Service, and the Customer's Customer Identification and password are authenticated by our computers. Following authentication, the customer accesses their "Home Screen" and commences their use of the Service.

3. Softrax is also a very different type of company than NetSuite. It is not an Application Service Provider with a hosted environment for its customers. To the contrary, Softrax is a standard software company, where customers purchase the software and load it onto their servers and computers for use within the company.

4. In my capacity as the CFO for NetSuite, I have direct access to NetSuite's records. I have personally reviewed those records and can state as follows: While it is true that NetSuite has some customers who are software companies – these are miniscule portion of our business and our product is not designed specifically for software companies. Since its inception in 1998, NetSuite has successfully licensed its products to approximately 11,000 customers. Of those 11,000, only 212 - **less than 2% are software companies**. Indeed, our records show that of the 212 software companies that NetSuite gained as customers, NetSuite has only "competed" directly with Softrax on less than 20 of those customers. As a result, I do not consider Softrax to be a major competitor to NetSuite. Indeed, even in those rare instances where Softrax is in the picture with NetSuite is usually in combination with other vendors such as Great Plains, SalesForce.com, and/or Siebel. In fact, our records show that we more often compete against companies other than Softrax whenever we do sell to software companies.

5. On or about June 9, 2005, Mr. Rasicot executed a confidentiality agreement in conjunction with his hiring at NetSuite. Pursuant to the terms of that agreement, Mr. Rasicot agreed as follows:

> I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to such employer, person or entity unless consented to in writing by such employer, person or entity.

6. NetSuite takes the protection of confidential information and trade secrets very seriously, as NetSuite's business depends on such information. Consequently, NetSuite is highly sensitive to Mr. Rasicot's obligations to Softrax in that regard. I have personally been in several meetings with Mr. Rasicot since his arrival to NetSuite in late June 2005, and during those meetings I have I have reminded him not to disclose any trade secret Softrax information to anyone at NetSuite. In addition, when Mr. Rasicot recently forwarded a copy of Softrax's counsel's July 19, 2005 letter to me for review, I immediately called Mr. Rasicot and specifically informed him not to share any Softrax trade secret or confidential information with anyone at NetSuite and reminded him of his contractual obligation with NetSuite not to do so.

7. To my knowledge, Mr. Rasicot has fully complied with his confidentiality obligations to Softrax. We at NetSuite have never asked Mr. Rasicot to disclose any of Softrax's confidential information, and he has never offered to disclose such information.

8. Mr. Rasicot's knowledge of product design, product functionality, and product specifications of Softrax's product is of little to no value to NetSuite. NetSuite hired Mr. Rasicot for the specific purpose of replacing me on sales calls. In the past, I have been brought into the "pre-sales" process to discuss with certain customers how NetSuite's product meets the requirements of certain public laws, regulations, and accounting standards – since the sales team has very little working knowledge of these rules and regulations, whereas I have more knowledge based on the fact that I am the CFO of NetSuite. My knowledge of Softrax was irrelevant to my performance of that

duty – and I do not expect it to be relevant whatsoever to Mr. Rasicot's performance either. NetSuite as a company is growing and strategically speaking my time is better spent than on sales calls. Mr. Rasicot was hired to replace me in these sales calls and to bring with him his deeper understanding of those public laws and regulations.

Signed under the pains and penalties of perjury on this ___ day of August, 2005.

Jim McGeever

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT
C.A. NO. 05-1342

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

AFFIDAVIT OF MELISSA D. SAUNDERS

I, Melissa D. Saunders, state under penalty of perjury as follows:

1. I am currently the Director of Sales Engineering of NetSuite, Inc. ("NetSuite"). I have been with NetSuite since November 2003. Unless otherwise indicated, I have personal knowledge of the following facts, and if called upon as a witness, I could and would competently testify to them.

2. In my capacity as the Director of Sales Engineering, I am Patrick Rasicot's first line supervisor. In turn, I report to the Senior Vice President of Worldwide Sales. Mr. Rasicot was hired as a "Subject Matter Expert" in NetSuite's Sales Organization.

3. Mr. Rasicot -first started working for NetSuite on June 20, 2005. For approximately the first six weeks, Mr. Rasicot attended product and sales training for the NetSuite product line. He was also introduced to people within the Sales Organization with whom he would be working.

4. In his position as a Subject Matter Expert at NetSuite, Mr. Rasicot has absolutely nothing to do with product development, writing software development specifications, or developing product strategies. He has no particular influence on product development direction, defining product specifications and functionalities and bug fixes, or prioritizing the work on product functionality. Indeed, his value to NetSuite is his specific knowledge of public regulations and the application thereof to some of NetSuite's customers.

5. Now that Mr. Rasicot's core duties have commenced, the following is a brief description of his job as a Subject Matter Expert. Mr. Rasicot's primary responsibility is to assist NetSuite Sales Representatives in describing the NetSuite product to prospective customers and to work with such prospective customers to identify the customer's needs as it relates to compliance with public laws and accounting standards such as those mandated by the Sarbanes-Oxley Act, Generally Accepted Accounting Procedures ("GAAP") compliance, Standard Operating Procedures for accounting, such as SOP 81-1, SOP 98-9, SOP 97-2, Vender Specific Objective Evidence ("VSOE"), and other similar regulations.

6. Specifically, Mr. Rasicot will engage after a NetSuite Sales Representative completes a "first call" with a contact at a prospective customer and a follow up sales call is set up with more senior executives such as the Chief Financial Officer. Mr. Rasicot will join the Sales Representative in the second call for the express purpose of describing how the functionality of the NetSuite product meets the requirements of the above-listed public laws and regulations.

7. Thereafter, Mr. Rasicot continues to participate with the Sales team in identifying the needs of the customers and working with NetSuite Sales Engineers after analyzing the prospective customer's requirements, to develop solutions for the identified requirements, and then to demonstrate how the NetSuite product can meet the prospective customer's requirements.

8. Mr. Rasicot is an integral part of the sales process. Because of his knowledge of public laws and regulations, Mr. Rasicot lends credibility to NetSuite's presentation of its product solutions to prospective customers as it relates to understanding the requirements of the public laws and regulations and how NetSuite will solve the prospective customer's requirements.

9. To my knowledge, Mr. Rasicot has fully complied with his confidentiality obligations to Softrax and no one at NetSuite has ever asked Mr. Rasicot to disclose any of Softrax's confidential information.

Signed under the pains and penalties of perjury on this ___ day of August, 2005.

Melissa D. Saunders

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C.A. NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff,

v.

PATRICK RASICOT,
Defendant.

AFFIDAVIT OF MEI LI

I, Mei Li, state under penalty of perjury as follows:

1. I am currently the Vice President of Corporate Communications of NetSuite, Inc. ("NetSuite"). I have been with NetSuite since January 2000. Unless otherwise indicated, I have personal knowledge of the following facts, and if called upon as a witness, I could and would competently testify to them.

2. In my capacity as the Vice President of Corporate Communications I am in charge of all aspects of Public Relations, Investor Relations, Analyst Relations, and internal communications. It is my responsibility to develop, review, and approve (final approval being with the CEO) all press releases issued by NetSuite.

3. I have reviewed the Affidavit of Gottfried Sehringer – specifically paragraph 12 thereof, wherein Mr. Sehringer makes unfounded representations about how NetSuite presents itself in the marketplace.

4. NetSuite's products are not "designed for use by software companies." NetSuite's products are designed for small and mid-sized businesses in general and

NetSuite highlights different functionalities of its product to different sectors of the market. Our customers range from telecommunication and wireless companies, to insurance, to consumer goods ,to manufacturing, and include, wholesale distribution, real estate, architecture and design, services, and software companies. Attached hereto as **Exhibit A** is a true and correct copy of our "Customers" page from NetSuite's website. Of the 18 "Featured Success Stories" customers – only one is a "software company."

5. Indeed, our Website also specifically lists the Industries to which NetSuite's product is marketed, which include Non-profit, Wholesale & Distribution, Electronic Commerce, Software, Advertising, Agriculture, Manufacturing, Retail, and Professional Services industries. Attached hereto as **Exhibit B** is a true and correct copy of our "Industries" web page from NetSuite's website.

6. Mr. Sehringer mentions one NetSuite press release issued by NetSuite on May 18, 2004. I am familiar with this press release. Out of approximately a total of 260 press releases issued by NetSuite since 1999, this is the only press release NetSuite has ever issued specifically mentioning software companies.

7. Mr. Sehringer describes Softrax as a "director competitor" to NetSuite. However, I had never heard of the company until today when I was shown Mr. Sehringer's statements.

Signed under the pains and penalties of perjury on this 9th day of August, 2005.

Mei Li

A

NETSUITE
ONE SYSTEM. NO LIMITS.

Home | Products | Customers | Industries | Services | Partners | News & Events | Resources

1 877 NETSUITE

Home > **Customers**

**Customer Success Stories**

ABBYY USA Software House, Inc.
Accordent
AD Systems
Advantage Asia Pacific Ltd
Aeris.net
Afro-Caribbean (AC) Healthcare Supply
Alan Stewart Homes, Ltd.
Alpha Thought Global, Inc.
Alligator River Growers
Alpine Investors
America Property Capital, LLC
Amicus Cellars & X Winery
Associated Grocers
BallYard Gallery
Big Toy Express
Biuti Profesional
BizActions LLC
BizCom USA/CX2 Technologies
Blueprint Global Services
Bonjour Fleurette
Buendia Coffee
California Software
Calley & Currier
Carolina CAD
CaseCentral
Cayman Islands Department of Tourism
Chicago Rubber & Seal
China Manufacturing Network
Clean Mark Group
Country Pet Foods
Courtroom Connect
CPI USA
Custer Battles

# CUSTOMERS



## VIEW BY INDUSTRY

Select Industry

NetSuite has thousands of customers worldwide ranging in industry, business size and software solutions. We encourage you to read these stories of tremendous savings, both through reducing IT costs, and more importantly through streamlining business operations.

## FEATURED SUCCESS STORIES: Telecommunications/Wireless

Aeris.net



**Aeris.net**
"The biggest bang for the buck today is in how much better we communicate between departments and how effective we are at solving customer issues."
—Peter Stone, CFO

WATCH THE VIDEO DOWNLOAD THE STORY READ THE STORY

SCH

DASH

ROLE

Relat
Indus
Webin

### Insurance

Filice



**Filice Insurance**
"NetSuite's commissions module was a major selling point for us. We couldn't find any other system that offered such functionality. Better yet, this particular module alone saves us a lot of money – at least $100,000 a year – because the way we calculate commissions is very sophisticated and it can take a long time for the accounting staff to run the numbers correctly."

- Watch video
- Read the story
- Download the story

D3Data LLC
Dale Thomas Popcorn
Davis Anderson
Decision Management Company
Design Cinema Privee
Designs for Health
Deudraeth
Document Science
Drumbalaya
Drummond Media
DTE Energy Technologies
DuPont Air Products NanoMaterials LLC
eBabka.com
Elcometer
Electronics Line
Engius LLC
EnergyFirst, a division of NutriScience Corp.
Explore Consulting
Filice Insurance
firstRain
Forest YMCA
Foster's Promotional Goods Inc.
freshFlowers
GHA Technologies
Glass Dimensions
Hampton City Schools
Heartstrings Enterprises
Helio Solutions
High Wire Networks
Home America Lending
ID8 Media, Inc.
Innova Disc Golf
IQ Biometrix, Inc.
JnD Consulting
JR's Sports Collectibles
JTA Property
Justoffbase
Jubilee Chocolates
Kassner Graphics
KIBAN Corporation

—Patrick Arnold, Vice President of Sales

## Consumer Goods



**eBabka.com (Aunt Heddy's Bakery)**
"The common data set for the customers, partners and employees is, simply put, the heart and soul of NetSuite. All of our business functions—customer interactions, shipping, order management, marketing—revolve around that core data set."

—Gary Root, CEO

- Watch video
- Read the story
- Download the story

## Manufacturing



**China Manufacturing Network**
"NetSuite is so easy to use that I've saved probably $50,000 to $100,000 in IT and configuration costs over the year."

—Everette Phillips, President and CEO

- Watch video
- Read the story
- Download the story



**DuPont Air Products NanoMaterials LLC**
"With NetSuite, we're more closely linked with our customers and this allows us to better support them, so it eventually will affect our bottom line in a positive way."

—Robert Grashoff, CEO

- Watch video
- Read the story
- Download the story



**Novak Conversions Inc.**
"We make a change in one place, and NetSuite changes it everywhere. It is the repository for all our data. It is the center of our business."

—Eric Forsberg, Vice

- Watch video
- Read the story
- Download the story

La Jolla Institute

Lightyear Technology, Inc.

Littlearth

Lohmueller & Associates, Inc.

Martor USA

Mavrik Jewelry

Mayday Mayday! Inc.

Meredith Management

Miglia Technology Ltd.

Millennium Venture Group

MiniCo, Inc.

MobiDepot

Mobile Productivity

Mobileation.com

NAFFA International, Inc.

National Society of Collegiate Scholars

Nelson & Pickens L.C.

New England Arbors

Niche Retail

Novak Conversions Inc.

Oakland Athletics

Oriel Wines

PAC International, Inc.

Pioneer Organics

Poulter Company

Projector Doctor

Qualitek Services Inc.

Randall Scott Cycle Company

Resera, Inc.

Retail Management Solutions

RLE Technologies

Rococo Chocolates

S&S Custom Wood Moldings

Saffron Rouge

Sansar Solutions

Secara

SECPay Ltd

Similasan USA

SmartSynch, Inc.

SoundCom

President

## Wholesale / Distribution



**TonerZone.com**
"NetSuite has helped us close a lot of deals. Without NetSuite, I would need five additional people — up to three in shipping and a couple in customer service — to handle our current volume."

—Ilan Douek, President

- Watch video
- Read the story
- Download the story



**Lightyear Technology, Inc.**
"The UPS® integration is a great feature for our customers. Oftentimes they would ask us for status updates and now we can provide it immediately. Instead of having to go to the shipper for the data, it is in our database and it doesn't matter who they call—customer support, accounting etc.—we are all able to access it immediately."

—John Borden, COO

- Watch video
- Read the story
- Download the story



**Elcometer**
"I want to more than double my business over the next five years, and the only cost-effective way to do this is with NetSuite Small Business."

