UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SOFTRAX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CASE 1:05-cv-11789-JLT |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICK RASICOT, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW (1) IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND (2) IN SUPPORT OF
PLAINTIFF'S MOTION FOR DISCOVERY PURSUANT TO RULE 56(f)**

Plaintiff Softrax Corporation ("Softrax"), submits this memorandum (1) in opposition to
Defendant Patrick Rasicot's Motion for Summary Judgment ("Motion") and (2) in support of
Plaintiff's Motion for Discovery Pursuant to Rule 56(f).

Rasicot's Motion is premised on the extraordinary assertion that the Noncompetition,
Nondisclosure and Inventions Agreement ("Agreement") he signed with Softrax does not cover
his working for NetSuite, Inc., a company both Rasicot and NetSuite admit is a direct competitor
of Softrax.  As detailed below, the Motion must be denied because Rasicot's proffered
construction of the Agreement:

- is contrary to the plain language of the Agreement;

- would require this Court to rewrite and add words to the Agreement;

- was squarely rejected by the Superior Court, which correctly construed the
  Agreement to cover Rasicot's working for NetSuite;

- was again rejected by a Single Justice of the Appeals Court, to which Rasicot
  made the identical argument now presented to this Court;

- ignores the stated purpose of the Agreement; and

- ignores Rasicot's conduct at the time he breached the Agreement, including his repeated efforts to deceive Softrax with respect to his plans to work for a competitor and his subsequent plea, once confronted by the fact of his employment with NetSuite, that Softrax "cut him some slack" under the Agreement and allow him to keep working for NetSuite.

On the present record, this Court should deny the Motion. If, however, the Court decides to consider in greater detail the circumstances under which Rasicot departed Softrax and joined NetSuite, as well as the other conduct of both Rasicot and NetSuite directly bearing on the construction of the Agreement, then Softrax respectfully requests the Court to defer ruling on the summary judgment motion until Rasicot and NetSuite have provided the discovery identified in Softrax's Rule 56(f) motion.

## FACTS

Rasicot has presented only a narrow subset of the full factual picture, ignoring settled law which discourages Courts from reading a contract in a vacuum, disregarding its context and purpose. *See* pages 11-12 below. The additional relevant facts are detailed in Plaintiff's Statement of Additional Material Facts in Opposition to Defendant's Motion for Summary Judgment ("SAMF"). Those additional facts are supported by the affidavits and documents attached thereto.

Furthermore, Rasicot has alleged numerous facts regarding NetSuite's business, customers and products. Softrax is able to contest some of those facts from statements included on NetSuite's own website. *See, e.g.,* paragraph 15 in Plaintiff's Response to "Statement of Undisputed Material Facts in Support of Defendant Patrick Rasicot's Motion for Summary Judgment," which demonstrates the utter falsity of Rasicot's assertion that NetSuite's products are not designed for use by software companies. But in other instances, Softrax is unable to determine the truth or falsity of claims regarding NetSuite's business, because the information is

in the hands of NetSuite and Rasicot and they have refused to provide any discovery.

Accordingly, Softrax has moved for relief under Fed. R. Civ. P. 56(f).

Based on what Softrax knows at this point, the relevant facts are summarized below.

### Softrax's Business

Softrax is a developer and seller of financial applications software based in Canton,

Massachusetts. The software is licensed to businesses wishing to optimize their revenues and

implement effective revenue management business processes. Softrax also provides professional

services at its customer sites, including implementation, business processes analysis and

technical projects. It has approximately 200-300 customers. While Softrax initially focused its

product and marketing on the software industry, it anticipated expanding its customer base to

other markets, and in fact has done so. *SAMF*, ¶¶ 1-2.

### Rasicot's Employment at Softrax and the Agreement

For nearly nine years, Softrax employed Rasicot in positions that immersed him in

Softrax's confidential and proprietary information and involved his direct contact with customers

and Softrax goodwill. *SAMF*, ¶¶ 3-4. Beginning in 1996, Rasicot installed, configured and

implemented Softrax's software at customer sites, and he trained Softrax customers. In that

capacity, and under Softrax's active tutelage, Rasicot gained a comprehensive knowledge of its

customers' needs and business practices. *SAMF*, ¶¶ 4, 9-11.

