UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SOFTRAX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CASE  1:05-cv-11789-JLT |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICK RASICOT, | ) | |
| Defendant. | ) | |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 and Fed. R. Civ. P. 56(f), plaintiff Softrax Corporation ("Softrax") submits the following statement of additional facts that are material to the motion for summary judgment filed by defendant Patrick Rasicot ("Rasicot"). Each fact is supported by cited affidavit testimony and/or documentary evidence. With only two exceptions, the affidavits referred to herein were previously filed in the Norfolk County Superior Court Action, and copies are included in the Superior Court record filed by defendant in this Court on September 19, 2005 (Docket No. 9). The new affidavits of Jake Fennessy, dated September 30, 2005, and T. Christopher Donnelly, dated October 3, 2005, are being filed today.

### Softrax's Business

1.  Softrax is a developer and seller of financial applications software based in Canton, Massachusetts. The software is licensed to businesses wishing to optimize their revenues and implement effective revenue management business processes. Softrax also provides professional services at its customer sites, including implementation, business processes analysis and technical projects. It has approximately 200-300 customers. *Affidavit*

*of Robert D. O'Connor, Jr., dated July 29, 2005("O'Connor Affidavit"), ¶¶2-3; Reply*

*Affidavit of Robert D. O'Connor, Jr., dated August 11, 2005("O'Connor Reply Affidavit"),*

¶11.

2.   While Softrax initially focused its product and marketing on the software

industry, it anticipated expanding its customer base to other markets, and in fact has done so.

*O'Connor Affidavit, ¶¶4-9; O'Connor Reply Affidavit, ¶9 and Ex. C thereto.*

### Rasicot's Employment at Softrax and the Agreement

3.   For nearly nine years, from 1996 until June 2005, Softrax employed Rasicot in

positions that immersed him in Softrax's confidential and proprietary information and

involved his direct contact with customers and Softrax goodwill.  See paragraphs 4-11 below

and *O'Connor Reply Affidavit, ¶32.  .*

4.   Beginning in 1996, Rasicot installed, configured and implemented Softrax's

software at customer sites, and he trained Softrax customers.  In that capacity, and under

Softrax's active tutelage, Rasicot gained a comprehensive knowledge of its customers' needs

and business practices.  Both the work Rasicot performed for customers and the information

he obtained from customers regarding their business processes was considered highly

confidential and proprietary in nature.  *Affidavit of David Milligan, dated August 1, 2005*

*("Milligan Affidavit"), ¶¶2-3.*

5.   In September 1996 when he joined Softrax and again in 1998, Rasicot signed

agreements committing him to protect the confidential and proprietary information of

Softrax.  *O'Connor Reply Affidavit, ¶19-20 and Ex. G and H.*

6.   In 2000, in conjunction with and in consideration for a twelve percent salary

increase and change of position, Rasicot signed the Noncompetition, Nondisclosure and

Inventions Agreement (the "Agreement").  *O'Connor Affidavit*, ¶¶4-9 and Ex. A thereto;

*O'Connor Reply Affidavit*, ¶¶22-23 and Ex. K thereto.

     7.  The purpose of the Agreement was protection of Softrax's legitimate business

interests, including (1) Softrax's confidential and proprietary information, (2) the investment

Softrax makes in its high level employees like Rasicot, (3) Softrax's competitive edge in

product development and customer service, and (4) Softrax's goodwill and other interests.

*O'Connor Affidavit*, ¶13.

     8.  Under the Agreement, in addition to committing to protect the confidential and

proprietary information of Softrax, Rasicot agreed not to work for a Softrax competitor for

two years after his employment ended.  Specifically, the Agreement provided in clear terms:

> [Rasicot] shall not  . . . during the [two years
> following service at Softrax], directly or indirectly
> (either as [an] employee . . . or in any other capacity
> whatsoever), engage in . . . any 'Prohibited Business'
> [i.e.] any business engaged primarily in the
> development, . . . sale, distribution [or] licensing . . .
> of products or services involving . . . financial
> application software designed for use by software and
> information services companies.

*O'Connor Affidavit*, ¶12 and Ex. A thereto.