—Joe Walker, Vice President

- Watch video
- Read the story
- Download the story



**MiniCo, Inc.**
"It worked the very first day. It was intuitive to get the order-taking system running on our own."

—Marilyn Leslie, CFO

- Watch video
- Read the story
- Download the story

Spring Mountain Capital

Sun International

Sunset Companies

The Association of Film Commissioners International

The End Records

The Grove Consultants International

TimeZoneOne

TonerZone

Total Immersion Swimming

TowerStream Corporation

Trailblazer Studio

TTI Instruments

Utility Safeguard

VimCo / Peg-lok

Vivitek, a member of the Sun Chemical Group

Web Recruit

Wine Accents

WineGlobe

Workforce Solution Inc.

WorldLingo



**Design for Health**
"Using NetSuite's SFA/CRM tool, our salespeople can track their sales and contacts in a very simple format. And it integrates directly into our company's financial information, part of the same NetSuite application. It is a beautiful resource for us."

—Jonathan Lizotte, Founder and CEO

- Watch video
- Read the story
- Download the story

## Real Estate



**Resera, Inc.**
"NetSuite shaves off at least a full week from my schedule every month and about a day and a half every week for my sales team."

—Courtenay Yates, Vice President and General Manager

- Read the story
- Download the story



**Meredith Management**
"With NetSuite, we have accurate, up-to-date information at our fingertips... and faster reporting means quicker budget decisions and better cash flow."

—Jonathan Hickok, CFO

- Watch video
- Read the story
- Download the story

## Architecture / Design



**ID8 Media, Inc.**
"Now we can design a marketing campaign based on who is buying what. Before it was just a canned campaign."

—Atul Bagga, Director of Marketing

- Watch video
- Read the story
- Download the story

**Services**



**Lohmueller & Associates, Inc.**
"NetSuite is a much, much better fit for probably 80 percent of our clients."
—Rufus Lohmueller, Founder and President

- Watch video
- Read the story
- Download the story




**Projector Doctor**
"NetSuite substantially improves the infrastructure and valuation of our company."
—Dean Mitchell, Partner

- Watch video
- Read the story

**Software**



**Document Sciences**
"Before NetSuite we would have to go through three different spread-sheets to establish what exactly was happening in our global sales pipeline."
—David Barker, Director of IT

- Watch video
- Read the story
- Download the story

**Software Reseller**




**KIBAN Corporation**
"With NetSuite, I saw the opportunity to bring enterprise-class capabilities to SMBs at an affordable price."
—Robert Rudzki, President and Founder

- Watch video
- Read the story
- Download the story

E

NETSUITE
ONE SYSTEM. NO LIMITS



Software
Wholesale / Distribution
Electronic Commerce
Advertising
Agriculture
Manufacturing
Nonprofit
Professional Services
Retail

# INDUSTRIES



Every industry has its own unique business processes and needs. For that reason, many companies today are demanding industry-focused solutions that meet their goals in every possible way.

With our Web-based, hosted solutions, NetSuite supports businesses across a wide variety of industries. Our solutions can be deployed faster and require less customization than generic packages that take a "one-size-fits-all" approach. And in case additional fine-tuning is needed, we offer extensive configuration and customization capabilities. Our Professional Services Team, along with our extensive network of local NetSuite Solution Providers, can set up the application, consult on best practices, and train your staff on all of NetSuite's capabilities.

**Learn more about how NetSuite works in your industries**




Software
Wholesale & Distribution
Electronic Commerce
Advertising
Agriculture
Manufacturing
Nonprofit
Professional Services
Retail

FREE TRIAL
SCHEDULE A DEM
CONTACT ME

WHITEPAPER
FREE Aberde
Executive
Summary

ROLE-BASED DEMO
Watch
Role-Based
Demo

**Related Links**
**Customer Success Stories**
**Webinars**

 Copyright ©2005 NetSuite Inc. All rights reserved.

11, C

COMMONWEALTH OF MASSACHUSETTS

RECEIVED & FILED 8/11/05 8/15/05 CLERK OF THE COURTS NORFOLK COUNTY

NORFOLK, ss. SUPERIOR COURT
C. A. NO. 05-1342

| | |
|---|---|
| SOFTRAX CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| PATRICK RASICOT, | ) |
| Defendant. | ) |

REPLY AFFIDAVIT OF ROBERT D. O'CONNOR, JR.

I, Robert D. O'Connor, Jr. state under penalty of perjury as follows:

1. I am currently the President and Chief Executive Officer of Softrax Corporation ("Softrax" or the "Company") and have held those or comparable positions since I helped to found the Company in 1985, under the name The RBS Group, Inc. The Company changed its name to Softrax Corporation in 1998.

2. I have read the affidavits of Mei Li, Melissa Saunders, Jim McGeever and Patrick Rasicot, each from NetSuite, filed yesterday afternoon. I submit this affidavit in reply to those affidavits, in order to correct some of the incorrect information therein.

Mr. Rasicot Is Competing with Softrax

3. The suggestion that Mr. Rasicot's duties and responsibilities as a NetSuite Subject Matter Expert are entirely different than the duties he had at Softrax is simply wrong.

4. Ms. Saunders, to whom Mr. Rasicot reports, acknowledges that Mr. Rasicot works with the NetSuite sales team "in identifying the needs of customers and working with NetSuite Sales Engineers after analyzing the prospective customer's requirements, to develop solutions for the identified requirements, and then to demonstrate how the NetSuite product can meet the prospective customer's requirements." Saunders Aff., para 7. Mr. Rasicot performed identical tasks and functions while employed by Softrax. See paragraph 11 of my first affidavit and paragraphs 2 - 8 of Mr. Sehringer's affidavit.

5. Remarkably, Mr. Rasicot now says he had "rare" contact with customers when he was working for Softrax. However, in his most recent employee evaluation Mr. Rasicot himself directly contradicts his sworn statement.

6. For example, Mr. Rasicot includes among his professional accomplishments, the following:

> "*Worked continually with customers* on support issues so that Customer Support could be lauded. This included last-second, drop-everything, 'you're the only one that can help us' trips to customer sites." *See* Exhibit A, Employee Performance Review, p. 6 (italics added).

This directly contradicts Mr. Rasicot's sworn testimony that his job "did not allow for direct interaction with customers" and that "[t]hroughout my time as a Product Manager, direct customer interaction was rare." Rasicot Aff, par. 11 and par. 12.

7. For another example, Mr. Rasicot states in his 2005 employee performance review that he

> "played a key role in securing numerous sales by working with sales, pre-sales and the prospects up until the time of closure." *See* Exhibit A, Employee Performance Review, page 6.

Again, this directly contradicts Mr. Rasicot's sworn statement that he interacted with prospective customers "on rare occasions." Rasicot Aff, par. 17.

8 . Ms. Saunders' testimony also provides consistent confirmation that Mr. Rasicot's position and job responsibilities at NetSuite place him in a directly competition with Softrax in the software industry. For one example, she states that:

> "Mr. Rasicot's primary responsibility is to assist the NetSuite Sales Representatives in describing the NetSuite product to prospective customers and to work with such prospective customers to identify the customer's needs as it [sic] relate to compliance with public laws and accounting standards such as those mandated by the Sarbanes-Oxley Act, Generally Accepted Accounting Procedures ("GAAP") compliance, *SOP 81-1, SOP 98-9, SOP 97-2 and Vendor Specific Objective Evidence ("VSOE") and other similar regulations*." Saunders Aff., par. 5 (italics added).

This description of Mr. Rasicot's position at NetSuite could not have been more telling. SOP 98-9, SOP 97-2 and VSOE apply *exclusively* to the rules of revenue recognition for software products. SOP 81-1 applies to revenue recognition for software products but also has application in other industries. In other words, Mr. Rasicot is working with the NetSuite sales representatives who are targeting the software industry, and with prospective customers in the software industry, to position NetSuite's products (which NetSuite states were "tailor made" for the software industry), in the most positive light, including, necessarily, discussing how such products might compare to those of other vendors (e.g. Softrax).

NetSuite Competes Directly With Softrax

9. One can put to rest immediately the claim that NetSuite does not compete against Softrax in the software industry. In describing its software products for software companies, NetSuite lists among the product's functionalities: revenue recognition, deferred revenue management, renewals management, advanced billing, pricing management, revenue forecasting, GAAP and regulatory compliance, complete financials, full application integration, reduced overhead. (*see* Exhibit B, NetSuite Website: Software) On Softrax's website, Softrax identifies among its product functionalities, the following: revenue recognition, deferred revenue, complex billing, order management, revenue forecasting, financials, facilitation enterprise integration, supports compliance with Sarbanes-Oxley, SEC and FASB, and more effective, accurate and compliant revenue management. (*see* Exhibit C, Softrax Website: Solutions) In other words, the products offered by NetSuite directly compete with the products offered by Softrax.

10. The NetSuite affidavits say that certain officers have not heard of Softrax, that NetSuite's customers in the software industry represent less than two percent (2%) of NetSuite's entire customer base (the revenue percentages were not provided), a percentage NetSuite describes as "miniscule," and that NetSuite is only 'aware of' twenty (20) times in which it has come up against Softrax as a competitor with prospective software customers.

11. It is true that Softrax is a much smaller company than NetSuite. Compared to NetSuite's thousands of customers, we have between two hundred and three hundred customers. We have one central office in Canton, Massachusetts. NetSuite is a large California based company with worldwide operations and offices in the United States, Canada, the United Kingdom, Singapore, Australia. It is therefore not surprising that NetSuite's Vice President of Corporate Communications had not heard of Softrax. Likewise, it did not surprise me to learn that NetSuite's Chief Financial Officer does not consider Softrax to be a "major competitor" to NetSuite.

12. However, other managers at NetSuite clearly have identified Softrax as a competitor within the software industry. NetSuite has, for example, attempted to hire at least two of our leading sales representatives. In other words, within the business unit at NetSuite which is targeting the software industry, Softrax is readily recognized.

13. In addition, what the NetSuite affidavits do not say is that NetSuite has been aggressively trying to increase its market penetration in the software industry. In fact, on its website, where NetSuite lists the different industries in its target market, at the top of the list is the Software industry (*see* Exhibit D, NetSuite Website: Industries) – a list that is not alphabetical.

14. Moreover, notwithstanding the repeated statements in the NetSuite affidavits that the NetSuite target market is "small and mid-sized businesses in general," the company's website very clearly represents the different business lines of the larger company to be industry focused. In fact, this industry focus and the acknowledgement of the uniqueness of different industries' business requirements is a primary, highlighted theme in NetSuite's marketing message. For example, NetSuite states on its "cover page" for the industries it targets:

> "Every industry has its own unique business processes and needs. For that reason, many companies today are demanding industry-focused solutions that meet their goals in every possible way. . . . Our solutions can be deployed faster and require less customization than generic packages that take a "one-size-fits-all" approach." *See* Exhibit D.

15. NetSuite's website also includes separate pages for each of the industries which it targets. On these pages, the marketing message for each industry is different and specific to that industry. For example, on the WebPage for the Software industry, NetSuite states:

> "Hundreds of software companies run their business on NetSuite – and we do too. Here's why NetSuite is the best application for software companies. . . .
>
> Financials are complex in any industry, and they are arguably the most complex in the software industry. The stumbling block for most software companies is managing revenue recognition and billing schedules – and ensuring compliance. . . ."

*See* Exhibit B. NetSuite's web site goes on to boasts that it offers "the best application for software companies" and "Integrated Back-Office with Software-Specific Features." The NetSuite website in fact goes on at length about the unique features its product has for software companies

16. In contrast, for example, the message on its WebPage for the Retail industry begins as follows:

> "Consolidation in the retail industry means that you have to work even harder to differentiate your business. That's why improving customer service is key to success. Knowing who is buying what and which promotions are successful—and then using that data to shape strategic decisions—can help you streamline your business and increase your profits."

*See* Exhibit E, NetSuite Website: Retail.

17. As stated previously, NetSuite has also represented to the public that products it sells to software companies are "tailor-made" for the software industry. *See* Exhibit F, May 18, 2004 NetSuite Press Release, p. 1. In addition, NetSuite offers a webinar entitled "NetSuite for Software Companies." *See* Exhibit B.

18. These numerous public statements by NetSuite show the falsity of Mr. McGeever sworn statement that "[NetSuite's] products are not 'designed for use by software companies.'" McGeever Aff., para. 2.

<u>Softrax Has Consistently Protected Its Confidential Information</u>

19. Mr. Rasicot was required to sign an Employee Proprietary Information Agreement when he became an employee of the Company in September1996. A copy of his signed confidentiality agreement is attached hereto as Exhibit G. At that time, the Company had not yet changed its

name to Softrax but rather had the name, The RBS Group. The indisputable fact that Mr. Rasicot signed the confidentiality agreement shows the utter falsity of Mr. Rasicot's sworn statement that he was not required to sign a confidentiality agreement when he was first hired. Rasicot Aff, par. 11.

20. Within two years thereafter, Mr. Rasicot was again required to sign a second NonDisclosure and Inventions Agreement, again with the Company when it was known as The RBS Group, prior to its 1998 corporate name change. A copy of that signed confidentiality agreement is attached hereto as Exhibit H. Again, the existence of this signed document is directly contrary to Mr. Rasicot's sworn statement that he was not required to sign a confidentiality agreement at any time during the first three and a half years following his initial employment by Softrax. Rasicot Aff, par. 11.

The Non-Competition Agreement Was Supported by Consideration

21. Mr. Rasicot was hired by Softrax Corporation in or about September 1996 to serve as a project manager in Softrax's implementation services group. His starting salary was $62,000. By April 1999, less than three years later, his annual salary had increased to $82,000. *See* Exhibit I, Payroll record. That remained his annual salary until he became a product manager in the following year. See Exhibit J, Payroll record.

22. In March 2000, Mr. Rasicot was offered and accepted the position of Product Manager which at that time reported into the Software Development group. Because of the change in department, the move was not called a promotion. However, with the new position came an increase in his annual salary to $91,350, an increase of almost $10,000 over his then current annual salary of $82,000.[1] *See* Exhibit K, March 13, 2000 Offer Letter. This is directly contrary to Mr. Rasicot's sworn statement that his annual salary increase in March 2000 was "not tied in any way" to his assumption of the new position as Product Manager in the Software Development Group. Rasicot Aff, par. 15. By the time he left the Company, in June 2005, his salary was over $100,000.