In 2000, in conjunction with and in consideration for a twelve percent salary increase and

change of position, Rasicot signed the non-competition Agreement. The purpose of Agreement

was to protect Softrax's legitimate business interests, including its confidential information, its

competitive edge, its investment in high level employees and its goodwill. *SAMF*, ¶¶ 6-7.[1]

---

[1] Rasicot had signed previously two agreements committing him to protect the confidential and proprietary information of Softrax. *SAMF*, ¶ 5.

3

Under the Agreement, in addition to committing to protect the confidential and proprietary

information of Softrax, Rasicot also agreed not to work for a Softrax competitor for two years

after his employment ended.  Specifically, the Agreement provided in clear terms:

> [Rasicot] shall not . . . during the [two years following service at
> Softrax], directly or indirectly (either as [an] employee . . . or in
> any other capacity whatsoever), engage in . . . any 'Prohibited
> Business' [i.e.] any business engaged primarily in the
> development, . . . sale, distribution [or] licensing . . . of products or
> services involving . . . financial application software designed for
> use by software and information services companies.

In his new position as Product Manager, Rasicot became not only further immersed in

Softrax's confidential and proprietary information, but a creator of that information.  He was

responsible for Softrax's three flagship products including their design, development, market

positioning and customer interface.  His job required in depth product knowledge, and a

comprehensive understanding of individual customer business requirements and needs as well as

larger market requirements.  Rasicot was responsible for, *inter alia*, writing software

development specifications, defining and prioritizing customer needs, responding to customer

concerns and issues, developing product strategy, and supporting Softrax's staff and customers,

beginning with the pre-sales process and continuing through implementation and ongoing use of

the software by the customers in live production.  *SAMF*, ¶¶ 9-11.

In October 2001, Rasicot's title was changed to senior product strategist in recognition of

his expertise and critical support role to many groups within Softrax.  A significant portion of

Rasicot's job involved working with both Softrax's installed customer base and the company's

prospective customers, a fact that Rasicot himself touted in his 2005 self-evaluation.  *SAMF*, ¶¶

10-11.

## Softrax's Discovery That Rasicot Was Working For NetSuite

On June 3, 2005, Rasicot voluntarily resigned from Softrax, effective June 17, 2005. In response to direct inquiries from four different Softrax officers, Rasicot said that he was planning to take the summer off to sail and to contemplate his future. *SAMF*, ¶ 13. Softrax learned later that those statements were false. *SAMF*, ¶ ¶ 15-20.

On or about July 14, 2005, Softrax heard that Rasicot may have actually joined NetSuite, a large and well-funded competitor of Softrax. (*See* pages 6-7 below for more information regarding NetSuite). On July 18, 2005, in response to a direct personal inquiry from Softrax's Chief Financial Officer as to Rasicot's relationship with NetSuite, Rasicot falsely stated that he was only working as "an outside consultant" for NetSuite, that this consultancy was limited to two days per week, and that his services were limited to the implementation of NetSuite products for manufacturing companies. A day later Rasicot repeated these false representations to a second Softrax officer and then expressly asked that Softrax "cut him some slack" and not enforce the Agreement against him. *SAMF*, ¶¶ 15-17.

Having learned that Rasicot was working with NetSuite, where Rasicot's inside information about Softrax and its customers would both harm Softrax and unfairly benefit NetSuite, Softrax sent Rasicot a cease and desist letter demanding compliance with the Agreement. Despite promising a response, Rasicot never responded. *SAMF*, ¶¶ 18-19. Instead, NetSuite wrote a letter (the "NetSuite Letter") which described Rasicot as a highly-paid NetSuite employee (rather than a consultant). The NetSuite Letter asserted that Rasicot, during his Softrax tenure, "did not have broad knowledge of Softrax's customers and its sales methods and he rarely, if ever, worked directly with customers." In fact, as Rasicot himself stated in his Softrax self-evaluation, (a) he worked directly "and continually" with Softrax customers, (b) he

5

also worked directly and extensively with the Softrax sales force and professional services teams regarding sales methods and customer needs, and (c) he was "key" in closing sales. *SAMF*, ¶¶20-21.

Moreover, in direct contrast to Rasicot's present contention that the language of the Agreement is unambiguous, the NetSuite Letter asserted: "The [A]greement is hopelessly ambiguous." From that premise, NetSuite contended that the Agreement did not prohibit Rasicot from working for a competitor. The NetSuite Letter then argued, as a fallback position: specifically, that NetSuite was outside the definition of "Prohibited Business" set forth in the Agreement. *SAMF*, ¶22. NetSuite did not deny that it competes with Softrax, because, in fact, NetSuite does, aggressively and by name.