     9.  In his new position as Product Manager, Rasicot became not only further

immersed in Softrax's confidential and proprietary information but also a creator of such

information.  He was responsible for Softrax's three flagship products including their design,

development, market positioning and customer interface.  His job required in depth product

knowledge, and a comprehensive understanding of individual customer business

requirements and needs as well as larger market requirements.  Rasicot was responsible, <u>inter

alia</u>, for writing software development specifications, defining and prioritizing customer

needs, responding to customer concerns and issues, developing product strategy, and supporting Softrax's staff and customers, beginning with the pre-sales process and continuing through implementation and ongoing use of the software by the customers in live production. *Affidavit of Gottfried Sehringer, dated July 29, 2005 ("Sehringer Affidavit"), ¶¶2-8; O'Connor Affidavit, ¶¶10-11; .*

10. In October 2001, Rasicot's title was changed to senior product strategist in recognition of his expertise and critical support role to many groups within Softrax. *Sehringer Affidavit, ¶3.*

11. A significant portion of Rasicot's job involved working with both Softrax's installed customer base and the company's prospective customers, a fact that Rasicot himself touted in his 2005 self-evaluation. *Sehringer Affidavit, ¶¶5-6 and Ex. A thereto.*

12. Rasicot was well compensated by Softrax. His annual salary at the time he resigned in June 2005 was $101,850. *Sehringer Affidavit, ¶9.*

### Softrax's Discovery That Rasicot Was Working For NetSuite

13. On June 3, 2005, Rasicot voluntarily resigned from Softrax, effective June 17, 2005. In response to direct inquiries from four different Softrax officers, Rasicot said that he was planning to take the summer off to sail and to contemplate his future. *Sehringer Affidavit, ¶10; O'Connor Affidavit, ¶12 and Ex. B thereto; O'Connor Reply Affidavit, ¶¶27 and 28 and Ex. L and M thereto; Milligan Affidavit, ¶¶15-16; Affidavit of Josh Roffman, dated August 11, 2005, ¶5.*

14. As described in paragraphs 15-20 below, Softrax learned later that those statements by Rasicot were false.

15. On or around July 14, 2005, Softrax heard that Rasicot may have actually joined NetSuite, a large and well-funded competitor of Softrax. *Affidavit of Jake Fennessy, dated August 1, 2005 ("Fennessy Affidavit")*, ¶4. (*See* paragraphs 24-31 below for more information regarding NetSuite).

16. On July 18, 2005, in response to a direct personal inquiry from Softrax's Chief Financial Officer as to Rasicot's relationship with NetSuite, Rasicot falsely stated that he was only working as "an outside consultant" for NetSuite, that the consultancy was limited to two days per week, and that his services were limited to the implementation of NetSuite products for manufacturing companies. *Fennessy Affidavit*, ¶4.

17. A day later Rasicot repeated these false representations to a second Softrax officer and then expressly asked that Softrax "cut him some slack" and not enforce the Agreement against him. *Milligan Affidavit*, ¶¶18-19.

18. Having learned that Rasicot was working with NetSuite, where Rasicot's inside information about Softrax and its customers would both harm Softrax and unfairly benefit NetSuite, on July 19, 2005, Softrax sent Rasicot a cease and desist letter demanding compliance with the Agreement. *Sehringer Affidavit*, ¶17 and Ex. C thereto; *Fennessy Affidavit*, ¶5

19. Despite promising a response, Rasicot never responded. *Fennessy Affidavit*, ¶¶6-7; *Sehringer Affidavit*, ¶17 and Ex. D thereto

20. Instead, NetSuite wrote a letter (the "NetSuite Letter") which described Rasicot as a highly paid NetSuite employee (rather than a consultant) and made clear that Rasicot was in a unique position at NetSuite to do serious harm to Softrax. *Sehringer Affidavit*, ¶17 and Ex. E thereto; *Fennessy Affidavit*, ¶¶8-9.

21. The NetSuite Letter asserted that Rasicot, during his Softrax tenure, "did not have broad knowledge of Softrax's customers and its sales methods and he rarely, if ever, worked directly with customers." *Sehringer Affidavit,* ¶17 and Ex. E thereto. In fact, as Rasicot himself stated in his Softrax self-evaluation, (a) Rasicot worked directly "and continually" with Softrax customers, (b) he also worked directly and extensively with the Softrax sales force and professional services teams regarding sales methods and customer needs, and (c) he was "key" in closing sales. *Sehringer Affidavit,* ¶¶5-6 and Ex. A thereto.

22. Moreover, in direct contrast to Rasicot's present contention that the language of the Agreement is unambiguous, the NetSuite Letter asserted: "The [A]greement is hopelessly ambiguous." *Sehringer Affidavit,* ¶17 and Ex. E thereto. From that premise, NetSuite contended that the Agreement did not prohibit Rasicot from working for a competitor. *Sehringer Affidavit,* ¶17 and Ex. E thereto. The NetSuite Letter then argued, as a fallback position, that NetSuite was outside the definition of "Prohibited Business" set forth in the Agreement. *Sehringer Affidavit,* ¶17 and Ex. E thereto.