23. Mr. Rasicot's assumption of the new position as Product Manager, which came with the much higher annual salary, was contingent on his signing a Non-Competition, NonDisclosure and Inventions Agreement. *See* Exhibit K. This fact is directly contrary to Mr. Rasicot's sworn statement that he received no "consideration of any kind" for signing the Non-Competition, Non-Disclosure and Inventions Agreement. Rasicot Aff, par. 12 and par. 15.

Mr. Rasicot Resigned Voluntarily and There Was No Age Discrimination

24. Over fifty percent (50%) of the Company's current employees are forty years of age or older nor has there ever been an age discrimination claim filed against Softrax. Mr. Rasicot's

---

[1] The figure Mr. Rasicot gives as his annual compensation for 2000 reflects his compensation for calendar year 2000. Because Softrax does not use the calendar year as its fiscal year, the figure Mr. Rasicot provides is misleading since it includes his bonus payments from two different fiscal years.

age had no bearing whatsoever on Softrax's decision to promote Josh Roffman as Director of Product Marketing.

25. Gottfried Sehringer, the Vice President of Marketing, to whom Mr. Rasicot reported directly, encouraged Mr. Rasicot to develop his skills so as to be able to advance within the organization. While acknowledging that it would be difficult to give Mr. Rasicot the "director" title he sought given the Company's then current size and structure, he stated,

> "If you are truly looking for the Product Management Director position, I would encourage you to dive into some of the areas highlighted in the development area [of the employee evaluation form]. Those will get you there. I think previously Lou, and now the to-be-hired Director could help you get that experience." *See* Exhibit A, Employee Performance Review, page 8.

Mr. Sehringer also identified, as ways in which Mr. Rasicot could advance his career development, the following:

> "Take product management course.
> Proactively look for project to expand your current responsibilities."

Both of these entries from Mr. Sehringer directly contradict Mr. Rasicot's sworn statement that Mr. Sehringer told him there was no room for growth for him within the Company. Rasicot Aff, par. 24.

26. When the position for a Director of Product Management was re-opened in early 2005, Josh Roffman, the only other Senior Product Strategist besides Mr. Rasicot, applied for and won the position. This directly contradicts Mr. Rasicot's sworn statement that Mr. Sehringer told Mr. Rasicot and the other product managers that they were not eligible to apply for the Director position – a contradiction which he himself acknowledges. Rasicot Aff, par. 24.

Mr. Rasicot, Misstated His Intentions and Subsequently Lied about his Position at NetSuite

27. As stated in my earlier affidavit and in the affidavits filed by Mr. Sehringer and Mr. Milligan, Mr. Rasicot told each of us, separately and directly, that he was planning to take the summer off to sail and think about what he would do next. In the email that I sent out, company-wide, to our employees announcing Mr. Rasicot's resignation and praising his past work for the Company, I stated:

> "Pat has decided it's time for a change and will be spending the summer sailing."

*See* Exhibit L, June 15, 2005 Email.

Mr. Rasicot replied to my email as follows:

> "Thank you – very much ........ said with a smile on my face ....."

*See* Exhibit M, June 15, 2005 Reply Email. There was no suggestion that I had misunderstood his statement to me that he would be spending the summer sailing. Unfortunately, it was only later that I understood why he was smiling.

28. On June 3, 2005, Mr. Rasicot received an email with the shipping information relating to a package being delivered to him by NetSuite's Finance & Administration Department. *See* Exhibit N, June 3, 2005 Email. The same day, he announced his resignation from Softrax. In his affidavit, Mr. Rasicot states that he had "not yet accepted NetSuite's offer [of employment]" when he handed in his resignation. Rasicot Aff., para 29. This kind of statement is game-playing. He had the offer and accepted it within a week, by his own admission, taking off only four days after leaving Softrax before starting with NetSuite. Rasicot Aff., para. 29 and para. 30.

29. Mr. Rasicot's purported indignation at being accused of dishonesty is ludicrous given the series of misrepresentations outlined above. Moreover, the dishonesty in his affidavit is only a continuation of the dishonesty he had previously practiced against the Company. As set forth in my previous affidavit, dated July 29, 2005, Mr. Rasicot deliberately attempted to hide, with *deliberate and repeated* misrepresentations to myself and other officers of Softrax, his intended and then actual employment relationship with NetSuite. Specifically, prior to his departure from the Company on June 17, 2005, Mr. Rasicot told me directly that he planned to take the summer off to sail. When Mr. Rasicot was confronted, a month later, on July 18, 2005, by Softrax's CFO, Jake Fennessy, with respect to the rumor that Mr. Rasicot was working for NetSuite, Mr. Rasicot told Mr. Fennessy that he was only working as an outside contractor for NetSuite, for two days a week, and limited strictly to implementing NetSuite's software in the manufacturing industry. He repeated this false representation to another officer of Softrax, David Milligan, the following day. The very next week we learned from NetSuite that Mr. Rasicot was, in fact, and contrary to his representations, a fulltime employee at NetSuite where he held the position of Subject Matter Expert, and worked with NetSuite's sales force, professional services teams and customers – a position, in other words, where the proprietary and confidential information he acquired at Softrax was most at risk of disclosure and being used against Softrax in the sales context.

<u>Mr. Rasicot's Alleged Potential Hardship</u>

30. Mr. Rasicot has no children. He is married and his wife has a full time job. Mr. Rasicot has elected not to take any health or dental care coverage from Softrax because he is carried on his wife's coverage. Mr. Rasicot owns a sailboat and takes trips to Europe. When Mr. Rasicot told people at Softrax that he was taking off the summer to sail and think about his next steps, there was no suggestion that taking such time off would cause him any hardship. Mr. Rasicot's sworn statement that his "family" relies upon his salary is misleading, at best. Rasicot Aff, par. 37.

<u>NetSuite Will Enjoy an Unfair Competitive Advantage If Mr. Rasicot Remains</u>

31. NetSuite says it hired Mr. Rasicot for his general expertise regarding published accounting standards and revenue recognition standards. This is not believable Mr. Rasicot is

not a certified or trained accountant. There are plenty of trained and certified accountants expert in the Subject Matter Expert field that NetSuite has identified.

32. It is clear that NetSuite is interested in the special expertise, grounded in Softrax confidential and proprietary information, that Mr. Rasicot gained at Softrax, at Sofrax's expense, and with the full knowledge that the information was proprietary and of competitive value. In particular, though not an exclusive listing, Mr. Rasicot learned at Softrax

- how software can be designed to support revenue recognition and accounting rules for the softwareindustry,
- what companies within the software industry need and the broad range of their business processes and requirements,
- how to "sell" business software to software customers,
- what software products are available to fulfill software industry business requirements and the competitive strengths and weaknesses of the different product offerings (including, first and foremost, the products of Softrax),
- how to bridge functionality gaps encountered by software industry customers,
- where those functionality gaps exist in products currently on the market, and
- how to conduct a software implementation process with a software company so as to achieve optimal results in terms of instituting 'best practices,' dovetailing the software configuration to the business processes, and successfully addressing specific customer needs and concerns.

All of this knowledge is based on confidential and proprietary information Mr. Rasicot received at Softrax, from his close work with the sales, professional services, customer support and development organizations and from his interface with Softrax customers and prospects. In other words, his value in the position he is described as having by Ms. Saunders could only be in businesses which have developed financial/business software to be marketed and sold to software and information companies.

Signed under the penalty of perjuries this 11th day of August, 2005.

Robert D. O'Connor, Jr.

A TRUE CO
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

Exhibit A

EXHIBIT – A

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## General Instructions

This performance appraisal form provides company-wide standards for evaluating employee performance against specific criterion and is an important part of the ongoing process of employee development. It is a communication tool, which enables the employee and supervisor to measure performance against mutually agreed upon standards and objectives. This performance appraisal form should be completed as part of the annual review process for all employees, but may be used at any time to document performance.

To get the maximum benefit from performance appraisals, employees and supervisors should be equally involved in the appraisal process. This Evaluation Form include the following sections

I. Performance Criterion – Supervisor's Evaluation
II. Performance Criterion – Employee Self Evaluation
III. Accomplishments, Jobs Objectives and Goals
IV. Areas of Strength and Development
V. Career Planning
VI. Additional Comments
VII. Signature Page

Following are guidelines to assist you in this process:

1. The employee enters their identification information by clicking on the header of this page.
2. The employee completes Section II- Employee Self Evaluation and other sections as instructed by his/her supervisor. Once the sections are completed the employee submits the electronic copy of the form to his/her supervisor. The supervisor reads the Employee's Self Evaluation to ensure that the employee's feedback is considered, and then completes Section I- Supervisor's Evaluation. The Supervisor's and the Employee's Self Evaluation will be reviewed together at the"face to face" Performance Review Meeting.
3. Once the form is returned to the supervisor, the Performance Review Meeting will be scheduled with the supervisor and the employee. During this meeting, in addition to review the completed sections, all remaining sections will be completed and new job objectives will be agreed upon and documented.

**The following performance rating definitions should be used.**

Please place an "X" in the box to the right of the appropriate rating in each area in Section I and II.

**Consistently Exceeded (CE)** Performance has been outstanding. All job requirements were consistently exceeded which resulted in outstanding job performance.

**Often Exceeded Requirements (OE)** Performance has been fully satisfactory and often exceeds requirements. All job requirements were successfully met and were often exceeded.

**Fully Met Requirements (FM)** Individual successfully met job requirements. Performance has been satisfactory, meeting all key position requirements. Occasionally exceeded performance expectations in some areas.

**Partially Met Requirements (PM) *** Individual successfully met some but not all fundamental requirements of job. Performance improvement is needed to fully meet job requirements.

**Did Not Meet Requirements (DM)*** Job performance did not meet any key requirements of job. Performance must be improved to meet fundamental requirements of job.

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | |
|---|---|---|---|
| Employee Name | Pat Rasicot | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | Dept.: | Marketing |
| Review Period | From June 2001 | To | February 2005 |

## SECTION I: PERFORMANCE CRITERION - SUPERVISOR'S EVALUATION

Following are job-related skills and abilities. Consider each characteristic separately and check the appropriate level of performance using the performance definitions as a guide. Please give comments and examples illustrating the reason for your ratings.

**Job Knowledge and Technical Skills:** Level of proficiency regarding content and procedures of the job and field of specialization. Includes ability to acquire and apply current as well as new knowledge and skills.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | X | | | | | | | | |

**Quality of Work:** Thoroughness, accuracy and attention to detail in executing job assignment and special projects.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Productivity:** Amount of work accomplished based on reasonable and expected levels.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Reliability:** Attendance and completion of job responsibilities within established time frames and with normal supervision.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Initiative:** Originates, develops and follow through on constructive tasks and responsibilities in a resourceful and logical manner.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Problem Solving Skills:** Effectively resolves situations and issues through accurate diagnosis, negotiation and execution.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | X | | | | | | | | |

**Organizing Skills:** Effectively plans, prioritizes and schedules workload to ensure on time completion of responsibilities.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Analytical Skills:** Ability to analyze and evaluate information in a logical and systematic manner.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Adaptability:** Productively adjusts to changes in the work situation, such as new people, ideas, assignments, procedures, etc.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | | | |

**Working Relationships:** Work effectively with others to achieve organizational objectives. Resolves issues appropriately. Recommendations are respected and readily considered by others.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | X | | | | |

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

**Communication/Documentation Skills:** Effectively communicates information verbally and in writing. This includes documentation of work such as records or reports, and presentation skills.

| *CE | | *OE | | *FM | X | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Judgment:** Ability to judge when to act independently, delegate downward, or refer situations to upper management. Actions are consistent with corporate direction and directives.

| *CE | | *OE | X | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Employee Relations Skills:** Develops and maintains positive work climate for subordinates. Demonstrates consistency and fairness in administering policies and procedures.

| *CE | | *OE | | *FM | X | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Please comment on the overall value of the employee to your group.**

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

Pat, You are a key contributor to the marketing team. I rely on and trust your judgment and advice regarding product functionality and problem resolutions. You have jumped in and solved many customer issues on short notice and your expertise is valued greatly by many coworkers and customers. Thank you for your commitment and many important contributions to Softrax.

P.S.: I know those ratings scales are always hard to fill out. I tend to start more in the middle to leave some room for highlights and be able to differentiate somewhat between the different areas.

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION II: PERFORMANCE CRITERION - EMPLOYEE SELF EVALUATION

Following are job-related skills and abilities. Consider each characteristic separately and check the appropriate level of performance using the performance definitions as a guide. Please give comments and examples illustrating the reason for your ratings.

**Job Knowledge and Technical Skills:** Level of proficiency regarding content and procedures of the job and field of specialization. Includes ability to acquire and apply current as well as new knowledge and skills.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Quality of Work:** Thoroughness, accuracy and attention to detail in executing job assignment and special projects.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Productivity:** Amount of work accomplished based on reasonable and expected levels.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Reliability:** Attendance and completion of job responsibilities within established time frames and with normal supervision.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Initiative:** Originates, develops and follow through on constructive tasks and responsibilities in a resourceful and logical manner.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Problem Solving Skills:** Effectively resolves situations and issues through accurate diagnosis, negotiation and execution.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Organizing Skills:** Effectively plans, prioritizes and schedules workload to ensure on time completion of responsibilities.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Analytical Skills:** Ability to analyze and evaluate information in a logical and systematic manner.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | X | *OE | | *FM | | *PM | | *DM | |

**Adaptability:** Productively adjusts to changes in the work situation, such as new people, ideas, assignments, procedures, etc.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | X | *FM | | *PM | | *DM | |

**Working Relationships:** Work effectively with others to achieve organizational objectives. Resolves issues appropriately. Recommendations are respected and readily considered by others.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *CE | | *OE | X | *FM | | *PM | | *DM | |

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

**Communication/Documentation Skills:** Effectively communicates information verbally and in writing. This includes documentation of work such as records or reports, and presentation skills.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Judgment:** Ability to judge when to act independently, delegate downward, or refer situations to upper management. Actions are consistent with corporate direction and directives.

| *CE | X | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

**Employee Relations Skills:** Develops and maintains positive work climate for subordinates. Demonstrates consistency and fairness in administering policies and procedures.

| *CE | | *OE | X | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

Please comment on your overall self-evaluation of your performance and it's value to the group.

| *CE | | *OE | | *FM | | *PM | | *DM | |
|---|---|---|---|---|---|---|---|---|---|

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | |
|---|---|---|---|
| Employee Name | Pat Rasicot | Title | Senior Product Strategistpecialist |
| Supervisor | Gottfried Sehringer | Dept.: | Marketing |
| Review Period | From June 2001 | To | February 2005 |

## SECTION III-A: ACCOMPLISHMENTS

List Accomplishments from previous period:

Spearheaded numerous major & point releases of the core products despite spending over 50% of my time assisting other areas of the organization in non-product management activities.