<u>**NetSuite Is A Direct Competitor Of Softrax**</u>

NetSuite competes directly with Softrax in providing software applications that address revenue management and related financial matters. NetSuite's chief financial officer admitted (in an affidavit submitted on behalf of Rasicot) that NetSuite has competed directly with Softrax for the same customers on numerous occasions. *SAMF*, ¶4. Moreover, NetSuite's website specifically identifies Softrax as a competitor. *SAMF*, ¶26.[2] The direct competition between NetSuite and Softrax is confirmed and detailed in the testimony of Softrax's chief executive officer. *SAMF*, ¶27.

NetSuite--with offices around the world--has thousands of customers, including software companies. *SAMF*, ¶28. Rasicot's attempt to argue that NetSuite's products are not designed for use by software companies is astounding, particularly because this claim is repeatedly

---

[2] As discussed on page 10-11 below, both Rasicot and NetSuite have refused to provide Softrax any discovery. Thus, the full extent to which NetSuite has internally identified Softrax as a competitor is presently unknown to Softrax.

contradicted by NetSuite.  For example, NetSuite has publicly proclaimed in its various

published marketing materials:

> "Many features in NetSuite are tailor-made for the software
> industry."  *SAMF*, ¶29.

> "Hundreds of software companies run their business on NetSuite--
> and we do too."  *SAMF*, ¶29.

> "Here's why NetSuite is the best application for software
> companies."  *SAMF*, ¶29.

> "NetSuite Features and Benefits for Software Companies."  *SAMF*,
> ¶29.

> "One Application to Manage Your Software Business.…  NetSuite
> is the one intelligent, integrated, customizable application to unify
> your business processes, increase visibility for better decision
> making, and extend processes to your customers and channel
> partners."  *SAMF*, ¶29.

> "To learn more about what NetSuite can do for your software
> company contact us now."  *SAMF*, ¶29.

In short, NetSuite falls squarely within the definition of a "Prohibited Business" set forth in the

Agreement.  It is, in the words of the Agreement, a business "engaged primarily in the

development [and] sale…of products…involving…financial application software designed for

use by software…companies."  Not surprisingly, this is exactly what the Superior Court and

Appeals Court each independently concluded.  *See* pages 8-10 below.


### Rasicot's Employment at NetSuite Would Cause Grave Irreparable Harm to Softrax

Rasicot's working for NetSuite would cause grave irreparable harm to Softrax.  Rasicot

has comprehensive knowledge of the architecture and database structure of Softrax's three

flagship products—knowledge that is confidential and proprietary.  Such knowledge could be

shared directly with NetSuite and its customers, giving NetSuite an unfair competitive

advantage; in addition, such knowledge and information would allow Rasicot to quickly discount or dismiss different product enhancement requests or design alternatives. Thus, much of the Softrax proprietary and confidential information could be conveyed even if Rasicot did not "intend" to do so. Furthermore, in his work with NetSuite customers and prospects, Rasicot would be drawing on proprietary and confidential Softrax information and goodwill. *SAMF*, ¶32.

## Construction of the Agreement by the Massachusetts Courts

Given Rasicot's clear violation of the Agreement, and facing continued irreparable harm including dissemination and abuse of its confidential and proprietary information, loss of good will and damage to its reputation, Softrax sued Rasicot in Massachusetts Superior Court on August 1, 2005.[3] At the same time, Softrax moved for a preliminary injunction. Rasicot opposed, submitting four affidavits and a 27-page memorandum of law. Rasicot's lead argument in the Superior Court was identical to the argument he now offers to this Court: that NetSuite is not a "Prohibited Business" within the Agreement because it is not engaged in selling software that is primarily designed for software and information service companies. [*Memo in Opposition*, p. 14].[4] Rasicot argued then, just as he does now, that NetSuite is excluded from the reach of the Agreement because NetSuite's customers include companies outside of the software industry in addition to customers which are software companies. The argument, however, is based on a fallacy. The Agreement does not say that the software must be primarily designed for software companies, but rather that the company's primary business must be the development and distribution of financial applications software. The Superior Court identified that fallacy.