23. NetSuite did not deny that it competes with Softrax. *Sehringer Affidavit,* ¶17 and Ex. E thereto.

### NetSuite Is A Direct Competitor Of Softrax

24. NetSuite competes directly with Softrax in providing software applications that address revenue management and related financial matters. See paragraphs 25-30 below.

*25.* NetSuite's chief financial officer has admitted (in a sworn affidavit submitted on behalf of Rasicot) that NetSuite has competed directly with Softrax for the same customers on numerous occasions. *Affidavit of Jim McGeever, dated August __, 2005, ("McGeever Affidavit"),* ¶4.

26. NetSuite's website specifically identifies Softrax as a competitor. *Affidavit of Jake Fennessy, dated September 30, 2005 ("Second Fennessy Affidavit"),* ¶ 3 and Exhibit A thereto.[1]

27. NetSuite and Softrax compete directly, according to Softrax's chief executive officer. *O'Connor Affidavit*, ¶16; *O'Connor Reply Affidavit*, ¶¶9-18 and Ex. B, C, D and F thereto.

28. NetSuite--with offices around the world--has thousands of customers, including no fewer than 212 software companies. *O'Connor Reply Affidavit*, ¶11; *McGeever Affidavit,* ¶4.

29. NetSuite's products are designed for use by software companies. For example, NetSuite has publicly proclaimed in its various published marketing materials:

> "Many features in NetSuite are tailor-made for the software industry." *Sehringer Affidavit,* ¶12 and Ex. B thereto.
>
> "Hundreds of software companies run their business on NetSuite--and we do too." *O'Connor Reply Affidavit*, ¶15 and Ex. B thereto.
>
> "Here's why NetSuite is the best application for software companies." *O'Connor Reply Affidavit*, ¶15 and Ex. B thereto.
>
> "NetSuite Features and Benefits for Software Companies." *O'Connor Reply Affidavit*, ¶15 and Ex. B thereto.
>
> "One Application to Manage Your Software Business…. NetSuite is the one intelligent, integrated, customizable application to unify your business processes, increase visibility for better decision making, and extend processes to your

---

[1] As shown in Plaintiff's Motion for Discovery Pursuant to Rule 56(f), both Rasicot and NetSuite have refused to provide Softrax any discovery. Thus, the full extent to which NetSuite has *internally* identified Softrax as a competitor is presently unknown to Softrax.

> customers and channel partners." *O'Connor Reply Affidavit*, ¶15 and Ex. B thereto.

> "To learn more about what NetSuite can do for your software company contact us now." *O'Connor Reply Affidavit*, ¶15 and Ex. B thereto.

30. Net Suite's website lists several industries which it targets. The first listed industry is Software. NetSuite devotes numerous pages to the Software industry. In contrast, seven of the remaining eight industries are addressed by only one page and the number of pages covering the other was only recently expanded. *Second Fennessy Affidavit*, ¶2.

31. NetSuite falls squarely within the definition of a "Prohibited Business" set forth in the Agreement. It is, in the words of the Agreement, a business "engaged primarily in the development [and] sale…of products…involving…financial application software designed for use by software…companies." See paragraphs 24-30 above.

### Rasicot's Employment at NetSuite Would Cause Grave Irreparable Harm to Softrax

32. Rasicot's working for NetSuite would cause grave irreparable harm to Softrax. Rasicot has comprehensive knowledge of the architecture and database structure of Softrax's three flagship products—knowledge that is confidential and proprietary. Such knowledge could be shared directly and indirectly with NetSuite and its customers, giving NetSuite an unfair competitive advantage; in addition, such knowledge and information would allow Rasicot to quickly discount or dismiss different product enhancement requests or design alternatives. Thus, much of the Softrax proprietary and confidential information could be conveyed even if Rasicot did not "intend" to do so. Furthermore, in his work with NetSuite customers and prospects, Rasicot would be drawing on proprietary and confidential Softrax information and goodwill. *Milligan Affidavit*, ¶¶6-14; *Sehringer Affidavit*, ¶¶14-22;

8

*O'Connor Affidavit*, ¶¶15-25; *O'Connor Reply Affidavit*, ¶¶3-8, 31-32; *Fennessy Affidavit*, ¶¶9-10.