Played a major role in getting the quality of Op's, Fin's and Contrax to the level that they are now despite VERY limited resources.

Worked continually with customers on support issues so that Customer Support could be lauded. This included last-second, drop-everything, "you're the only one that can help us" trips to customer sites.

Supported all VSOE, SOP, Revenue and general accounting design and QA for new products. Supported all of development, customer, customer support & professional services support and training – even though I have no background in any of this.

Played a key role in securing numerous sales by working with sales, presales and the prospects up until the time of closure.

## SECTION III-B: JOB OBJECTIVES AND GOALS

Evaluate* accomplishments against goals and objectives established for previous period.

*Consistently Exceeded Requirements (CE) *Often Exceeded Requirements (OE) *Fully Met Requirements (FM) *Partially Met Requirements (PM) *Did Not Meet Requirements (DM)

## SECTION III-C: JOB OBJECTIVES AND GOALS

List New Goals and Objectives for period beginning________________ and ending ________________.

Support successful Softrax 8 roll-out

Plan and communicate post 8.0 product strategy

Continue to plan and execute the Contrax Roadmap

Re-engineer internal processes and communications to reduce the fire drills and improve your ability to work on the above points.

Assess and communicate market needs beyond customer request

Help make the extended development organization (Mindtree) work

Work with the entire team to support other key initiatives (revenue manager/ BI)

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION IV: AREAS OF STRENGTH AND DEVELOPMENT

Identify areas of strength as well as those where improvement is needed. This section is to be discussed during the performance appraisal meeting.

### A. Areas of Strength:

Product knowledge
Ability to adjust to constantly changing priorities
Time management and prioritization
Coordinating projects and personnel from all areas in order to accomplish our objectives
Babysitter - I would call that fire fighter

### B: Areas of Development:

Pat, your are well respected and needed when "fires" need to be fought. However I do encourage you, with every fire, to look at root of the issue and work on avoiding the fire altogether. I know this will not be always possible. But I am convinced, that with persistence and pro-active communications this will get better

Related to the issues below, here are some more general areas:
Product strategy development
Market planning
Product and market promotion
Product Communications

### C. Plans for Development/Improvement (Be specific as to action plans and target dates):

**Action Plan** (including resources needed).

| Event | Resources | Target Date |
|---|---|---|
| Take product management course | | |
| | | |
| | | |
| | | |
| | | |

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | |
|---|---|---|---|
| Employee Name | Pat Rasicot | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | Dept.: | Marketing |
| Review Period | From June 2001 | To | February 2005 |

## SECTION V: CAREER PLANNING

### A. Identify employee's career goals/ambitions.

Don't take this statement as negative – just a reality: I need to get "Director" on my resume – it's way overdue. I fully realize that there is no opportunity for this at Softrax – oh well, that's life. In the meantime, until an opportunity arises, I will just continue with what I'm doing.

Pat. I hear what you are saying, but you know that this would be difficult with the current structure and company size. If you are truly looking for the Product Management Director position I would encourage you to dive into some of the issues highlighted in the development area. Those will get you there. I think previously Lou, and no the to-be-hired Director could help you get that experience.

However it is also reasonable to stay more on the technical side. However when and if that could lead to the "Director" in the title I cannot say at this point.

### B. Identify ways to help employee achieve these goals.

Plans for Career Development

| Event for Career Development | Resources | Target Date |
|---|---|---|
| Take product management course<br><br>Proactively look for project to expand your current responsibilities | | |

## SECTION VI: EMPLOYEE ADDITIONAL COMMENTS

Never thought you'd actually ask --- and in the spirit of openness and honesty – here you go.....

The past fours years at Softrax have seen multiple new products & customer additions. These additions have obviously made the workload on the PM group grow increasingly larger. With these additions and growth in responsibilities came a decrease in the size and bandwidth of the PM group. This was to be expected due to the economic conditions of the company and the PM group continually stepped up to the task. Unfortunately, this also led to certain things not getting accomplished (product research etc) - this was looked upon negatively by the Management Team – thus, the hiring of Lou Pereira (please don't argue this point). Instead of having been recognized as stepping up and going the extra mile in the time of need, the opposite occurred and the perception was that we were either not willing or capable of accomplishing our objectives. This, accompanied by the constant lauding (at company meetings) of what "fantastic" jobs that the other groups in the company have done, have done nothing but bring the PM group down – especially when we spend over 50% of our time bailing out these other groups.

To add the icing to the cake – over the past few quarters, while other groups have been adding personnel, we have added nothing that will help us get out of the situation that we are in (HANDS-ON help). The group has given and given over the past few years – it's time for Softrax to step up and give a little back.

In conclusion, we are not blind – as a matter of fact we are probably the most "connected" of any group in the company. We see and hear who gets what in the way of compensation. We see the bonuses in development, we see the commissions to sales, pre-sales, LQM's, Marcom etc. These are justified and deserved by those departments. The issue is that, once again, who supports these departments? Who performs demo's for them? Who is constantly helping them out so that they can accomplish their objectives? To add insult to injury, the small reward system instituted last year relating to being compensated for pre-sales work was taken away – Thanks – that was really justified.

Thank you and good day.

SOFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| Employee Name | Pat Rasicot | | Title | Senior Product S~~trategist~~pecialist |
|---|---|---|---|---|
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

SØFTRAX

# EMPLOYEE PERFORMANCE REVIEW

| | | | | |
|---|---|---|---|---|
| Employee Name | Pat Rasicot | | Title | Senior Product Strategist~~pecialist~~ |
| Supervisor | Gottfried Sehringer | | Dept.: | Marketing |
| Review Period | From | June 2001 | To | February 2005 |

## SECTION VII - SIGNATURE PAGE

| | | |
|---|---|---|
| Employee Name | Pat Rasicot | |
| Employee Signature | [signature] | Date 2-15-05 |

| | | |
|---|---|---|
| VP Name | G. SEHRINGER | |
| VP Signature | [signature] | Date 2/15/05 |

| | | |
|---|---|---|
| Human Resources Name | | |
| Human Resources Signature | | Date |

NOTE: The employee's signature confirms she/he has read the contents of this Employee Review Form.

Exhibit B

EXHIBIT B

NETSUITE

Home | Products | Customers | Industries | Services | Partners | News & Events | Resources

1 877 NETSUITE

Home > Industries > **Software**

**Software**
Dashboard
Financials
Revenue Management
Marketing Automation
Sales Force Automation
Customer Support Service
Website Analytics
**Wholesale / Distribution**
**Electronic Commerce**
**Advertising**
**Agriculture**
**Manufacturing**
**Nonprofit**
**Professional Services**
**Retail**

# SOFTWARE

**NetSuite—The One Integrated Application To Manage Your Software Business**

With NetSuite, your software company can manage its entire front-office and back-office operations with a single, flexible, powerful business application—integrating customer relationship management, customer service, financials, inventory management, ecommerce, and more.

Hundreds of software companies run their business on NetSuite—and we do too. Here's why NetSuite is the best application for software companies.

- Advanced Financials with Revenue Management and Revenue Recognition
- The Best CRM for Software Companies
- One Application to Manage Your Software Business




**NetSuite 360 Degree View of the Software Business Lifecycle**



**FREE TRIAL**

**SCHEDULE A DEMO**

**CONTACT ME**

**CUSTOMERS**
Read about NetSuite Software Customer Success Stories

**WEBINARS**
NetSuite For Software Companies

**ROLE-BASED DEMO**
Watch Role-Based Demo

- The Ultimate Business Dashboard
- Integrated Back-Office with Software-Specific Features
- Deep Services & Support Functionality
- Rich Channel and Partner Relationship Management
- Easy Customization and Integration
- Amazingly Affordable

## NETSUITE FEATURES AND BENEFITS FOR SOFTWARE COMPANIES

**Advanced Financials with Revenue Management and Revenue Recognition.** Financials are complex in any industry, and they are arguably the most complex in the software industry. The stumbling block for most software companies is managing revenue recognition and billing schedules—and ensuring compliance. Few financial packages provide these tools, forcing companies to manage these complexities offline in spreadsheets or in third party standalone packages. With NetSuite you have one financial system that manages accounting, complex billing and revenue recognition—so there's no more double entry.

See Details

- **Revenue Recognition**
- **Deferred Revenue Management**
- **Renewals Management**
- **Advanced Billing**
- **Pricing Management**
- **Revenue Forecasting**
- **GAAP & Regulatory Compliance**
- **Complete Financials**
- **Full Application Integration**
- **Reduced Overhead**

**The Best CRM for Software Companies.** CRM software can make or break a software company, and a top analyst firm recently ranked NetSuite CRM software #1 in Sales Management, Forecasting, Opportunity Management and Dashboards. Why? Unlike standalone CRM applications, NetSuite CRM software is seamlessly integrated with financials and your back office systems, giving you a 360 degree view of the customer.

See Details

- **360 View of the Customer**

- **True Marketing ROI**
- **Complete Lead to Order Process**
- **Complete Order to Cash Process**
- **Multiple Forecasts**
- **Integrated Commissions**
- **Self-Service Customer Centers**
- **Bug Tracking Integration**
- **Partner Relationship Management**
- **Upsell/Cross-sell**
- **Maintenance/Renewals Automation**

**One Application to Manage Your Software Business.** Software firms typically cobble together and then juggle several different business applications—and numerous spreadsheets to manage the intricacies of the software industry. Now you can stop wasting precious resources managing multiple "silo" systems. NetSuite is the one intelligent, integrated, customizable application to unify your business processes, increase visibility for better decision making, and extend processes to your customers and channel partners.

See Details

- **One System—Complete Software Lifecycle Management**
- **Advanced Financials**
- **One View of the Customer**
- **Built to Run a Software Companies**
- **Subscription Business**
- **Trading Partner Collaboration**
- **The World's Most Customizable ASP**

**The Ultimate Business Dashboard to Manage Your Business.** NetSuite gives every user in your company a custom dashboard that allows them to monitor everything in the business relevant to them. Finally, "information at your fingertips" is a reality. You can see data trends in leads, opportunities, service issues, expenses, and much more. It's all managed with point-and-click content additions and drag and drop layout.

See Details

- **Key Performance Indicators**
- **Real-time Visibility**
- **Saved Searches**
- **Group Calendaring**

- **RSS Content**
- **Direct Drill-Down**

**Integrated Back-Office with Software-Specific Features.** NetSuite lets you manage the complex back office within one system.

See Details

- **Inventory and Fulfillment**
- **Complete Procure to Pay Process**
- **Paperless Expense Reports**
- **Employee Management**
- **Real Time Processes, Intelligence**

**Deep Services & Support Functionality.** Quality of services and support are critical to software companies—both early on during implementation and over time for customer satisfaction and retention. High levels of service can be costly, and that's why NetSuite gives you the tools to provide the right level of service to the right customers at the best cost.

See Details

- **Multi-channel Service**
- **Job Tracking**
- **Bug Tracking Integration**
- **Customer Center**

**Rich Channel and Partner Relationship Management Capabilities.** NetSuite lets you empower channel partners as an extension of your sales organization with rich Channel & Partner Relationship Management capabilities, making it as easy for them to sell & service as your internal reps.

See Details

- **Sales Management**
- **Account Visibility**
- **Joint Marketing**
- **Inventory Visibility**
- **Sales Tools**
- **Joint Customer Support & Service**

**Easy Customization and Integration.** NetSuite's NetFlex customization and extension technology platform provides growing software businesses with a flexible, powerful and extensible business management solution.

See Details

- **Customization**
- **Web Services**
- **AppBuilder**
- **Verticals**

**Amazingly Affordable.** NetSuite provides dramatic cost savings relative to other combinations of front-office and back-office applications, including GreatPlains with Salesforce.com or MSCRM, Accpac and Accpac CRM, and more.

To learn more about what NetSuite can do for your software company **contact us now**.

CONTACT ME    SCHEDULE A DEMO

About Us | Job Openings | Privacy Policy | Contact Us |

Copyright ©2005 NetSuite Inc. All rights reserved.

Exhibit C

EXHIBIT C

SOFTRAX®

contact us

Solutions | Services | Customers | News & Events | Sales & Support | About Softrax

**Softrax Solutions**

- **Revenue Management**
- Revenue Recognition
- Deferred Revenue
- Billing & Revenue Recognition
- Maintenance Renewals
- Complex Billing
- Order Management
- Contract Management
- Business Intelligence
- Revenue Analytics
- Revenue Forecasting
- Financials
- Professional Services Automation
- Enterprise Integration

**Business Benefits**

- Enhance Your Existing Financial Infrastructure
- Eliminate Spreadsheets
- Stop Revenue Leakage
- Manage Growth
- Upgrade Your Financial System
- Facilitate Sarbanes-Oxley Compliance

## Manage more effectively with new insights into critical financial information

Revenue management is a fully integrated and automated process for managing the financial transactions associated with your customer relationships. Softrax revenue management solutions improve the accuracy, availability, and usability of your key financial information by eliminating spreadsheets and integrating the flow of revenue data across all your accounting processes.

Softrax solutions are based on a fundamental architectural advantage that enables automation to be applied independently to billing and revenue recognition in a coordinated way. As a result, very complex revenue models and the demands they place on your billing, recognition, allocation, scheduling, and compliance activities can be effectively automated in one system.