---

[3] The entire Superior Court record appears as Docket Entry 9 in this action.
[4] As shown in the Argument below, Rasicot's argument is fatally flawed as it requires the Court to move words and add words to the Agreement.

On August 11, 2005, the Superior Court heard lengthy oral argument from counsel for both parties.  The following day, the Superior Court Justice (Judge Patrick Brady, appointed in 1989) flatly rejected Rasicot's argument:

> NetSuite falls within the contract's definition of "prohibited businesses" as it is "engaged primarily in the . . . sale . . . of products . . . involving . . . financial application software designed for use by software . . . companies."  As I construe the language, it does not matter that a relatively small percentage of NetSuite's customers are software companies.

*Softtrax Corp. v. Rasicot*, No. 05-1342 (Mass. Sup. Ct. August 12, 2005) (memorandum and order granting preliminary injunction).  The Superior Court enjoined Rasicot from working for NetSuite through final disposition of the case.

Rasicot then filed a petition to the Single Justice of the Massachusetts Appeals Court for interlocutory review of the Preliminary Injunction pursuant to Mass. Gen. Laws c. 231, § 118 (1st paragraph).  The sole focus of the petition was the Superior Court's construction of the Agreement.  Rasicot first argued that NetSuite was not a "Prohibited Business" under the language of the Agreement.  Rasicot then argued that "at the very least, the definition [of Prohibited Business] is ambiguous," and that the alleged ambiguity should be construed against Softtrax.  *SAMF*, ¶ 35.

The Single Justice of the Appeals Court denied Rasicot's petition.

Notwithstanding Rasicot's previous argument to both the Superior Court and the Appeals Court that the language of the Agreement is "at the very least," ambiguous, he has now taken the position that the language is completely unambiguous as a matter of law.  Such a change in position, on its face, invites great skepticism.  In this case, to argue that contractual language is unambiguous after two experienced jurists have, in fact, ruled directly contrary to the

construction which Rasicot now argues is the only possible construction, further exposes the frivolous nature of the Motion.

### Rasicot and NetSuite Refuse All Discovery

The Superior Court ordered trial to commence November 7, 2005, with discovery to be completed by October 28, 2005. On August 16, 2005, Softrax served on Rasicot a request for production of documents, and noticed his deposition for September 20, 2005. Shortly thereafter, Softrax moved for issuance of a letter rogatory and commission to depose NetSuite in California.

On August 30, 2005, 29 days after the complaint was initially filed, Rasicot removed the action to this Court, relying on diversity jurisdiction. Rasicot elected not to move for dissolution of the Preliminary Injunction, which remains in effect.[5] The undersigned contacted Rasicot's counsel to determine whether Rasicot considered the prior document requests and deposition notice effective. Rasicot's counsel stated an intention to move for summary judgment and to seek a protective order barring all discovery.

On September 6, 2005, Softrax served its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). Softrax then issued a subpoena for documents and deposition testimony from NetSuite. NetSuite subsequently objected to producing *any* documents or providing *any* testimony. Rasicot has not produced any documents and failed to appear for deposition. Due to the combined Rasicot-NetSuite stonewall, Softrax does not yet have, *inter alia*, the following:

- the details of Rasicot's interactions with NetSuite while Rasicot was employed by Softrax;

- the scope of the services Rasicot has provided to NetSuite to date;

---

[5] Section 1450 states, in pertinent part: "All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the District Court."

- the amount of money paid to Rasicot by NetSuite, including the amount of 'salary' paid to Rasicot after the preliminary injunction was entered enjoining Rasicot from working for NetSuite;

- full information concerning NetSuite's consideration of Softrax as a competitor;

- communications between NetSuite and Rasicot concerning the noncompetition Agreement;

- and agreements between Rasicot and NetSuite regarding the Agreement, including arrangements for attorney's fees and costs.

The Rasicot-NetSuite barricade has also prevented Softrax from determining whether Rasicot is violating the Preliminary Injunction. NetSuite continued to pay Rasicot salary after entry of the injunction. Compensation is ordinarily paid in exchange for services rendered. Indeed, on August 22, 2005, the Superior Court, denying Rasicot's motion for clarification of the injunction, ruled: "[T]his Court notes that if NetSuite is paying Defendant, this strongly suggests that Defendant is performing some services in violation of the Preliminary Injunction."