## Construction of the Agreement by the Massachusetts Courts

33. On August 1, 2005, Softrax sued Rasicot in Massachusetts Superior Court. (The entire Superior Court record was filed in this Court on September 19, 2005, as Docket Number 9). At the same time, Softrax moved for a preliminary injunction. Rasicot opposed, submitting four affidavits and a 27-page memorandum of law. Rasicot's lead argument in the Superior Court was identical to the argument he now offers to this Court: NetSuite is not a "Prohibited Business" within the Agreement because it is not primarily engaged in selling software that is designed for software and information service companies. *Memo in Opposition*, p. 14. Rasicot argued then, just as he does now, that NetSuite is excluded from the reach of the Agreement because NetSuite's customers include companies outside of the software industry in addition to customers which are software companies.

34. On August 11, 2005, the Superior Court heard oral argument for more than an hour. The following day, the Superior Court Justice (Judge Patrick Brady, appointed in 1989) rejected Rasicot's argument:

> NetSuite falls within the contract's definition of "prohibited businesses" as it is "engaged primarily in the . . . sale . . . of products . . . involving . . . financial application software designed for use by software . . . companies." As I construe the language, it does not matter that a relatively small percentage of NetSuite's customers are software companies.

*Affidavit of T. Christopher Donnelly, dated October 3, 2005 ("Donnelly Affidavit")*, ¶2 and Ex. A thereto. The Superior Court enjoined Rasicot from working for NetSuite through final disposition of the case.

35. Rasicot then filed in the Massachusetts Appeals Court a petition to the Single

Justice for interlocutory review of the Preliminary Injunction pursuant to Mass. Gen. Laws c.

231, § 118 (1st paragraph). The sole focus of the petition was the Superior Court's

construction of the Agreement. Rasicot first argued that NetSuite was not a "Prohibited

Business" under the language of the Agreement. Rasicot then argued that "at the very least,

the definition [of Prohibited Business] is ambiguous," and that the alleged ambiguity should

be construed against Softrax. *Memorandum of Law in Support of Defendant Patrick*

*Rasicot's Petition to the Single Justice*, ¶ 11 (attached hereto as Exhibit A).

36. The Single Justice of the Appeals Court denied Rasicot's petition.

### Rasicot and NetSuite Refuse All Discovery

37. The Superior Court ordered trial to commence November 7, 2005, with discovery

to be completed by October 28, 2005. *Donnelly Affidavit,* ¶2 and Ex. A thereto.

38. On August 16, 2005, Softrax served on Rasicot a request for production of

documents, and noticed his deposition for September 20, 2005. On August 18, 2005, Softrax

moved for issuance of a letter rogatory and commission to depose NetSuite in California.

*Donnelly Affidavit,* ¶¶2-4 and Ex. B, C and D thereto.

39. On August 30, 2005, 29 days after the complaint was initially filed, Rasicot

removed the action to this Court, relying on diversity jurisdiction. Softrax's counsel

contacted Rasicot's counsel to determine whether Rasicot considered the prior document

requests and deposition notice effective. Rasicot's counsel stated an intention to move for

summary judgment and to seek a protective order barring all discovery. *Donnelly Affidavit,*

¶¶6-7.

40. On September 6, 2005, Softrax served its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). Softrax then issued a subpoena for documents and deposition testimony from NetSuite. NetSuite subsequently objected to producing any documents or providing any testimony. Rasicot has not produced any documents and failed to appear for deposition. *Donnelly Affidavit,* ¶¶8-13 and Ex. E, F and G thereto.

SOFTRAX CORPORATION

By its attorneys,

/s/ T. Christopher Donnelly
T. Christopher Donnelly (BBO #129930)
Paula M. McManus (BBO #648029)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Dated: October 3, 2005

# EXHIBIT A

# COMMONWEALTH OF MASSACHUSETTS.

# Appeals Court.

Norfolk, ss.

No. _____.

---

SOFTRAX CORPORATION,

Plaintiff-Respondent,

v.

PATRICK RASICOT,

Defendant-Petitioner.

---

### PETITION FOR SINGLE JUSTICE REVIEW OF
### AN INTERLOCUTORY DECISION OF THE SUPERIOR COURT.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT PATRICK RASICOT'S PETITION TO THE
## SINGLE JUSTICE FOR INTERLOCUTORY REVIEW
## PURSUANT TO G.L. c. 231, § 118 (1ST PARA.).

---

Scott A. Birnbaum (BBO # 543834),
Robert N. Feldman (BBO # 630734),
Melissa M. Longo (BBO # 647649),
BIRNBAUM & GODKIN, LLP,
280 Summer Street,
Boston, MA  02210-1103.
Tel: (617) 307-6100,
Fax: (617) 307-6101.