With Softrax you can easily control business models that create headaches for other systems, especially when it comes to managing deferred revenue, contract renewals, and issuing complex invoices. Because Softrax stores all revenue related information, your audit and analysis processes are always based on high integrity revenue data. By implementing Softrax you get a robust financial infrastructure that supports growth and innovation as you scale your business.

### Solution Highlights

**Contract management**

- All the details of the contract are managed throughout the contract life cycle, including terms for billing and revenue recognition
- Sales orders and contract renewals are supported with multiple pricing based on volume or service level

**Billing**

- Business models and customer billing can be customized by account
- Automatic pricing based on contractual terms can be applied to any line item

### Related Information



Empower your revenue management processes beyond compliance
learn more



Gain complete control over your revenue related events
learn more



Improve the integrity of your critical revenue data
learn more

### Customer Perspective

"Softrax's revenue management capabilities will allow SSA Global to absorb new entities into our corporate domain efficiently and provide SSA with an operational platform that will be key to effectively managing future growth."

John Walles
EVP-Operations
SSA Global

### Resources

Webcast: CFO Roundtable—Technology executives discuss how they have met the Sarbanes-Oxley challenge
View



Remember Me . For future sign-ups and downloads
**sign up**



Sign up for our eNewsletter
**sign up**



Attend an online demo.
**register**



Talk to a Softrax Sales Representative
**contact us**

| | |
|---|---|
| **Revenue allocation** | ■ Accurate and consistent revenue booking<br>■ Contracts that have multiple elements and numerous revenue streams are assigned appropriate allocation and recognition schedules according to your business rules |
| **Revenue recognition** | ■ Revenue is booked and recognized in the appropriate fiscal accounting periods, according to accounting practices and regulations<br>■ Visibility into this process is provided with a transactional audit trail and reporting tools<br>■ Updates issued as new regulations from the SEC and FASB appear |
| **Revenue reporting** | ■ Access to detailed reports and audit trails, with visibility into revenue schedules to enable proactive revenue management |
| **Revenue forecasting/planning** | ■ Revenue forecasting and ability to adjust business plans to reflect changing business scenarios<br>■ Supports analysis of changes in future maintenance revenues, deferred revenues by product, forecasting services revenue by customer or engagement, and measurement of profit and loss impact according to service engagement |
| **Support compliance with Sarbanes-Oxley, SEC and FASB** | ■ Provide a transactional audit trail for SOX 404 assertions<br>■ Create a foundation for robust internal controls over revenue processes<br>■ Support compliance with revenue recognition rules (SOP 97-2, 98-9, 81-1, VSOE, SAB 101, and EITF 00-21)<br>■ Identify and optimize revenue processes<br>■ Improve the integrity of revenue data<br>■ Better establish and enforce internal controls for revenue |

Webcast.
PriceWaterhouseCoopers— Best practices in revenue recognition
View

Article: Contract Management - An Enterprise Perspective
View

Article: Strategic Finance Magazine—Avoiding Revenue Management Surprises
Read more

White Paper.
www.RevenueRecognition.com and IDC Survey—Financial Executive Benchmarking Panel: Compliance Edition
Read more

White Paper: Softrax Interactive Checklisk for Sarbanes-Oxley 404 Compliance (XLS/PDF)
Read more

White Paper: Meta Group-Leveraging Revenue Management Solutions
Read more

Product Data Sheets:
Learn more about how Softrax products deliver critical functionality for revenue management.
Softrax Operations
Softrax Contrax
Softrax Financials

© 2001-2005 Softrax Corporation. All Rights Reserved. Contact us toll free at 1 888-476-3872.

home | softrax solutions | softrax services | softrax customers | news & events | about softrax | support | faq | site map | privacy | resources | contact softrax

Exhibit D

EXHIBIT D



NETSUITE
ONE SYSTEM. NO LIMITS.

Home | Products | Customers | Industries | Services | Partners | News & Events | Resources

1 877 NETSUITE

Home > Industries

- **Software**
- **Wholesale / Distribution**
- **Electronic Commerce**
- **Advertising**
- **Agriculture**
- **Manufacturing**
- **Nonprofit**
- **Professional Services**
- **Retail**

# INDUSTRIES



Every industry has its own unique business processes and needs. For that reason, many companies today are demanding industry-focused solutions that meet their goals in every possible way.

With our Web-based, hosted solutions, NetSuite supports businesses across a wide variety of industries. Our solutions can be deployed faster and require less customization than generic packages that take a "one-size-fits-all" approach. And in case additional fine-tuning is needed, we offer extensive configuration and customization capabilities. Our Professional Services Team, along with our extensive network of local NetSuite Solution Providers, can set up the application, consult on best practices, and train your staff on all of NetSuite's capabilities.

**Learn more about how NetSuite works in your industries**

- Software
- Wholesale & Distribution
- Electronic Commerce
- Advertising
- Agriculture
- Manufacturing
- Nonprofit

FREE TRIAL

SCHEDULE A DEMO

CONTACT ME

WHITEPAPER

FREE Aberdeen Executive Summary

ROLE-BASED DEMO

Watch Role-Based Demo

**Related Links**

Customer Success Stories

Webinars



Professional Services

Retail

About Us | Job Openings | Privacy Policy | Contact Us |

Copyright ©2005 NetSuite Inc. All rights reserved.

Exhibit E

EXHIBIT E

NETSUITE
ONE SYSTEM. NO LIMITS.

Home | Products | Customers | Industries | Services | Partners | News & Events | Resources

1 877 NETSUITE

Home > Industries > **Retail**

- **Software**
- **Wholesale / Distribution**
- **Electronic Commerce**
- **Advertising**
- **Agriculture**
- **Manufacturing**
- **Nonprofit**
- **Professional Services**
- Retail

# RETAIL



FREE TRIAL

SCHEDULE A DEMO

CONTACT ME

Consolidation in the retail industry means that you have to work even harder to differentiate your business. That's why improving customer service is key to success. Knowing who is buying what and which promotions are successful—and then using that data to shape strategic decisions—can help you streamline your business and increase your profits.

**NetSuite's solutions meet your needs with the following capabilities:**

- **Real-time Dashboards** that give you a full view into sales, inventory and more.
- **Marketing Automation** to target your customer base with upsell campaigns and promotions based on complete records, including purchase history, buying patterns, or service incidents . You can also track the effectiveness of various promotions in real time, maximizing the effectiveness of each campaign on the fly. Inventory management including: serialized inventory; customer-specific-pricing; multiple units of measure; matrix items; bar coding; pick, pack, ship capability; and drop shipment.
- **Inventory management with support** for serialized inventory, customer-specific pricing, multiple

**With NetSuite, you receive immediate and long-term benefits:**

- Increase revenues and improve customer relationships by using complete customer records to create highly targeted offers and promotions.
- Increase margins, improve visibility and order tracking with advanced inventory management and integrated UPS shipping.
- Grow your business and extend your service offerings with leading CRM, Web presence and Ecommerce tools.

WHITEPAPER

FREE Aberdeen Executive Summary

ROLE-BASED DEMO

Watch Role-Based Demo

**Related Links**

Customer Success Stories

Webinars

units of measure, matrix items, bar coding, pick, pack, ship capability, and drop shipment.

- **FedEx® Shipping Integration and UPS OnLine® Shipping Tools** for faster, more direct shipping and tracking.
- **Integrated Ecommerce** to extend services and drive revenue through online marketing, sales and order management. Seamless integration with customer relationship management (CRM) and enterprise resource planning (ERP) enables you to manage all your business processes with one powerful software suite.
- **Customer and Vendor Centers** that provide customers and vendors with self-service portals to check the status of orders, and conduct customer-specific order management and financial transactions 24/7.

## Webinars

**Ecommerce Integration.**

▶ Register Today!

Have you considered an ecommerce solution that integrates your web store with inventory, accounting, sales and support offering a personalized web experience without the costly resources? Hear directly from NetSuite CEO Zach Nelson and NetSuite customers Leslie Raymond, Director of Internet Services at Davis Anderson, and CEO John Doyle of Jubilee Chocolates discuss their reasons for choosing NetSuite's ecommerce solution and how they benefit daily from our one system.

## Customer Success Stories

**Saffronrouge.com**

"As a developer, I have blown a lot of time and money in trying to build systems and applications that integrate with each other. By starting Saffron Rouge with NetSuite from day one I have avoided all that cost and effort."

—Jeff Binder, CEO, Saffron Rouge

- Read the story
- Download the story

**Niche Retail**

"We'd have a staff two to three times as large if orders and shipping weren't integrated into the system. If NetSuite were not available, our business would not exist."

—Tyler Smith, Partner, Niche Retail

- Read the story
- Download the story

**Foster's Promotional Goods**

"One of the reasons we chose NetSuite is that it helps us attract and service big clients. Through electronic business processes, we can react quickly to their needs."

—Paul Brancaleone, President, Foster's Promotional Goods

- Read the story
- Download the story

 Copyright ©2005 NetSuite Inc. All rights reserved.

Exhibit F

**Exhibit F**

SOFTWARE COMPANIES STANDARDIZE ON NETSUITE

Rejecting the Difficulties of Using Multiple, Disconnected Systems to Run their Business, Hundreds of Software Companies Choose to Run their Entire Business on NetSuite.

SAN MATEO, CA – May 18, 2004 – NetSuite, Inc., today announced continued penetration of the software vertical market by signing up new customers, including San Mateo, CA-based Biz360® Inc. (replacing salesforce.com/Peachtree); Olympia, WA-based Retail Management Solutions (replacing MAS 90/Siebel OnDemand); Houston, TX-based Postmark DMS, LLC (replacing QuickBooks/Sales Cycle); and Bangkok, Thailand-based QTranslation (replacing salesforce.com/home-grown accounting software). These new wins add to the more than 100 software companies around the world who have standardized on NetSuite. NetSuite and its customers are holding a Webinar on May 19 at 11:00 a.m. PT / 2:00 p.m. ET to discuss the benefits of managing their business with a single, integrated Web-based solution to manage software business processes using new Web-based technology. For more information, please go to www.netsuite.com/sba. NetSuite's product offerings include NetSuite, NetERP, NetCRM, and Oracle® Small Business Suite. The Oracle Small Business Suite name is used under license from Oracle Corporation (NASDAQ: ORCL).

One commonality these companies had prior to using NetSuite is that they all used disparate software applications to run their business – one for financials, one for sales, one for customer service and support, one for inventory management, one for marketing. Frustrated with the cost and complexity of using different software packages, these companies chose NetSuite as the one solution to automate their business operations from financials, to inventory management, to lead management, to sales and marketing. Additionally, NetSuite's advanced customization technology gives them the ability to tailor NetSuite to meet their specific needs in the software industry. Also, because it is an on-demand, Web-based service, NetSuite eliminates the pain of managing, upgrading and maintaining traditional software.

Many features in NetSuite are tailor-made for the software industry including:

- The NetSuite Customer Center allows customers to easily check account status information, including bill paying, checking for new product releases, and logging support cases.
- The NetSuite Partner Center allows software companies to give third-party resellers the same functionality as they give internal sales reps. Leads can be distributed, forecasts can be updated, MDF can be tracked and used, and orders can be placed all through the NetSuite Partner Center.
- NetSuite's customer service functionality is powerful as it easily integrates with third-party defect tracking products, allowing support personnel to identify and log newly discovered issues. As well, NetSuite allows customers to be updated

quickly about the status of their reported issues and the target time for fixes. In a future release, a defect and issue tracking module will be included with NetSuite.

- NetSuite Advanced Billing allows software companies to create unique billing schedules on a line item by line item basis; for instance, to bill for a software service on a monthly basis, but bill for consulting 100% up front. This billing schedule then automatically percolates throughout the rest of the system, bringing revenue into the forecast as appropriate as well as generating invoices automatically when they are due to be paid.
- The NetSuite Dashboard contains multiple key performance indicators to allow software companies to monitor sales on a cash, bookings and billings basis in real-time.
- NetSuite customization allows NetSuite functionality to easily be extended to include capabilities like consulting job tracking so that consulting projects can be tracked and billed on the customer record.
- Later this year, NetSuite will add revenue recognition, a key accounting feature for software companies.

NetSuite itself runs all back-office and front-office operations on the product, and more than 100 software companies currently use the product to manage everything from financials, to logistics management to CRM, to eCommerce. Recently added customers include:

Biz360 Inc. (www.biz360.com) based in San Mateo, California, which provides Fortune 500 companies with real-time market intelligence, has standardized their business on NetSuite by replacing salesforce.com and Peachtree. Tamara Macduff, CFO of Biz360 said: "Using separate financial and CRM applications worked on a department level, but didn't give us the integrated view we really needed to understand our business. With NetSuite we will have everything in one place, and having a unified view of critical information will make all the difference."

Retail Management Solutions (www.rm-solutions.com), a provider of point-of-sale technology to the pharmacy industry based in Olympia, Washington previously used Peachtree and UpShot. They considered switching to MAS 90, but in the end they chose NetSuite. The clear reason is illustrated by CEO Brad Jones: "We have salespeople spread across North America, so having Web-based access to the same customer data has been our No. 1 requirement. We used Siebel OnDemand / UpShot for a year and a half, but it only had that one piece: SFA. On the ERP side I had used Peachtree and evaluated MAS 90 previously, but even that product could not do everything we needed. NetSuite has been all we had hoped for and more. From the Advanced Partner Center to the UPS integration to the marketing automation to the customization capabilities, I haven't seen anything in the market that can compete with this."

Postmark DMS, LLC (www.postmarkdms.com), an industry leading marketing company offering superior technology, products, tools and expert services for workshops and seminars, based in Houston, Texas, previously used QuickBooks. "Postmark is experiencing rapid growth causing our business to need a flexible and effective system,"

said Roger Marksberry, Managing Partner, Postmark DMS. "Our goal was to find an integrated solution for accounting, financial planning, inventory management, CRM, customer care management, and employee productivity that could also become fully integrated with our own internal systems. NetSuite is the only system that can provide this level of sophistication for a business our size. Five months of operating experience has confirmed the NetSuite selection was a magnificent and profitable decision."