## ARGUMENT

### I.    SUMMARY JUDGMENT MUST BE DENIED BECAUSE THE AGREEMENT DOES NOT, AS A MATTER OF LAW, PERMIT RASICOT TO WORK FOR NETSUITE

In construing a contract, the Court is guided by the language of the instrument, its purpose, justice and common sense. *Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 701 (1964). A contract should be given a construction which will make it a rational business instrument, giving the language reasonable meaning. The contract "must be read in a manner that will give effect to the chief design to be accomplished by it." *Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers*, 411 Mass. 39, 57 (1991).

Summary judgment may be entered only when there are no genuine issues of material fact. Summary judgment on an issue of contract construction is appropriate only when the "plain terms unambiguously favor" the moving party; otherwise, "contract meaning normally becomes a matter for the factfinder." *Bank v. Int'l Bus. Machine Corp.*, 143 F.3d 420, 424 (1st Cir. 1998)(quoting *Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 52 (1st Cir. 1996)). In view of the numerous considerations which guide contract construction, summary judgment is rarely granted on a matter of contract interpretation. Thus, it is no surprise that Rasicot has failed to cite *any* case in which summary judgment has been entered in circumstances remotely similar to those presented here.

### A. The Language of the Agreement Clearly Proscribes Rasicot Working for Net Suite

The Agreement's proscription against Rasicot working for NetSuite could not be clearer. Rasicot cannot work for any "Prohibited Business." A "Prohibited Business" is defined as "any business engaged primarily in the development, . . . sale, distribution [or] licensing . . . of products or services involving . . . financial application software designed for use by software and information services companies." NetSuite is engaged primarily in the business of developing, selling and licensing products and services involving financial application software. Its financial application software is also expressly designed for use by software and information services companies, according to NetSuite's own marketing materials. *SAMF*, ¶¶29-31. Significantly, NetSuite itself identifies Softrax as a competitor. *SAMF*, ¶26.

In the face of the plain words of the Agreement, Rasicot instead proffers an "interpretation" that in reality requests this Court to materially revise the language in the Agreement. Specifically, Rasicot would like this Court to add the words "solely," "exclusively," "only" and/or "specifically" to the Agreement, so it would read:

> [Rasicot] shall not…during the [two years following service at
> Softrax], directly or indirectly (either as [an] employee…or in any
> other capacity whatsoever), engage in…any 'Prohibited Business'
> [i.e.] any business engaged primarily in the development,…sale,
> distribution [or] licensing…of products or services
> involving…financial application software designed for use
> ***solely/exclusively/only/specifically*** by software and information
> services companies.

Indeed, NetSuite's chief financial officer revealed defendant's position when he asserted that

NetSuite's "product is not designed *specifically* for software companies." Affidavit of Jim

McGeever, dated August __, 2005, ¶2 (emphasis added). However, that the software was, in

fact, designed for use by software companies, he carefully does not deny. Rasicot's hope was,

and apparently still is, to deflect the Court's attention from the actual contractual language.

Whether a product is designed *specifically* or *solely* for software companies is totally irrelevant.

That is not what the actual language in the Agreement requires.

      The circumstances of Softrax's business in 2000 confirm that the noncompetition

agreement was written to encompass businesses whose products are targeted to customers inside

and outside of the software industry. Even accepting as true Rasicot's estimate that only five

percent of Softrax's customers in 2000 were outside the software field, not only did Softrax have

such customers but it also reasonably anticipated that its business would expand to include many

more—as, in fact, it has. *SAMF*, ¶2. Thus, in 2000, it would have made no sense for Softrax to

limit the reach of its noncompetition agreement when Softrax itself was expanding its own reach.

Softrax's legitimate business interests--confidential and proprietary information and goodwill--

would equally be at risk whether a former employee joined a competitor which had only

software customers, or which had software customers as well as many customers outside of the

software vertical. The contract does not draw a distinction between those situations. Rather, the

Agreement excludes businesses, such as cash register sellers (those not engaged primarily in the

sale of financial application software), whose product simply included an ancillary software component--i.e., a business not engaged primarily in the sale of products involving financial application software.

The simple truth is that the words that Rasicot wants to add to the Agreement's definition of Prohibited Business -- "solely," "exclusively," "only" and/or "specifically" -- do not appear in that definition, and the Court has no authority to add them. *Attorney Gen'l v. Comm. Of Norfolk County*, 412 Mass. 1012, 1013 (1992) (citing *Marcelle Inc. v. Sol V.S. Marcus Co.*, 274 Mass. 469, 474 (1931)); *National Medical Care, Inc. v. Zigelbaum*, 18 Mass. App. Ct. 570, 575-576 (1984); *Fenoglio v. Augut, Inc.,* 50 F.Supp.2d 46, 52 (D. Mass. 1999) (same).