Attorneys for Defendant-Petitioner
Patrick Rasicot.

<u>TABLE OF CONTENTS</u>

Table of Authorities ................................ i

I.   INTRODUCTION .................................. 1

II.  BACKGROUND .................................... 1

III. ARGUMENT ...................................... 6

     A. The Superior Court's
        Interpretation Of The Contract
        Is Subject To De Novo Review. .............. 6

     B. The Superior Court Erroneously
        Interpreted The Agreement To
        Apply To NetSuite. ......................... 7

     C. Any Ambiguity In The Agreement Must Be
        Strictly Construed Against Softrax. ....... 11

IV.  RASICOT SHOULD BE AWARDED FEES AND EXPENSES .... 13

V.   CONCLUSION ................................... 14

## TABLE OF AUTHORITIES

### State Cases

Allstate Ins. Co. v. Bearce,
    412 Mass. 442 (1992) ........................... 7

Augat, Inc. v. Aegis,
    409 Mass. 165 (1991) .......................... 3

Berkowitz v. President & Fellows of Harvard College,
    58 Mass. App. Ct. 262 (2003) ................. 11

City of Haverhill v. George Brox, Inc.,
    47 Mass. App. Ct. 717 (1999) ................. 11

Lexington Ins. Co. v. All Regions Chem. Labs, Inc.,
    419 Mass. 712 (1995) .......................... 7

Massachusetts Mun. Wholesale Elec. Co. v. Danvers,
    411 Mass. 39 (1991) .......................... 11

Murphy v. Noonan,
    30 Mass. App. Ct. 950 (1991) ................. 10

Packaging Industries Group, Inc. v. Cheney,
    380 Mass. 609 (1980) .......................... 6

Schrader v. State,
    517 A.2d 1139 (Md. Ct. App. 1987) ............. 8

Sentry Insurance v. Firstein,
    14 Mass. App. Ct. 706 (1982) ............. 12, 13

White v. Comm'r of Dep't of Employment and Training,
    40 Mass. App. Ct. 249 (1996) .................. 7

Yorke Management v. Castro,
    406 Mass. 17 (1989) .......................... 13

### Federal Cases

Bohn v. Park City Group, Inc.,
    94 F.3d 1457 (10th Cir. 1996) ................. 8

Lanier Prof'l Serv., Inc. v. Ricci,

192 F.3d 1 (1st Cir. 1999) ..................... 12

<u>Malat v. Riddell</u>,
    383 U.S. 569 (1966) ........................... 8

<u>Other Authorities</u>

Restatement (Second) of Contracts § 188 (1991) ...... 12

## I.  INTRODUCTION

Defendant Patrick Rasicot ("Rasicot") respectfully seeks interlocutory review of the Superior Court's entry of a preliminary injunction preventing him from working for his current employer, NetSuite, Inc. ("NetSuite") based on an erroneous interpretation of the noncompetition agreement between Rasicot and his former employer, Plaintiff Softrax Corporation ("Softrax").  The Superior Court's interpretation is erroneous because NetSuite does not fall within the specific, narrow definition of the kind of business that Rasicot is prohibited from working for under the noncompetition agreement.

## II.  BACKGROUND

Softrax's Complaint describes itself as a Delaware corporation, based in Canton, Massachusetts, that "develops, markets, distributes and supports software that provides revenue management functionality."  A-2, ¶ 3.[1]  Rasicot is a resident of Rhode Island, who was hired by Softrax in 1996 as a service professional who implemented Softrax's software with its customers.  A-66, ¶ 10; A-3, ¶ 4.

---

[1] Relevant portions of the record are reproduced as an Addendum to this Memorandum.  Citations to the record are indicated as "A-___."

On March 13, 2000, Rasicot executed a standard form noncompetition agreement (the "Agreement") with Softrax.  A-10-17.[2]  In relevant part, the Agreement purports to prohibit Rasicot, during a two-year period following the termination of employment, from engaging in (as an employee or otherwise) any "Prohibited Business."  A-10-11, § 2(a),(b).

The parties' dispute turns largely on the term "Prohibited Business," which is given a narrow, specific definition in the Agreement:

> the term "Prohibited Business" shall mean any business engaged primarily in the development, manufacture, production, sale, distribution, licensing or other disposition (at wholesale or retail, on commission or otherwise) of products or services involving operations, project management or financial application software designed for use by software and information services companies.