QTranslation (www.qtranslation.com), a growing Southeast Asian translation services firm based in Bangkok, Thailand – with operations in the USA, UK, Sweden, Spain, Singapore and Australia – and serviced by NetSuite Australia distributor Net Return (www.netsuite.com.au), has given up salesforce.com for NetSuite's one solution. Conor Bracken, managing director of QTranslation commented: "We were frustrated with having our data in different systems – salesforce.com, our own custom-built database, and multiple accounting processes. Apart from all the time wasted in data re-entry, we could not see a full picture of the company's performance. We look forward to how NetSuite will help us keep all our data integrated in one, Web-based application."

NetSuite enables companies to manage all key business operations in a single, integrated system, which includes customer relationship management; order management and fulfillment; inventory management; finance; e-commerce and Web site management; and employee productivity. NetSuite is delivered as an on-demand service, so there is no hardware to procure, no large, up-front license fee, and no complex set-ups. Finally, NetSuite's patent-pending "real-time dashboard" technology provides an easy-to-use user interface with role-specific portal views of the application.

For more information about NetSuite visit: www.netsuite.com.

###

Trademark
Oracle is a registered trademark of Oracle Corporation and/or its affiliates.

Exhibit G

EXHIBIT G

**RBS GROUP, INC.**

**EMPLOYEE PROPRIETARY INFORMATION AGREEMENT**

In consideration and as a condition of my employment, or continuing employment, by RBS Group, Inc. and /or by companies which it owns, controls, or is affiliated with, or their successors in business (the "Company"), and the compensation paid therefore:

1. Confidentiality: I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose, or make any use of except for the benefit of the Company, at any time either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data or other information of the Company relating to products, processes, know-how, designs, customer lists, business plans, financial information, marketing plans and strategies, and pricing strategies or any subject matter pertaining to any business of the company or any of its clients, licensees or affiliates, which I may produce, obtain or otherwise acquire during the course of my employment, except as herein provided. I further agree not to deliver, reproduce or in any way allow any such trade secrets, confidential information, knowledge, data or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company.

2. Conflicting Employment - Return of Confidential Material: I agree that during my employment with the Company I will not engage in any other employment, occupation, consulting or other activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings and data of any nature pertaining to any invention or confidential information of the Company or to my employment, and I will not take with me any documents containing or pertaining to any confidential information, knowledge or data of the Company which I may produce or obtain during the course of my employment. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit A.

3. Maintenance of Records: I agree to keep and maintain adequate and current written records of all technical documentation, sales and customer transactions, which records shall be available to and remain the sole property of the Company at all times.

4. Modification: This agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by the employee and the Company. I agree that any subsequent change or changes in my duties, salary or compensation shall not effect the validity or scope of this Agreement.

5. Entire Agreement: I acknowledge receipt of this Agreement, and agree that with respect to the subject matter thereof it is my entire agreement with the Company, superseding any previous oral or written communications, representations, understandings, or agreements with the Company or any officer or representative thereof.

6. Severability: In the event that any paragraph or provision of this Agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from this Agreement and the entire agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

7. Successors and Assigns: This Agreement shall be binding upon my heirs, executors, administrators or other legal representatives and is for the benefit of the Company, its successors and assigns.

8. Governing Law: This Agreement shall be governed by the laws of the State of Massachusetts.

9. Counterparts: This Agreement shall be signed in two counterparts, each of which shall be deemed an original and both of which shall together constitute one agreement.

Dated: 9/30/96

Accepted and Agreed:

RBS Group, Inc.

By Patrick Rasicot Employee: [signature]

Title: Project Manager Witness: ______________

Exhibit H

EXHIBIT H

Rasicot

# THE RBS GROUP, INC.

## NONDISCLOSURE AND INVENTIONS AGREEMENT

This Agreement is made among The RBS Group, Inc., a Massachusetts corporation (the "Company"), and the undersigned employee of or consultant to the Company (the "Employee").

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the Employee hereby acknowledges and agrees as follows:

1. **Introduction**. As a result of his/her relationship with the Company, and because of the nature of his/her responsibilities, the Employee has acquired or hereafter will acquire valuable trade secrets, proprietary data and confidential information with respect to the Company and its business. In view of the foregoing, the Employee acknowledges that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company that the Employee undertakes the obligations contained in this Agreement.

2. **Nondisclosure**. The Employee will not, without the express written consent of the Company, directly or indirectly, communicate or divulge to, or use for the benefit of himself or of any person, firm, association or corporation, any of the Company's trade secrets, proprietary data or confidential information, which trade secrets, proprietary data and confidential information were communicated to or otherwise learned of or acquired by the Employee in the course of his/her relationship with the Company. The Employee agrees that such trade secrets, proprietary data and confidential information include but are not limited to the following: the Company's existing and contemplated products, joint ventures, research and development programs, business, accounting, engineering and financial information and data, marketing plans, pricing, methods and processes involved in manufacturing, selling, and marketing products; lists and/or identities of the Company's customers and vendors and prospective customers and vendors; information, specifications and data relating to the Company's products; the Company's licensing arrangements' and the identity of any persons or entities associated with or engaged by the Company as consultants, advisers, agents, distributors or sales representatives. Information that is proprietary or

confidential, or constitutes a trade secret, shall remain so notwithstanding its availability to other employees of the Company.

Notwithstanding the foregoing, the Employee may disclose such trade secrets, proprietary data and confidential information only to the extent that disclosure thereof is required (1) in the course of his/her performing services for or on behalf of the Company, or (2) by a court or other governmental agency of competent jurisdiction, provided the Employee promptly notifies the Company and cooperates fully with the Company in obtaining any available protective order or the equivalent prior to the disclosure of such information. This provision does not apply to any information which legally is or becomes generally known to the public from authorized sources other than the Employee.

3. **Title to Certain Property**. All tangible materials including, but not in any way limited to, printouts, specifications, models, books, records, manuals, sales literature, training materials, customer files, correspondence, documents, contracts, orders, memoranda, notes, agreements, invoices and receipts (and all copies and reproductions thereof) in the possession or control of Employee which in any way relate or pertain to the Company's business or the business of any Affiliate of the Company, whether furnished to the Employee by the Company or prepared, compiled or acquired by the Employee shall be the sole property of the Company.

4. **Inventions: Disclosure, Assignment and Further Assurances**. If at any time or times prior to the Severance Date, the Employee shall (either alone or with others) make, conceive, discover, reduce to practice or become possessed of any invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "Inventions") that relates to the business of the Company, or any of the products or services being developed, manufactured or sold by the Company, or results from tasks assigned the Shareholders by the Company or results from the use of premises or equipment owned, leased or contracted for by the Company, such Inventions and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and the Employee shall promptly disclose to the Company (or any persons designated by it) each such Invention and hereby assigns any rights the Employee may have or acquire in the Invention and benefits and/or rights resulting therefrom to the Company and its assigns without compensation and shall communicate, without cost

or delay, and without publishing the same, all available information relating thereto with all necessary plans and models to the Company.

The Employee shall promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, any other invention, modification, discovery, design, development, improvement, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) made, conceived, discovered, reduced to practice or possessed by the Employee (either alone or with others) at any time or times prior to the Severance Date for the purpose of determining whether they constitute "Inventions," as defined herein.

Upon disclosure of each Invention to the Company, the Employee shall, at the request and expense of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:

(a) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

In the event the Company is unable, after reasonable effort, to secure the Employee's signature on any letters patent, copyright or other analogous protection relating to an Invention, whether because of the Employee's physical or mental incapacity or for any other reason whatsoever, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agent and attorney-in-fact, to act for and in their behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

5. **Absence of Restrictions Upon Disclosure and Competition.** The Employee represents and warrants that his/her performance of all of the terms of this Agreement and of services

on behalf of the Company does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by him/her in confidence or in trust prior to his/her becoming associated with the Company or refrain from competing, directly or indirectly, with the business of any previous employer or other party. The Employee has returned all documents and materials belonging to any of his/her former employers. The Employee will not disclose to the Company or induce any of the Company's employees to use proprietary information or trade secrets of any of their former employers. The Employee has not entered into, and hereby agrees that he/she will not enter into, any agreement either written or oral in conflict herewith.

6. **Compliance with Company Nondisclosure Obligations**. The Employee hereby acknowledges that the Company may hereafter be subject to non-disclosure or confidentiality agreements with third parties pursuant to which the Company must protect or refrain from use of proprietary and/or confidential information which is the property of such third party or other party. The Employee hereby agrees upon the direction of the Company to be bound by the terms of such agreements in the event the Employee has access in the course of his/her relationship with the Company to the proprietary and/or confidential information protected thereunder to the same extent as if the Employee was an original individual signatory thereto.

7. **Certain Remedies**. In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled, in addition to any other legal rights or remedies which it may have, to maintain an action for preliminary and permanent injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate. In the event of any action by either party to enforce the provisions of this Agreement, the non-prevailing party shall be responsible for paying all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) incurred by the prevailing party in connection with such action; provided, however, that if there is no clear prevailing party in such action, the court or arbiter hearing such action will make the determination as each party's responsibility for paying such costs and expenses.

8. **Reasonable Covenants**. The Employee acknowledges and agrees that the restrictive covenants contained herein (a) are necessary for the reasonable and proper protection of the goodwill of the Company and its trade secrets, proprietary data

and confidential information, (b) are reasonable with respect to length of time, scope and geographic area and (c) will not prohibit the Employee from engaging in other businesses or employment for the purpose of earning a livelihood following the termination of his/her relationship with the Company.

9. **Severability**. Each provision of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. If the invalidity or unenforceability of any provision hereof is due to unreasonableness of the time or scope or geographic extent of any covenant or restriction, said covenant or restriction nevertheless shall be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction.

10. **Assignment and Benefit**. This Agreement shall be binding upon the Employee's heirs, executors and administrators. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors and assigns.

11. **Waiver**. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

12. **Entire Agreement**. The Employee acknowledges receipt of this Agreement, and agree that with respect to the subject matter hereof it is the entire agreement with the Company, superseding any previous oral or written communication, representation, understanding or agreement with the Company or any representative thereof.

13. **Notice**. All notices, requests, demands and any other communications hereunder shall be made in writing and shall be deemed to have been duly given if delivered in person or sent by registered or certified mail, postage prepaid, if to the Company addressed to the President of the Company at the Company's principal executive office, and if to the Employee at the address appearing beneath his/her signatures to this Agreement. Any party may change its or his/her address for notice hereunder by giving notice of change of address in the manner herein provided.

14. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of

Massachusetts, without regard to its conflicts of law principles. The Employee hereby submits to the personal jurisdiction of the courts of the Commonwealth of Massachusetts and the Federal Courts of the United States of America located in such commonwealth in respect to the interpretation and enforcement of the provisions of this Agreement and all transactions contemplated hereby.

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ THE FOREGOING EMPLOYEE NON-COMPETITION, NONDISCLOSURE AND INVENTIONS AGREEMENT AND UNDERSTANDS AND AGREES TO EACH AND EVERY PROVISION. THE EMPLOYMENT FURTHER ACKNOWLEDGES THAT THIS AGREEMENT WAS DRAFTED BY COUNSEL ON BEHALF OF THE COMPANY AND THAT HE/SHE HAS BEEN GIVEN THE OPPORTUNITY TO CONSULT COUNSEL OF HIS/HER OWN CHOOSING AND HAS EITHER DONE SO OR VOLUNTARILY CHOSEN NOT TO DO SO PRIOR TO THEIR EXECUTION HEREOF.

Dated: 7/24

EMPLOYEE:

[signature]
Signature

Ray Rasicot
Printed Name

Address: 220 Forbes Rd.
Braintree

225630

**Exhibit I**

EXHIBIT I

ri Zullo

| | |
|---|---|
| m: | David Milligan |
| t: | Saturday, April 24, 1999 4:52 PM |
| | Terri Zullo |
| | Jake Fennessy; Susan Sprague |
| ject: | Quarterly Staff Bonus Data |

ri

ve completed the preparation of the required sheets for the reporting quarter of January 1, 1999 through April 3, 1999. ll deliver the hardcopy to you at your request.

ddition to this quarter's payments, I would like to process the bonus of last quarter for Harve Solomon. At my request, withheld payment of it at the end of January 1999. Do you still have the hardcopy? Let me know and I will update on at needs to be done to process this money.

ddition to the bonus activity I would like to request an addition to the payroll run to reward Marie's delivery of services n her home.

Please increase Patrick Rasicot's annual salary to $82,000. This salary is effective on 4/1/99 and you should calculate retroactive amount due.

Exhibit J

EXHIBIT J

| | | | | | | |
|---|---|---|---|---|---|---|
| ASICOT,PATRICK L.<br>6 CRANBERRY ROAD<br>NO. ATTLEBORO,MA 02960<br><br>Stat: ACTIVE Sex: M<br>SSN: 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 Race: 1 | File: 000086<br>Dept: 600<br><br><br>Hire: 09/30/1996<br>Birth: 09/16/1961 | Cur Gross: 3,416.67<br>Salary: 3416.67 Semi-Mon<br>Rate Calc: 3<br>LWW: 09 NWW: 12<br>Paid 12th of Month: 1,2<br>Prior Qtr Month 3 | Marital Status: M-MARRIED<br>Federal:<br>01 Exemptions<br>02 MA<br>02 MA SUI/DI | 10.0000% 81 | 22,126.66 Y Gross<br>3,820.07 Y FIT<br>1,371.85 Y SS<br>320.84 Y MED<br>1,010.92 Y State 1<br>2,212.68 Y 401K<br>165.97 Acc 04 401K<br>2,212.68 Acc 23 401K | 22,126.68 Q Gross<br>3,820.07 Q FIT<br>1,371.85 Q SS<br>320.84 Q MED<br>1,010.92 Q State 1<br>2,212.68 Q 401K<br>8,460.00 Acc 06 BONUS |

**Exhibit K**

EXHIBIT K

SOFTRAX CORPORATION

45 Shawmut Roa
Canton, MA 0202
phone 781-830-92
fax 781-830-9345
www.softrax.com

March 13, 2000

Patrick Rasicot
36 Cranberry Road
North Attleboro, MA 02760

Dear Patrick,

I gives me great pleasure to offer you the opportunity to transition into a position of importance and growth reporting to me as a Product Manager starting March 20, 2000. Your semi-monthly base salary will be $3,806.25, payable at an annualized rate of $91,350.00. You and I will articulate the transition schedule and objectives that qualify you for participation in the on-target annual bonus program. Your annual target will be $11,000.00, to be paid out semi-annually, provided you are an active employee in good standing at the time payment is made. All of the compensation described in this letter will, of course, be subject to applicable withholdings.