Rasicot seems to contend that the word "primarily"--notwithstanding its placement in the sentence--should somehow modify "for use by software companies" rather than modifying the words which actually precede and follow it. Specifically, the language covers a business "engaged primarily in the development . . . sale, distribution [or] licensing . . . of products or services involving ... financial applications...." Rasicot's strained construction would require the Court to rewrite the agreement by moving the word "primarily" to the final clause, so it would read "designed ***primarily*** for use by software...companies." *See National Medical Care, Inc.*, 18 Mass. App. Ct. at 575-576.

In short, both the Superior Court and the Appeals Court Single Justice independently identified Rasicot's attempted legerdemain and correctly rejected it. This Court should do the same.

### B. Rasicot's Actions and Words at the Time of His Breach Confirm that the Agreement Proscribes His Working for NetSuite

In addition to the plain language of the noncompetition agreement, which itself is dispositive, Softrax's construction is supported by Rasicot's repeated attempts at deception

contemporaneous with his violation of the Agreement.  As detailed in several affidavits, Rasicot

affirmatively, repeatedly mislead Softrax with respect to his relationship with NetSuite.  In fact,

after Rasicot had already accepted the position at NetSuite, and while he was still working for

Softrax, Rasicot continued to tell Softrax that he had no immediate plans for his future other than

sailing.  *SAMF*, ¶13.  Subsequently, in an effort to 'cover up' his violation of the Agreement,

Rasicot lied about the nature of his position, saying under oath in his affidavit, for example, that

he had little contact with customers when, by his own assertion in his employee self-evaluation,

he spent a huge amount of time dealing with customers and prospective customers.  *Affidavit of*

*Patrick Rasicot, dated August 10, 2005*, ¶17; *SAMF*, ¶21.

    The record permits this Court to draw the inference from Rasicot's conduct--particularly

his lies and subsequent plea for "some slack"--that Rasicot was well aware, in June 2005 and

thereafter, that his working for NetSuite would and did violate his noncompetition Agreement.[6]

### C.  The Purpose of the Agreement and Common Sense Confirm that the Agreement Prohibits Rasicot from Working for NetSuite

    It is beyond dispute that the purpose of the Agreement was protection of Softrax's

legitimate business interests, in particular its confidential and proprietary information, its

investment in high level, highly compensated employees such as Rasicot, its competitive edge in

product development and customer service, and its goodwill.  *SAMF*, ¶7.  The object of the

Agreement would not be served by construing it to prohibit Rasicot's employment at a Softrax

competitor with customers in only *one* industry (software companies) but to allow his

employment at a Softrax competitor with customers in *multiple* industries, including the software

industry.  In either case, Softrax's legitimate interests would be irreparably harmed.  Such

---

[6] As addressed under Heading II below, Rasicot and NetSuite have unilaterally barred Softrax from discovering further information regarding their actual understanding of the noncompetition Agreement.  Softrax seeks relief under Rule 56(f), to the extent the Court wishes further information.

construction would be irrational, at odds with the black letter principles that a contract be

construed to give it effect as a rational business instrument and to accomplish its chief design.

*Bank*, 145 F.3d at 430; *Mass. Mun.*, 411 Mass. at 57.

### D.  The Superior Court and Appeals Court Decisions Fortify Softrax's Construction of the Agreement

Rasicot's summary judgment Motion is founded on the contention that his construction of

the Agreement is the *only* permissible construction—that it must be adopted as a matter of law

because the Agreement can be read *no other way*.  In fact, a sixteen year veteran Superior Court

Justice, on a replete record, construed the Agreement directly opposite to Rasicot's position.

Even if not strictly binding as "law of the case," it is certainly illuminating as to how an unbiased

reader would construe the Agreement.   If the Agreement "unambiguously favor[ed]" Rasicot,

*Bank*, 143 F.3d at 424, then it would be virtually impossible for an experienced judge to read the

Agreement any other way.  But that is exactly what happened here.