A-11, § 2(c).

At the time Rasicot signed the Agreement, approximately 95% of Softrax's customers were software manufacturers.  A-138, ¶ 13.  Today software companies

---

[2] In the Superior Court, Rasicot raised several defenses to the enforcement of the Agreement, including that it was not supported by consideration. Rasicot does not waive any of these arguments, even though they are not specifically addressed in this Petition.

2

still comprise a majority of Softrax's customer base.[3]
Id.

   After receiving a pay cut, being lied to about
the possibility of promotion, and then being passed
over for promotion by a less qualified, younger
employee, Rasicot resigned from Softrax and began to
work for NetSuite.  A-140-41, ¶¶ 18, 24, 26.[4]

   NetSuite is an application service provider
("ASP") which licenses an integrated Enterprise
Resource Planning ("ERP") Customer Relationship
Management ("CRM") and eCommerce solution to small and
mid-sized companies of all types.  A-158-59, ¶ 2.
Software companies represent a tiny proportion of

---

[3] Softrax does not dispute that its customers always
have been predominantly software companies.  Its Chief
Executive Officer stated in his affidavit:  "Softrax
initially focused its marketing and sales efforts on
the software industry.  The Company's software is
still designed so that it can be effectively used by
software companies and the software industry remains
the largest part of our installed base."  A-64-65,
¶ 4.

[4] The parties dispute whether Rasicot was sufficiently
candid with Softrax regarding his post-employment
plans.  See Augat, Inc. v. Aegis, 409 Mass. 165, 172
(1991)(an at-will employee "has no general duty to
disclose his plans to his employer, and generally he
may secretly join other employees in the endeavor
without violating any duty to his employer")(citation
omitted).  Nevertheless, this dispute is not germane
to the legal issue raised by this Petition and will
not be fully addressed here.

NetSuite's customers: out of 11,000 customer installations, only 212 — less than 2% — were for software companies. A-159, ¶ 4. The same generic product is licensed to all of NetSuite's customers. A-143, ¶ 32.

NetSuite hired Rasicot because of his expertise in public laws and accounting standards such as those mandated by the Sarbanes-Oxley Act of 2002 and Generally Accepted Accounting Principles ("GAAP"). A-163, ¶ 5. The services Rasicot performed at NetSuite before he was enjoined — describing NetSuite's products to prospective customers and working with them to identify customer needs as they relate to these public laws and accounting standards — were previously performed by NetSuite's Chief Financial Officer who had no knowledge of Softrax's products. A-163, ¶ 5; A-160-61, ¶ 8.

On August 1, 2005, Softrax filed its Complaint against Rasicot alleging a single claim for breach of the Agreement, and a motion for preliminary injunction, accompanied by affidavits, seeking to prohibit Rasicot from working for NetSuite, which Softrax alleged was a "Prohibited Business." See A-1-84. Rasicot opposed the preliminary injunction on

4

August 10, 2005, and filed his own supporting affidavits. See A-108-76.

The Superior Court (Brady, J.) held a non-evidentiary hearing on August 11, 2005 and, on the next day, granted Softrax's motion to enjoin Rasicot from working for NetSuite until further order of the court. See A-241. The court granted the preliminary injunction based on its interpretation of the Agreement's definition of the term "Prohibited Business." In its hand-written Memorandum and Order, the Superior Court explained:

> The π is likely to prevail on the merits. NetSuite falls within the Contract's definition of "Prohibited Businesses" as it is "engaged primarily in the . . . sale . . . of products . . . involving . . . financial application software designed for use by software . . . companies." As I construe the language, it does not matter that a relatively small percentage of NetSuite's customers are software companies.

Id. (ellipses in original). As discussed below, the Superior Court erred in concluding that NetSuite fits within the definition of a "Prohibited Business" under the plain language of the Agreement.

5

## III.  ARGUMENT

A.   The Superior Court's Interpretation Of
     The Contract Is Subject To De Novo Review.

Generally speaking, in reviewing a lower court's decision with respect to a request for preliminary injunction, the task of an appellate court is to determine whether the trial court abused its discretion in granting or denying the preliminary relief. See Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 615 (1980). However, as the Supreme Judicial Court has explained,

> in assessing whether a judge erred in granting or denying a request for preliminary injunctive relief, we must look to the same factors properly considered by the judge in the first instance. Evaluation of these factors turns on mixed questions of fact and law. On review the (trial) court's conclusions of law are subject to broad review and will be reversed if incorrect. Furthermore, while weight will be accorded to the exercise of discretion by the judge below, if the order was predicated solely on documentary evidence we may draw our own conclusions from the record.