We will request Board of Directors' approval of a stock option agreement giving you the opportunity to purchase an additional 2,000 shares of SOFTRAX Corporation common stock under our Incentive Stock Option Plan. Board approval is generally obtained in 30-90 days.

To accept this invitation to transition into the position of Product Manager and as a condition of employment, we ask that you please sign and return this letter and the enclosed Non-Competition Nondisclosure Inventions Agreement, which covers confidentiality, outside business activities, ethics and other matters by March 15, 2000.

Patrick, congratulations on becoming part of the SOFTRAX Corporation Development Team.
Sincerely,

John Moss
Vice President of Engineering

Accepted and agreed:

(Signature) 3/13/00 Date

cc: Robert O'Connor, President
cc: Jake Fennessy, Vice-President of Finance & Administration

Exhibit L

EXHIBIT L & M

**Robert O'Connor**

---

**From:** Patrick Rasicot
**Sent:** Wednesday, June 15, 2005 2:14 PM
**To:** Robert O'Connor
**Subject:** RE: Ode to Pat Rasicot...

Thank you – very much............said with a smile on my face.......

---

**From:** Robert O'Connor
**Sent:** Wednesday, June 15, 2005 11:41 AM
**To:** SOFTRAX Global
**Subject:** Ode to Pat Rasicot...

Everyone:

I wanted to take a few minutes of your time to salute Pat Rasicot via email. The timing of his resignation does not afford us the luxury of well deserved public appreciation. His personal schedule has a conflict that prevents him from joining us in New Hampshire.

Pat has played an invaluable role in the company's history and growth. Pat joined the company as an implementation project manager and consultant. He dedicated himself to thoroughly learning Operations and Financials and implemented many of our earliest and most challenging customers. The success of each of these implementations was a requirement to getting our company off-the-ground.

Pat later decided to use his product knowledge to be one of our first product mangers. In this capacity, Pat proved a great resource to our customers as well as our development, customer care, services and other internal organizations. He has always been the "go-to-person" of areas of complex issues that our customers and prospects face. While we may not have gotten ideas and answers with "service and a smile", we always got the best solution after his thoughtful consideration. In addition to these duties, Pat maintained an unofficial HR function when he frequently hosted employees in his cube to discuss current world events or latest company development!

Pat has decided it's time for a change and will be spending the summer sailing. We've asked him to help in some transitional training so we hopefully have not seen the last of him. Please join me in thanking Pat for his countless contributions to the birth and growth of Softrax. We wish him well in future endeavors and know that he will always remain a close friend of the company.

Best regards,

Bob

Exhibit M

EXHIBIT L & M

**Robert O'Connor**

**From:** Patrick Rasicot
**Sent:** Wednesday, June 15, 2005 2:14 PM
**To:** Robert O'Connor
**Subject:** RE: Ode to Pat Rasicot...

Thank you – very much............said with a smile on my face.......

---

**From:** Robert O'Connor
**Sent:** Wednesday, June 15, 2005 11:41 AM
**To:** SOFTRAX Global
**Subject:** Ode to Pat Rasicot...

Everyone:

I wanted to take a few minutes of your time to salute Pat Rasicot via email. The timing of his resignation does not afford us the luxury of well deserved public appreciation. His personal schedule has a conflict that prevents him from joining us in New Hampshire.

Pat has played an invaluable role in the company's history and growth. Pat joined the company as an implementation project manager and consultant. He dedicated himself to thoroughly learning Operations and Financials and implemented many of our earliest and most challenging customers. The success of each of these implementations was a requirement to getting our company off-the-ground.

Pat later decided to use his product knowledge to be one of our first product mangers. In this capacity, Pat proved a great resource to our customers as well as our development, customer care, services and other internal organizations. He has always been the "go-to-person" of areas of complex issues that our customers and prospects face. While we may not have gotten ideas and answers with "service and a smile", we always got the best solution after his thoughtful consideration. In addition to these duties, Pat maintained an unofficial HR function when he frequently hosted employees in his cube to discuss current world events or latest company development!

Pat has decided it's time for a change and will be spending the summer sailing. We've asked him to help in some transitional training so we hopefully have not seen the last of him. Please join me in thanking Pat for his countless contributions to the birth and growth of Softrax. We wish him well in future endeavors and know that he will always remain a close friend of the company.

Best regards,

Bob

Exhibit N

**Exhibit N**

From: donotreply@fedex.com [mailto:donotreply@fedex.com]
Sent: Friday, June 03, 2005 12:58 PM
To: Patrick Rasicot
Subject: FedEx shipment 791092993511

G and A DEPARTMENT of NETSUITE, INC sent PATRICK Rasicot
a FedEx Express Saver FedEx Pak.

This shipment is scheduled to be sent on 03JUN05.

The tracking number(s) are: 791092993511

To track this shipment online click on the following link:
http://www.fedex.com/Tracking?tracknumbers=791092993511&action=track&cl
ienttype=fsm&language=english&cntry_code=us

---

FedEx Ship Manager at fedex.com is the world's first shipping
application accessible
via the internet. With FedEx Ship Manager, you no longer need to
handwrite
airbills or install additional software.

Register for FedEx Ship Manager and try the future of shipping today!
https://www.fedex.com/cgi-bin/ship_it/interNetShip?us

Disclaimer

---

FedEx has not validated the authenticity of any email address.

12.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C. A. NO. 05-1342

RECEIVED & FILED 8/11/05 8/15/05 CLERK OF THE COURTS NORFOLK COUNTY

SOFTRAX CORPORATION,

Plaintiff,

v.

PATRICK RASICOT,

Defendant.

REPLY AFFIDAVIT OF JOSH ROFFMAN.

I, Josh Roffman state under penalty of perjury as follows:

1. I am currently the Director of Product Management at ("Softrax" or the "Company") and have held that position since May, 2005. Prior to that, I was a product manager and Senior Product Strategist. I have been with Softrax since 1998 and worked with Patrick Rasicot, in one capacity or another, since joining the Company.

2. In March 2000, Mr. Rasicot accepted the position of Product Manager within the Software Development Department when the position became vacant on the departure of the previous Product Manager. I was one of the two then existing Product Managers. Mr. Rasicot is incorrect when he states that the previous Product Manager was fired.

3. When the position of Director of Product Management was opened in the spring of this year, I spoke separately with the three other Product Managers to let them know of my interest in applying for the position. Mr. Rasicot was very supportive of my putting my name in for the position. He said that he himself was interested in getting that kind of position, but not at Softrax. Mr. Rasicot had frequently expressed his dissatisfaction with the Vice President of Marketing, to whom the Director position would report. Mr. Rasicot never applied for the Director position, so I do not see how he can say that I was chosen over him.

4. Mr. Rasicot is married but does not have any children. He has repeatedly spoken to myself and other Softrax employees about how great it is to have a wife with a well-paying job. He would say, "She's the one making the money." He would also joke

around about how great it was to have a wife who wanted him to stay home and walk the dogs rather than continue to work. Mr. Rasicot and his wife also own a sailboat.

5. When Mr. Rasicot told me that he was resigning from the Company, he said that he had no immediate plans for the future, that he might work for his brother (who has a construction business) for a few weeks, that he was talking to a few other people, and that he wanted to spend some time with his boat, clear his head and relax. Mr. Rasicot never told me that he accepted the job at NetSuite the following week.

Signed under the penalty of perjuries this 11th day of August, 2005.

Josh Roffman

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

docket.

dated 8/12/05 8/15/05 13.0

RECEIVED CLERK NORFOLK COUNTY

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 05-1342

Softrax Corporation, Plaintiff(s)

v.

Patrick Rasicot, Defendant(s)

# INTERLOCUTORY ORDER ON PRELIMINARY INJUNCTION

This action came on to be further heard at this sitting upon the return of an order of notice to show cause why the application for a preliminary injunction should not be granted, and was argued by counsel; and thereupon, upon consideration thereof, it is ORDERED and ADJUDGED th~~at upon payment to the clerk of the sum of $5.00~~ $90.00 ~~the~~ application under the Plaintiff's Motion for Preliminary Injunction hereby ~~prayers of the Complaint hereby~~ is granted, and the defendant, Patrick Rasicot is

enjoined and restrained from

working for NetSuite, Inc.,

until further order of Court.

By the Court ( Brady, J.)

Entered Aug 12, 2005

Att: John P. Hurley III
Assistant Clerk

A TRUE COPY
Attest: Mary E. Kenney 9/1/05
Deputy Assistant Clerk

F — 43

15.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
DOCKET NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff

v.

PATRICK RASICOT,
Defendant.

No clarification necessary. However, the Court notes that if NetSuite is paying Δ, this strongly suggests that Δ is performing some service in violation of the P.I.

Brady, J
22 Aug 05

**DEFENDANT PATRICK RASICOT'S**
**EMERGENCY MOTION TO CLARIFY ORDER**

On August 12, 2005, the Court entered a preliminary injunction enjoining Defendant Patrick Rasicot "from working for" NetSuite, Inc., until further order of the Court. The Court did not require plaintiff Softrax, Inc., to post security. See Mass. R. Civ. P. 65(c) ("no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant"). Rasicot respectfully believes that the preliminary injunction was erroneously entered and, on August 16, 2005, Rasicot filed a petition for single justice review pursuant to Mass. Gen. Laws ch. 231, § 118.

Upon receipt of the Court's order, Rasicot immediately discontinued all work activities for NetSuite. Nevertheless, NetSuite also believes that the Court's preliminary injunction was erroneously entered, and wishes to continue to compensate Mr. Rasicot even though he cannot and will not perform any services for NetSuite while the injunction remains in place. Such payments would be entirely consistent with the Court's preliminary injunction order, which only prohibited Rasicot from working for NetSuite.

Nevertheless, in an abundance of caution, Rasicot's counsel contacted Softrax's counsel, first by telephone on August 12, 2005, and then by letter on August 16, 2005

(Exhibit A hereto), and sought Softrax's view about whether NetSuite's continued compensation of Rasicot was inconsistent with the Court's Order. Softrax's counsel responded by letter on August 19, 2005 (Exhibit B hereto). In his letter, Softrax's counsel (1) asserts, without explanation, that compensation by NetSuite is not in conformity with the Court's order; and (2) alleges, without any evidence whatsoever, that it does not believe that Rasicot is complying with the Court's Order.

Softrax's expansive interpretation of the preliminary injunction demonstrates its desire to be as punitive as possible to a former employee who had the temerity to leave its employ. If Softrax's interpretation of the Court's preliminary injunction is correct, and NetSuite is not permitted to compensate Rasicot during the pendency of this litigation—even though Rasicot performs no services for NetSuite—then Rasicot will be immediately without any salary while he remains in limbo awaiting a decision from the single justice and the trial on the merits. Such an order serves absolutely no purpose other than to punish Rasicot.

Accordingly, Rasicot respectfully requests the Court clarify that, so long as Rasicot does not perform any services for NetSuite, NetSuite is permitted to provide compensation to Rasicot during the pendency of this action.

Respectfully submitted,
PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Dated: August 19, 2005

Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100

**CERTIFICATE OF SERVICE**

I, Robert N. Feldman, counsel for the defendant, do hereby certify that on this 19th day of August, 2005, I caused to be served a true copy of the foregoing upon all parties by hand delivering same to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Robert N. Feldman

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

RECYCLED 80000 SERIES 30% P.C.W.

BIRNBAUM & GODKIN, LLP
ATTORNEYS AT LAW

Scott A. Birnbaum
Direct Dial: (617) 307-6120
birnbaum@birnbaumgodkin.com

August 16, 2005

BY FAX

T. Christopher Donnelly, Esq.
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street
33rd Floor
Boston, MA 02108

Re: *Softrax Corporation v. Patrick Rasicot, NOCV2005-1342*

Dear Chris:

On Friday, August 12, 2005, I informed you that in our view the preliminary injunction that was entered earlier that day does not preclude NetSuite from compensating Mr. Rasicot during the pendency of this matter. I asked you whether you disagreed with this position. You informed me that you would need to speak with your client and would get back to me. I have not yet heard from you. Please let me know your client's position on this as soon as possible.

Very truly yours,

Scott A. Birnbaum

cc: Patrick Rasicot

*********************
*** FAX TX REPORT ***
*********************

TRANSMISSION OK

| | |
|---|---|
| JOB NO. | 0713 |
| DEPT. ID | 24161 |
| DESTINATION ADDRESS | 916177203554 |
| PSWD/SUBADDRESS | |
| DESTINATION ID | |
| ST. TIME | 08/16 18:58 |
| USAGE T | 00'23 |
| PGS. | 2 |
| RESULT | OK |

**BIRNBAUM & GODKIN, LLP**
**280 Summer Street, 5th Floor**
**Boston, MA 02210**
**Tel: 617-307-6100**
**Fax: 617-307-6101**

# TELECOPY COVER SHEET

If there is a problem with transmission or if all pages are not received, please call (617) 307-6100 for retransmission.

**TO:** **T. Christopher Donnelly, Esquire** FAX #: 617-720-3554

COMPANY

FROM: Scott A. Birnbaum, Esquire DATE: August 16, 2005

Number of pages including this cover page: 2

RE: Softrax v. Rasicot

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are

RECYCLED 80000 SERIES 30% P.C.W.

B

Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
617.720.2880 ph.
617.720.3554 fx.
www.dcglaw.com

T. Christopher Donnelly
tcd@dcglaw.com

August 19, 2005

**BY HAND**

Scott Birnbaum, Esq.
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210

Re: Softrax Corporation v. Patrick Rasicot
Norfolk Superior Court - Civil Action No. 05-1342

Dear Scott:

I am responding to your letter dated August 16, 2005.