Similarly enlightening is the fact that Appeals Court Justice Graham--a jurist since 1982

who was elevated to Appeals Court in 2004—agreed with the construction of the Agreement

given by the Superior Court.  In doing so, the Appeals Court Justice flatly rejected Rasicot's

proposed construction which Rasicot was advocating based on the identical argument he is now

making to this Court.[7]

In short, in two separate decisions, experienced judges not only construed against Rasicot

the very language he tells this Court is subject to only one interpretation, but rejected Rasicot's

argument that the Agreement is, "at the very least, ambiguous."  To these jurists, the language of

the Agreement is unambiguous.  NetSuite falls within the definition of Prohibited Business and

Rasicot was enjoined from working there.

---

[7] Further, this Court should not ignore the fact that Rasicot argued, alternatively, in both state court forums that the Agreement was ambiguous – an argument both the Superior Court Justice and the Appeals Court Justice rejected.

### E. Summary

All tools of contract construction--language, purpose, common sense, affecting a rational instrument, intent of the parties--point to one conclusion: the Agreement prohibits Rasicot from working for NetSuite, a competitor of Softrax. Not surprisingly, the Superior Court and Appeals Court Single Justice reached the same conclusion. Entry of summary judgment for Rasicot would, quite literally, be unprecedented. Rasicot's Motion should be denied.

**II.      IF THE COURT WISHES MORE DETAILED INFORMATION REGARDING CONDUCT OF RASICOT RELEVANT TO CONSTRUCTION OF THIS AGREEMENT, IT SHOULD PERMIT SOFTRAX'S DISCOVERY**

As demonstrated above, there are overwhelming reasons to deny Rasicot's Motion. If, however, the Court wishes more detailed information regarding conduct of Rasicot relevant to construction of the Agreement, then it should grant Softrax's Motion for Discovery Pursuant to Rule 56(f).

Under Fed. R. Civ. P. 56(f), the Court may continue a summary judgment motion to allow deposition and other discovery directed toward developing facts to oppose summary judgment. As set forth above, facts relevant to construction of the Agreement include the conduct of Rasicot and NetSuite before, during and after his departure from Softrax and statements by Rasicot and NetSuite regarding the Agreement and its reach. While Rasicot has made some harmful admissions on those topics, he and NetSuite (and perhaps other witnesses) are the source of relevant facts and documents. For example, it would certainly be relevant to know that NetSuite privately acknowledged to Rasicot that he was at risk under the noncompetition Agreement and, therefore, (a) Rasicot should hide his employment plans from Softrax, and (b) NetSuite would cover, directly or indirectly, any fees and expenses Rasicot might incur as a result of his taking employment with NetSuite. As a further example, it would

be relevant to know if Rasicot sent emails expressing concerns about the breadth of the noncompetition Agreement, or on his ability to perform services for NetSuite without violating the Agreement. Likewise, it would be relevant to understand the scope and nature of the work Rasicot has already performed for NetSuite, the extent and timing of the compensation he has received from NetSuite, and the commitments on future compensation which NetSuite may have made to him.

In addition, seven of the fifteen "facts" included in Rasicot's Statement of Undisputed Facts make assertions regarding NetSuite's business, products and customers. Rasicot seems to think those alleged facts are material. Yet he and NetSuite have refused to provide any discovery on those topics--or any others. They have therefore put Softrax in the unfair position of being unable to fully controvert those allegedly material facts. If the Court considers those facts relevant, then Softrax should be permitted discovery on them.

The fact that Rasicot and NetSuite have joined together to refuse all discovery, while, at the same time, Rasicot rushed to file a summary judgment motion, promotes the inference that they have information to hide--information detrimental to their present position.

Accordingly, the Court should permit the discovery appended to the Donnelly Affidavit filed in support of Plaintiff's Motion for Discovery Pursuant to Rule 56(f). *Resolution Trust Corp. v. North Bridge Assoc., Inc.,* 22 F.3d 1198, 1203 (1st Cir. 1998); *Commonwealth Alum. Corp. v. Markowitz*, 164 F.R.D. 117, 120-121 (D. Mass. 1995) (granting Fed. R. Civ. P. 56(f) motion where "there is no evidence that *any* discovery has begun") (emphasis in original).

## CONCLUSION

Softrax respectfully requests the Court to deny Rasicot's summary judgment motion or, alternatively, defer disposition thereof and allow Softrax discovery.

SOFTRAX CORPORATION

By its attorneys,

/s/ T. Christopher Donnelly

T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Date:   October 3, 2005