Id. at 615-16 (emphasis added; internal quotations and citations omitted).

Here, the Superior Court entered the preliminary injunction because it interpreted the language of the Agreement to include NetSuite within the contractual definition of the term "Prohibited Business." See

6

A-241.  The Superior Court did not observe any wit-
nesses or make any credibility determinations, but
rather based its decision upon its reading of the
Agreement.  As such, and because "[t]he interpretation
of a written contract or lease is a question of law,
not of fact," Lexington Ins. Co. v. All Regions Chem.
Labs, Inc., 419 Mass. 712 (1995)(citing Allstate Ins.
Co. v. Bearce, 412 Mass. 442, 446-47 (1992)), the
Superior Court's interpretation of "Prohibited
Business" is subject to de novo review by this Court.
See White v. Comm'r of Dep't of Employment and
Training, 40 Mass. App. Ct. 249 (1996)("This case
involves a question of law, namely, the effect of an
agreement between Digital and the employee upon the
latter's right to unemployment benefits, and the
matter is subject to de novo judicial review.")
(citations omitted).

> **B.    The Superior Court Erroneously
> Interpreted The Agreement To
> Apply To NetSuite.**

At the heart of the parties' dispute is the
interpretation of the definition of "Prohibited
Business."  The Agreement narrowly defines a
"Prohibited Business" as one that is "engaged
primarily" in the sale of financial application

software "designed for use by software . . . companies."[5] This narrow definition makes perfect sense because, at the time Rasicot was asked to sign the Agreement, Softrax's business was overwhelmingly limited to selling financial application software to software companies. Indeed, at that time approximately 95% of Softrax's sales of its software product were made to software companies, See A-138, ¶ 13, and a large majority of Softrax's sales are sill to software companies.

Softrax presented no evidence that NetSuite's products (unlike Softrax's) were primarily designed for use by software companies. Rather, Softrax merely showed the court below that NetSuite's products were capable of being used by software companies, and that NetSuite markets to those companies (as well as to a host of other types of small to midsized companies[6]).

---

[5] "Primarily" has been defined by many courts to mean "of first importance," "principally," or "representing more than 50 percent." See, e.g., Malat v. Riddell, 383 U.S. 569, 572 (1966); Bohn v. Park City Group, Inc., 94 F.3d 1457, 1461 (10th Cir. 1996); Schrader v. State, 517 A.2d 1139, 1146 (Md. Ct. App. 1987).

[6] As explained by NetSuite's Vice President of Corporate Communications,

> NetSuite's products are not "designed for use by software companies." NetSuite's products are designed for small and mid-sized business in

A-181-82, ¶¶ 14-18.  Softrax has not demonstrated that

the product NetSuite markets to software companies is

different from the product it markets to the several

other industries to which it actively sells (wholesale

and distribution, electronic commerce, advertising,

agriculture, manufacturing, nonprofit, professional

services, and retail).  A-207-09, Exh. D.[7]

Even though it is uncontradicted that NetSuite

sells its software product to a wide variety of small

---

general and NetSuite highlights different
functionalities of its products to different
sectors of the market.  Our customers range from
telecommunication and wireless companies, to
insurance, to consumer goods, to manufacturing,
and include, wholesale distribution, real estate,
architecture and design, services, and software
companies.

A-166-67.

[7] Softrax's focus on a single sentence in one 2004
press release by NetSuite to suggest that NetSuite's
product was designed for use by software companies is
highly misleading.  The phrase, "[m]any features in
NetSuite are tailor-made for the software industry. .
." does not mean that NetSuite's product was designed
for software customers; rather, it plainly connotes
that features of NetSuite's products are well-suited
for software customers.  See Encarta Online Dictionary
("tailor-made" defined as (1) ideal for somebody or
something: perfectly suited to somebody or for a
purpose; (2) made by tailor: made by a tailor rather
than in a factory." http://encarta.msn.com/encnet/
features/dictionary/DictionaryResults.aspx?
refid=1861718089/).  Tellingly, out of some 260 press
releases issued by NetSuite since 1999, this was the
only NetSuite press release that specifically
mentioned software companies.  A-167, ¶ 6.

and midsize customers in a wide variety of industries, and that software companies constitute only a tiny percentage of its customer base, the Superior Court erroneously concluded that NetSuite was a "Prohibited Business" and enjoined Rasicot from continuing to be employed there.  In essence, the Superior Court expanded the definition of "Prohibited Business" to include any business that sells a financial service software product that can be used by software companies.