The Preliminary Injunction enjoins Mr. Rasicot "from working for NetSuite, Inc. until further order of Court." Your report that NetSuite is "compensating Mr. Rasicot during the pendency of this matter" begs the question: compensating him for what? Ordinarily a business compensates only those persons who perform work for it. You told me on August 12, 2005 that Mr. Rasicot immediately ceased working for NetSuite on your receipt of the Preliminary Injunction from the Clerk. While I have the utmost respect for your ethical professionalism, the information you convey is only as good as what your client Mr. Rasicot conveys to you. Softrax, understandably, does not believe Mr. Rasicot. The record demonstrates he is not credible and has prevaricated when it was in his interest to do so. Softrax's concerns are heightened by NetSuite's utter failure to reply in the past week to my August 12, 2005 letter notifying NetSuite of the Preliminary Injunction and requesting NetSuite's confirmation that Mr. Rasicot is not working for it. Rather than receiving any such confirmation, all Softrax has had is word from you that NetSuite is compensating Mr. Rasicot—an action ordinarily associated with employment.

Of additional concern to Softrax is that Mr. Rasicot may continue to be in contact with NetSuite, conveying confidential and proprietary information of Softrax. Any such contact would constitute work within the meaning of the Preliminary Injunction.

In the present circumstances, Softrax cannot agree that Mr. Rasicot is conforming to the Preliminary Injunction.

In addition, please understand that Softrax reserves all claims, rights and remedies against Mr. Rasicot and NetSuite, including, without limitation, those relating to all payments and other forms of value (employee benefits, stock options etc.) conveyed by NetSuite to Mr. Rasicot. Without limiting the foregoing, please be advised that NetSuite's employment of Mr. Rasicot and its continuing compensation of Mr. Rasicot constitute tortious interference with the Softrax-Rasicot Noncompetition, Nondisclosure and Inventions Agreement and violations of M.G.L. c. 93A.

Thank you for your attention to the foregoing. Please call if you have any question.

Very truly yours,

T. Christopher Donnelly

TCD/gs

cc: Peter McMahon, Esq. (by email and first class mail)
Paula M. McManus, Esq.

16.0

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT CLERK'S OFFICE
John Adams Courthouse
One Pemberton Square, Suite 1200
BOSTON, MASSACHUSETTS 02108-1705
(617) 725-8106

August 19, 2005

Norfolk Superior Court Dept.
Clerk for Civil Business
Court House
Dedham, MA 02026

RECEIVED & FILED 8/22/05
CLERK OF THE COURTS
NORFOLK COUNTY

RE: No. 2005-J-0393

**SOFTRAX CORPORATION**
**vs.**
**PATRICK RASICOT**

NOTICE OF DOCKET ENTRY

Please take note that, with respect to the PETITION pursuant to GLc 231, s. 118 with attach, filed by Patrick Rasicot. (Paper #1),

on August 18, 2005, the following order was entered on the docket of the above-referenced case:

RE#1 After review, the petition is denied. (Graham, J.)
*Notice/attest/Brady, J.

Very truly yours,

The Clerk's Office

Dated: August 19, 2005

To: Norfolk Superior Court Dept.
Scott A. Birnbaum, Esquire
T. Christopher Donnelly, Esquire

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

[redacted]

RECEIVED
AUG 16 2005
APPEALS COURT

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. APPEALS COURT

| | |
|---|---|
| SOFTRAX CORPORATION,<br>Plaintiff-Respondent,<br><br>v.<br><br>PATRICK RASICOT,<br>Defendant-Petitioner. | NO. 2005-J-393 |

**DEFENDANT PATRICK RASICOT'S PETITION TO THE SINGLE JUSTICE FOR INTERLOCUTORY REVIEW PURSUANT TO G.L. c. 231, § 118 (1ST PARA.)**

**I. THE ACTION OF THE TRIAL COURT BEING APPEALED FROM.**

On August 12, 2005, the Superior Court (Brady, J.) issued a Preliminary Injunction enjoining Defendant from working for his current employer. The Superior Court Docket Number is NOCV2005-01342. A copy of the order of the Superior Court is attached hereto as Exhibit A.

**II. ISSUES OF LAW RAISED BY THE PETITION.**

1. Was the Superior Court's interpretation of the parties' written noncompetition agreement to apply to Defendant's current employer erroneous?

2. Is the parties' written noncompetition agreement ambiguous?

170

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
DOCKET NO. 05-1342

SOFTRAX CORPORATION,
Plaintiff

v.

PATRICK RASICOT,
Defendant.

8/23/05
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

**ANSWER AND JURY DEMAND**

Defendant Patrick Rasicot ("Rasicot"), by his attorneys, for his answer, states as follows:

1. Denied.

2. Rasicot is without information regarding the allegations in Paragraph 2, and accordingly denies those allegations.

3. Rasicot denies the allegations in Paragraph 3, except that he admits that Softrax is in the business of developing, marketing, and distributing software products that are primarily designed for and sold to software companies.

4. Admit.

5. Paragraph 5 contains legal conclusions to which no response is required. To the extent a response is required, the allegations in Paragraph 5 are denied.

6. Admit.

7. Paragraph 7 contains legal conclusions to which no response is required. To the extent a response is required, the allegations in Paragraph 7 are denied.

8. Rasicot denies the allegations in Paragraph 8 except he admits that Softrax hired him in 1996; that he held the positions of product manager and senior product specialist while employed there; and that Rasicot's employment with Softrax terminated in June 2005.

9. Rasicot denies the allegations in Paragraph 8 except he admits that on or about March 13, 2000, he executed a Noncompetition, Nondisclosure, and Inventions Agreement, which document speaks for itself.

10. Paragraph 10 refers to a written document which speaks for itself.

11. The document speaks for itself.

12. The document speaks for itself.

13. Denied.

14. Rasicot denies the allegations in Paragraph 14, except he admits that he informed Softrax on or about June 3, 2005, that his employment with Softrax would terminate on or about June 17, 2005.

15. Rasicot is without information regarding the allegations in the first sentence of Paragraph 15 and accordingly denies those allegations. Admit that on or about July 18, 2005 Rasicot spoke with Softrax. The remaining allegations in Paragraph 15 are denied.

16. The documents referenced in Paragraph 16 speak for themselves. The remaining allegations in Paragraph 16 are denied.

17. Denied.

18. Rasicot is without information regarding the allegations in Paragraph 18 and accordingly denies those allegations.

19. Denied.

20. Denied.

21. Denied.

22. The document speaks for itself.

23. Rasicot repeats and reincorporates by reference the responses contained in Paragraphs 1-22 as if they were made separately herein.

24. Denied.

25. Denied.

26. Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's claim fails for lack of consideration.

### Third Affirmative Defense

Plaintiff's claim is barred by the doctrines of waiver and/or estoppel.

### Fourth Affirmative Defense

Plaintiff's claim is barred by the doctrine of unclean hands, including but not limited to Plaintiff's misrepresentations, discriminatory treatment (based on Defendant's age), and constructive discharge.

**Fifth Affirmative Defense**

The Agreement is unenforceable, including without limitation, because it is vague, ambiguous, unnecessary to enforce any legitimate business interest of Softrax, and violative of public policy.

**TRIAL DEMAND**

RASICOT HEREBY DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

WHEREFORE, Rasicot respectfully requests that the Court enter judgment in Defendant's favor on Plaintiff's Complaint, with costs and attorney's fees thereon, and such other relief as the Court may deem just and proper.

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO#647649)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

Dated: August 22, 2005

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05

**CERTIFICATE OF SERVICE**

I, Melissa M. Longo, counsel for the defendant, do hereby certify that on this 22nd day of August I caused to be served a true copy of the foregoing upon all parties by mailing same, first class mail, postage pre-paid, to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Melissa M. Longo

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
DOCKET NO. 05-1342

SOFTRAX CORPORATION, )
Plaintiff )
)
v. )
)
PATRICK RASICOT, )
Defendant. )
)

**DEFENDANT PATRICK RASICOT'S**
**NOTICE OF FILING OF NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. § 1446(d), Defendant Patrick Rasicot hereby notifies the Court of the filing of a Notice of Removal of the above-captioned action to the United States District Court for the District of Massachusetts. The Notice of Removal, attached hereto as Exhibit 1, was filed with the United States District Court for the District of Massachusetts on August 30, 2005.

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Dated: August 30, 2005

Melissa M. Longo

Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

**CERTIFICATE OF SERVICE**

I, Melissa M. Longo, counsel for the defendant, do hereby certify that on this 30th day of August 2005, I caused to be served a true copy of the foregoing upon all parties by fax and by mailing same, first class mail, postage pre-paid, to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Melissa M. Longo

1

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

5-1342

18.8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

05 11789 JLT

| | |
|---|---|
| SOFTRAX CORPORATION,<br>Plaintiff,<br>v.<br>PATRICK RASICOT,<br>Defendant. | CASE NO. ______<br>**NOTICE OF REMOVAL**<br>(Diversity) |

I hereby certify on 8/30/05 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on
☑ original filed in my office on 8/30/05
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts
By: ______
Deputy Clerk

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. § 1441 *et seq.*, Defendant Patrick Rasicot hereby removes this civil action from the Massachusetts Superior Court, Norfolk County, Session B, Case No. 05-01342, to the United States District Court for the District of Massachusetts. This Court has removal jurisdiction because this is a civil action "of which the district courts of the United States have original jurisdiction" and an action in which "none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(a) - (b); *see* 28 U.S.C. § 1332.

Removal of this action is proper for the following reasons:

1. On August 1, 2005, plaintiff Softrax Corporation ("Softrax") filed this action against defendant Patrick Rasicot ("Rasicot") in Massachusetts Superior Court, Norfolk County, Case No. 05-01342 (the "State Action"). A true and correct copy of the Summons and Complaint in the State Action is attached hereto as Exhibit 1.[1]

[1] All references to exhibits cited herein, including all process, pleadings and orders served upon defendant, are included in the Appendix of Exhibits Cited in Notice of Removal, submitted herewith.

2. In the State Action complaint, Softrax identifies itself as "a corporation organized under the laws of Delaware, with its principal place of business in Canton, Norfolk County, Massachusetts." Ex. 1, ¶ 2.

3. Rasicot is a resident of the state of Rhode Island. *See* Ex. 1, ¶ 4.

4. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, as explained in the following paragraphs 8-10.

5. In the State Action complaint, Softrax alleges that Rasicot has breached a Noncompetition, Nondisclosure and Inventions Agreement (the "Agreement") dated March 13, 2000. (A copy of the Agreement is attached to Softrax's complaint. *See* Ex. 1.) In its prayer for relief in the State Action complaint, Softrax seeks a preliminary and permanent injunction,

> restraining and enjoining Rasicot from (i) engaging in "Prohibited Business" as defined in Section 2(c) of the Agreement for the "Noncompete Period" defined in the Agreement and (ii) otherwise breaching the agreement.

Ex. 1 at 7.

6. Section 2(c) of the Agreement defines the "Noncompete Period" as "the period commencing on the date of this Agreement and ending two (2) years following the date on which the Employee last performs services for or on behalf of the Company (the 'Severance Date')."

7. Softrax alleges in the State Action complaint that Rasicot resigned from Softrax in June, 2005. *See* Ex. 1, ¶ 8.

8. While Softrax omits any claimed damages from its State Action complaint, the value of the object of the litigation – restraining Rasicot from performing

his new job with NetSuite (*see* Ex. 1, ¶ 16) – is clearly ascertainable by reference to the terms of Rasicot's employment arrangement with NetSuite.

9. A true and correct copy of NetSuite's May 30, 2005 offer letter to Rasicot for the position of "Subject Matter Expert – PreSales" is attached hereto as Exhibit 34. NetSuite's offer letter, which was accepted by Rasicot's counter-signature on June 6, 2005, explicitly sets forth Rasicot's compensation:

> You will be reporting to Melissa Saunders and will receive an annulized [*sic*] salary of $110,000 with an estimated on target earnings of $150,000. . . . You will be granted the option to acquire 15,000 shares of NetSuite common stock, subject to approval by the Board of Directors. Your options will vest, consistent with NetSuite's Stock Plan, 25% one year from grant date and 1/48th monthly thereafter for a total of 4 years vesting.
> Upon your start day, you will be eligible to participate in NetSuite's employee benefit plans including medical, dental, vision, life and disability insurance. You will be eligible to participate in NetSuite's 401(k) plan 90 days after your start date with the company matching 34% of your contribution up to $3,570 per year. . . .

Ex. 2, at 1.

10. Given that Rasicot's compensation, as detailed above, well exceeds $75,000 in a single year, Softrax's requested two-year injunction has a value that exceeds the jurisdictional amount requirements of 28 U.S.C. § 1332.

11. Accordingly, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, and is one which may be removed to this Court by defendant pursuant to the provisions of 28 U.S.C. §§ 1441 and 1446.

12. After serving the State Action complaint, Softrax sought and received a preliminary injunction. On or about August 12, 2005 the Superior Court (Brady, J.), entered a Memorandum and Order, attached hereto as Exhibit 22, allowing Softrax's

Motion for Preliminary Injunction and ordering defendant to refrain from working for NetSuite. On or about August 19, 2005, that order was upheld by a single justice of the Massachusetts Appeals Court. *See* Ex. 29.

13. This Notice of Removal is timely in that it is brought within thirty (30) days of notice of plaintiff's State Action complaint upon Rasicot.

14. A Notice of Filing of this Notice of Removal will be filed promptly with the Massachusetts Superior Court, Norfolk County, and will be served on plaintiff.

15. Rasicot reserves all defenses available to him at law, in equity, or otherwise. Rasicot does not waive any defenses available to him by the filing of the instant Notice.

16. Attached to the Appendix of Exhibits Cited In Notice of Removal, filed herewith, are Exhibits 1-34, which are true and correct copies of all additional pleadings and orders from the State Action.

WHEREFORE, defendant Patrick Rasicot notices the removal of this case to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1332 and 1441, *et seq*.

Respectfully submitted,
PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Dated: August 30, 2005

Scott A. Birnbaum (BBO# 543834)
Robert N. Feldman (BBO# 630734)
Melissa M. Longo (BBO# 647649)
Birnbaum & Godkin, LLP
280 Summer Street, 5th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

**CERTIFICATE OF SERVICE**

I, Melissa M. Longo, counsel for the defendant, do hereby certify that on this 30th day of August 2005, I caused to be served a true copy of the foregoing upon all parties by fax and by mailing same, first class mail, postage pre-paid, to all counsel of record:

T. Christopher Donnelly
Paula M. McManus
COUNSEL FOR PLAINTIFF
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, MA 02108
Tel: 617-720-2880

Melissa M. Longo

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
9/1/05