In effect, the Superior Court ignored the word "primarily" and significantly enlarged the narrow phrase "designed for use by" to the far more expansive notion "capable of use by."  In so doing, the court erred.  See Murphy v. Noonan, 30 Mass. App. Ct. 950, 951 (1991) ("a court cannot alter the clear terms of a contract and by doing so place the parties in a position different than that for which they bargained") (citations omitted).

Under the clear language of the Agreement, NetSuite was not a "Prohibited Business."  The Superior Court erred, therefore, by enjoining Rasicot from working for Netsuite.

10

C.   Any Ambiguity In the Agreement Must
     Be Strictly Construed Against Softrax.

Although Rasicot asserts that the definition of

"Prohibited Business" very clearly excludes NetSuite

because it is not primarily engaged in the business of

selling software designed for use by software

companies, at the very least, the definition is

ambiguous.[8]  Whether a contract is ambiguous is a

question of law.  Berkowitz v. President & Fellows of

Harvard College, 58 Mass. App. Ct. 262, 270 (2003).

In the event of an ambiguity, a court must

determine the intent of the parties from the evidence

presented.  City of Haverhill v. George Brox, Inc., 47

Mass. App. Ct. 717, 720 (1999) (citing Massachusetts

Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45-

46 (1991).  Here, the only evidence bearing on the

intent of the parties is the uncontroverted fact that,

at the time Rasicot was required to sign the

Agreement, NetSuite was overwhelmingly engaged in the

business of developing and selling software that was

---

[8] In addition, the Superior Court apparently
interpreted "primarily" as modifying the phrase
"development, sale, distribution, licensing or other
disposition . . .," rather than modifying the
remainder of the sentence, i.e., "the . . . sale . . .
of products . . . involving . . . financial
application software designed for use by software . .
. companies."

designed for use by software companies.  It is only logical that Rasicot would have understood that, by signing the Agreement, he was committing not to work for a company that was like Softrax - a company that primarily designed and sold its financial software to software companies.  The Superior Court erred by failing to recognize this.

The Superior Court also erred by not construing the Agreement strictly against Softrax and resolving any ambiguity in Rasicot's favor as it was required to do for two reasons:  first, Softrax was the author of the Agreement and, second, the Agreement was a post-employment restrictive covenant.

As this Court recognized in Sentry Insurance v. Firstein, 14 Mass. App. Ct. 706 (1982), standardized form employment covenants, such as at issue here, must be construed strictly against the employers who drafted those agreements, "'because they are the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.'"  Id. at 707 (quoting Restatement (Second) of Contracts § 188 cmt. g(1991)); see also Lanier Prof'l Serv., Inc. v. Ricci, 192 F.3d 1, 5 (1st

12

Cir. 1999) (under Massachusetts law, when unable to resolve ambiguity in contract language, courts should resort to the "familiar principle" that an ambiguous post-employment restraint will be construed against the employer).

Here, it is not clear from the Superior Court's Memorandum and Order whether the court implicitly determined that ambiguity exists in the Agreement's definition of "Prohibited Business."  If the court below did make such a determination, it failed to say so, and, contrary to the dictates of Sentry Insurance, it failed to construe the Agreement strictly against Softrax, which authored the standardized form Agreement and required Rasicot to sign it without any negotiation.  See A-234 (March 13, 2000 Letter Offer of Employment from Softrax to Rasicot); A-138, ¶ 12.

IV.  RASICOT SHOULD BE AWARDED FEES AND EXPENSES

The Agreement provides that in any action to enforce any provision of the Agreement, the prevailing party is entitled to be awarded "all reasonable costs and expenses (including, without limitation, court costs and attorneys' fees) . . . ."  A-15.  In accordance with the procedure outlined in Yorke Management v. Castro, 406 Mass. 17, 20 (1989), Rasicot

13

respectfully requests an award of his costs and
expenses, including attorneys' fees, incurred in this
Petition.

## V.  CONCLUSION

For the foregoing reasons, Defendant Patrick
Rasicot respectfully dissolve the Superior Court's
order enjoining him from working for NetSuite.

Dated:  August 16, 2005

Respectfully submitted,

PATRICK RASICOT

By his attorneys
BIRNBAUM & GODKIN, LLP

Scott A. Birnbaum
(BBO# 543834)
Robert N. Feldman
(BBO# 630734)
Melissa M. Longo
(BBO # 647649)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
Tel: 617-307-6100
Fax: 617-307-6101

15